1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2       Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER Cal. Bar No. 246048
4  TIMOTHY C. PERRY, Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Attorneys for ARRIVA PHARMACEUTICALS, INC.

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 (SAN FRANCISCO DIVISION)

11         On Appeal from the United States Bankruptcy Court
                 for the Northern District of California
12                     Hon. Edward D. Jellen

13 ALPHAMED PHARMACEUTICALS            No. 08-01279-SI
   CORP.,
14                                     **DECLARATION OF PHILIP J. BARR,**
                                       **Ph.D., IN SUPPORT OF MOTION TO**
15          Claimant-Appellant,        **DISMISS AS MOOT THE APPEAL OF**
                                       **ALPHAMED PHARMACEUTICALS**
16 v.                                  **CORP. OF THE PLAN**
                                       **CONFIRMATION ORDER AND**
17 ARRIVA PHARMACEUTICALS, INC.,       **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT**
18          Reorganized Debtor-        **THEREOF**
                   Appellee.
19                                     Date: May 23, 2008
                                       Time: 9:00 a.m.
20                                     Location: Courtroom 10, 19th Floor
                                                 450 Golden Gate Ave.
21                                                San Francisco, CA 94102

22

23

24

25

26

27

28

1      I, Philip J. Barr, PhD., declare as follows:

2      1.    I received a Ph.D. in Chemistry from the University of Birmingham, England

3 in 1978. I am the former Director of Molecular Biology at Chiron Corporation,

4 Emeryville, California, and I am an Adjunct Professor of Pharmaceutical Chemistry at the

5 University of California, San Francisco. I have authored or co-authored over 180 scientific

6 publications, and I am a named inventor on over 50 issued worldwide patents. I was one

7 of the four founders of Arriva Pharmaceuticals, Inc., a California corporation ("Arriva"),

8 the reorganized debtor-appellee in this case. I make this declaration in that capacity.

9 Except for those statements made upon information and belief, the following facts are

10 based upon my personal knowledge and if called to testify, I could and would competently

11 testify to such facts. As to those statements made upon information and belief, I believe

12 them to be true.

13      <u>Arriva's Business</u>

14      2.    Arriva was founded in 1997. At various times since 1997 I have been the

15 President, Chief Scientific Officer and Board Member of Arriva. I am currently the Chief

16 Scientific Officer of Arriva. I make this declaration in that capacity. Except for those

17 statements made upon information and belief, the following facts are based upon my

18 personal knowledge and if called to testify, I could and would competently testify to such

19 facts. As to those statements made upon information and belief, I believe them to be true.

20      3.    This declaration is submitted in support of the Motion to Dismiss as Moot

21 the Appeal of AlphaMed Pharmaceuticals Corp. ("AlphaMed") of the Plan Confirmation

22 Order and Memorandum of Points and Authorities in Support Thereof (the "Motion").

23      4.    In this declaration I will discuss Arriva's background in some detail. This

24 will provide context necessary for the facts underlying the mootness of AlphaMed's

25 appeal. This declaration covers relevant events up until, but not including, the

26 confirmation of Arriva's plan or reorganization.

27      5.    Arriva is a privately held biopharmaceutical company located in Alameda,

28 California. Founded in 1997, Arriva seeks to develop protease inhibitors for treatment of

      DECLARATION

1  fatal respiratory diseases such as hereditary emphysema, chronic obstructive pulmonary
2  disease and asthma.  Among other things, Arriva holds the license rights to certain patents
3  (the "Protease License").  A copy of the License Agreement is attached to this declaration
4  as Exhibit A.  A copy of a "Term Sheet" setting forth terms of the licensing of patents
5  subject to the Protease License to Arriva (then known as AlphaOne Pharmaceuticals Inc.)
6  is attached to this declaration as Exhibit B.

7       6.    AlphaMed is a Florida corporation founded in 1999 by John Lezdey and his
8  sons Darren Lezdey and Jarett Lezdey (collectively, the "Lezdeys").  Ostensibly launched
9  as a competitor to Arriva, AlphaMed has often served as a vehicle for the Lezdeys'
10 litigation against Arriva.

11      7.    This bankruptcy appeal represents the latest episode in the long-running saga
12 of the Lezdeys' and AlphaMed's harassing litigation against Arriva.  Indeed, Arriva filed
13 for bankruptcy protection principally because of the difficulty in raising funds while
14 defending lawsuits against the Lezdeys and AlphaMed and the uncertainty of future
15 litigation.

16                            The Lezdey Litigation

17      8.    Arriva and its former founder and employee, Allan Wachter, have been the
18 victims of endless, vexatious litigation caused by John Lezdey and his sons Darren Lezdey
19 and Jarett Lezdey, together with their various affiliated companies.  They are collectively
20 called "the Lezdeys."  The Lezdeys have lost in every litigation, and one or more of them
21 have lost appeals to numerous courts, have been sanctioned by numerous courts, had an
22 arrest warrant issued against them, and are the subject of a $17 million-plus judgment by
23 Wachter in which Arriva has an interest.

24      9.    In 1999, one of the founders of Arriva, Dr. Allan Wachter filed suit in
25 Arizona state court against the Lezdeys, Protease Sciences, Inc. ("PSI") and other

26
27
28

-2-

1   defendants,[1] seeking a declaration that the Lezdeys held no valid interest in the Protease

2   License. Dr. Wachter filed this suit after it was discovered John Lezdey had fraudulently

3   licensed patents subject to the Protease License to AlphaMed.

4          10.    On February 3, 2000, the Arizona Court ruled in Dr. Wacher's favor, finding

5   PSI held no valid interest in the Protease License. The Arizona Court entered a final

6   judgment against those Lezdey defendants who were not in bankruptcy as of that time,

7   namely Darren and Jarett Lezdey (the two Lezdey sons), and JL Technology. In so doing,

8   the Arizona Court issued a preliminary injunction, and later a permanent injunction,

9   enjoining all of the Lezdeys from "acting or speaking, or purporting to act or speak, on

10  behalf of [PSI] or [Sonoran] without [Dr. Wachter's] express written consent." A copy of

11  the preliminary injunction is attached to this declaration as Exhibit C. A copy of the

12  permanent injunction is attached to this declaration as Exhibit D. A copy of the relevant

13  pages of the Arizona Trial Transcript of January 15, 2002 (at 142:13 to 143:18) is attached

14  to this declaration as Exhibit E.

15         11.    On February 22, 2002, the Arizona Court also entered a money judgment in

16  favor of Dr. Wachter and Wachter plaintiff parties to the Arizona litigation (the "Wachter

17  Judgment"). A copy of the Wachter Judgment is attached to this declaration as Exhibit F.

18         12.    On September 10, 2003, the Arizona Court entered an "Under Advisement

19  Ruling," in which it determined John Lezdey had violated its orders. A copy of this ruling

20  is attached as Exhibit G.

21         13.    Also in 1999, Arriva filed suit in the United States District Court for the

22  Northern District of California, case no. 99-012169-SI, seeking a declaration that it held

23  the only valid interest in the Protease License. The case was held in abeyance while the

24  Arizona Litigation continued apace. After Arriva succeeded in the Arizona Litigation,

25

26  ―――――――――――――――

27  [1] Dr. Wachter named the following defendants: John Lezdey, Doreen Lezdey, Darren
    Lezdey, Jarret Lezdey, J&D Science, Inc., J.L. Technology, LP, Sonoran Desert Chemicals
28  LLC, Protease Sciences, Inc., John Does 1 through 100.

1   Arriva moved to dismiss the California Litigation, including the Lezdeys' counterclaims
2   against Arriva.

3       14.    On July 5, 2006, citing the Arizona proceedings, United States District Judge
4   Illston dismissed the parties' claims.  Among other considerations, District Judge Illston
5   relied on principles of federalism and comity, noting the *Brillhart* doctrine prevented her
6   from adjudicating the dispute.  An Arizona Superior Court, District Judge Illston noted,
7   already was considering the issues raised in the Arriva Declaratory Relief Case.  As
8   District Judge Illston held, "comity between this Court and the Arizona Superior Court
9   warrants denial of jurisdiction."  Further:

10          The Court concludes that the [Protease License] issue has
            already been extensively litigated in the Arizona court, and that
11          any litigation in this court would be duplicative.  The license's
            validity was a specific finding in the court's final judgment and
12          permanent injunction against Lezdey's sons and J.L.
            Technology and in its preliminary injunction order against
13          Lezdey.

14      15.    District Judge Illston continued on to note "after obtaining several adverse
15  rulings in Arizona, defendants [Lezdeys] seek a more favorable forum.  The Ninth Circuit
16  has discouraged such opportunistic maneuvering."  A copy of District Judge Illston's order
17  is attached to this declaration as Exhibit H.

18      16.    In 2003, AlphaMed filed suit against Arriva in the United States District
19  Court for the Southern District of Florida sitting in diversity.  In 2005, the lawsuit
20  proceeded to trial on three claims: misappropriation of trade secrets, tortious interference
21  with business and unfair competition.  In 2006, the jury returned a verdict against Arriva in
22  the amount of $78 million.  Despite the jury's verdict, the Court entered judgment as a
23  matter of law in favor of Arriva, holding that the Lezdeys should take nothing from Arriva
24  and that Arriva should recover costs from AlphaMed.  *See AlphaMed v. Arriva*, 432 F.
25  Supp. 2d 1355 (S.D. Fla. 2006).  AlphaMed has appealed that judgment.  Although the
26  parties fully briefed that appeal, the Eleventh Circuit has not yet scheduled argument or
27  ruled on the matter.  A copy of the Florida Court's order entering judgment in favor of
28  Arriva as a matter of law is attached to this declaration as Exhibit I.

-4-

DECLARATION

17.     On June 14, 2007, John Lezdey, J.L. Technology and Jamie Holdings, LLC, filed a suit in Nevada state court, seeking a declaration that Arriva's Protease License was invalid.  The Lezdeys sought such a declaration in the Nevada Complaint for the same reasons they advanced in Arizona State Court and in the United States District Court for the Northern District of California.  The Nevada case has been automatically stayed during Arriva's bankruptcy case  A copy of the complaint in that action is attached to this declaration as Exhibit J.

18.     On August 29, 2007, Arriva filed its Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California.  That case, which underlies this appeal, is docketed at no. 07-42767.  On the same day as it filed for bankruptcy, Arriva submitted its first Chapter 11 Plan of Reorganization.

19.     Arriva defended against claims filed by various purported creditors, including AlphaMed.  In the end, the Bankruptcy Court disallowed the claims of AlphaMed while designating John Lezdey's vote as having been cast in bad faith.  The Bankruptcy Court's order disallowing the claim of AlphaMed, as well as the orders disallowing the claims of other Lezdey parties, are attached to this declaration as Exhibit K.  The Bankruptcy Court's order disqualifying the vote of John Lezdey and designating his vote as having been cast in bad faith is attached to this declaration as Exhibit N.  The transcript of the hearing during which the Bankruptcy Court read into the record its findings of fact and conclusions of law is attached to this declaration as Exhibit M.

20.     On October 30, 2007, during Arriva's bankruptcy proceedings, AlphaMed filed an adversary complaint against Arriva in the bankruptcy court, case no. 07-4181, seeking a declaration that the Protease License did not belong to Arriva.  Arriva promptly filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  The Bankruptcy Court then dismissed the complaint with prejudice.  In dismissing the complaint, the Bankruptcy Court relied on substantially the same reasons as did United States District Judge Illston when she dismissed the similar lawsuit in 1999.  Specifically, the United States Bankruptcy Judge Edward E. Jellen relied on principles of federalism and comity, noting

-5-

DECLARATION

1  that the *Rooker-Feldman* doctrine prohibited him from directly reviewing issues already

2  adjudicated by the Arizona Superior Court.  The Bankruptcy Court's order dismissing with

3  prejudice the adversary complaint of AlphaMed is attached to this declaration as Exhibit L.

4      21.    In addition, Bankruptcy Judge Jellen held AlphaMed had failed sufficiently

5  to plead standing to maintain its adversary action.

6

7      I declare under penalty of perjury under the laws of the United States of America

8  that the foregoing is true and correct.  Executed on April 7th, 2008, at Alameda,

9  California.

10

11  _____

12                    PHILIP J. BARR, Ph.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5TIP1\400741049.1                                      DECLARATION

# EXHIBIT A



# LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement") is made and entered into this 16th day of April, 1998 ("Effective Date") by and between Protease Sciences, Inc. a Nevada corporation ("LICENSOR") and AlphaOne Pharmaceuticals, Inc. a California corporation ("LICENSEE")..

## R E C I T A L S :

A.      Dr. Allan Wachter and John Lezdey jointly, have carried out research involving the use of alpha 1-antitrypsin and other protease inhibitors to treat inflammation and various other conditions and disorders of the human body, conceived of several inventions relating thereto, and have applied for and obtained the issued United States, European and worldwide patents relating thereto described in Exhibit A to this Agreement (the "Patents").

B.      Pursuant to various assignments by Dr. Wachter and Mr. Lezdey, LICENSOR is the owner of the entire right, title and interest in and to such inventions and the PATENTS, and to all patent applications and patents which may cover such inventions in the future.

C.      LICENSOR and LICENSEE entered into a Term Sheet dated November 10, 1997 and a letter agreement dated November 10, 1997 which set forth certain understandings between LICENSOR and LICENSEE regarding the terms of a license to the Patents.

D.      LICENSOR and LICENSEE have determined to amend certain provisions of the Term Sheet and desire to finalize the terms of a license to the Patents under which LICENSEE shall obtain an exclusive right and license under the Patents to utilize the inventions described therein in certain fields of use, and LICENSOR shall grant such a license to LICENSEE, subject to the terms and conditions hereof;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

## ARTICLE I

## DEFINITIONS

As used in this Agreement, the following terms shall be defined as set forth below:

1.01    The "INVENTIONS" shall mean all inventions described in the LICENSED PATENTS.

1.02    "LICENSED PATENTS" shall mean the United States and foreign Patents listed in Exhibit A to this Agreement, together with any patents in any country worldwide owned, in whole or in part, by LICENSOR during the term of this Agreement relating to the formulation, application and administration of, and the use in the treatment of human conditions and diseases of, alpha 1-antitrypsin, and any and all continuations, continuations-in-part, divisionals and substitutes of any such patent, any and all foreign counterparts of any of the above mentioned





patents and any and all reissues or re-examinations or extensions of any of the above mentioned patents.

1.03   "LICENSED PROCESS" shall mean and include all methods and/or processes which are covered by any claim of any Licensed Patents.

1.04   "LICENSED PRODUCTS" shall mean and include all products which are covered by any claim of any of the LICENSED PATENTS and either (a) used in accordance with any LICENSED PROCESS under any claim of any of the LICENSED PATENTS in the country or territory where such use occurs; or (b) manufactured, sold, offered for sale or imported under any claim of any of the LICENSED PATENTS in the country or territory where such product is sold, provided that such products are made using any of the following recombinant protein expression systems: (i) *E. coli* and other bacteria; (ii) yeast and other fungi; (iii) insect cells; (iv) mammalian cells; and (v) plant cells; but not any product covered by any claim of the LICENSED PATENTS which is manufactured in, or the product of, blood plasma.

1.05   "NET SALES" shall mean gross revenues received by LICENSEE on sales of LICENSED PRODUCTS by LICENSEE or, if LICENSEE shall resell LICENSED PRODUCTS in bulk for repackaging and resale by other pharmaceutical companies, the gross revenues received by such other companies for their sale of LICENSED PRODUCTS, less (i) credits or allowances on account of rejections of products previously sold, (ii) discounts allowed and taken in amounts not to exceed amounts customary in the trade, and (iii) sales, use, ad valorem and other similar taxes and government imposed duties or charges. In determining the gross revenues of a pharmaceutical company for its sale of LICENSED PRODUCTS which are sold to it by LICENSEE in bulk, if such pharmaceutical company shall combine the LICENSED PRODUCTS with other products, including delivery mechanisms or packaging, or other pharmaceutical compositions or formulations, the gross revenues of such pharmaceutical company from the sale of such a combination product shall be allocated among the various components, including LICENSED PRODUCTS, pro rata on the basis of the value of each such component; provided, however, that allocations based on such value shall be limited to situations where the composition o f the combination product includes other active ingredients, or where proprietary delivery systems are employed, and shall not be applied in situations where inerts or ordinary packaging are employed. In addition, to the extent that a combination is itself an INVENTION, the gross revenues attributable to the sale of such combination shall be the total sale price of such combination.

1.06   "FIELD OF USE" shall mean use of the INVENTIONS, including but not limited to any products (whether enzymes and/or primers and/or templates and/or reaction products) used in or created by use of the INVENTIONS and any procedures used in use of the INVENTIONS, for:

   a)   treatments of human skin disorders, including but not limited to atopic dermatitis, eczema and psoriasis;

   b)   treatments of human respiratory disorders and conditions, including but not limited to emphysema, asthma and cystic fibrosis;





c)   treatment of human viral diseases and conditions;

d)   treatments of disorders and diseases of the human eye, including but not limited to conjunctivitis and parasitic diseases; and

e)   treatment of diseases and conditions of human blood *in* and *ex vitro*, including but not limited to septicemia and septic shock and whole blood, plasma and blood products held in storage.

1.07    "ROYALTY YEAR" shall mean each twelve month period commencing January 1 and ending December 31.  For the first year of this Agreement, the ROYALTY YEAR shall be the period of time between the signing of the Agreement and December 31.

1.08    "QUARTER YEAR" shall mean the three-month periods ending March 31, June 30, September 30 and December 31 of each ROYALTY YEAR.

1.09    "IMPROVEMENTS" shall mean any inventions developed by LICENSEE or on its behalf during the term of this Agreement relating to the formulation, application and administration of, and the use in the treatment of human conditions and diseases of, alpha 1-antitrypsin, which inventions (i) are designed to be used to create products or processes in the FIELD OF USE and (ii) entail the practice of one or more of the INVENTIONS.

ARTICLE II

GRANT OF LICENSE; IMPROVEMENTS

2.01    LICENSOR hereby grants to LICENSEE, subject to the terms and conditions of this Agreement, an exclusive, worldwide, right and license under the LICENSED PATENTS and IMPROVEMENTS in the FIELD OF USE, for the term defined by ARTICLE III, to make, have made, use, offer to sell, sell and import products including without limitation LICENSED PRODUCTS, and to use and practice methods and/or processes including without limitation LICENSED PROCESSES.



2.02    LICENSOR shall not grant to any third party a license under the LICENSED PATENTS or the IMPROVEMENTS to offer to sell, sell or import alpha 1-antitrypsin made in transgenic animals without the prior written consent of the LICENSEE, which consent shall not be unreasonably withheld.

2.03    LICENSEE may grant sublicenses under the exclusive right and license granted to LICENSEE pursuant to Article 2.01, provided that (i) any such sublicense shall require the sublicensee to pay a royalty to LICENSOR of at least three percent (3%) of such sublicensee's gross revenues from sales of LICENSED PRODUCTS (less such deductions and subject to such apportionment among combination products as are described and are consistent with the definition of NET SALES in this Agreement) and (ii) LICENSEE shall pay to LICENSOR an amount equal to thirty percent (30%) of any upfront or other similar fee paid to LICENSEE with respect to the granting of such sublicense.



2.04   In partial consideration of the grant of by LICENSOR of the licenses and other rights set forth in this Agreement, LICENSEE hereby assigns to LICENSOR its entire irght, title and interest in and to any IMPROVEMENTS. LICENSEE shall promptly disclose any information relating to IMPROVEMENTS to LICENSOR and shall reasonably assist LICENSOR, at LICENSOR'S expense, in replicating or practicing any methods, techniques or results developed by LICENSEE with are embodied in the IMPROVEMENTS. The parties shall cooperate and act reasonably in seeking patent protection for IMPROVEMENTS. LICENSEE shall execute any other further documentation necessary or appropritae to evidence, secure or perfect LICENSOR'S rights in the IMPROVEMENTS.

## ARTICLE III

### TERM OF LICENSE

3.01   The term of the license granted hereunder shall commence upon the signing hereof and shall continue until the expiration date of the last to expire patent in the LICENSED PATENTS.

## ARTICLE IV

### CONSIDERATION

4.01   As consideration for the rights and license granted by LICENSOR to LICENSEE hereunder, LICENSEE shall pay to LICENSOR a royalty equal to three percent (3%) of LICENSEE'S NET SALES. LICENSOR and LICENSEE agree to negotiate in a commercially reasonable manner with respect to any proposed change in the definition of NET SALES as it applies to any particular proposed transaction by LICENSEE involving the sale by LICENSEE of LICENSED PRODUCTS in bulk for repackaging and resale of such LICENSED PRODUCTS by another pharmaceutical company; provided, however, that LICENSOR shall be under no obligation to agree to any such change that would reduce its compensation from any such transaction below the amount LICENSOR would have received under a sublicensing royalty arrangement pursuant to Article 2.03.

4.02   LICENSEE has previously issued to LICENSOR 2,000,000 shares of Common Stock pursuant to a Founders Restricted Stock Purchase Agreement. In consideration of LICENSOR's entering into this Agreement on the terms herein, LICENSEE shall, simultaneously with the execution of this Agreement by LICENSEE and LICENSOR, issue to LICENSOR 1,000,000 shares of Common Stock pursuant to an amendment to the Founders Restricted Stock Purchase Agreement, which shares shall fully vest in LICENSOR upon the occurrence of the conditions specified in such amendment (all of such Common Stock, collectively, is referred to herein as the "Founders Common Stock").





## ARTICLE V

## PAYMENTS AND REPORT

5.01    Within 30 days of the end of each QUARTER YEAR, LICENSEE shall furnish to LICENSOR a written report setting forth NET SALES for such QUARTER YEAR and the royalties payable to LICENSOR for such QUARTER YEAR, accompanied by full payment of such royalties. The timely payment of royalties hereunder is of the essence. Accordingly, overdue amounts shall accrue interest at the rate of 1% per month.

5.02    The reports required by this ARTICLE V shall be certified by LICENSEE to be correct to the best of LICENSEE's knowledge and information. All payments shall be paid to LICENSOR in U.S. dollars. In the event that conversion from foreign currency is required in calculating a payment hereunder, the exchange rate used shall be the interbank rate quoted by Bank of America N.T. & S.A. on the last business day of the QUARTER YEAR in which such payment was earned.

5.03    If this Agreement should be terminated at any time other than at the end of a QUARTER YEAR or ROYALTY YEAR, the last report and payment shall be made within 60 days after the effective date of such termination, and shall include any NET SALES up to and after the date of termination.

## ARTICLE VI

## BOOKS AND RECORDS

LICENSEE shall keep and maintain complete and accurate records and books of account in sufficient detail and form so as to enable verification of NET SALES payable by LICENSEE hereunder. Such records and books of account shall be maintained for a period of no less than 3 years following the year to which they pertain. LICENSEE shall permit such records and books of account to be examined by a certified public accountant selected by LICENSOR and acceptable to LICENSEE, such acceptance not to be unreasonably withheld, provided that no more than one such examination may be conducted by or on behalf of LICENSOR in any ROYALTY YEAR. Each and any such examination shall be at LICENSOR'S expense, during normal business hours, and upon 10 days' prior written notice to LICENSEE; provided, however, that LICENSEE shall pay the cost of any audit that determines a discrepancy in favor of LICENSEE of five percent (5%) or more between the amount LICENSOR was paid and the amount it should have been paid pursuant to this Agreement.

## ARTICLE VII

## PATENT PROSECUTION AND INFRINGEMENT

7.01    Prosecution and Maintenance of Patents. LICENSOR shall be responsible for diligently filing, prosecuting and maintaining the Patents Rights licensed to LICENSEE under this Agreement in the United States and foreign countries, subject to the expense reimbursement



alphaone/protease license/sf-456889 v1                    5                    4/15/98 4:27 PM



provisions of Section 7.06 below. The parties shall consult in good faith regarding the foreign countries in which patent protection is to be pursued by LICENSOR. LICENSOR shall also furnish to LICENSEE copies of all substantive communications to and from United States and foreign patent offices regarding the LICENSED PATENTS within a reasonable time prior to filing such communication or promptly following receipt thereof, as the case may be. LICENSOR shall in good faith consider and incorporate the reasonable comments and requests LICENSEE may have relating to such patent applications or communications. In the event that LICENSOR elects not to file a patent application on an invention of LICENSOR licensed to LICENSEE hereunder, or decides to abandon any pending application or granted patent on such Invention or relating to the Patents in any country, it shall provide adequate notice to LICENSEE and give LICENSEE the opportunity to file or maintain such application or patent at its own expense. In the event LICENSEE shall thereupon file or maintain such application, LICENSOR shall assign ownership of the patent application for such Invention. LICENSEE shall be relieved of all obligations under this Agreement to pay royalties to LICENSOR with respect to such patent application or patent following any such assignment.

   7.02   No Other Technology Rights. Except as otherwise provided in this Agreement, under no circumstances shall a party hereto, as a result of this Agreement, obtain any ownership interest or other right in any technology, trade secrets, patents, pending patent applications, products, vaccines, antibodies, cell lines or cultures, or animals of the other party, including items owned, controlled or developed by the other, or transferred by the other to such party at any time pursuant to this Agreement.

   7.03   Enforcement of Licensed Patents. LICENSOR shall use good faith efforts to enforce the LICENSED PATENTS. Upon learning of a significant and continuing infringement of any LICENSED PATENTS by a Third Party, the LICENSOR or LICENSEE, as the case may be, promptly shall provide notice to the other party in writing of the fact and shall supply the other party with all evidence possessed by the notifying party pertaining to and establishing said infringement(s). LICENSOR have six months from the giving of notice under this Section, or such lesser period of time if a further delay would result in material harm to, or the loss of a material right of, LICENSEE, to abate the infringement, or to file suit against at least one of the infringers, at its sole expense, following consultation with LICENSEE. If LICENSOR does not, within six months of the giving of such notice or such lesser period of time if a further delay would result in material harm to, or the loss of a material right of, LICENSEE, abate the infringement or file suit to enforce the LICENSED PATENTS against at least one infringing party in a country of the Territory, LICENSEE shall have the right to take whatever action it deems appropriate in its own name or, if required by law, in the name of LICENSOR, to enforce the LICENSED PATENTS. All monies recovered upon the final judgment or settlement of any such suit shall be retained by the party bearing the costs of enforcement of such LICENSED PATENTS.

   7.04   Third Party Claim of Infringement. If a claim of infringement is brought against LICENSEE, an Affiliate or any sublicensee alleging infringement of any patent in such country owned by a Third Party by reason of the manufacture, use or sale of Products, LICENSEE shall promptly give notice thereof to LICENSOR and provide LICENSOR with all information in LICENSEE's possession regarding such claim. LICENSOR shall indemnify, defend and hold LICENSEE harmless against any damages, costs, expenses and liabilities (including attorneys'



alphaone/protease license/sf-456689 v1                   6                        4/15/98 4:27 PM



fees and expenses, but not lost profits or other consequential damages) arising out of such claim. LICENSOR shall conduct the defense of any suit for infringement at its expense and LICENSEE may participate in such defense, at its option and expense. LICENSEE shall furnish to LICENSOR such assistance as LICENSOR may reasonably need and request from time to time for the conduct of the defense of such suit. LICENSOR shall not dispose of or settle any such claim in any manner which may adversely affect LICENSEE's rights or interests without LICENSEE's prior written consent, which shall not be unreasonably withheld. If LICENSOR defends against such claim or suit, there shall be no abatement of amounts payable by LICENSEE to LICENSOR hereunder; provided, however, that (i) LICENSOR shall bear any and all damages assessed against LICENSEE by reason of any infringement, including any ongoing royalties that may be payable to third parties, and (ii) LICENSEE shall be entitled to offset against amounts owed to LICENSOR hereunder any amounts LICENSOR is obligated to pay LICENSEE pursuant to this Section. Without limiting any obligation of LICENSOR hereunder or any remedies available to LICENSEE, if LICENSOR fails to defend such claim or suit, LICENSEE shall have the right to do so, and LICENSOR hereby agrees to reimburse LICENSEE for all reasonable costs and expenses, including attorneys' fees, incurred by LICENSEE in connection with such defense.

7.05    Damages. Without limiting LICENSOR's obligations under Section 7.04, if damages and/or costs are awarded against LICENSEE as a result of any suit or claim falling within the provisions of Section 7.04, or LICENSEE incurs defense costs for which LICENSOR is obligated to reimburse LICENSEE under Section 7.04, LICENSEE may offset such damages and/or costs against any amounts which would otherwise be payable to LICENSOR by LICENSEE. If LICENSEE becomes obligated to pay royalties to any Third Party in order to make, have made, use or sell Products, such royalties shall be creditable against up to 100% of the amounts otherwise payable to LICENSOR hereunder with respect to the infringing Products sold in that country.

7.06    Patent Expenses. Exhibit B contains LICENSOR's best estimate of the current annual maintenance fees and related costs payable by LICENSOR with respect to the LICENSED PATENTS. Within thirty (30) days after the execution of this Agreement, LICENSEE shall pay to LICENSOR an amount specified in Exhibit B, which the parties agree represent that portion of the annual maintenance fees and related costs for the Licensed Patents that shall have become due from and been paid by LICENSOR after November 10, 1997 and prior to the date of this Agreement which LICENSEE should pay. In addition, LICENSEE shall reimburse LICENSOR for any (i) filing and patent prosecution costs incurred in connection with additional filings made with respect to the Licensed Patents in foreign jurisdictions where filings have not yet been made and (ii) filing and patent prosecution costs in connection with any patents which may in the future become subject to this Agreement; provided, however, that if LICENSOR shall recover all or a portion of annual maintenance fees and other costs with respect to the LICENSED PATENTS from another third party, any amounts due from or previously paid by LICENSEE with respect to such fees and costs shall be reduced on a dollar-for-dollar basis (and such amounts previously paid refunded to LICENSEE) (it being agreed that any amounts recovered by LICENSOR from third parties with respect to the LICENSED PATENTS, whether with respect to infringement or otherwise, that exceed the costs incurred by LICENSOR in pursuit of such payments from third parties shall thereafter be deemed to have been recovered with respect to fees and other costs of the LICENSED PATENTS); and further provided,





however, that except as set forth in Exhibit B LICENSEE shall not be required to pay any costs that may be incurred by LICENSOR in connection with any action brought by LICENSOR, or other actions taken by LICENSOR, relating to the enforcement of the LICENSED PATENTS against third parties with respect to the alleged infringement by such third parties of the LICENSED PATENTS in fields which have not been licensed to LICENSEE hereunder, or involving alpha-1 antitrypsin manufactured in any manner or system other than those expressly listed in the definition of LICENSED PRODUCTS and permitted to be made and sold by LICENSEE pursuant to the terms of this Agreement.

## ARTICLE VIII

### DUE DILIGENCE IN COMMERCIALIZATION

8.01   LICENSEE shall plan and implement appropriate efforts to achieve successful commercialization of LICENSED PRODUCTS and LICENSED PROCESSES in the FIELD OF USE, and has provided to LICENSOR a copy of LICENSEE's current business plan as outlined in private placement materials used by LICENSEE in raising capital through the sale of LICENSEE's Series A Preferred Stock (the "Plan").

8.02   As soon as practicable following the date of this Agreement, LICENSEE shall implement the Plan for commercializing LICENSED PRODUCTS and LICENSED PROCESSES in the FIELD OF USE.

8.03   LICENSEE shall provide periodic status reports to LICENSOR, at least annually, indicating progress and problems to date in commercialization, and a forecast and schedule of major events required to commercialize, the LICENSED PRODUCTS and LICENSED PROCESSES in the FIELD OF USE.

8.04   If at any time LICENSEE abandons or suspends its commercialization activities or its intent to commercialize LICENSED PRODUCTS and LICENSED PROCESSES in accordance with the Plan for a period exceeding 90 days, LICENSEE shall immediately notify LICENSOR giving reasons and a statement of its intended actions, such notification to be a reporting requirement only.

## ARTICLE IX

### TERMINATION

9.01   To the extent permitted by applicable law, LICENSOR may terminate this Agreement by written notice to LICENSEE at any time after 60 days' written notice to LICENSEE in the event that LICENSEE:

(i)     fails to make, within the 30 day period set by the notice, any payment which is due and payable pursuant to this Agreement and which under the terms of the Agreement has been in arrears for more than 1 month; or





(ii)    commits a material breach of any other obligation of this Agreement which breach is not cured within the 30 day period set by the notice; or

(iii)    becomes insolvent or, a petition in bankruptcy is filed against LICENSEE and is consented to, acquiesced in or remains undismissed for 90 days; or makes a general assignment for the benefit of creditors, or a receiver is appointed for LICENSEE, and LICENSEE does not return to solvency before the expiration of said 30 day period set by the notice; or

(iv)    fails to exercise due diligence in bringing the LICENSED PRODUCTS and/or LICENSED PROCESSES to market in accordance with Article VIII.

9.02    In addition, , LICENSOR may terminate this Agreement and the licenses granted hereunder as follows:

a)    If LICENSEE shall not, on or before November 10, 1998, have raised at least $2,200,000 to fund its operations, including $200,000 that has been invested prior to the date hereof in the Series A Preferred Stock of the Company by its founding executive officers and the principal shareholders of LICENSOR (the "Founders Equity Contribution"), then LICENSOR may terminate the licenses granted hereunder. Such termination shall be accomplished by the giving of written notice to LICENSEE and the surrender by LICENSOR of the Founders Common Stock issued to it by LICENSEE on or before December 31, 1998 .

b)    If LICENSEE shall not, or before November 10, 1999, have raised at least $4,200,000 to fund its operations, including the Founders Equity Contribution,, then LICENSOR may terminate the licenses granted hereunder. Such termination shall be accomplished by the giving of written notice to LICENSEE and the surrender by LICENSOR of the Founders Common Stock issued to it by LICENSEE on or before December 31, 1999 .

9.03    LICENSEE shall be entitled to terminate this Agreement, in whole or in part, by written notice to LICENSOR at any time after 60 days' written notice to LICENSOR in the event that LICENSOR commits a material breach of any of the provisions of this Agreement, which breach is not cured within the thirty 30 day period set by the notice.

9.04    Except as necessary for the purpose of the orderly closure of the business, including without limitation the orderly sell-off of LICENSED PRODUCTS in inventory upon the effective date of termination, and except as otherwise expressly provided herein, upon termination of this Agreement, all rights and licenses granted by LICENSOR to LICENSEE under the terms and conditions of this Agreement shall terminate. Promptly thereafter, LICENSEE shall return to LICENSOR all materials provided to LICENSEE by LICENSOR. In addition, upon termination pursuant to this Article IX, LICENSEE shall execute such documentation as may be necessary or appropriate to assign and transfer to LICENSOR any



alphaone/protease license/sf-456889 v1                    9                    4/15/98 4:27 PM



rights that LICENSEE retains in any IMPROVEMENTS, and shall provide LICENSOR with copies of all materials in LICENSEE'S possession relating thereto.

9.05    Termination of this Agreement shall not affect any rights or obligations accrued prior to the effective date of such termination and specifically LICENSEE's obligation to pay all royalties on NET SALES prior to that date in accordance with Article 4.01.

9.06    The rights provided in this ARTICLE IX shall be in addition and without prejudice to any other rights which the parties may have with respect to any breach or violations of the provisions of this Agreement.

9.07    Waiver by either party of a single default or breach, or of a succession of defaults or breaches, shall not deprive such party of any right to terminate this Agreement pursuant to the terms hereof upon the occasion of any subsequent default or breach.

## ARTICLE X

### WARRANTY OF OWNERSHIP AND DISCLAIMER OF OTHER WARRANTIES

10.01   LICENSOR represents and warrants to LICENSEE that LICENSOR is the owner of the LICENSED PATENTS, has the full, absolute and unconditional right to enter into this Agreement with LICENSEE, that LICENSOR's execution, delivery and performance of this Agreement has been authorized by all necessary corporate and shareholder action on the part of LICENSOR, and that LICENSOR has not entered licensed any of the LICENSED PATENTS to any other person.  Other than these representations and warranties, LICENSOR makes no representations or warranties that any LICENSED PATENT is valid, or that the manufacture, use, sale or other disposal of the LICENSED PRODUCTS does not infringe upon any patent or other rights not vested in LICENSOR.

10.02   LICENSOR DISCLAIMS ALL WARRANTIES WHATSOEVER, WITH RESPECT TO THE LICENSED PATENTS, THE INVENTIONS, AND THE LICENSED PRODUCTS AND LICENSED PROCESSES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES AS TO THE MERCHANTABILITY OR FITNESS OF THE LICENSED PRODUCTS OR LICENSED SERVICES FOR A PARTICULAR PURPOSE and LICENSEE shall make no statements, representations or warranties whatsoever to any third parties which are inconsistent with such disclaimer by LICENSOR.

## ARTICLE XI

### NOTICES

Any notice required by this Agreement shall be sent by Registered or Certified U.S. Mail, or by telex or cable and shall be deemed delivered if sent to the following addresses of the respective parties or such other address as is furnished by proper notice to the other party:



alphaone/protease license/sf-456889 v1                    10                    4/15/98 4:27 PM



FOR LICENSOR:

PROTEASE SCIENCES
1034 Laurel Oak Road, Suite 4
Voorhees, NJ 08043
phone:  609-346-0202
fax:     609-346-1333

FOR LICENSEE:

ALPHAONE PHARMACEUTICALS, INC.
850 Marina Village Parkway
Alameda, California 94501
phone:  510-337-1250
fax:     510-337-1251

ARTICLE XII

LAWS AND REGULATIONS

     LICENSEE shall comply with all foreign and United States federal, state, and local laws, regulations, rule and orders applicable to the testing, production, transportation, packaging, labeling, export, sale and use of the LICENSED PRODUCTS and LICENSED PROCESSES. In particular, LICENSEE shall be responsible for assuring compliance with all U.S. export laws and regulations applicable to this license and LICENSEE's activities hereunder.

ARTICLE XIII

CONFIDENTIALITY

     LICENSEE and LICENSOR acknowledge that during the term of this Agreement, LICENSEE and LICENSOR may provide each other with certain information about the INVENTIONS or the LICENSED PRODUCTS or LICENSED PROCESSES or this Agreement which the disclosing party may consider to be confidential and proprietary information ("CONFIDENTIAL INFORMATION"). Such CONFIDENTIAL INFORMATION shall be clearly labeled as "CONFIDENTIAL" or "PROPRIETARY" or if orally disclosed shall be reduced to writing by the disclosing party within thirty (30) days after disclosure; provided, however, that the term CONFIDENTIAL INFORMATION shall not include:

        (i)    Information which at the time of disclosure was previously known to the receiving party as demonstrated by written records;

        (ii)    Information which at the time of disclosure is published or otherwise generally available to the public; or

        (iii)    Information which, after disclosure, is published or otherwise becomes generally available to the public through no breach of an obligation under this Agreement by the receiving party.

Any party relying upon any of the foregoing exceptions shall bear the burden of establishing its applicability and will not publicly disclose any information in reliance thereon for thirty (30) days following notice to the other party of its intent to do so. Both parties shall use the same degree of care to protect and not disclose CONFIDENTIAL INFORMATION of the other party that they use to protect their own confidential information. The obligations of the parties under





this ARTICLE XIII shall survive expiration or termination of this Agreement for a period of 3 years after the effective date of expiration or termination.

## ARTICLE XIV

### INDEMNIFICATION

14.01  Licensee will indemnify, defend and hold LICENSOR harmless from any and all claims, demands, lawsuits and associated costs and expenses, including reasonable attorneys' fees and cost of settlement, arising out of LICENSEE's manufacture, promotion, marketing, and sale of the LICENSED PRODUCTS; provided, however, that LICENSEE will not be obligated to indemnify, defend, and hold LICENSOR harmless where the claim, demand, lawsuit and associated costs and expenses arises out of the breach by LICENSOR and further provided that LICENSOR promptly notifies LICENSEE upon becoming aware of any such claims.  Such indemnification will include product liability or negligence claims, false advertising claims, and any unfair trade, labor or other practices.  LICENSEE shall have the right to conduct the defense of any such claim.

## ARTICLE XV

### MISCELLANEOUS

15.01  Any delays in or failure by either party in performance of any obligations hereunder shall be excused if and to the extent caused by such occurrences beyond such party's reasonable control, including but not limited to such occurrences as acts of God, strikes or other labor disturbances, war, and other causes which cannot reasonably be controlled by the party who failed to perform.

15.02  This Agreement shall be kept confidential by each of LICENSOR and LICENSEE except to the extent necessary for each of them to conduct their business and financial affairs, and any disclosures concerning the terms of this Agreement shall be as minimal as is practical under the circumstances.  This Agreement may not be amended except by written agreement signed by both of the parties, and shall not be assigned by either LICENSEE or LICENSOR except upon the advance written consent of the nonassigning party.  Any permitted assignee shall agree in writing to comply with all the terms and restrictions contained in this Agreement.  Any attempted assignment in violation of the provisions of this Section 14.02 shall be void.  This Agreement constitutes the entire agreement of the parties relating to the subject mater hereof, and all prior representations and understandings, including the Term Sheet and Letter Agreement between the parties, each dated November 10, 1997, are merged into and superseded hereby.

15.03  This Agreement shall be governed by and in accordance with the laws of the state of California applicable to contracts entered into between two persons who are resident in that state, except where the federal laws of the United States are applicable and have precedence.



15.04  The provisions of this Agreement shall be deemed separable.  If any part of this Agreement is rendered void, invalid, or unenforceable, such shall not affect the validity or enforceability of the remainder of this Agreement unless the part or parts which are void, invalid or unenforceable shall substantially impair the value of this Agreement as to either LICENSOR or LICENSEE.  In the event that any part of this Agreement becomes or is rendered void, invalid, or unenforceable and separating such part from the remainder of this Agreement would substantially impair the value of this Agreement as to either LICENSOR or LICENSEE, LICENSOR and LICENSEE shall modify such part in accordance with Article 14.02 to obtain a valid and enforceable part and provide a value to LICENSOR and LICENSEE that most nearly effects LICENSOR' and LICENSEE's intent in entering into this Agreement.

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate originals by their duly authorized representatives.

PROTEASE SCIENCES, INC.                    ALPHAONE PHARMACEUTICALS, INC.
  ("LICENSOR")                               ("LICENSEE")

By: _Allan M. Wachter, M.D._               By: _____

Its: _Chief Executive Officer_              Its: ____President / COO____



SCHEDULE A

Protease Sciences, Inc. Patents and Applications

U.S. Application No.

08/922,120
08/665,314
08/731,255

U.S. Patent No.

4,916,117
5,008,242
5,114,917
5,134,119
5,093,316
5,217,951
5,190,917
5,290,762
5,346,886
5,492,889
5,166,134
5,215,965
5,376,633
5,532,215

Foreign (European)

EP-0512090B1
EP-0512090
EPA 98850029.4
EPA 53923757.4 (Pending Anti-viral)

Germany

691 23 960

Switzerland

0 512 090

Belgium

0 512 090

Austria

0 512 090

Denmark

0 512 090





## Schedule B

1. $2,575 for filing European Patent Application corresponding to U.S. serial no. 08/731,255.

2. $700 for payment of issue fee and additional patent copies for U.S. serial no. 08/731,255.

3. $8,000 for payment of annuities for European patents corresponding to EP 0512090B1.

4. $8,000 for payment of annuities for European patents corresponding to EPA 432,117.

5. $26,000 for payment of foreign associates fees with regard to opposition filed against EP 0512090B1 including attendance at hearing and filing of brief, attendance at hearing by Licensor, and costs for preparing briefs.

6. $4,000 for annuities and prosecution costs from foreign associate relating to European application on anti-viral agents.

7. $23,000 fees to Kenyon & Kenyon.

8. $365 for requesting examination for Canadian application.

9. $480 for payment of Canadian annuities for three patent application.

10. $600 for payment of annuities in Australia for three patent applications.

11. $800 for prosecution of Japanese application on alpha 1-antitrypsin.

Total - $66,520



<u>France</u>

0 512 090

<u>Italy</u>

21610 BE/97

<u>Netherlands</u>

0 512 090

<u>Sweden</u>

0 512 090

<u>United Kingdom</u>

0 512 090

<u>Australia</u>

Application No. 53507/94
Application No.  8920/91

<u>Canada</u>

Application No. 2,129,132
Application No. 2,091,354
Application No. 2,019,974

<u>Korea</u>

Application No. 6175/94

<u>Japan</u>

Application No. 6-41041



**EXHIBIT B**

Term Sheet
AlphaOne Pharmaceuticals, Inc.
and
Protease Sciences, Inc.
November 10, 1997

1.   Subject Matter.  AlphaOne Pharmaceuticals, Inc. (the "Company") and Protease Sciences, Inc. ("Protease") have discussed the terms and conditions of an agreement between the Company and Protease whereby Protease would exclusively license to the Company on a worldwide basis certain rights under patents owned by Protease relating to alpha 1-antitrypsin (the "Licensed Patents").  A list of the Licensed Patents, and jurisdictions where filings have been made with respect to them or in which they have been granted, is described in the Business Plan of the Company and will be attached as Exhibit A.

2.   Scope of License Grant.  Subject to the terms and conditions to be set forth in a definitive agreement between the parties, Protease will grant to the Company an exclusive, worldwide license, with rights to sublicense with the consent of Protease (which consent shall not be unreasonably withheld), under the Licensed Patents to make, have made, use and sell Products using recombinant alpha 1-antitrypsin in the following fields:  (i)  treatments of human skin disorders, including but not limited to atopic dermatitis, eczema and psoriasis; (ii) treatments of human respiratory disorders and conditions, including but not limited to emphysema, asthma and cystic fibrosis; (iii) treatment of human viral diseases and conditions; (iv) treatments of disorders and diseases of the human eye, including but not limited to conjunctivitis and parasitic diseases; and (v) treatment of diseases and conditions of human blood *in* and *ex vitro*, including but not limited to septicemia and septic shock and whole blood, plasma and blood products held in storage.  Protease will further grant to the Company an exclusive, worldwide license, with rights to sublicense, to make or have made alpha 1-antitrypsin using any of the following recombinant protein expression systems: (i) *E. coli* and other bacteria; (ii) yeast and other fungi; (ii) insect cells; (iv) mammalian cells; and (v) plant cells. Protease shall not grant to any third party a license to make or have made alpha 1-antitrypsin in transgenic animals without the prior written consent of the Company, which consent shall not be unreasonably withheld.

3.   Consideration for License. In consideration for the grant of license rights as set forth in 2 above, the Company will:

1

sf-351233



    (a)    Issue to Protease 2,000,000 shares of Common Stock of the Company for a purchase price of $200, which Common Stock shall represent 40% of the outstanding equity securities of the Company on a fully-diluted basis prior to the receipt by the Company of financing.

    (b)    Pay to Protease royalties on Gross Sales of Products equal to 6% of such Gross Sales (if the Company shall sell Products in bulk form for repackaging, remarketing and distribution by another pharmaceutical or other company, such as Bayer, "Gross Sales" for purposes of calculating such royalties shall be the Gross Sales of Products of such pharmaceutical or other company) continuing until the Licensed Patents expire or are declared unenforceable or invalid, and a to be negotiated, commercially reasonable percentage of amounts received from third parties as royalties on Product sales or as up-front license or pre-paid royalty payments.

    4.   Maintenance Costs. Upon the execution of a definitive agreement embodying the terms of this Term Sheet, the Company shall pay or reimburse Protease for annual maintenance fees and related costs for the Licensed Patents coming due after the date of this Term Sheet, together with (i) filing and patent prosecution costs incurred in connection with additional filings made with respect to the Licensed Patents in foreign jurisdictions where filings have not yet been made and (ii) filing and patent prosecution costs in connection with any patents which may in the future become subject to the definitive agreement; provided, however, that if Protease shall recover all or a portion of annual maintenance fees and other costs with respect to the Licensed Patents from another third party, any amounts due from the Company with respect to such fees and costs shall be reduced on a dollar-for-dollar basis.

    5.   Further Provisions. The Company and Protease agree that additional provisions as are typical in agreements of the type contemplated by this Term Sheet, including commercially reasonable due diligence obligations on the part of the Company, will be included in a definitive agreement between Protease and the Company.

    6.   Governing Law. The laws of the State of California shall govern this Term Sheet.

[remainder of page intentionally left blank]



sf-351233



The Company and Protease have executed this Term Sheet as of the date first written at the top of this Term Sheet.

ALPHAONE PHARMACEUTICALS, INC.

By: _____
Philip J. Barr, President

PROTEASE SCIENCES, INC.

By: _____
Allan M. Wachter, Chief Executive Officer

By: _____
John Lezdey, President



3

sf-351233

NOV 18 '97 14:58    FROM MOFO FAX CTR 2687512    TO 9=1#16027058129#    PAGE.029/033



The Company and Protease have executed this Term Sheet as of the date first written at the top of this Term Sheet.

ALPHAONE PHARMACEUTICALS, INC.

By: _____
    Philip J. Barr, President

PROTEASE SCIENCES, INC.

By: _____
    Allan M. Wachter, Chief Executive Officer

By: _____
    John Lezdey, President



sf-351233

3



NOV 12 '97 14:27    FROM MOFO FOX LLP 2687512    TO 94142601303232    PAGE.28 23

The Company and Protease have executed this Term Sheet as of the date first written at the top of this Term Sheet.

ALPHAONE PHARMACEUTICALS, INC.

By: _____

Philip J. Barr, President

PROTEASE SCIENCES, INC.

By: _____

Allan M. Wachter, Chief Executive Officer

By: _____

John Lexdey, President



sf-351233

3

**EXHIBIT C**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                              CLERK OF THE COURT
                                        FORM V000


HONORABLE EDWARD O. BURKE               M. K. SMITH/MINKOW
                                        Deputy


CV1999-009334

                                    FILED:  FEB 0 3 2000

ALLAN WACHTER, M.D., ET AL          DAVID C TIERNEY   02385

v.

JOHN LEZDEY, ET UX, ET AL           DAVID W. DOW   07377




MINUTE ENTRY

FINDINGS OF FACT

1. Plaintiff, Allan Wachter, ("Wachter") is a medical
doctor. Defendant, John Lezdey, ("Lezdey") is an
attorney. Wachter and Lezdey invented certain patented
medical inventions in the field of treating inflammation
with alpha 1- antitrypsin and other Protease inhibitors
("the Drug").

2. Wachter and Lezdey transferred their interest in the
inventions and related U.S. patents to Sonoran Desert
Chemicals Limited ("Sonoran"), a Nevada limited liability
company. Sonoran has two members, each with a 50 percent
interest:  Nathan M. Technologies Limited Partnership
("Nathan") and J.L. Technology Limited Partnership
("J.L.") Seth Chemicals, Inc. ("Seth") is the corporate
general partner of Nathan;  Seth and Nathan are owned and
controlled by Wachter and his family.  J&D Science, Inc.
("J&D") is the corporate general partner of J.L.  J&D

Docket 019                                         Page 1



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                CLERK OF THE COURT
                                          FORM V000

HONORABLE EDWARD O. BURKE                 M. K. SMITH/MINKOW
                                                Deputy

CV1999-009334

and J.L. are owned and controlled by Lezdey and his
family.

3. In 1992, Wachter and Lezdey formed Protease Sciences,
Inc. ("Protease"), a Nevada corporation. Wachter and his
family own a 50% interest in Protease. Lezdey and his
family own the other 50% interest in Protease. Wachter
and Lezdey are officers and directors of Protease.

4. Protease was formed to test the Drug, develop related
products, and to assist in marketing the Drug and related
products.

5. Wachter and Lezdey are co-trustees for the benefit of
all shareholders of Protease pursuant to a Voting Trust
Agreement dated as of January 22, 1992, (the "Voting Trust
Agreement") (Exhibit 8).

6. Lezdey and his wife, Noreen Lezdey, executed an
Assignment of Certificate Number 1, evidencing their 1,000
shares of Protease common stock to John Lezdey and Allan
M. Wachter as Trustees under the Voting Trust Agreement
and authorized Jay M. Mann to transfer those shares on the
books of the corporation. (Exhibit 9)

7. Wachter and his wife, Susan Wachter, executed an
Assignment of Certificate Number 2, evidencing their 1,000
shares of Protease common stock to John Lezdey and Allan
M. Wachter as Trustees under the Voting Trust Agreement
and authorized Jay M. Mann to transfer those shares on the
books of the corporation. (Exhibit 9)

8. Wachter and Lezdey, as voting trustees, executed the
two Trust Certificates, acknowledging their receipt of the
shares of stock from the Wachters and the Lezdeys pursuant

Docket 019                                        Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                              CLERK OF THE COURT
                                        FORM V000

HONORABLE EDWARD O. BURKE                M. K. SMITH/MINKOW
                                              Deputy

CV1999-009334

to the Voting Trust Agreement. (Exhibit 10) No new stock
certificates in the name of the two trustees were created.

9. Lezdey has acted as general counsel and patent counsel
for Wachter, Sonoran and Protease.

10. Wachter, as Secretary of Protease, signed minutes of
an annual meeting of the directors of Protease dated
December 14, 1993. (Exhibit 6)

11. The minutes of the December 14, 1993, annual meeting
of directors confirmed that Wachter and Lezdey were the
sole members of The Protease Board of Directors; that
Lezdey was the President and Treasurer of Protease, and
that Wachter was the Chief Executive Officer, Vice
President and Secretary of Protease.

12. On December 28, 1993, Lezdey, Wachter, Protease and
Sonoran executed an Agreement (the "Sonoran Protease
Agreement") effective as of December 31, 1992, which
appointed Protease as Sonoran's agent to exercise certain
delegated powers and duties, including: (a) conducting
clinical studies and research utilizing the patents and
related technology; (b) procuring of licensing,
distribution and/or marketing or related agreements with
third parties; and (c) collecting amounts due Sonoran
under agreements procured by Protease for Sonoran.

13. Lezdey prepared a document titled "Minutes" (Exhibit
12) which purports to memorialize a telephonic meeting of
Protease's Board of Directors on November 7, 1996,
wherein the directors (Wachter and Lezdey) purportedly
agreed that Darren and Jarett Lezdey shall each be given
2.5 percent of the Protease stock from the shares of the
existing shareholders.

Docket 019                                           Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                    CLERK OF THE COURT
                                              FORM V000

HONORABLE EDWARD O. BURKE                     M. K. SMITH/MINKOW
                                              Deputy

CV1999-009334

14. Wachter did not participate in the alleged November 7,
1996, call and did not agree to give Lezdey's sons (Darren
and Jarett Lezdey) 2.5 percent of his Protease shares.

15. Mrs. Wachter did not agree to give Lezdey's sons any
of the Protease shares which had been issued to the
Wachters.

16. Lezdey signed Exhibit 12 in the purported capacity of
Acting Secretary of Protease.

17. Lezdey prepared a document titled "Minutes" (Exhibit
13) which purports to memorialize a telephonic meeting of
the Protease Board of Directors on April 13, 1997, wherein
the directors purportedly agreed to: (1)Hire a certain
law firm to pursue legal action against Bayer Corporation
for infringement of the patents of which Protease was a
licensee; (2)Move Protease's corporate headquarters to
New Jersey; and (3)license Alpha One Pharmaceuticals, Inc.
all rights to the recombinant product use in the Protease
patents upon terms to be later agreed upon by the Board.

18. Lezdey signed Exhibit 13 as Acting Secretary of
Protease.

19. The Protease Board did not agree on April 13, 1997, to
take the actions recited in Exhibit 13.

20. On April 13, 1997, there was no entity in existence
named Alpha One Pharmaceuticals, Inc.

21. Lezdey prepared a document on Sonoran letterhead
titled "Minutes of Meeting" (Exhibit 19) dated August 5,
1997, which recites that Wachter's purported resignation
from all Sonoran and Protease activities was accepted.

Docket 019                                              Page 4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                              CLERK OF THE COURT
                                        FORM V000

HONORABLE EDWARD O. BURKE               M. K. SMITH/MINKOW
                                        Deputy

CV1999-009334

22. Lezdey signed Exhibit 19 as President and Acting Secretary.

23. Lezdey prepared a document titled "Minutes" (Exhibit 20) which purports to memorialize a telephonic meeting of the Protease Board of Directors on November 7, 1997, wherein the board purportedly agreed that Protease would give 2.5 percent of its shares of Alpha One stock to Ken Hodges.

24. Lezdey signed Exhibit 20 as Acting Secretary of Protease.

25. As of November 7, 1997, Protease did not own any shares of Alpha One.

26. Wachter did not participate in the alleged November 7, 1997, call and never agreed to give any of Protease's shares of Alpha One to Ken Hodges.

27. On November 10, 1997, Protease signed a Term Sheet setting forth terms of a proposed agreement wherein Protease would exclusively license to AlphaOne Pharmaceuticals, Inc. ("AlphaOne") rights in the patents relating to the Drug. (Exhibit 21)

28. Lezday signed the Term Sheet as President of Protease.

29. On or about March 10, 1998, Lezdey prepared a document which purported to be a meeting of Wachter and himself as the purported majority shareholders of Alpha One. (Exhibit 22)

30. Protease did not own the majority of Alpha One stock on March 10, 1998, or at any other time.

Docket 019                                          Page 5

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                              CLERK OF THE COURT
                                        FORM V000

HONORABLE EDWARD O. BURKE               M. K. SMITH/MINKOW
                                        Deputy

CV1999-009334

31. Lezdey also prepared and signed a document dated March
10, 1998, purporting to be minutes of a meeting of the
Alpha One Board of Directors wherein Darren Lezdey was
made a signor on the Alpha One bank account at Wells Fargo
Bank. (Exhibit 50)

32. No such meeting of the Alpha One board took place on
March 10, 1998.

33. Wachter and Lezdey were not members of the Alpha One
Board of Directors on March 10, 1998.

34. Wachter received a two page letter dated March 23,
1998, addressed to him from Darren Lezdey which discussed
Darren Lezdey's concerns about his income from AlphaOne
(Exhibit 35), and which was forwarded by Wachter to
AlphaOne.  Exhibit 35 did not refer to the purported
November 7, 1996, agreement between Wachter and Lezdey to
give 2.5 percent of their Protease stock to each of
Lezdey's sons.

35. Wachter's signature was placed on an altered one page
version of Exhibit 35 by someone other than himself.
(Exhibit 38)

36. The altered version of the letter (Exhibit 34)
contains a statement (not in the original received by
Wachter in 1998) that Wachter had agreed to give 2.5
percent of his shares in Protease to Darren and Jarett
Lezdey.

37. When Wachter received the March 23, 1998, letter from
Darren Lezdey (Exhibit 35), which did not contain that
statement, Wachter was a 50/50 shareholder of Protease
under the Voting Trust Agreement with Lezdey.

Docket 019                                          Page 6

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000

CLERK OF THE COURT
FORM V000

HONORABLE EDWARD O. BURKE

M. K. SMITH/MINKOW
Deputy

CV1999-009334

38. On April 16, 1998, Protease, entered into a License Agreement with AlphaOne under which Protease granted AlphaOne an exclusive license to utilize the inventions described in the patents in certain fields. (Exhibit 33)

39. Pursuant to the License Agreement, Protease received approximately 50 percent of AlphaOne's common stock and Wachter and Lezdey each were elected as directors of AlphaOne.

40. Under the License Agreement, Protease will receive royalties on AlphaOne's net sales and a portion of other monies received by AlphaOne from sublicensees.

41. Lezdey knew the material terms and conditions of the License Agreement, advised Wachter that the License Agreement was valid, and approved Wachter's execution thereof as Chief Executive Officer of Protease.

42. On May 14, 1999, Lezdey wrote Dr. Preuveneers of AlphaOne, purportedly on behalf of Protease, questioning the validity of the License Agreement and asserting that AlphaOne had breached the License Agreement if it existed. (Exhibit 45)

43. Wachter, as one of the two members of The Protease Board of Directors, did not authorize Lezdey to assert on behalf of Protease that AlphaOne had breached the License Agreement.

44. On May 21, 1999, Lezdey, together with his sons Darren and Jarett Lezdey, and Aaron Lovaas, a Nevada attorney, purported to hold a meeting of the shareholders of Protease followed by a meeting of the Protease Board of Directors.

Docket 019

Page 7

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                    CLERK OF THE COURT
                                                   FORM V000

HONORABLE EDWARD O. BURKE                 M. K. SMITH/MINKOW
                                                   Deputy

CV1999-009334

45. As of May 21, 1999, Wachter was a member of the
Protease Board of Directors and a shareholder of
Protease, either as trustee under the Voting Trust
Agreement or in his individual capacity.

46. As a shareholder, Wachter was entitled under the
Protease bylaws to receive not less than 10 days notice of
any special meeting of the shareholders.

47. The Lezdeys did not give Wachter (and Wachter did not
receive) any notice of the purported May 21, 1999,
shareholders' meeting, and Wachter did not participate in
that meeting.

48. Although the Lezdeys contend that Wachter had resigned
as an officer and director of Protease in July or August
1997, at the purported May 21, 1999, shareholders'
meeting, the Lezdeys purportedly voted to remove Wachter
from The Protease Board of Directors and terminate his
employment agreement with Protease.

49. Lezdey then purportedly held a meeting as the alleged
sole remaining member of the Protease Board of Directors
and purportedly removed Wachter as an officer of Protease.
(Exhibit 46)

50. On May 21, 1999, Wachter and his wife, Susan Wachter,
owned a 50 percent interest in Protease, either as the
beneficiaries of the Voting Trust Agreement or as the
holders of Certificate No. 2 issued by Protease in January
1992.

51. No stock certificates for any shares of Protease stock
had been issued or transferred to Darren Lezdey or Jarett

Docket 019                                              Page 8

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000

CLERK OF THE COURT
FORM V000

HONORABLE EDWARD O. BURKE

M. K. SMITH/MINKOW
Deputy

CV1999-009334

Lezdey as of May 21, 1999, and neither of them owned any
shares of Protease stock on May 21, 1999.

52. Neither Darren Lezdey nor Jarett Lezdey had any legal
right to vote any shares of Protease stock on May 21,
1999, nor to attempt to remove Wachter from the Board of
Directors.

53. The purported shareholders' meeting of May 21, 1999,
was invalid because no notice thereof was sent to Wachter
as required by Protease's bylaws.

54. The purported shareholders' meeting of May 21, 1999,
was also invalid because without Wachter's participation,
in person or by proxy, there was no quorum for such a
meeting under Protease's bylaws.

55. The purported removal of Wachter from the Protease
Board of Directors at the purported May 21, 1999,
shareholders' meeting was invalid because as only one of
the two trustees under the Voting Trust Agreement, Lezdey
did not have the authority to vote the shares of Protease
stock transferred to the trustees without Wachter's
joinder.

56. Even if the Voting Trust Agreement was not fully
implemented (as alleged by the Lezdeys), the purported
removal of Wachter from Protease's Board of Directors at
the purported shareholders' meeting of May 21, 1999, was
invalid because Lezdey owned no more than 50 percent of
the Protease stock and, therefore, did not have sufficient
votes to remove Wachter from the board under Protease's
bylaws.

57. Because Wachter was not removed from Protease's Board
of Directors at the purported shareholders' meeting of May

Docket 019

Page 9

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                CLERK OF THE COURT
                                          FORM V000

HONORABLE EDWARD O. BURKE                 M. K. SMITH/MINKOW
                                          Deputy

CV1999-009334

21, 1999, the action subsequently taken by Lezdey (as the
purported sole remaining member of the Board of Directors)
to remove Wachter as an officer of Protease was invalid.

58. On May 27, 1999, attorney Aaron Lovaas, purportedly
acting on Protease's behalf, sent a letter to Dr.
Preuveneers of AlphaOne stating that Wachter had been
removed from Protease's board and no longer had any
authority to act or speak on behalf of Protease.
(Exhibit 47)

59. On May 27, 1999, Lezdey sent a letter to Dr.
Preuveneers of AlphaOne which stated Protease's purported
position that there was no valid License Agreement between
Protease and AlphaOne and further asserting that even if
there was a contract in place, it has been terminated in
December 1998, pursuant to notice by Protease.  Exhibit
48)

60. Wachter, as one of the two members of The Protease
Board of Directors on May 27, 1999, did not authorize
Lezdey to assert the positions stated in Exhibit 48 on
behalf of Protease.

61. The Sonoran-Protease Agreement and the License
Agreement are valid and enforceable.

62. Lezdey and Wachter have a fiduciary relationship with
Protease, Sonoran, AlphaOne and to each other.

63. In violation of his fiduciary duties, Lezdey disrupted
negotiations with Steve Gorlin, a potential investor in
AlphaOne, by threatening to withdraw patents from AlphaOne
unless Darren and Jarett Lezdey were given additional
AlphaOne stock; by soliciting Wachter to provide certain
secret information of AlphaOne to facilitate a separate

Docket 019                                          Page 10

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000

CLERK OF THE COURT
FORM V000

HONORABLE EDWARD O. BURKE

M. K. SMITH/MINKOW
Deputy

CV1999-009334

deal with Prometic BioSciences, in violation of the
License Agreement; by targeting certain employees of
AlphaOne (including Liesl Songer-Nelson and David Kent)
for termination of employment; by forcing the resignation
of one employee; and by preparing false documents
purporting to evidence action by Protease's Board of
Directors.

64. Lezdey's actions have caused or threaten to cause
immediate, substantial, and irreparable injury to
Protease, Sonoran and Plaintiffs by interfering with
AlphaOne's business operations and its contractual and/or
prospective business relations and, therefore, interfering
with its performance under the License Agreement.

65. Lezdey's acts have interfered with and threaten to
destroy AlphaOne's contractual and/or prospective business
relations with Prometic BioSciences, Baxter Health Care,
and others and, thereby, cause Protease and Sonoran to
lose economic and other benefits.

66. Lezdey has used or attempted to use his positions as
trustee under the Voting Trust Agreement and as
shareholder, Director and President of Protease to exclude
Wachter from the management of Protease.

67. Lezdey, Darren Lezdey, and Jarett Lezdey, have claimed
authority to act on behalf of Protease without Wachter's
consent or the authorization of the Protease Board of
Directors and have acted in ways detrimental to the
interests of Protease, Sonoran and/or Plaintiffs
including, without limitation: conducting discussions or
negotiations with other companies to form business
arrangements involving the development of certain uses of
the Drug in violation of the License Agreement;
purporting to "fire" Protease's and Sonoran's legal

Docket 019

Page 11

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                    CLERK OF THE COURT
                                                  FORM V000

HONORABLE EDWARD O. BURKE                      M. K. SMITH/MINKOW
                                                      Deputy

CV1999-009334

counsel and assuming the representation thereof;  hiring
attorneys to represent Protease and/or Sonoran in
litigation commenced by AlphaOne to assert positions not
approved by Protease's  Board of Directors and
inconsistent with its interests under the License
Agreement.

68. Despite demand, the Lezdey, Darren Lezdey and Jarett
Lezdey, have failed, refused and neglected to cease their
course of unlawful and otherwise improper conduct.

69. Lezdey's actions have caused and threaten to cause
immediate, substantial and irreparable injury to
Plaintiffs, Protease and Sonoran.


CONCLUSIONS OF LAW

1. Plaintiffs are entitled to a preliminary injunction to
   prevent Defendants Lezdey, Jarett Lezdey, Darren Lezdey,
   J.L. and J&D and other persons acting for them or with
   them, from contacting Prometic BioSciences, Baxter
   Health Care, and other persons with whom AlphaOne has
   any prospective contractual relations or otherwise
   interfering with AlphaOne's business operations and its
   contractual or prospective business relations without
   Plaintiffs' concurrence;

2. Plaintiffs are entitled to a preliminary injunction to
   prevent Defendants Lezdey, Jarett Lezdey, Darren Lezdey,
   J.L. and J&D and other persons acting for them or with
   them from acting or speaking or purporting to act or
   speak on behalf of Protease or Sonoran without
   Plaintiffs' expressed consent.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

02/02/2000                                  CLERK OF THE COURT
                                            FORM V000

HONORABLE EDWARD O. BURKE             M. K. SMITH/MINKOW
                                          Deputy

CV1999-009334

## ORDER

   **IT IS THEREFORE ORDERED** that Defendants John Lezdey and
Noreen Lezdey, husband and wife; Darren Lezdey, an individual;
and Jarett Lezdey, an individual, J&D Science, Inc., and J.L.
Technology Limited or any other persons acting for them or with
them, are hereby preliminarily enjoined from contacting Prometic
BioSciences, Baxter Health Care, or any other person with whom
AlphaOne has any contractual or prospective business relations or
otherwise interfering with AlphaOne's business operations and its
contractual and/or prospective business relations, and,

   **IT IS FURTHER ORDERED** that Defendants John Lezdey and Noreen
Lezdey, husband and wife; Darren Lezdey, an individual; and
Jarett Lezdey, an individual, J&D Science, Inc., and J.L.
Technology Limited and any other persons acting for them or with
them are preliminarily enjoined from acting or speaking, or
purporting to act or speak, on behalf of Protease or Sonoran
without Plaintiffs' express consent.

   IT IS FURTHER ORDERED that service of this Preliminary
Injunction may be made upon all Defendants by direct service upon
David Dow, Esq.

   IT IS FURTHER ORDERED that this Preliminary Injunction shall
be effective only upon the posting by Plaintiffs a bond or other
security with the Clerk of the Court in the amount of $50,000.00
by 5:00 p.m. on February 10, 2000.

   **DATED** February ____, 2000.

                          _____
                          HONORABLE EDWARD O. BURKE
                          JUDGE OF THE SUPERIOR COURT

Docket 019                                          Page 13

The foregoing instrument is a full, true and correct copy of
the original on file in this office.

Attest October 4         20 04
MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By H. Rodriguez         Deputy







2010 DEC -6 PM 1:43

SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

| | |
|---|---|
| ALLAN WACHTER, M.D., an individual and on behalf of his marital community; SETH CHEMICALS, INC., a Nevada corporation; NATHAN M. TECHNOLOGIES LIMITED PARTNERSHIP, a Nevada limited partnership, | No. CV 99-09334 |
| Plaintiffs, | **AMENDED INJUNCTION** |
| v. | |
| JOHN LEZDEY and NOREEN LEZDEY, husband and wife; DARREN LEZDEY, an individual; JARETT LEZDEY, an individual; J & D SCIENCE, INC., a Nevada corporation; J.L. TECHNOLOGY LIMITED PARTNERSHIP, a Nevada limited partnership; SONORAN DESERT CHEMICALS LIMITED LIABILITY COMPANY, a Nevada limited liability company; PROTEASE SCIENCES, INC., a Nevada corporation; JOHN DOES 1 THRU 100, | (Assigned to the Honorable Edward O. Burke) |
| Defendants. | |
| PROTEASE SCIENCES, INC., a Nevada corporation; and JOHN LEZDEY, | |
| Counterclaimants, | |
| v. | |
| ALLAN M. WACHTER and SUSAN WACHTER, husband and wife, | |
| Counterdefendants. | |

DCT/361961/WA090-2

267

1    The Court having granted Plaintiff's 8/25/00 Motion to Amend Injunction by the

2    Court's 10/12/00 Minute Entry (page 8), the Court hereby amends the 2/02/00

3    Preliminary Injunction entered in these proceedings as follows:

4        (A)    The 2/02/00 Preliminary Injunction remains in effect.

5        (B)    The 2/02/00 Preliminary Injunction's Findings of Fact are supplemented by

6    adding the following five Findings:

7        (70)    Michael Weber, Esq., acting for John, Jarett, and Darren Lezdey, formed

8    AlphaMed Pharmaceuticals, Inc., in June of 1999.  Initial Stockholders included Jarett

9    Lezdey, Darren Lezdey, Michael Weber.  The Board of Directors initially included John,

10   Jarett, and Darren Lezdey, and Michael Weber.

11       (71)    In September of 1999, without corporate authority to do so, the Lezdeys

12   and Michael Weber caused there to be created a purported License Agreement from

13   Protease Sciences, Inc., to AlphaMed Pharmaceuticals, Inc., related to certain patents

14   which were then licensed to Protease from Sonoran Desert Chemicals Limited Liability

15   Company.  This purported License Agreement was executed by John Lezdey, purporting

16   to act for Protease, and by Jarett Lezdey, acting for AlphaMed Pharmaceuticals, Inc.

17       (72)    On 11/22/99, John Lezdey testified untruthfully in his deposition in this

18   action that he was not on the Board of Directors of AlphaMed and that AlphaMed did not

19   then (purport) to have a License Agreement from Protease.

20       (73)    The existence of the purported 9/99 License Agreement to AlphaMed from

21   Protease (and the existence of a second purported 3/01/00 License Agreement between

22   the same entities) was concealed from Plaintiffs' counsel until certain depositions of the

23   Lezdeys held on 8/14/00 in Tampa, Florida.

24       (74)    ~~But for the involuntary petition in Bankruptcy filed by the Lezdeys against~~

25   ~~Protease Sciences, Inc., in Nevada, this Court would have set aside and declared void the~~

26   ~~License Agreements between Protease Sciences, Inc. and AlphaMed Pharmaceuticals,~~

27   ~~Inc., but this Court will leave the matter of those License Agreements for the Bankruptcy~~

28   ~~Court in Nevada so long as there are Bankruptcy proceedings pending.~~

DCT/361961/WA090-2                                  2

1    (C)    The 2/02/00 Preliminary Injunction's Conclusions of Law are

2    supplemented by adding the following Conclusion:

3    (3)    Plaintiffs are entitled to a preliminary injunction to prevent Defendants

4    John Lezdey, Jarett Lezdey, Darren Lezdey, Noreen Lezdey, J.L. and J & D, and other

5    persons or entities acting for them or with them (including but not limited to Michael   *EOB*

6    Weber, Esq., and Bob Williams) from taking any actions in any capacity to give effect to

7    (or draw for themselves or any entity, including but not limited to AlphaMed

8    Pharmaceuticals, Inc., any benefit from) the purported License Agreement(s) between

9    Protease Sciences, Inc., and AlphaMed Pharmaceuticals, Inc.

10    (D)    The 2/02/00 Preliminary Injunction's ORDER is hereby supplemented by

11    adding the following two paragraphs:

12    IT IS FURTHER ORDERED that Defendants John Lezdey, Jarett Lezdey,

13    Darren Lezdey, Noreen Lezdey, J.L. Technology Limited and J & D Science, Inc., and

14    any other persons or entities acting for them or with them (including but not limited to   *EOB*

15    Michael Weber, Esq., and Bob Williams) are enjoined from taking any actions in any

16    capacity to give effect to (or draw for themselves or any entity, including but not limited

17    to AlphaMed Pharmaceuticals, Inc. any benefit from) the purported License Agreements

18    Between Protease Sciences, Inc., and AlphaMed Pharmaceuticals, Inc.

19    IT IS FURTHER ORDERED that no additional bond shall be required to

20    be posted to give effect to this Amendment to the 2/02/00 Preliminary Injunction and that

21    service of this Amendment may be made upon all the above-referenced Defendants by

22    direct service upon David Dow, Esq., or Joel Hoxie, Esq.

23    DATED this 27th day of November, 2000.

24

25

26    *Edward O. Burke*

27    Hon. Edward O. Burke, Judge

28    of the Maricopa County Superior Court

DCT/361961/WA090-2                                    3

The foregoing instrument is a full, true and correct copy of
the original on file in this office.

Attest _Oct, 4,_____ 20_04_

MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By _L. Johnson_____ Deputy

# EXHIBIT D

FILED
3/22/02  10:00 am
MICHAEL K. JEANES, Clerk
By M. Mendoza
Deputy

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

ALLAN WACHTER, M.D., an individual
and on behalf of his marital community;
SETH CHEMICALS, INC., a Nevada
corporation; NATHAN M. TECHNOLOGIES
LIMITED PARTNERSHIP, a Nevada limited
partnership,

        Plaintiffs,

v.

JOHN LEZDEY and NOREEN LEZDEY,
husband and wife; DARREN LEZDEY, an
individual; JARETT LEZDEY, an individual;
J & D SCIENCE, INC., a Nevada
corporation; J.L. TECHNOLOGY LIMITED
PARTNERSHIP, a Nevada limited
partnership; SONORAN DESERT
CHEMICALS LIMITED LIABILITY
COMPANY, a Nevada limited liability
company; PROTEASE SCIENCES, INC., a
Nevada corporation; JOHN DOES 1 THRU
100,

        Defendants.

PROTEASE SCIENCES, INC., a Nevada
corporation; and JOHN LEZDEY,

        Counterclaimants,

v.

ALAN M. WACHTER and SUSAN
WACHTER, husband and wife,

        Counterdefendants.

No. CV 99-09354

COPY FOR
CERTIFICATION

**PERMANENT INJUNCTION**

CERTIFIED COPY

    Judgment against Defendants Jarett and Darren Lezdey having been ordered on

December 15, 2001 (signed on January 9, 2002); Judgment against Noreen Lezdey as to

the Counterclaims having been ordered on December 15, 2001; further relief against

Noreen, Darren and Jarett Lezdey and J.L. Technology Limited Partnership having been

ordered January 15, 2002, this cause having come on for trial to the Court on January 15,

SACKS TIERN, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2

1  2002, the Plaintiffs/Counterdefendants being represented by their attorney, David C.

2  Tierney, and the Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey and J.L.

3  Technology Limited Partnership neither present in person nor represented by counsel,

4  despite repeated advance[1] notice, and the Court having heard the evidence offered by

5  Plaintiffs/Counterdefendants at trial and having duly considered the same, it is ordered

6  that the Preliminary Injunction of February 2, 2000 (as amended by the October 12, 2000

7  Minute Entry and formally amended on November 27, 2000) is hereby made a permanent

8  injunction as to all Defendants, except J & D Science, Inc. and John Lezdey and is

9  supplemented as follows.  The Preliminary Injunction, as amended on November 27,

10  2000, remains in effect against John Lezdey and J & D Science, Inc.  Defendants John

11  Lezdey and J & D Science, Inc. are in bankruptcy in Tampa, Florida at this time, so none

12  of these findings will form the basis for any relief against those two Defendants.

13       The Court finds as follows:

14       1.     Plaintiff Allan Wachter is a medical doctor.  Defendant John Lezdey is an

15  attorney.  Dr. Wachter and John Lezdey invented certain patented medical inventions in

16  the field of treating inflammation with alpha 1-antitrypsin and other protease inhibitors

17  (the "Drugs").

18       2.     Dr. Wachter and John Lezdey transferred their interest in the Drugs and

19  related U.S. patents to Defendant Sonoran Desert Chemicals Limited ("Sonoran"), a

20  Nevada limited liability company.  Sonoran has two members, each with a fifty percent

21  ownership interest:  Plaintiff Nathan M. Technologies Limited Partnership ("Nathan")

22  and Defendant J.L. Technology Limited Partnership ("J.L.").  Plaintiff Seth Chemicals,

23  Inc. ("Seth") is the corporate general partner of Nathan; Seth and Nathan are owned and

24  controlled by Dr. Wachter and his family.  J & D Science, Inc. ("J & D") is the corporate

25  . . .

26

27  [1] Including the Court's statement to John Lezdey and Jarett Lezdey in the Pretrial
   Conference on 1/9/02 that a bankruptcy filed by one defendant does not stay the case as
28  to other defendants.

SACKS TIERN.  P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA  85251-3647

424990v2/WA090-2                    2

1  general partner of J.L. J & D and J.L. are owned and controlled by John Lezdey and his

2  family.

3      3.    In 1992, Dr. Wachter and John Lezdey formed Defendant Protease

4  Sciences, Inc. ("Protease"), a Nevada corporation. The Wachters own a 50% interest in

5  Protease. John Lezdey and Noreen Lezdey own the other 50% interest in Protease. Dr.

6  Wachter and John Lezdey are officers and directors of Protease.

7      4.    Protease was formed to test the Drugs, develop related products, and to

8  assist in marketing the Drugs and related products.

9      5.    Dr. Wachter and John Lezdey are co-trustees for the benefit of all

10  shareholders of Protease pursuant to a Voting Trust Agreement dated as of January 22,

11  1992 (the "Voting Trust Agreement") [Exhibits 13, 18, 19, and 20][2].

12      6.    John Lezdey and his wife, Noreen Lezdey, executed an Assignment of

13  Certificate Number 1, evidencing their 1,000 shares of Protease common stock, to John

14  Lezdey and Allan M. Wachter as Trustees under the Voting Trust Agreement, and

15  authorized Jay M. Mann to transfer those shares on the books of the corporation.

16  [Exhibit 20]

17      7.    Dr. Wachter and his wife, Susan Wachter, executed an Assignment of

18  Certificate Number 2, evidencing their 1,000 shares of Protease common stock, to John

19  Lezdey and Allan M. Wachter as Trustees under the Voting Trust Agreement, and

20  authorized Jay M. Mann to transfer those shares on the books of the corporation.

21  [Exhibit 20]

22      8.    Dr. Wachter and John Lezdey, as voting trustees, executed the two Trust

23  Certificates, acknowledging their receipt of the shares of stock from the Wachters and

24  the Lezdeys pursuant to the Voting Trust Agreement.  [Exhibit 20]  No new stock

25  certificates in the name of the two trustees were created.

26

27  _____

28  [2] Exhibit references are to the numbers of the exhibits admitted in the 1/15/02 hearing on the Permanent Injunction.

SACKS TIERNL P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2                    3

9.     John Lezdey has acted as general counsel and patent counsel for Dr. Wachter, Sonoran and Protease.

10.    Dr. Wachter, as Secretary of Protease, signed minutes of an annual meeting of the directors of Protease dated December 14, 1993. [Exhibit 46]

11.    The minutes of the December 14, 1993 annual meeting of directors confirmed that Dr. Wachter and John Lezdey were the sole members of the Protease Board of Directors; that John Lezdey was the President and Treasurer of Protease, and that Dr. Wachter was the Chief Executive Officer, Vice President and Secretary of Protease. In fact, Dr. Wachter had possession of the checkbook and handled the finances of Protease. [Exhibit 46]

12.    On December 28, 1993, John Lezdey, Dr. Wachter, Protease and Sonoran executed an Agreement (the "Sonoran Protease Agreement") effective as of December 31, 1992, which appointed Protease as Sonoran's agent to exercise certain delegated powers and duties, including: (a) conducting clinical studies and research utilizing the patents and related technology; (b) procuring of licensing, distribution and/or marketing or related agreements with third parties; and (c) collecting amounts due Sonoran under agreements procured by Protease for Sonoran. [Exhibit 26]

13.    John Lezdey prepared a document titled "Minutes" [Exhibit 64], which purports to memorialize a telephonic meeting of Protease's Board of Directors on November 7, 1996, wherein the directors (Dr. Wachter and John Lezdey) purportedly agreed that Darren and Jarett Lezdey shall each be given 2.5 percent of the Protease stock from the shares of the existing shareholders.

14.    Dr. Wachter did not participate in the alleged November 7, 1996 call and did not agree to give John Lezdey's sons (Darren and Jarett Lezdey) 2.5 percent of his Protease shares.

15.    Mrs. Wachter did not agree to give Darren or Jarett Lezdey any of the Protease shares, which had been issued to the Wachters.

. . .

SACKS TIERN, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

16.    John Lezdey signed Exhibit 64 in the purported capacity of "Acting Secretary" of Protease.

17.    John Lezdey prepared another document titled "Minutes" [Exhibit 72], which purports to memorialize a telephone meeting of the Protease Board of Directors on April 13, 1997, wherein the directors purportedly agreed to: (1) hire a certain law firm to pursue legal action against Bayer Corporation for infringement of the patents of which Protease was a licensee; (2) move Protease's corporate headquarters to New Jersey; and (3) license AlphaOne Pharmaceuticals, Inc. ("AlphaOne") all rights to the recombinant product used in the Protease patents upon terms to be later agreed upon by the Board.

18.    John Lezdey signed Exhibit 13 as "Acting Secretary" of Protease.

19.    The Protease Board did not agree on April 13, 1997 to take the actions recited in Exhibit 13.

20.    On April 13, 1997, there was no entity in existence named AlphaOne Pharmaceuticals, Inc.

21.    John Lezdey prepared a document on Sonoran letterhead titled "Minutes of Meeting" [Exhibit 80] dated August 5, 1997, which recites that Dr. Wachter's purported resignation from all Sonoran and Protease activities was accepted. John Lezdey signed Exhibit 80 as President and "Acting Secretary" of Protease.

22.    Dr. Wachter did not attend any meeting on August 15, 1997 and did not resign from any or all Sonoran and Protease activities.

23.    John Lezdey prepared a document titled "Minutes" [Exhibit 90], which purports to memorialize a telephonic meeting of the Protease Board of Directors on November 7, 1997, wherein the board purportedly agreed that Protease would give 2.5 percent of its shares of AlphaOne stock to Ken Hodges.

24.    John Lezdey signed Exhibit 90 as "Acting Secretary" of Protease.

25.    As of November 7, 1997, Protease did not own any shares of AlphaOne.

. . .

SACKS TIERN
P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3847

424990v2/WA090-2                    5

26.     Dr. Wachter did not participate in the alleged November 7, 1997 call and never agreed to give any of Protease's shares of AlphaOne to Ken Hodges.

27.     On November 10, 1997, Protease signed a "Term Sheet" setting forth terms of a proposed agreement wherein Protease would exclusively license to AlphaOne all rights in the patents relating to the Drugs. [Exhibit 91]

28.     John Lezdey signed the Term Sheet as President of Protease.

29.     On or about March 10, 1998, John Lezdey prepared a document that purported to memorialize a meeting of Dr. Wachter and himself as the purported majority shareholders of AlphaOne. [Exhibit 107]

30.     Protease did not own the majority of AlphaOne stock on March 10, 1998, or at any other time.

31.     John Lezdey also prepared and signed a document dated March 10, 1998, purporting to be minutes of a meeting of the AlphaOne Board of Directors wherein Darren Lezdey was made a signor on the AlphaOne bank account at Wells Fargo Bank. [Exhibit 107]

32.     No such meeting of the AlphaOne Board took place on March 10, 1998.

33.     Dr. Wachter and John Lezdey were not members of the AlphaOne Board of Directors on March 10, 1998.

34.     Dr. Wachter received a two-page letter dated March 23, 1998, addressed to him from Darren Lezdey, which discussed Darren Lezdey's concerns about his income from AlphaOne [Exhibit 111], and which was forwarded by Dr. Wachter to AlphaOne. Exhibit 111 did not refer to the purported November 7, 1996 agreement between Dr. Wachter and John Lezdey to give 2.5 percent of their Protease stock to each of John Lezdey's sons.

35.     Dr. Wachter's signature was placed on an altered one-page version of Exhibit 111 by someone other than himself. [Exhibit 112]

. . .

. . .

SACKS TIERN, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2                              6

36.    The altered version of the letter [Exhibit 112] contains a statement (not in the original received by Dr. Wachter in 1998) that Dr. Wachter had agreed to give 2.5 percent of his shares in Protease to Darren and Jarett Lezdey.

37.    When Dr. Wachter received the March 23, 1998 letter from Darren Lezdey [Exhibit 111], which did not contain that statement, Dr. Wachter was a 50/50 shareholder of Protease under the Voting Trust Agreement with John Lezdey.

38.    On April 16, 1998, Protease entered into a License Agreement with AlphaOne under which Protease granted AlphaOne an exclusive license to utilize the inventions described in the patents in certain fields. [Exhibit 131]  That license is fully in effect today.

39.    Pursuant to the License Agreement, Protease received approximately fifty percent (50%) of AlphaOne's common stock, and Dr. Wachter and John Lezdey each were elected as directors of AlphaOne.

40.    Under the License Agreement, Protease will receive royalties on AlphaOne's net sales and a portion of other monies received by AlphaOne from sublicensees.

41.    John Lezdey knew the material terms and conditions of the License Agreement, advised Dr. Wachter that the License Agreement was valid, and approved Dr. Wachter's execution thereof as Chief Executive Officer of Protease.

42.    On May 14, 1999, John Lezdey wrote Dr. Martin Preuveneers of AlphaOne, purportedly on behalf of Protease, questioning the validity of the License Agreement and asserting that AlphaOne had breached the License Agreement if it existed. [Exhibit 213]

43.    Dr. Wachter, as one of the two members of the Protease Board of Directors, did not authorize John Lezdey to assert on behalf of Protease that AlphaOne had breached the License Agreement.

. . .

. . .

SACKS TIERN... P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2

7

44.    On May 21, 1999, John Lezdey, together with his sons Darren and Jarett Lezdey, and Aaron Lovaas, a Nevada attorney, purported to hold a meeting of the shareholders of Protease followed by a meeting of the Protease Board of Directors.

45.    As of May 21, 1999, Dr. Wachter was a member of the Protease Board of Directors and a shareholder of Protease, either as trustee under the Voting Trust Agreement or in his individual capacity.

46.    As a shareholder, Dr. Wachter was entitled under the Protease bylaws [Exhibit 15] to receive not less than 10 days' notice of any special meeting of the shareholders.

47.    The Lezdeys did not give Dr. Wachter (and Dr. Wachter did not receive) any notice of the purported May 21, 1999 shareholders' meeting, and Dr. Wachter did not participate in that meeting.

48.    Although the Lezdeys contended that Dr. Wachter had resigned as an officer and director of Protease in July or August 1997, at the purported May 21, 1999 shareholders' meeting, the Lezdeys purportedly voted to remove Dr. Wachter from the Protease Board of Directors and terminate his employment agreement with Protease.

49.    John Lezdey then purportedly held a meeting as the alleged sole remaining member of the Protease Board of Directors and purportedly removed Dr. Wachter as an officer of Protease. [Exhibit 220]

50.    On May 21, 1999, Dr. Wachter and his wife, Susan Wachter, owned a 50 percent interest in Protease, either as the beneficiaries of the Voting Trust Agreement or as the holders of Certificate No. 2 issued by Protease in January 1992.

51.    No stock certificates for any shares of Protease stock had been issued or transferred to Darren Lezdey or Jarett Lezdey as of May 21, 1999, and neither of them owned any shares of Protease stock on May 21, 1999.

52.    Neither Darren Lezdey nor Jarett Lezdey had any legal right to vote any shares of Protease stock on May 21, 1999, nor to attempt to remove Dr. Wachter from the Board of Directors.

SACKS TIERNL, P. A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

53.    The purported shareholders' meeting of May 21, 1999 was invalid because no notice thereof was sent to Dr. Wachter as required by Protease's bylaws.

54.    The purported shareholders' meeting of May 21, 1999 was also invalid because, without Dr. Wachter's participation, in person or by proxy, there was no quorum for such a meeting under Protease's bylaws.

55.    The purported removal of Dr. Wachter from the Protease Board of Directors at the purported May 21, 1999 shareholders' meeting was also invalid because, as only one of the two trustees under the Voting Trust Agreement, John Lezdey did not have the authority to vote the shares of Protease stock transferred to the trustees without Dr. Wachter's joinder.

56.    Even if the Voting Trust Agreement was not fully implemented (as alleged by the Lezdeys), the purported removal of Dr. Wachter from Protease's Board of Directors at the purported shareholders' meeting of May 21, 1999 was invalid because John Lezdey owned no more than 50 percent of the Protease stock and, therefore, did not have sufficient votes to remove Dr. Wachter from the Board under Protease's bylaws.

57.    Because Dr. Wachter was not removed from Protease's Board of Directors at the purported shareholders' meeting of May 21, 1999, the action subsequently taken by John Lezdey (as the purported sole remaining member of the Board of Directors) to remove Dr. Wachter as an officer of Protease was invalid.

58.    On May 27, 1999, attorney Aaron Lovaas, purportedly acting on Protease's behalf, sent a letter to Dr. Preuveneers of AlphaOne stating that Dr. Wachter had been removed from Protease's Board and no longer had any authority to act or speak on behalf of Protease. [Exhibit 221]

59.    On May 25 and 27, 1999, John Lezdey sent letters to Dr. Preuveneers of AlphaOne which stated Protease's purported position that there was no valid License Agreement between Protease and AlphaOne, and further asserting that even if there was a contract in place, it had been terminated in December 1998, pursuant to notice by Protease. [Exhibits 224 and 228]

SACKS TIERNL, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2

9

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

60.     Dr. Wachter, as one of the two members of the Protease Board of Directors on May 27, 1999, did not authorize John Lezdey to assert the positions stated in Exhibits 224 and 228 on behalf of Protease.

61.     The Sonoran-Protease Agreement and the Protease-AlphaOne[3] License Agreement are valid and enforceable.

62.     John Lezdey and Dr. Wachter have a fiduciary relationship with Protease, Sonoran, AlphaOne and each other.

63.     In violation of his fiduciary duties, John Lezdey disrupted negotiations with Steve Gorlin, a potential investor in AlphaOne, and sought to harm AlphaOne by (a) threatening to withdraw patents from AlphaOne unless Darren and Jarett Lezdey were given additional AlphaOne stock, (b) soliciting Dr. Wachter to provide certain secret information of AlphaOne to facilitate a separate deal with Prometic BioSciences, in violation of the License Agreement, (c) targeting certain employees of AlphaOne (including Liesl Songer-Nelson and David Kent) for termination of employment, (d) forcing the resignation of one employee, (e) preparing false documents purporting to evidence action by Protease's Board of Directors and AlphaOne's Board of Directors, and (f) contacting Baxter Health Care and Prometic BioSciences to create doubt about AlphaOne's legal right to license patents to AlphaOne, thereby impeding Baxter's and Prometic's financing needed by AlphaOne. [Exhibits 244 and 258]

64.     John Lezdey's actions have caused or threaten to cause immediate, substantial, and irreparable injury to Protease, Sonoran and Plaintiffs by interfering with AlphaOne's business operations and its contractual and/or prospective business relations and, therefore, interfering with its performance under the License Agreement to AlphaOne.

65.     John Lezdey's acts have interfered with and threaten to irreparably harm AlphaOne's contractual and/or prospective business relations with Prometic

---

[3] AlphaOne changed its name to Arriva Pharmaceuticals, Inc. ("Arriva") in 2001.

424990v2/WA090-2                           10

1    BioSciences, Baxter Health Care, and others and, thereby, cause Protease and Sonoran to

2    lose economic and other benefits.

3       66.    John Lezdey has used or attempted to misuse his positions as trustee under

4    the Voting Trust Agreement and as shareholder, Director and President of Protease to

5    exclude Dr. Wachter from the management of Protease.

6       67.    Darren Lezdey and Jarett Lezdey have claimed authority to act on behalf of

7    Protease without Dr. Wachter's consent or the authorization of the Protease Board of

8    Directors and have acted in a conspiracy with John Lezdey which has been and is

9    detrimental to the interests of Protease, Sonoran and/or Plaintiffs, including, without

10   limitation, (a) conducting discussions or negotiations with other companies to form

11   business arrangements involving the development of certain uses of the Drugs in

12   violation of the License Agreement, (b) purporting to act as Protease directors and

13   officers to "fire" Protease's and Sonoran's legal counsel and to assume the

14   representation thereof, and (c) hiring attorneys to represent Protease and/or Sonoran in

15   litigation commenced by AlphaOne to assert positions not approved by Protease's Board

16   of Directors and inconsistent with its interests under the License Agreement with

17   AlphaOne.

18      68.    On or about July 20, 1999, John, Jarett and Darren Lezdey incorporated

19   AlphaMed Pharmaceuticals, Inc., a Florida corporation ("AlphaMed"), with the

20   assistance of Attorney Michael Weber.  Initial stockholders included Jarett Lezdey,

21   Darren Lezdey, and Michael Weber.  The Board of Directors included the same people,

22   plus John Lezdey. [Exhibits 247 and 248]

23      69.    On September 2, 1999 and March 1, 2000, John, Jarett and Darren Lezdey

24   (without any corporate authority to do so) purported to cause Protease to secretly license

25   certain patents to AlphaMed. [Exhibits 270 and 294] The purported September 2, 1999

26   License Agreement was executed by John Lezdey purporting to act for Protease and

27   Jarett Lezdey for AlphaMed.  The purported License to AlphaMed related to patents

28   . . .

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2                    11

1    then licensed to Protease from Sonoran. Dr. Wachter was not informed of the purported

2    actions of the Lezdeys or the purported licenses to AlphaMed.

3       70.    John, Jarett and Darren Lezdey actively concealed from Dr. Wachter the

4    purported License Agreement from Protease to AlphaMed in order to profit personally

5    from these purported licenses.

6       71.    At all material times, Darren Lezdey and Jarett Lezdey knew that their

7    father, John Lezdey, was an officer and director of Protease and that his acts and

8    omissions were in breach of his duties to Protease and its other officers and shareholders

9    (the Wachters).

10      72.    John, Jarett and Darren Lezdey, as recited in Paragraphs 45-57 and 69

11   above, did not have stockholder control or any sort of control of Protease at any time and

12   their actions relating to Protease are a nullity. The purported September 2, 1999 or

13   March 1, 2000 licenses from Protease to AlphaMed are wholly void and of no effect.

14   This Court specifically finds that the actions of Darren and Jarett Lezdey as recited in

15   Paragraphs 45-57 and 69-70 above relating to AlphaMed and the purported licenses

16   constitute a fraud by each of them on Plaintiffs.

17      73.    The Court further finds that the conduct of Defendants Darren Lezdey,

18   Jarett Lezdey and J.L. giving rise to this Judgment (a) was fraudulent and done as part of

19   a conspiracy to assist another (John Lezdey) to commit fraud which breached his

20   fiduciary duties to Plaintiffs Wachter; and (b) constituted willful and malicious injury

21   done by Darren Lezdey, Jarett Lezdey, John Lezdey, and J.L. to Plaintiffs and their

22   property. The injuries suffered by Plaintiffs were the result of deliberate and intentional

23   acts in which Darren, Jarett and John Lezdey and J.L. intended the consequences not

24   simply the acts themselves.

25      74.    Any other actions purported to have been taken by Darren and Jarett

26   Lezdey on behalf of Protease on or since May 21, 1999 are likewise wholly void and of

27   no effect.

28   . . .

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3547

424990v2/WA090-2                    12

1    75.    Since this Court's February 2, 2000 Preliminary Injunction, its October 12,

2   2000 Minute Entry, and its November 27, 2000 Amended Preliminary Injunction,

3   Darren and Jarett Lezdey have violated the Preliminary Injunction, as amended, by

4   continuing to do business as AlphaMed and by making use of the void license

5   agreements. Darren and Jarett Lezdey have maintained page 2 of the April 2, 2001 Web

6   page asserting the license, which page is attached to the unopposed April 6, 2001 Second

7   Application for Contempt.   As shown at trial, and in Paragraphs 5 and 6 of Dr.

8   Wachter's Declaration submitted with the April 6, 2001 Second Application for

9   Contempt, AlphaMed approached companies (and investors) with which AlphaOne was

10   dealing and falsely insisted that AlphaMed and not AlphaOne had the license from

11   Protease.

12    76.    Despite the Court's Orders, Darren Lezdey and Jarett Lezdey have failed,

13   refused and neglected to cease their course of unlawful and otherwise improper conduct.

14    77.    The actions of Darren and Jarett Lezdey have caused and threaten to cause

15   immediate, substantial and irreparable injury to the Plaintiffs and to Protease and to

16   Sonoran.

17    78.    The Court finds that Defendants Darren and Jarett Lezdey have assisted

18   their father, John Lezdey, in breaching his fiduciary duties toward Dr. Wachter,

19   Sonoran, and Protease.  Restatement Second of Torts, § 876(b).  While the Court will

20   not order any relief at this time as regards John Lezdey or J & D, because of their

21   January 14, 2002 and January 8, 2002 bankruptcy filings, there is no legal impediment to

22   the entry of this Injunction as to the remaining Defendants.

23                    **ORDER/PERMANENT INJUNCTION**

24    I.    Good cause appearing, IT IS THEREFORE ORDERED that Defendants

25   Noreen Lezdey, an individual; Darren Lezdey, an individual; and Jarett Lezdey, an

26   individual; and J.L. Technology Limited Partnership, a Nevada limited partnership; and

27   any other persons or entities acting in concert with them who received notice of this

28   Order, including, but not limited to, any agents, servants, employees, or attorneys of said

SACKS TIERNI A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2                     13

1   Defendants, are prohibited and are hereby permanently enjoined from contacting
2   Prometic BioSciences, Baxter Health Care, or any other entity or person with whom
3   AlphaOne/Arriva[4] has any contractual or prospective business relations or from otherwise
4   interfering with AlphaOne/Arriva's business operations and its contractual and/or
5   prospective business relations without Plaintiffs' express written consent.

6       II.    IT IS FURTHER ORDERED that Defendants Noreen Lezdey, an
7   individual; Darren Lezdey, an individual; and Jarett Lezdey, an individual; and J.L.
8   Technology Limited Partnership, a Nevada limited partnership; and any other persons or
9   entities acting in concert with them who received notice of this Order, including, but not
10  limited to, any agents, servants, employees, or attorneys of said Defendants, are
11  prohibited and are hereby permanently enjoined from acting or speaking, or purporting to
12  act or speak, on behalf of Protease Sciences, Inc. or Sonoran Desert Chemicals Limited
13  Liability Company without Plaintiffs' express written consent.

14      III.   IT IS FURTHER ORDERED that Defendants Noreen Lezdey, an
15  individual; Darren Lezdey, an individual; and Jarett Lezdey, an individual; and J.L.
16  Technology Limited Partnership, a Nevada limited partnership; and any other persons or
17  entities acting in concert with them who received notice of this Order, including, but not
18  limited to, any agents, servants, employees, or attorneys of said Defendants, are
19  prohibited and are hereby permanently enjoined from taking any actions in any capacity
20  to give effect to (or to draw for themselves or any entity, including, but not limited to,
21  AlphaMed Pharmaceuticals, Inc., any benefit from) the invalid License Agreements
22  between Protease Sciences, Inc. and AlphaMed Pharmaceuticals, Inc.

23      IV.    IT IS FURTHER ORDERED that Defendants Darren Lezdey, an
24  individual, and Jarett Lezdey, an individual, shall immediately disclose in writing to Dr.
25  Wachter all actions which either of them have heretofore (since January 1, 1996) taken
26  on behalf of, or in the name of, either Protease Sciences, Inc. or Sonoran Desert

27  _____

28  [4] AlphaOne changed its name to Arriva Pharmaceuticals, Inc. ("Arriva") in 2001.

424990v2/WA090-2                                14

SACKS TIERNEY, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1  Chemicals Limited Liability Company without Dr. Wachter's express knowledge or

2  consent. Failure to make such disclosure by 10 days after service of this Injunction shall

3  be a contempt of this Injunction.

4      V.    IT IS FURTHER ORDERED that Defendants Darren Lezdey, an

5  individual, and Jarett Lezdey, an individual, shall in 10 days remove from the AlphaMed

6  Pharmaceuticals, Inc. Web Site referenced above all references to a purported License

7  Agreement with Protease Sciences, Inc.. They are enjoined from making such references

8  in the future in any media context.

9      VI.    IT IS FURTHER ORDERED that no bond shall be required to be posted to

10  give effect to this Permanent Injunction and that effective service of this Injunction may

11  be made upon all the enjoined Defendants by first-class mail on John Lezdey, such

12  service to be effective three (3) days after mailing.

13      VII.    IT IS FURTHER ORDERED that violations of this Injunction by any of the

14  enjoined parties shall, in addition to any other applicable sanction applied for by

15  Plaintiffs, result in an automatic sanction of $100,000 per violation.

16      VIII.  The Court expressly finds under Rule 54(b), Arizona Rules of Civil

17  Procedure, that there is no just reason for delay and directs the clerk to enter this

18  judgment forthwith.

19      DATED this _22_ day of ___February___, 2002.

20

21                  _Edward O. Burke_

22                  Edward O. Burke

                  Judge of the Superior Court

23

24

25

26

27

28

SACKS TIERNE, A, LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

424990v2/WA090-2                 15

# EXHIBIT E

1

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4
    ALLAN WACHTER, M.D., an    )
5   individual; et al.,        )
                               )
6            Plaintiffs,       )
                               )
7   vs.                        )
                               )  CV 99-09334
8   JOHN LEZDEY and NOREEN     )
    LEZDEY, husband and wife;  )
9   et al.,                    )
                               )
10           Defendants.       )
    _____)

11

12

13                    Phoenix, Arizona

14                   January 15, 2002

15

16
          BEFORE:  The Honorable EDWARD O. BURKE, Judge
17

18
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
19
                   **(PREPARED FOR APPEAL)**
20
                      **(Bench Trial)**
21

22

23  Prepared for:                 Reported by:

24                                 Scott M. Coniam, RPR, CCR
    COPY                          Certified Court Reporter
25                                Certificate Number 50269

2

1                              APPEARANCES

2

3                    SACKS TIERNEY P.A.
                     By:  Mr. David C. Tierney
4

5                                Index

6    Witness:              Examination by:        Page:

7    Allan Wachter, M.D.   Mr. Tierney              19

8    Philip Jeffrey Barr   Mr. Tierney              79

9    Brian W. Napper       Mr. Tierney             104

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                          PROCEEDINGS

 2

 3              THE COURT:  This is CV 99-09334, Allan Wachter

 4     vs. John Lezdey.  It's the time set for trial of this

 5     matter.

 6              May we have the appearances, please.

 7              MR. TIERNEY:  David C. Tierney for

 8     Dr. Allan Wachter, Susan Wachter, and various corporate and

 9     partnership defendants listed in the caption.

10              THE COURT:  The record will reflect that it's 9:36

11     and nobody from the defendants is present.

12              I have received -- I received yesterday, by

13     facsimile, an order from the Arizona Court of Appeals

14     confirming that this trial may proceed in spite of the

15     notice of appeal filed last week.

16              I assume, Mr. Tierney, that the defendants are not

17     going to appear.

18              MR. TIERNEY:  Judge, we've had no contact with

19     them since Thursday afternoon, approximately 2:00 o'clock,

20     on January 10th.  I believe it was after the pretrial

21     conference.  Have no reason to believe they're going to be

22     here today.

23              THE COURT:  All right.  Let's proceed with the

24     trial.

25              I haven't ruled on the application for contempt,
```

1       and Nathan cross-named -- Nathan named Lezdey as a manager,

2       and J.L. Tech, Judge, named Wachter as manager just to get

3       them up into this structure here.

4              So if you'll go through John Lezdey's motion which

5       he filed, saying that he is an owner of Seth and he can

6       instruct -- as his position is in Seth, he can instruct

7       Nathan to withdraw as a plaintiff, he's wrong.  He's not --

8       he's simply a manager, one of the managers of this LLC, is

9       not the -- that Mr. Lezdey is a managing member, but he is a

10      manager which the LLC law permits there to be a manager.

11      That is not a member.

12             THE COURT:  The court finds in favor of the

13      plaintiffs, Allan Wachter, M.D., individually and in behalf

14      of his marital community, Seth Chemicals, Inc., a Nevada

15      corporation, and Nathan M. Technologies Limited Partnership,

16      awards compensatory damages in the sum of $11,629,906

17      against the defendants, John Lezdey and Noreen Lezdey,

18      Darren Lezdey, an individual, Jarett Lezdey, an individual,

19      J.L. Technology Limited Partnership, a Nevada limited

20      partnership, Sonoran Desert Chemicals Limited Liability

21      Company --

22             MR. TIERNEY:  Excuse me, Judge.  I don't think the

23      damages -- I'm sorry if I didn't speak up.  I don't think

24      the damages should run against Sonoran and Protease.  They

25      should simply run against the Lezdeys and their entities.

1              THE COURT:  All right.  Strike that reference to

2      Sonoran.

3              So the damages will run against John and Noreen,

4      Darren and Jarett Lezdey and J.L. Technology Limited

5      Partnership, correct?

6              MR. TIERNEY:  Correct.

7              THE COURT:  The court adopts the findings of fact

8      submitted by Mr. Tierney in his form of preliminary

9      injunction on January 9, 2001.

10             MR. TIERNEY:  I think that was a form of

11     permanent, Judge.

12             THE COURT:  Form of permanent injunction.

13             The Court finds that the actions of John Lezdey,

14     an attorney licensed to practice law, are beyond outrageous.

15     They're difficult for this court to comprehend both from an

16     economic point of view in that he appears to be dead set to

17     kill the goose that may lay the golden egg, but he's also

18     used his position as an attorney to abuse the plaintiffs, to

19     abuse the plaintiffs' associates, and beyond, just abuse to

20     the legal process, he's abused them by -- he and his family

21     have abused them by incredibly outrageous acts of

22     threatening death to Dr. Wachter's wife and children.

23     Certainly, one would hope that every judge of this court

24     would agree with me that that type of conduct cannot be

25     tolerated by any litigant, much less -- much less a litigant

1    who is an attorney.

2         In addition, the evidence has shown that Mr. John

3    Lezdey has continually lied in this court, he has violated

4    earlier orders in this court, and he has the nerve,

5    apparently, to leave this court and -- leave this very

6    courtroom and go to the branch bank of Wells Fargo and wipe

7    out the company's bank account, in violation of the Court's

8    injunction.

9         In addition to all that, many of the documents

10   that Mr. Lezdey and the other defendants have put forth both

11   to Dr. Wachter and prospective investors have been false.

12   There's been evidence of forgery.  There's been severe

13   evidence of breach of fiduciary duty by John Lezdey, and

14   there's very strong evidence that Darren and Jarett Lezdey

15   have cooperated with it.

16        In 30 years of law practice in the commercial law

17   area, I've seen some shocking things, but nothing comes

18   close to the conduct of the defendants in this case.

19        The court hereby orders that the defendants are

20   liable for punitive damages in the sum of $5,814,983, which,

21   if you do the math, is 50 percent of the compensatory

22   damages.

23        Mr. Tierney, what are you looking for with regard

24   to the contempt citation?

25        MR. TIERNEY:  Judge, we suggested in our papers on

148

1

2

3

4

5

6

7

8          I, SCOTT M. CONIAM, a Certified Court Reporter,

9     Certificate Number 50269, do hereby certify that the

10    foregoing pages constitute a true and correct transcript of

11    my stenographic notes taken at said time and place, all done

12    to the best of my skill and ability.

13          I FURTHER CERTIFY that I am in no way related to any of

14    the parties hereto, nor am I in any way interested in the

15    outcome hereof.

16          DATED at Phoenix, Arizona, this 16th day of May, 2002.

17

18

19

20    SCOTT M. CONIAM, RPR, CRR
      Certified Realtime Reporter
      Certified Court Reporter
21    Certificate # 50269

22

23

24

25

**EXHIBIT F**

COPY FOR
CERTIFICATION

FILED
2/22/02 10:00 am
MICHAEL K. JEANES, Clerk
By M Muntour
Deputy

SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

ALLAN WACHTER, M.D., an individual
and on behalf of his marital community;
SETH CHEMICALS, INC., a Nevada
corporation; NATHAN M. TECHNOLOGIES
LIMITED PARTNERSHIP, a Nevada limited
partnership,

        Plaintiffs,

        v.

JOHN LEZDEY and NOREEN LEZDEY,
husband and wife; DARREN LEZDEY, an
individual; JARETT LEZDEY, an individual;
J & D SCIENCE, INC., a Nevada
corporation; J.L. TECHNOLOGY LIMITED
PARTNERSHIP, a Nevada limited
partnership; SONORAN DESERT
CHEMICALS LIMITED LIABILITY
COMPANY, a Nevada limited liability
company; PROTEASE SCIENCES, INC., a
Nevada corporation; JOHN DOES 1 THRU
100,

        Defendants.

PROTEASE SCIENCES, INC., a Nevada
corporation; and JOHN LEZDEY,

        Counterclaimants,

        v.

ALAN M. WACHTER and SUSAN
WACHTER, husband and wife,

        Counterdefendants.

No. CV 99-09334

JUDGMENT

CERTIFIED COPY

SACKS TIERNEY
P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

    Judgment against Defendants Jarett and Darren Lezdey having been ordered on

December 15, 2001 (signed on January 9, 2002); Judgment against Defendant Noreen

Lezdey as to her Counterclaims having been ordered on January 9, 2002; this cause

having come on for trial to the Court on January 15, 2002, the

Plaintiffs/Counterdefendants being represented by their attorney, David C. Tierney, and

the Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey and J.L. Technology

426699v2/WA090-2

SACKS TIERNL   P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1   Limited Partnership neither present in person nor represented by counsel, despite

2   repeated advance[1] notice, and the Court having heard the evidence offered by

3   Plaintiffs/Counterdefendants at trial and having duly considered the same,

4       The Court finds all facts in favor of the Plaintiffs/Counterdefendants as required to

5   sustain this Judgment.  The Court is aware of a 1/8/02 bankruptcy filing by J & D

6   Science, Inc. and a 1/14/02 bankruptcy filing by John Lezdey and, as a result, no relief is

7   ordered against John Lezdey or J & D Science, Inc., at this time.

8       The Court further finds that the conduct of Defendants Darren Lezdey, Jarett

9   Lezdey and J.L. Technology Limited Partnership giving rise to this Judgment (a) was

10  fraudulent and done as part of a conspiracy to assist another (John Lezdey) to commit

11  fraud which breached his fiduciary duties to Plaintiffs Wachter; and (b) constituted

12  willful and malicious injury done by Darren Lezdey, Jarett Lezdey, John Lezdey, and J.L.

13  Technology Limited Partnership to Plaintiffs and their property.  The injuries suffered by

14  Plaintiffs were the result of deliberate and intentional acts in which Darren, Jarett and

15  John Lezdey and J.L. Technology Limited Partnership intended the consequences not

16  simply the acts themselves.  The Court has made findings of fact in this regard in the

17  Permanent Injunction issued on the same date as this Judgment.

18      Good cause appearing, IT IS HEREBY ORDERED granting Plaintiffs Judgment

19  on their Complaint against Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey,

20  and J.L. Technology Limited Partnership, jointly and severally, for compensatory

21  damages in the principal sum of eleven million, six hundred twenty-nine thousand, nine

22  hundred sixty-six dollars ($11,629,966.00), with interest thereon at the rate from January

23  15, 2002, until paid.

24      IT IS FURTHER ORDERED granting Plaintiffs punitive damages against

25  Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey, and J.L. Technology Limited

26

27  [1] Including the Court's statement to John Lezdey and Jarett Lezdey in the Pretrial

28  Conference on 1/9/02 that a bankruptcy filed by one defendant does not stay the case as
    to other defendants.

426699v2/WA090-2                              2

Partnership, jointly and severally, in the sum of five million, eight hundred fourteen thousand, nine hundred eighty-three dollars ($5,814,983.00), with interest thereon at the rate from January 15, 2002, until paid.

IT IS FURTHER ORDERED granting Counterdefendants judgment on all the Counterclaims asserted against them whether asserted individually or asserted on behalf of Defendant Protease Sciences, Inc.

IT IS FURTHER ORDERED declaring pursuant to Arizona Revised Statutes Section 12-1831, et seq., as follows:

1.  Allan and Susan Wachter are the owners (subject to the Voting Trust Agreement dated January 22, 1992) of fifty percent (50%) of the issued and outstanding shares of stock of Protease Sciences, Inc., a Nevada corporation;

2.  Allan and Susan Wachter (both individually and as part of the Voting Trust) have not at any time transferred or assigned, or agreed to transfer or assign, to Darren Lezdey or Jarett Lezdey or any other person any shares of Protease Sciences, Inc. stock;

3.  Darren Lezdey and Jarett Lezdey are not, and have never been, officers or directors of Protease Sciences, Inc.;

4.  Allan Wachter was not at any time removed as a director or officer of Protease Sciences, Inc., and did not at any time resign as a director or officer of Protease Sciences, Inc.

5.  All actions taken by John Lezdey, Darren Lezdey and/or Jarett Lezdey purporting to remove Allan Wachter as a director or officer of Protease Sciences, Inc., have been invalid and of no force or effect;

6.  The agreement by and among John Lezdey, Allan Wachter, Protease Sciences, Inc., and Sonoran Desert Chemicals, L.L.C., effective as of December 31, 1992, whereby Protease was appointed as Sonoran's agent to exercise certain delegated powers and duties, is valid and enforceable;

. . .

SACKS TIERNL, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

7.    The License Agreement dated April 16, 1998 between Protease Sciences, Inc. and AlphaOne Pharmaceuticals, Inc. (now known as Arriva Pharmaceuticals, Inc.) was duly executed on behalf of Protease by Allan Wachter as its authorized representative;

8.    Protease Sciences, Inc., has never terminated the April 16, 1998 License Agreement with AlphaOne Pharmaceuticals, Inc. (now Arriva), and that License Agreement remains in full force and effect.

9.    Protease Sciences, Inc., did not authorize John Lezdey to execute the agreements dated September 2, 1999 and March 2000 whereby Protease purportedly licensed certain patents to AlphaMed Pharmaceuticals, Inc. (or any other such agreements with AlphaMed) and all such agreements are void and of no legal force or effect.

IT IS FURTHER ORDERED granting Plaintiffs their reasonable attorneys' fees against Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey and J.L. Technology Limited Partnership, jointly and severally, in the sum of $ *425,000 00*                , with interest thereon at the rate from the date of this Judgment, until paid.

IT IS FURTHER ORDERED granting Plaintiffs their taxable costs against Defendants Noreen Lezdey, Darren Lezdey, Jarett Lezdey and J.L. Technology Limited Partnership, jointly and severally, with interest thereon from the date of the taxation of costs.

The Court expressly finds under Rule 54(b), Arizona Rules of Civil Procedure, that there is no just reason for delay and directs the clerk to enter this Judgment forthwith.

DATED this *22* day of *February*           , 2002.

*Edward O. Burke*

Edward O. Burke
Judge of the Superior Court

SACKS TIERN, P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3847

426699v2/WA090-2

4

**EXHIBIT G**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 1999-009334                                          09/03/2003

CLERK OF THE COURT
HON. PAUL A KATZ                                        B. Navarro
                                                       Deputy
                                           SEP 1 0 2003
                                      FILED: _____

ALLAN WACHTER, et al.                 DAVID C TIERNEY

v.

JOHN LEZDEY, et al.                   DAVID BROOKS


                                      FINANCIAL SERVICES-CCC
                                      MCSO-DIS
                                      DOUGLAS J ROVENS
                                      ROVENS LAMBS LLP
                                      660 S FIGUEROA ST
                                      STE 1910
                                      LOS ANGELES CA 90017
                                      DARREN LEZDEY AND
                                      JARETT LEZDEY
                                      148 MARCDALE BLVD
                                      INDIAN ROCKS BEACH FL 33785


                        **UNDER ADVISEMENT RULING**


        This Court having conducted an Evidentiary Hearing on Plaintiff Allan Wachter's ("Dr.
Wachter") Third Application for Contempt which was filed with the Court on August 16, 2002,
and was supplemented on September 6, 2002 and May 7, 2003, which said hearing concluded on
July 8, 2003; having considered the evidence presented during the course of the Evidentiary
Hearing; having considered the pre-hearing and post-hearing memoranda submitted by the
parties as regards this petition; having reviewed the court file, including the contempt citations
issued by the Honorable Edward O. Burke on November 22, 2000 and January 15, 2002; and
good cause appearing, hereby finds as follows:

        1. John Lezdey has failed to purge the two contempt citations previously issued by this
Court against him and has failed to pay a penny of the $125,000.00 in court fines imposed as
sanctions against him. (This Court's Order of February 26, 2002 provides an additional sanction

Docket Code 019                    Form V000A                          Page 1

JPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 1999-009334                                                    09/03/2003

of $1,000.00 per month beginning March 15, 2002 for each month that the $75,000.00 sanction from the first contempt citation of October 12, 2002 remains unpaid which to date is $17,000.00). This Court finds and believes that this Defendant has had the ability to pay these fines and to comply with the Preliminary Injunction entered against him by Judge Burke on February 2, 2000. John Lezdey is and remains in willful violation of this Court's Preliminary Injunction and the subsequent enforcement orders issued incident thereto.

2. John Lezdey has acted and purported to speak for Sonoran in the Amgen-Sonoran patent interference proceeding before the United States Patent and Trademarks Office. This action by John Lezdey is in violation of the February 2, 2000, Preliminary Injunction against him and was protested as early as June 2, 2002 by Dr. Wachter. John Lezdey willfully continued, and with the active help of Attorney Douglas Rovens during the last months, has been threatening Dr. Wachter with suit if Dr. Wachter did not accede to actions that John Lezdey took in the Amgen-Sonoran proceedings. John Lezdey's actions are in violation of this Court's February 2, 2000 Preliminary Injunction. The appearance by John Lezdey in the Amgen-Sonoran patent interference proceedings was done without Dr. Wachter's consent, and was continued despite Dr. Wachter's express requests that John Lezdey desist. These actions by John Lezdey are in violation of this Court's February 2, 2000 Preliminary Injunction.

3. John Lezdey has appeared in and filed a brief pro-per in the European Court of Patent Appeals, although on February 22, 2002, this Court found him in contempt for his contacting that European Court of Patent Appeals. Accordingly, it is clear that John Lezdey willfully has again violated this Court's February 2, 2000 Preliminary Injunction as regards his further and continuing contacts with the European Court of Patent Appeals after February 22, 2002. The John Lezdey brief in the European Court of Patent Appeals was done without Dr. Wachter's consent. These actions by John Lezdey are in violation of this Court's February 2, 2000 Preliminary Injunction.

4. John Lezdey contacted a group of investors in Arriva Pharmaceuticals, Inc. (FKA AlphaOne Pharmaceuticals, Inc.) through Dr. Mascioli, and as the August 30, 2002 e-mail identified in the deposition reveals, John Lezdey tried to damage Arriva's business relations with its investors. This contact with MPM Investors by John Lezdey was done without Dr. Wachter's consent. These actions by John Lezdey are in violation of this Court's February 2, 2000 Preliminary Injunction.

5. On March 19, 2003 and on May 7, 2003, through Attorney Douglas Rovens, John Lezdey filed a certain Counterclaim on behalf of Sonoran Desert Chemicals, LLC. ("Sonoran") in the Federal District Court (Northern District of California) without Dr. Wachter's consent. This action by John Lezdey is in violation of this Court's February 2, 2000 Preliminary Injunction.

6. Further, willful civil contempt has again occurred as is stated herein above and Defendant John Lezdey remains unrepentant, and is once again claiming an inability to attend

Docket Code 019                         Form V000A                              Page 2

JPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 1999-009334                                                          09/03/2003

these proceedings while continuing to actively violate this Court's February 2, 2000 Preliminary Injunction and has repeatedly delayed the immediate proceedings by bad faith attempts to remove this matter to the U.S. District Court for the District of Arizona and the filing of personal bankruptcy proceedings.

Now, therefore,

**IT IS ORDERED** holding Defendant John Lezdey in civil contempt of court for the willful violations of this Court's orders of the February 2, 2000 Preliminary Injunction and this Court's subsequent contempt orders of October 12, 2000 and February 26, 2002.

**IT IS FURTHER ORDERED** that John Lezdey surrender himself to the custody of the Maricopa County Sheriff's Office by reporting to the Maricopa County Jail, Estrella Facility at 2939 W. Durango, Phoenix, AZ, no later than **12:00 p.m. on October 28, 2003** to begin serving an indeterminate jail sentence until such time as he has purged said contempt citations as specifically set forth below. Prior to reporting to the jail, John Lezdey shall obtain a copy of his Confinement Order and Self-Surrender Instructions from the Deputy Clerk of this Court Division (Old Courthouse, 125 W. Washington, 1st Floor, Ste. 101, Phoenix, AZ) which he shall take with him to the jail at the time of his surrender.

A.  On or before **October 8, 2003**, John Lezdey shall make the first payment toward the $143,000.00 fine (as of September 15, 2003) previously levied by Judge Burke to the Clerk of this Court in an amount not less than $50,000.00, and shall, on or before the first day of each month thereafter, pay an additional sum of $50,000.00 to the Clerk of this Court until this full fine amount has been satisfied.

B.  John Lezdey shall withdraw from the Amgen-Sonoran patent interference proceedings as he has been - - and is appearing there in violation of this Court's February 2, 2000 Preliminary Injunction.  This item of contempt will be considered purged upon John Lezdey's filing with this Court a certified copy of an Order confirming his withdrawal from those Amgen-Sonoran proceedings, and his proof of having cooperated with Dr. Wachter to permit other counsel to succeed John Lezdey in those proceedings, and to notify Judges Gardner Lane and Torczon of this ruling.

C.  John Lezdey shall withdraw his brief and his appearance from the European Court of Patent Appeals by documents approved as to form by the patent attorney for Arriva/Baxter in those proceedings, and this item of contempt will be considered purged upon proof of the withdrawal having been filed in the European proceedings, and proof of that filing (certified by attorneys for Arriva/Baxter) has been filed with this Court (and approved as to form by Wachter's counsel in this case).

Docket Code 019                          Form V000A                          Page 3

JPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 1999-009334                                                    09/03/2003

D.  By certified letter, John Lezdey informs Dr. Mascioli that he (John Lezdey) retracts all statements, which he has made to Mascioli, and Dr. Mascioli confirms receipt of such letter, and such confirmation has been filed with this Court.

E.  John Lezdey (and Attorney Douglas Rovens, who is before this Court having been admitted *pro hac vice*) shall dismiss without prejudice the Counterclaim which has been filed in U.S. District Court in California, and a certified copy of such dismissal is filed in this Court.

F.  John Lezdey is ordered to resign as attorney-in-fact for Sonoran and Protease Sciences, Inc. ("Protease") on all patents referred to in the 1993 Assignment, and to inform the U.S. PTO and European PTO and each and every foreign representative of that resignation and to inform each such representative that they are to report to and take instructions from Dr. Allan Wachter, the substitute attorney-in-fact, or his designee.  John Lezdey shall sign any documents necessary to accomplish the above and shall turn over all files related to the said patents.

**IT IS FURTHER ORDERED** that if John Lezdey has met the six conditions to purge his contempt as is set forth in Paragraphs A through F above on or before the date of his self-surrender to the Maricopa County Jail, he shall present an affidavit with supporting documents to this Court verifying, under oath or affirmation, that he has fully complied with these six conditions for the purging of his contempt.

**IT IS FURTHER ORDERED** that once these initial six conditions have been met, Defendant John Lezdey shall monthly submit an affidavit and supporting documents to this Court indicating that he has continued to make his monthly $50,000.00 purge payments.

**IT IS FURTHER ORDERED** that in complying with this Court's purge orders B through F, inclusive, John Lezdey, his attorneys, agents or assigns shall not take any steps to jeopardize the interests of Dr. Allan Wachter, Sonoran, Protease, or any licensees of Sonoran or Protease in any United States or foreign patents which are the subject matter of this litigation.

**IT IS FURTHER ORDERED** that John Lezdey shall fully cooperate with Dr. Wachter, Sonoran, Protease and their attorneys to do whatever is necessary to allow them to substitute patent agents or attorneys for purposes of defending or continuing to defend the patents of Sonoran, Protease and their licensees in any of the patents which are the subject matter of this litigation.

**IT IS FURTHER ORDERED** that Plaintiff Dr. Wachter and Defendant John Lezdey shall keep each other notified of any events or activities that they may become aware of that might adversely affect the rights of one another, Sonoran, Protease or their licensees in connection with these patents and the rights flowing therefrom so that all of the parties' interests in this intellectual property may be properly protected.

Docket Code 019                      Form V000A                           Page 4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 1999-009334                                           09/03/2003

This Court further finds that any interests that John Lezdey has in the patents, which are the subject matter of this litigation, is through his shareholder interests in Sonoran and Protease and he is reminded that he is not authorized to act on behalf of either of these companies without the express permission and consent of their respective Boards of Directors or orders of this Court.

Defendant's failure to purge his contempt or surrender by October 28, 2003 will result in the issuance of a warrant for his arrest.

**IT IS FURTHER ORDERED** signing this Minute Entry as a formal order of the Court.

FILED:  Exhibit Worksheet; Hearing Worksheet

ISSUED:  Order of Confinement; Self-Surrender Instructions


_____
JUDICIAL OFFICER OF THE SUPERIOR COURT

Docket Code 019                    Form V000A                    Page 5

The foregoing instrument is a full, true and correct copy of
the original on file in this office.

Attest _____Oct. 4,_____ 20_04_
MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By _____ Deputy

# EXHIBIT H

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARRIVA PHARMACEUTICALS, INC. fka ALPHAONE PHARMACEUTICALS, INC., a California corporation,

            Plaintiff,

  v.

SONORAN DESERT CHEMICALS, LLC, etc., et al.,

            Defendants.
_____/

AND RELATED COUNTERCLAIMS.
_____/

No. C 99-02169 SI

**ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' DECLARATORY RELIEF COUNTERCLAIM, CONDITIONED UPON PLAINTIFF's DISMISSAL OF CLAIMS**

      On June 23, 2006, the Court heard argument on plaintiff's motion to dismiss defendants' counterclaim for declaratory relief. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS plaintiff's motion for the reasons and on the conditions set forth below.

**BACKGROUND[1]**

**1.    Parties and factual history**

      This action arises from a dispute between two former business partners, Dr. Allan Wachter ("Wachter"), a medical doctor, and defendant John Lezdey ("Lezdey"), a patent attorney. In the early

_____

[1]Much of the factual history appears in both parties' moving papers and are therefore assumed to be uncontested. Citations are therefore provided only when a fact is disputed or appears only in the filings of one party.

United States District Court

For the Northern District of California

1990s, Wachter and Lezdey invented and jointly acquired patents for medical technologies related to the treatment of inflammation. In 1992, Wachter and Lezdey transferred their interests in the patents to defendant Sonoran Desert Chemicals Limited ("Sonoran"). Sonoran is 50% owned by Wachter through two holding companies, Nathan M. Technologies and Seth Chemicals, and 50% owned by Lezdey, also through two holding companies, J.L. Technology LP and J & D Science, Inc.

Shortly after forming Sonoran, Wachter and Lezdey formed Protease Sciences, Inc. ("Protease") and authorized Protease to serve as Sonoran's agent for, among other things, negotiating and entering into licensing agreements on behalf of Sonoran. Protease was originally owned 50% by Wachter and his family and 50% by Lezdey and his family. At the time, Wachter and Lezdey were Protease's sole board members. The identity of Protease's current owners and board members is a matter of dispute between Wachter and Lezdey. *See* Def. Counterclaim, ¶ 11; Decl. of Grant L. Kim In Support of Arriva's Motion to Dismiss ("Kim Decl."), Ex. 23, at 5-19.

On April 16, 1998, Protease entered into a purported License Agreement with plaintiff Arriva Pharmaceuticals, Inc. ("Arriva"),[2] then known as AlphaOne Pharmaceuticals, under which Protease granted Arriva exclusive license to utilize the Sonoran patents in specified medical fields. Pl. Compl. Ex.1. The validity of this Protease/Arriva license is the central disputed issue giving rise to this action. Wachter alone signed the agreement on behalf of Protease, but Arriva contends that Lezdey advised and approved the execution of the agreement. Pl. Compl. ¶ 13. Lezdey, on the other hand, alleges that the agreement was unlawfully executed without his knowledge or consent. Def. Counterclaim ¶ 19.

At some point following the execution of the Protease/Arriva license, Arriva entered into a sub-license with counter-Defendant Baxter Healthcare Corporation ("Baxter") that provided Baxter with specified rights to the patents. The validity of this sub-license is also disputed by Lezdey. Def. Compl. ¶ 23.

AlphaMed Pharmaceuticals ("AlphaMed") is the final relevant party to the dispute. AlphaMed was formed by Lezdey and his family in 1999. In the same year, AlphaMed purportedly received a license from Protease for its patents. Arriva alleges that the Protease/AlphaMed license is invalid and

---

[2]Arriva is owned by Wachter, Lezdey and others.

1  violates the terms of the Protease/Arriva exclusive licensing agreement.  Compl. ¶¶ 27-30.

2

3  **2.      This action: Filing and stay**

4        After Lezdey allegedly questioned the validity of the Protease/Arriva license and the

5  Arriva/Baxter sub-license in discussions with Arriva's board members, potential investors and business

6  partners, Arriva and Wachter filed multiple lawsuits, including this action.  In May 1999, Arriva filed

7  the complaint before this Court, naming seven defendants: Lezdey, Lezdey's two sons (Jarrett and

8  Darren Lezdey), Sonoran, Protease, and Lezdey's two holding companies, J&D Science and J.L.

9  Technology.[3] Shortly after the filing of this complaint, Wachter filed his own complaint in Arizona state

10  court, raising similar issues and naming the same seven defendants plus Lezdey's wife, Noreen.

11        After this Court denied Arriva's motion for a temporary restraining order, the parties agreed to

12  a stay of this federal action, pending the outcome of the related Arizona case.  In particular, the parties

13  noted that the Arizona court was adjudicating issues related to the ownership of Protease and to the

14  validity of actions taken by Protease with respect to Arriva, and that these issues could have a significant

15  impact on this action.  Kim Decl., Ex. 3, Joint Case Management Statement of December 2, 1999, at 2.

16  The stay took effect in December 1999.

17

18  **3.      Arizona court litigation:  Preliminary injunction[4]**

19        In February 2000, the Arizona state court, following an evidentiary hearing attended by Lezdey,

20  issued a preliminary injunction that prohibited Lezdey, his sons or either of his two holding companies

21  from "acting or speaking, or purporting to act or speak, on behalf of Protease or Sonoran without

22  Plaintiffs' [Wachter's] consent."  Kim Decl., Ex. 4, Preliminary Injunction of February 2, 2000, at 13.

23  The injunction also prohibited the defendants from contacting any of Arriva's potential business partners

24  and investors or otherwise interfering with Arriva's business operations. *Id.*

25  _____

26        [3]Arriva's complaint also includes employment-related causes of action against Lezdey's sons, who
   subsequently filed counterclaims against Arriva. Issues related to these causes of action are not the
27  subject of this motion and are therefore not discussed.

28        [4]This Court takes judicial notice of the Arizona court orders and pleadings.

3

United States District Court
For the Northern District of California

More importantly for this matter, the Arizona court issued extensive Findings of Fact along with its Order. These findings include:

- "Lezdey knew the material terms and conditions of the [Protease/Arriva] License Agreement, advised Wachter that the Agreement was valid, and approved Wachter's execution thereof." *Id.*, ¶ 41.

- The Protease/Arriva license is "valid and enforceable." *Id.*, ¶ 61

In November 2000, the Arizona Superior Court added to its finding through an amendment to the preliminary injunction. The court further found that the Protease/AlphaMed license was improperly created and that John Lezdey had testified untruthfully in his deposition regarding the AlphaMed license. Kim Decl., Ex.6, Amended Injunction, at 2-3. All other findings were confirmed. *Id.*

Lezdey and his sons did not appeal the Arizona court's preliminary injunction.

## 4.    Arizona court litigation: Permanent injunction

Following a series of delays, including an unsuccessful attempt by Lezdey to have the case removed to a federal court in Arizona, a bench trial took place in January 2002. The trial was not without its peculiarities. Despite repeated advance notice, neither Lezdey, his sons, his wife nor their counsel attended the trial.[5] In addition, in the month preceding the trial, the Arizona court had entered a liability judgment against Lezdey's sons as a sanction for their failure to appear for depositions. The trial against Lezdey's sons, therefore, was on the issue of damages only. Another factor complicating the trial was Lezdey's declaration of bankruptcy on the day immediately preceding the trial's commencement, thereby automatically staying the case against him. Notwithstanding these complications, the court conducted a bench trial against Lezdey's sons (on damages only), his wife Noreen and J.L. Technology.[6] The trial included multiple hours of witness testimony and the introduction of almost 300 exhibits. Kim Reply Decl., Ex. A, Tierney Affidavit, ¶ 21.

---

[5]Lezdey contends that ill health and financial difficulties prevented him and his family from attending the trial. The Arizona court rejected this argument. Kim Decl., Ex. 15 at 5.

[6]Lezdey's other holding company, J & D Science, was not a party to the trial, having also filed for bankruptcy in the week prior to trial.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    On February 22, 2002, the Arizona Court issued a final judgment against Lezdey's sons and J.L.

2    Technology.[7]  In addition to awarding Wachter $17.4 million in compensatory and punitive damages,

3    the court issued a permanent injunction against Lezdey's sons and J.L. Technology that mirrored its

4    preliminary injunction.  Moreover, the court found that the Protease/Arriva license was "valid and

5    enforceable" and remained "fully in effect."  Kim Decl., Ex. 8, Permanent Injunction, ¶¶ 38, 61.  The

6    court further found that John Lezdey had violated his fiduciary duty to Wachter, Protease, Sonoran and

7    Arriva by, among other things, preparing false documents and improperly interfering with Arriva's

8    business operations and prospective business partners.  Lastly, the court found the Protease/AlphaMed

9    license to be "wholly void and of no effect." Id., ¶ 72.

10    Lezdey's sons and J.L. Technology unsuccessfully appealed the Arizona judgment and

11    permanent injunction.

12    Although the validity of the Protease/Arriva license would appear to have been decided in the

13    Arizona litigation, defendants argue that this Court should discount the Arizona court's ruling for two

14    primary reasons.  First, as a result of the bankruptcy stay, John Lezdey was not a direct party to the

15    Arizona trial, the final judgment or the permanent injunction.[8]  Second, the judgment against Lezdey's

16    sons resulted from a discovery sanction and not from evidence produced at trial.  For these reasons,

17    defendants assert that Lezdey and his sons have not had an adequate opportunity to litigate the license

18    issue.

19

20    **5.    Arizona court litigation: Pending suit against John Lezdey**

21    In July 2002, the Bankruptcy Court lifted the automatic stay that had prevented Wachter from

22    pursuing his claims against Lezdey in the Arizona litigation.  As a result of numerous postponements,

23    a trial date has yet to be determined.  However, the Arizona court has scheduled a conference between

24    the parties and a newly assigned Superior Court judge on August 25, 2006 to schedule a trial date.  The

25

26    [7]The Arizona Superior Court also entered judgment against Lezdey's wife Noreen.  This
      judgment was vacated on appeal.
27

28    [8]Lezdey was, however, indirectly a party to the trial and its result as a co-owner of J.L.
      Technology LP.

5

parties' Pretrial Statement indicates that the validity of the Protease/Arriva license will once again be a central issue.[9]  Kim Reply Decl., Ex. D, Joint Pretrial Statement, filed June 21, 2004, at 12 (xiv)-(xv), 19 (xv)-(xxii).

**6.     Arizona court litigation: Contempt proceedings against John Lezdey**

Lezdey's relationship with the Arizona Superior Court has not been good.  He has been held in contempt of court on three separate occasions: first, in October 2000, for testifying untruthfully during his deposition and refusing to appear at a later deposition; second, in February 2002, for willfully violating the court's preliminary injunction by interfering with Arriva's business operations and acting on behalf of Protease without Wachter's consent; and in September 2003, for failing to pay previously imposed sanctions, for continuing to violate the preliminary injunction, and for repeatedly delaying the Arizona action through bad faith procedural actions.

In its final contempt order, the Arizona court specifically found that Lezdey's filing of the federal counterclaim in this case on behalf of Sonoran without Wachter's consent was a violation of the preliminary injunction and has ordered Lezdey to dismiss the Sonoran counterclaim in this court.

The Arizona contempt proceedings had one additional and important outcome.  In November 2004, as a sanction for Lezdey's continued disregard of the various contempt orders, the Arizona court dismissed with prejudice all of Lezdey's counterclaims against Wachter in the Arizona litigation. Lezdey and Sonoran rely heavily on this inability to bring a counterclaim in Arizona court in their opposition to the motion under consideration here.

**7.     Florida litigation:  AlphaMed v. Arriva**

In 2003, AlphaMed, the company controlled by Lezdey and his sons, filed a tort suit against Arriva in Florida federal court, claiming that Arriva had misappropriated trade secrets and engaged in unfair competition.  A trial resulted in a jury verdict in favor of AlphaMed.  However, on May 26, 2006, the Florida district court granted Arriva's motion for judgment as a matter of law.  AlphaMed has filed

---

[9]Whether Lezdey will be collaterally estopped from re-litigating the license validity issue is an open question.

6

United States District Court
For the Northern District of California

1  a notice of appeal.

2

3                                      **DISCUSSION**

4          Arriva seeks an order dismissing the declaratory relief counterclaim by defendants Lezdey and

5  Sonoran, on the grounds that the central issue in the counterclaim - the validity of the Protease/Arriva

6  license - is the subject of ongoing litigation in an Arizona state court, and that this Court's involvement

7  is therefore duplicative and unnecessary. Arriva argues alternatively that defendant Sonoran's

8  counterclaim should be dismissed because Sonoran lacks capacity to assert the counterclaim without

9  Wachter's consent.[10]

10

11  **1.    Dismissal of Lezdey and Sonoran's counterclaim based on the *Brillhart* factors**

12          Under the express terms of the Declaratory Judgment Act, the granting of declaratory relief by

13  a district court is discretionary. *See* 28 U.S.C.A. § 2201(a) (West 2006); *Cont'l Cas. Co. v. Robsac*

14  *Indus.*, 947 F.2d 1367, 1369 (9th Cir. 1991). Although a pending state action does not require a district

15  court to refuse declaratory relief jurisdiction, when the state action presents the same state law issues

16  as the federal action, "there exists a presumption that the entire suit should be heard in state court."

17  *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1366-67 (citing *Brillhart v. Excess Ins. Co.*, 316 U.S.

18  491, 495 (1942)).

19          Three primary factors govern a federal court's decision to grant declaratory relief jurisdiction

20  when a related action is pending in state court: (1) avoidance of duplicative litigation, (2) avoidance of

21  needlessly determining issues of state law, and (3) discouragement of forum shopping by either party.

22  *See Brillhart*, 316 U.S. at 495; *Robsac*, 947 F.2d at 1371; *Am. Nat'l Fire Ins. Co. v. Hungerford*, 53 F.3d

23  1012, 1016-19 (9th Cir. 1995), *overruled on other grounds, Gov't Employees Ins. v. Dizol*, 133 F.3d

24  1220, 1227 (9th Circ. 1998). An analysis of these factors may entail an inquiry into, among other

25  things, the scope of the state action, the availability of remedies and defenses, and the involvement of

26  _____

27          [10]Arriva represented in its moving papers that if the counterclaim is dismissed, Arriva will
withdraw its claims against Lezdey and Sonoran, as well as its claims against three related companies.
28  The discussion which follows is conditioned on Arriva's doing so.

7

1   necessary parties. *Brillhart*, 316 U.S. at 495.

2          Both parties agree that the validity of the Protease/Arriva license is "at the heart of this . . .

3   counterclaim for declaratory and injunctive relief." Kim. Decl., Ex. 21, at 3. Plaintiff Arriva therefore

4   argues that, because the license's validity has been and continues to be the subject of extensive litigation

5   in Arizona state court, retrying the issue in this Court would: (a) be duplicative and wasteful, (b) require

6   an unnecessary determination of state law, and (c) encourage defendant Lezdey's bad faith efforts to

7   forum shop and otherwise disrupt the Arizona litigation. Defendants Lezdey and Sonoran counter by

8   arguing that the validity of the license has not been extensively litigated in Arizona, that this Court is

9   better suited to decide the issue and that Arriva is the party guilty of forum shopping.

10

11   **A.     First *Brillhart* factor:  Duplicative litigation of license validity**

12          The Court concludes that the Protease/Arriva license issue has already been extensively litigated

13   in the Arizona court, and that any litigation in this court would be duplicative.  The license's validity

14   was a specific finding in the court's final judgment and permanent injunction against Lezdey's sons and

15   J.L. Technology and in its preliminary injunction order against Lezdey.  The preliminary injunction was

16   issued after a two-day evidentiary hearing in which both Lezdey and his counsel participated.  The final

17   judgment and permanent injunction followed a bench trial that included multiple hours of testimony and

18   the introduction of almost 300 exhibits. Kim Reply Decl., Ex. A, Tierney Affidavit, ¶ 21.  Moreover,

19   during the more than 7 years that the litigation has been pending in Arizona court, Lezdey and his

20   counsel have filed an answer and counterclaims, actively participated in discovery and submitted

21   numerous motions. Finally, to the extent that this history of litigation is insufficient, defendant Lezdey

22   will have the opportunity to once again litigate the license issue in the upcoming trial against him in

23   Arizona state court.

24          Defendants Lezdey and Sonoran argue that litigation of the license issue would not be

25   duplicative because plaintiff Arriva and counter-Defendant Baxter are not parties in the Arizona

26   litigation.  However, the Ninth Circuit has held that dismissal of a federal declaratory relief claim may

27   be warranted even when the parties to a related state court proceeding are not identical to those in the

28   federal action.  *See Am. Nat'l Fire Ins. Co. v. Hungerford*, 53 F.3d 1012, 1015 (9th Cir. 1995).  This

United States District Court
For the Northern District of California

8

United States District Court

For the Northern District of California

1    is particularly true when the state court has already developed a factual record and/or will effectively

2    decide the issue about which declaratory relief is sought. *See id.* at 1017. In *Hungerford*, an insurance

3    company filed a federal claim against one of its customers seeking a declaration of non-coverage. *Id.*

4    at 1015. The insured was involved in a related state court proceeding that shared many of the

5    underlying facts with the federal action. *Id.* However, the insurance company was "not a party to [the

6    California state] action and could not, under California law, have been joined as a party or had the issue

7    of insurance coverage heard in the California proceeding." *Id.* at 1016. Nonetheless, the Ninth Circuit

8    dismissed the insurance company's declaratory relief claim. *Id.* at 1019. The court held that the state

9    court was a more suitable forum for the insurance company's declaratory relief claim because the state

10   court had already developed an extensive factual record while the federal record was "barren." *Id.* at

11   1017. Trying the insurance company's claim in federal court would therefore "result in a waste of

12   federal resources at every level of the decision making process." *Id.* at 1018; *see also McGraw-Edison*

13   *Co. v. Performed Line Products Co.*, 362 F.2d 339, 344-345 (9th Cir. 1966) (dismissing defendant's

14   declaratory relief counterclaim on the grounds that the issue would be effectively decided in a related

15   Ohio District Court case even though defendant was not a party to the Ohio case and could not be bound

16   by its result).

17          With regard to the present action, the Arizona court has developed a much more extensive

18   factual record than this Court. The Arizona litigation has involved considerable discovery (in which

19   Lezdey and Sonoran have participated), multiple evidentiary hearings and a bench trial that resulted in

20   a lengthy findings of fact. The factual record before this Court is, on the other hand, essentially

21   "barren." *See Hungerford*, 53 F.3d at 1017. In addition, as discussed previously, the Protease/Arriva

22   license issue will be decided by the Arizona court even though Arriva and Baxter are not party to the

23   Arizona proceedings.          Defendants distinguish *Hungerford* by arguing that a key factor in the

24   *Hungerford* court's dismissal was the availability of declaratory relief in state court. *See Hungerford*,

25   53 F.3d at 1018. While the defendants in this case have admittedly been barred from bringing a

26   declaratory relief claim in the Arizona court, the remedy's unavailability is the result of defendant

27   Lezdey's contemptuous acts, not as a result of a procedural hurdle. In striking Lezdey's counterclaims,

28   Arizona Superior Court Judge Armstrong noted, "To protect and preserve the integrity of the judicial

9

1   system, Defendant [Lezdey] should not be permitted to press claims in the Court while openly defying

2   its authority." Declaration of John C. Steele in Support of Lezdey and Sonoran's Opposition ("Steele

3   Decl."), Ex. C, Superior Court of Arizona Order, at 2. Lezdey has not appealed this decision.

4   Furthermore, Lezdey's explanation for his behavior towards the Arizona court - that plaintiff Arriva and

5   Wachter are participating in a malicious scheme to bankrupt Lezdey and his family in which the Arizona

6   court is complicit - is unpersuasive. Def. Opposition at 7, 12.

7       Defendants also argue that, because the Arizona court's judgment against Lezdey's sons was the

8   result of a discovery sanction and not the result of evidence produced at trial, the license issue has not

9   actually been litigated in the Arizona court. This argument is flawed for two reasons. First, none of the

10   cases cited by either party requires that an issue have been *actually litigated* in state court. The cases

11   only require that the issue be the subject of *pending* state litigation. A well-developed factual record

12   in state court, not a final judgment, is the relevant factor. *See Hungerford*, 53 F.3d at 1016. Even

13   assuming that the defendants are correct and the rules of collateral estoppel will not prevent re-litigation

14   of the license's validity in this Court or the Arizona court, the validity of the Protease/Arriva license will

15   be a main issue in the pending Arizona trial against John Lezdey. Second, although Lezdey's sons were

16   the subject of the discovery sanction, another defendant in the 2002 Arizona trial and final judgment,

17   the Lezdey holding company J.L. Technology, had not been the subject of sanctions. The evidence

18   presented at trial was therefore necessary for a finding of its liability.

19       In summary, judicial economy would be best served by allowing the Arizona state court to

20   decide (to the extent it has not already decided) the Protease/Arriva license validity issue. The Arizona

21   court has already developed a factual record on the issue through a previous trial and related discovery

22   (in which defendants Lezdey and Sonoran have participated) and will continue to hear evidence and

23   argument on the issue in the upcoming trial of John Lezdey. Re-litigating the same issue in this Court

24   would therefore be unnecessarily duplicative.

25

26   **B.    Second *Brillhart* factor: Unnecessary determination of state law**

27       The Court also concludes that comity between this Court and the Arizona Superior Court

28   warrants denial of jurisdiction. The Supreme Court in *Brillhart* instructed that "gratuitous interference

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   with the orderly and comprehensive disposition of a state court litigation should be avoided." *Brillhart*,

2   316 U.S. at 495.  In *Hungerford*, the Ninth Circuit noted that even if declaratory judgment would help

3   clarify the legal issue pending before a state court, "such clarification would only come at the cost of

4   increasing friction between state and federal courts, and would constitute an improper encroachment

5   on state court jurisdiction." *Hungerford*, 53 F.3d at 1019.  The court was particularly concerned about

6   the risk that the state and federal courts might reach different conclusions when interpreting the same

7   facts.  *Id.* at 1019 n.7.  In *McGraw-Edison*, the Ninth Circuit concluded that "it is well settled . . . that

8   a declaratory judgment may be refused . . . where it is being sought merely to determine issues which

9   are involved in a case already pending and can be properly disposed of therein." *McGraw-Edison*, 362

10  F.2d at 343.  Finally, where "the sole basis of [federal] jurisdiction is diversity of citizenship, the federal

11  interest is at its nadir." *Robsac*, 947 F.2d at 1371.

12          Here, the sole basis for jurisdiction is diversity.  Second, as in *Hungerford* and *McGraw-Edison*,

13  the license issue is one of state, not federal, law.  Even if, as the defendants contend, the license issue

14  should be governed by California rather than Arizona law, it is nonetheless a state law issue.  Third,

15  because the validity of the Protease/Arriva license was a direct finding of the Arizona court in the 2002

16  trial and will be an issue in the upcoming trial, there exists the risk that this Court's ruling would

17  directly conflict with the Arizona court's ruling.  This is the precise risk that the *Hungerford* court

18  envisioned and consciously avoided.  Finally, from a pragmatic standpoint, the fact that significant

19  discovery and fact-finding have taken place in the Arizona court and not in this Court makes the Arizona

20  court a more suitable forum for resolution of the license issue.

21

22          **C.      Third *Brillhart* factor: Avoidance of forum shopping**

23          Finally, the Court finds that dismissal is warranted to avoid forum shopping by the defendants.

24  The parties agreed to stay this litigation to allow the Arizona suit to proceed; now, after obtaining

25  several adverse rulings in Arizona, defendants seek a more favorable forum.  The Ninth Circuit has

26  discouraged such opportunistic maneuvering.  *See Am. Casualty Co. v. Krieger*, 181 F.3d 1113, 1119

27  (9th Cir. 1999) (upholding district court's granting of declaratory relief on the grounds that it helped

28  prevent the defendants, who had lost several motions in federal court, from "wiping the slate clean and

starting this litigation anew in state court on the eve of their federal court trial.")

Defendant Lezdey has also been formally rebuked for forum shopping and other delay tactics by multiple courts. The Arizona District Court sternly reprimanded and sanctioned Lezdey for attempting a second removal of the state case to federal court. Kim Decl., Ex. 12 at 2:5. A Florida Bankrupty Court judge was equally direct; while dismissing a motion by Lezdey in 2003, Judge Timothy Corcoran noted that "it appears that this motion is just one more attempt by the debtor [Lezdey] to avoid or delay trial in the Arizona action by engaging in improper forum shopping . . . the debtor's conduct is even more egregious than was apparent in previous papers." Kim Decl., Ex. 11, Order Denying Debtor's Motion for Temporary or Preliminary Relief, at 20. Finally, in the last of its three contempt orders against Lezdey, the Arizona Superior Court specifically cited Lezdey's repeated, bad faith efforts to delay the Arizona trial through forum shopping. Kim Decl., Ex. 17, Order dated September 10, 2003 at 2, ¶ 6.

**2. Dismissal of Sonoran's counterclaim**

Arriva argues alternatively that Sonoran's counterclaim should be dismissed on the grounds that, by law, Sonoran lacks capacity to file the counterclaim because it does not have Wachter's authorization. This Court agrees.

Arriva argues that Sonoran, by the terms of its own Operating Agreement[11] and the rulings of the Arizona court, can only lawfully bring a counterclaim with the consent of Dr. Wachter. This authorization is, of course, lacking. The Sonoran Operating Agreement requires that Lezdey or Wachter get the consent of the other before acting on behalf of Sonoran, provided that either party supplies written notice that their consent is required. Kim Decl., Ex. 20, Sonoran Operating Agreement, at 3.1. Arriva contends that Wachter provided Lezdey with the required written notice when he filed various motions with the Arizona court requesting that Lezdey be prohibited from acting on behalf of Sonoran

[11] According to Federal Rule of Civil Procedure 17(b), Sonoran's capacity to sue is governed by Nevada law, the state of its incorporation. Under Nevada law, the decision to file a lawsuit must be made by members of the company in proportion to their capital contribution unless the corporation's operating agreement provides an alternate procedure, as is the case here. Nev. Rev. Stat §§ 86.281 and 86.291.

United States District Court

For the Northern District of California

1    without Wachter's consent.  Arriva further argues that the Arizona court's preliminary injunction, which

2    specifically prohibited Lezdey from acting for Sonoran without Wachter's consent, created a second

3    legal obligation.  This second obligation is reinforced by the fact that the Arizona court found Lezdey

4    to be in violation of the injunction when he filed this counterclaim on behalf of Sonoran - a decision that

5    Lezdey unsuccessfully attempted to appeal.

6           Defendants do not contest any of the above facts.  Instead, defendants argue that this Court

7    implicitly rejected the lack of capacity argument when it granted defendants leave to file their

8    counterclaims.  Providing leave to file a claim, however, is not a decision on that claim's merits.  In fact,

9    in a later order denying Lezdey's request for a TRO prohibiting enforcement of the Arizona injunction,

10   this Court noted that its decision to allow the counterclaims "was not intended to, and did not, express

11   any opinion concerning the validity of the Arizona injunction then in place against Mr. Lezdey." Kim

12   Reply Decl., Ex. E, Order Filed October 17, 2003.

13          Since Lezdey and Sonoran do not contest the key facts presented by Arriva, this Court concludes

14   that Sonoran lacks the capacity to sue without Wachter's consent.

15

16                                        **CONCLUSION**

17          For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiff's

18   motion to dismiss defendants' counterclaims for declaratory relief (Docket No. 129).[12]  This dismissal

19   is conditioned upon plaintiff filing a dismissal without prejudice of its claims against Lezdey, Sonoran

20   and the remaining defendants other than Lezdey's sons Jarrett and Darren within 7 days of the filing

21   date of this Order.  Following plaintiff's dismissal, the only claims remaining before this Court will be

22   Arriva's two employment-related causes of action against Darren and Jarrett Lezdey and Darren and

23   Jarrett Lezdey's counterclaims for back pay, breach of contract and other employment-related issues.

24   These remaining claims will be the subject of the parties' next case management conference, scheduled

25

26          [12]Since defendants' request for injunctive relief is derivative of its declaratory relief claim, that
     claim is likewise dismissed by this Order.  *See Golden Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750,
27   755 (holding that, when an action consists of a declaratory relief claim and a non-declaratory claim that
     is "wholly dependent upon a favorable decision" on the declaratory claim, the entire action is one for
28   declaratory relief).

United States District Court

For the Northern District of California

1    for July 28, 2006.

2

3        **IT IS SO ORDERED.**

4

5    Dated: July 5, 2006

6                                                SUSAN ILLSTON
7                                                United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

# EXHIBIT I

CLOSED CIVIL CASE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20078-CIV-ALTONAGA/Turnoff

FILED by ___ D.C.

MAY 2 6 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIA.

ALPHAMED  PHARMACEUTICALS
CORP.,

      Plaintiff,

vs.

ARRIVA  PHARMACEUTICALS, INC.;
and SPINELLI CORPORATION,

      Defendants.

_____/

### FINAL JUDGMENT

THIS CAUSE came before the Court on the Omnibus Order on Defendants' Post-Trial

Motions, which granted, *inter alia*, judgment as a matter of law for Defendants, Arriva

Pharmaceuticals, Inc. and Spinelli Corporation. Pursuant to Federal Rule of Civil Procedure 58, it

is **ORDERED AND ADJUDGED** that judgment is entered in favor of Defendants, Arriva

Pharmaceuticals, Inc. and Spinelli Corporation, and against Plaintiff, AlphaMed Pharmaceuticals

Corp.. Plaintiff shall take nothing from Defendants, and the action is **DISMISSED** on the merits.

The Court retains jurisdiction to consider the issue of attorney's fees and costs. The Clerk of the

Court is instructed to **CLOSE** the case, and all pending motions not otherwise ruled on are **DENIED**

**AS MOOT**.

DONE AND ORDERED in Chambers at Miami, Florida this 26 day of May, 2006.

*Cecilia M. Altonaga*

CECILIA M. ALTONAGA
UNITED STATES DISTRICT JUDGE

**EXHIBIT D**

CASE NO. 03-20078-CIV-ALTONAGA/Turnoff

Copies provided to:

Magistrate Judge William C. Turnoff
Counsel of record

-2-

**EXHIBIT J**

1   **CALLISTER & REYNOLDS**
    **MATTHEW Q. CALLISTER, ESQ.**
2   Bar Number 001396
3   **BROOKE A. BOHLKE, ESQ.**
    Bar Number 009374
4   823 South Las Vegas Boulevard
5   Las Vegas, Nevada 89101
    (702) 385-3343
6   Attorneys for Plaintiff JOHN LEZDEY; J.L.
    TECHNOLOGY, L.P., and JAMIE HOLDINGS, LLC
7

**FILED**

**JUN 14  11 52 AM '07**

CLERK OF THE COURT

8                          **DISTRICT COURT**

9              **CLARK COUNTY, NEVADA** A 5 42981

10  JOHN LEZDEY, an Individual; J.L.            CASE NO.:
    TECHNOLOGY, L.P., a Nevada limited          DEPT NO:    X I
11  partnership; JAMIE HOLDINGS, LLC,
                                                **COMPLAINT**
12          Plaintiffs,
                                                Causes of Action:
13  vs.                                             1)  Dissolution of Sonoran Desert Chemicals, LLC
                                                        and Protease Science, Inc.
14  ALAN WACHTER, an Individual; SUSAN              2)  Declaratory Relief
    WACHTER, an Individual; NATHAN M.               3)  Breach of Fiduciary Duty
15  TECHNOLOGIES LIMITED PARTNERSHIP,               4)  Injunctive Relief
    A Nevada limited partnership; SETH
16  CHEMICALS, INC., a Nevada corporation;
    ARRIVA PHARMACEUTICALS, INC. fka            **REQUEST FOR BUSINESS COURT**
17  ALPHAONE PHARMACEUTICALS,                   **CONCERNS DISPUTES REGARDING**
    INC., California corporation; PHILLIP       **CONTROL AND OPERATION OF ENTITIES**
18  BARR, an individual; SONORAN DESERT         **CREATED UNDER NRS CHAPTERS 78-88**
    CHEMICALS, L.L.C., a Nevada limited
19  liability corporation; PROTEASE
    SCIENCE, INC., a Nevada corporation; and    **Exempt From Arbitration**
20  and Does 1 through 10,                       (Pursuant to NAR 3(A) Complaint seeks
                                                Declaratory Relief)
21          Defendants.

22

23

24

25

26

27

28

-1-

1    Plaintiffs, John Lezdey ("Lezdey"), J.L. Technology, L.P. ("JLT"), and

2   Jamie Holdings, LLC ("Jamie") (collectively "Plaintiffs") for their causes of action

3   against defendants, Allan Wachter and Susan Wachter (collectively "Wachter"), Nathan

4   M. Technologies Limited Partnership ("Nathan"), Seth Chemicals, Inc. ("Seth"), Arriva

5   Pharmaceuticals, Inc. ("Arriva"), Phillip Barr ("Barr"), Sonoran Desert Chemicals L.L.C.

6   ("Sonoran"), and Protease Science, Inc. ("Protease") (sometimes collectively

7   "Defendants") hereby complain and allege as follows:

## REQUEST TO ASSIGN CASE AS BUSINESS MATTER

9

10    1.    This case concerns control, operation, and governance of the Firm, which is

11   an entity created under NRS Chapters 78-88.

12    2.    As such, this case constitutes a business matter under EDCR 1.61(a)(1).

13    3.    Accordingly, Plaintiff requests this case be assigned as a business matter

14   under EDCR 1.61(c).

## THE PARTIES

16    4.    Plaintiff Lezdey is a chemist and patent attorney residing in Florida.  Lezdey

17   is the named inventor, owner, and author of the original patent application for alpha1-

18   antitrypsin ("AAT"), the compound that is at issue in this litigation.

19    5..   Plaintiff JLT is a Nevada limited partnership of which Lezdey is a partner.

20   JLT owns fifty percent (50%) of defendant Sonoran.

21    6.    Plaintiff Jamie is a Florida limited liability company of which Lezdey is an

22   owner.  Certain assets, including Lezdey's interest in Protease and Sonoran and interest in

23   the various patents that are the subject of this action, are owned by Jamie.

24    7.    Defendant Allan Wachter is an individual and through various entities is a

25   joint venture partner with Lezdey in Sonoran and Protease.

26

27

28

- 2 -

8.     Defendant Susan Wachter is Allan Wachter's spouse and has an interest in defendants Sonoran and Protease as a result of her marital interest in certain Wachter entities.

9.     Defendant Nathan is a Nevada limited liability company that was formed by Wachter and of which Plaintiffs are informed and believe and based thereon allege Wachter has a controlling interest.

10.     Defendant Seth is a Nevada corporation that was formed by Wachter and of which Plaintiffs are informed and believe and based thereon allege Wachter has a controlling interest.

11.     Defendant Sonoran is a Nevada limited liability company that was formed by Lezdey and Wachter as a holding company for patents and other intellectual property developed by them.

12.     Defendant Protease is a Nevada corporation that was formed by Lezdey and Wachter to act as agent for Sonoran with respect to licensing Sonoran's patents, subject to the approval of Sonoran.

13.     Defendant Arriva is a California corporation with its principal place of business in Alameda County, California. Arriva has conspired with Wachter to breach Wachter's fiduciary duties to Lezdey, including actively participating with Wachter to destroy the value of Sonoran and Protease, as alleged more fully below.

14.     Defendant Barr is an individual and at all relevant times was an officer, director, and shareholder of Arriva. Barr has conspired with Wachter to breach Wachter's fiduciary duties to Lezdey, including actively participating with Wachter to destroy the value of Sonoran and Protease, as alleged more fully below.

15.     Venue is proper in Clark County, Nevada pursuant to N.R.S. 13.040.

16.     The District Court in the State of Nevada, County of Clark, has personal jurisdiction and subject matter jurisdiction to hear this matter.

- 3 -

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

17.     Lezdey graduated from Rutgers University in 1953 with a degree in Chemistry. After graduation he began work as a research chemist for Bristol Myers Squibb. Lezdey graduated from Brooklyn law school in 1962 and completed an LLM in patent law at Georgetown University in 1972. For over thirty (30) years, Lezdey was involved in the preparation and prosecution of pharmaceutical patents for others. Lezdey is the named inventor in approximately twenty (20) patents.

18.     In or around 1986 Lezdey met Wachter, at the time a thirty (30) year-old medical doctor and research fellow. Wachter was referred to Lezdey in connection with some research on a protein called Alpha1-antichymotrypsin ("ACT"), which he was conducting for the University of Pennsylvania. Wachter's ACT research was the property of the University. Even so, Wachter wanted to pursue ACT commercially.

19.     In or around 1986 or 1987, while working with Wachter on ACT, Lezdey discovered a use for AAT, a related, but what ultimately turned out to be a far more useful compound, to treat diseases associated with inflammation, including emphysema, asthma, cystic fibrosis, psoriasis, and many other indications. At the time, Wachter did not want to pursue AAT, instead continuing his work with ACT. Lezdey recognized the value of AAT and filed a patent application for AAT. Also, Lezdey recognized and believed that a partnership with a medical doctor in connection with the development, FDA approval, and marketing of AAT would be useful. Therefore, even though Wachter initially was not interested in pursuing AAT with Lezdey, in order to cement and develop a long-term relationship with Wachter, Lezdey prepared patent applications and obtained several patents related to AAT and its potential applications in his and Wachter's names as joint inventors, and Lezdey voluntarily abandoned his original AAT patent application.

-4-

20.    In the early 1990's Lezdey and Wachter formed Sonoran and Protease

Sonoran was formed as a holding company for Lezdey's and Wachter's valuable

intellectual property rights, including the AAT patents. Lezdey and Wachter assigned to

Sonoran all of their right, title, and interest in and to the AAT related patents for the

United States. Outside of the United States the patents remained in the names of Lezdey

and Wachter as inventors. Sonoran is indirectly owned by Lezdey and Wachter. Sonoran

is owned 50% by JLT, and 50% by Nathan. Lezdey is the President and primary

shareholder of J&D Science, which is the general partner of JLT (collectively the "Lezdey

Entities"). Wachter is the President and primary shareholder of Seth, which is the general

partner of Nathan (collectively the "Wachter Entities"). At all relevant times, JLT has

been the Managing Member of Sonoran.

21.    Protease is owned by Wachter and Lezdey. The Bylaws of Protease provide

that only "[t]he President shall execute on behalf of the corporation, and may affix the

corporate seal or cause it to be affixed to all instruments requiring such execution."

22.    On or around December 31, 1992, Sonoran entered into an agreement with

Protease whereby Protease was appointed as Sonoran's agent for purposes of:

(1) engaging in continued research and clinical study activities relating to AAT and

related products; (2) seeking administrative and regulatory approval for distribution and

use of AAT and related products; and (3) negotiating and entering into licensing,

distribution, and other agreements for and on behalf of Sonoran worldwide (the "Protease

Agency Agreement"). The Protease Agency Agreement specifically provided, however,

that Sonoran retained all rights to the patents:

- 5 -

1    In acting under this Agreement, Protease is acting solely as

2    the agent of Sonoran. Protease shall have no authority to

3    engage in any transaction that would effect the sale, transfer,

4    or encumbrance of any of the rights of Sonoran with respect

5    to the Patents. . . . All proprietary rights in the Patents, the

6    Drug (AAT) and the Related Products, and any additional

7    patents or product hereafter obtained or developed shall

8    belong to Sonoran.

9    Further, the Protease Agency Agreement expressly provided that any licensing agreement

10    entered into by Protease had to be ratified by Sonoran.

11    The obligations, duties, and authority of Protease pursuant to

12    this Agreement shall include the following:

13    *    *    *

14    The procurement of licensing, distribution, and/or marketing

15    or related agreements with third parties worldwide relating to

16    the Patents and related technology, the Drug, and the Related

17    Products, subject to the ratification by Sonoran; . . .

18

19    23.    Also, in 1997 Arriva (then known as AlphaOne Pharmaceuticals, Inc.) was

20    incorporated in California with the expectation of becoming the manufacturer of yeast-

21    based AAT under a license agreement with Sonoran once specified funding requirements

22    had been met. At the time of incorporation, Protease owned a majority of the vested

23    shares of Arriva. From the outset, Protease was to maintain a controlling interest in

24    Arriva. Lezdey, individually, owned and continues to own 30,000 shares of Arriva stock.

25

26

27

28

- 6 -

JUN-25-2007  15:53        CALLISTER & REYNOLDS                3B57743      P.009

24.     In November 1997 Arriva and Protease, as Sonoran's agent, signed a
Term Sheet (essentially a limited license), which outlined the terms of a proposed license
agreement whereby Arriva would obtain the exclusive, worldwide license, with the right
to sublicense with the prior consent of Protease and Sonoran, the right to make, use and
sell products using yeast-derivative AAT pursuant to the Sonoran patents to treat various
diseases and medical conditions.  In return, Protease was to receive:  2,000,000 shares of
Arriva stock, which was to represent 40% of the outstanding shares of the company on a
fully diluted basis; milestone payments consisting of thirty percent (30%) gross of all
milestone funds raised by Arriva; and a 6% royalty on all sublicenses.  The purpose of the
Term Sheet was to give Arriva the opportunity to raise capital for research and
development and obtain FDA approval of AAT and its various uses.  In order to move
forward with an exclusive, worldwide license agreement, Arriva was required to meet
express financial milestones set forth in the Term Sheet and related letter agreement.
Specifically, Arriva was required to raise $4 million to fund its operations, the first $2
million having to be raised within one year.  The term sheet was to remain in effect for a
period of one year and was signed by Lezdey as President of Protease.

25.     During the spring of 1998 Arriva and Protease began negotiating the terms
of a proposed license agreement as contemplated by the Term Sheet that would be
executed provided the financial requirements were met and all other terms and conditions
were satisfactory to Lezdey and Sonoran.  As a result of differences over the terms of the
proposed agreement and Arriva's failure to raise the required capital, Lezdey consistently
refused to enter into any license agreement with Arriva on behalf of Sonoran.

26.     Between April 22 and May 6, 1998, the parties renegotiated material terms
of the Term Sheet to provide that Protease would receive 1,000,000 additional shares of
Arriva stock (for a total of 3,000,000 shares) in consideration for a reduction in the royalty
percentage from six percent (6%) to three percent (3%) of Gross Sales.

- 7 -

27.    In November 1998 Lezdey on behalf of Protease agreed to extend the Term Sheet for an additional thirty (30) days, through December 31, 1998, based on representations that Arriva was close to obtaining the required financing. The funding, however, was never achieved and the Term Sheet expired on December 31, 1998.

28.    Plaintiffs are informed and believe and based thereon allege that during 1998, however, and unbeknownst to Lezdey, Arriva bribed and convinced Wachter, who was an Arriva officer and board member at the time, to sign a draft of the proposed license agreement, dated April 16, 1998. Upon information and belief, Arriva agreed to pay Wachter a twelve percent (12%) royalty on asthma indications, potentially worth tens of millions of dollars, or more, in consideration for signing the draft license agreement. Additionally, Arriva agreed to pay Wachter a substantial annual salary and benefits. Wachter had no authority, whatsoever, to sign the agreement on behalf of Protease. The Bylaws of Protease expressly specify that the President plus the Secretary (two officers) must execute contracts on behalf of the company; a security feature put in place to avoid the type of fraud and corporate abuse committed here. This limitation on Wachter's authority was known to Arriva and to its officers and board members, including Barr (as found by a federal court jury as allege more fully below).

29.    The invalid license agreement signed by Wachter purported to give Arriva an exclusive worldwide right and license under the AAT patents to make, use, offer to sell, sell and import products relating to the AAT patents. As set forth above, Protease did not have the ability to convey any interest in the AAT patents because all right, title and interest in the patents was owned by Sonoran for the United States and by Lezdey and Wachter, individually, throughout the rest of the world. Furthermore, as Arriva knew, Sonoran and Lezdey had to approve any licensing agreement entered into by Protease. Arriva did not seek or obtain Sonoran's consent to the alleged licensing agreement with Protease and knew that Lezdey did not approve or ratify the agreement on Sonoran's behalf.

- 8 -

1    30.    On or about March 16, 1999, during a telephone conference with Arriva,

2    including certain of its board members and other, Lezdey suffered a stroke and was

3    hospitalized.  Seizing the opportunity to wrest control of Arriva away from Protease

4    (which held a controlling interest at that time) and its president, Lezdey, Arriva held an

5    unscheduled and illegal board meeting on March 17, 1999.  During the meeting, the board

6    members purported to ratify minutes from a prior board meeting alleged to have taken

7    place on New Years Day 1999.  This January 1, 1999, phantom meeting never occurred.

8    The "newly formed" board approved the election of a new Chief Executive Officer and

9    removed Lezdey as Chairman of the Board, thereby violating Arriva's Bylaws, which

10   required that Protease fill two seats on Arriva's board of directors.

11   31.    In or around July 1999, based on the unauthorized Protease/Arriva license

12   agreement, Arriva improperly entered into a purported sublicense agreement with Baxter

13   Healthcare for the worldwide right to make, use and sell AAT.  Arriva failed to obtain the

14   required consent and approval of Protease or Sonoran to enter into the agreement.  Lezdey

15   and Sonoran are informed and believe and based thereon allege that Baxter paid more than

16   $20 million in up-front fees to Arriva pursuant to the purported license agreement, none of

17   which has been paid to Protease or Sonoran.  Moreover, Arriva has raised significant

18   additional funds from other investors, lead by MPM Capital L.P., a biotech venture capital

19   firm, and entered into sublicensing agreements with Prometic, a Canadian company, a

20   portion of which is due and owing to Protease on Sonoran's behalf.

21   32.    Protease informed Baxter that Arriva did not have rights to the AAT patents

22   or any license under which to issue a sub-license.  In response, Arriva filed or

23   sponsored multiple lawsuits in different states against Plaintiffs.  Arriva funded Wachter's

24   litigation efforts against Plaintiffs, including a suit in Arizona, which resulted in a

25   preliminary injunction against Lezdey pursuant to which Lezdey can not act on behalf of

26   defendants Sonoran or Protease without defendant Wachter's agreement and approval.  As

27   a result, there is a deadlock and because of Wachter's conflict of interest, as more fully

28   detailed below, Sonoran and Protease have not generated any income to Lezdey or to the

- 9 -

1  Lezdey Entities, and Wachter's actions and failure to act have resulted in substantial

2  damages to Plaintiffs.

3         33.    After Lezdey was improperly ousted from Arriva and sued by Wachter and

4  Arriva, Lezdey's sons, who had been instrumental in business development for Arriva and

5  were Arriva employees pursuant to employment agreements with Arriva, also were

6  terminated by Arriva and sued by Wachter and Arriva. As a result, Lezdey's sons formed

7  a company called AlphaMed Pharmaceuticals Corporation ("AlphaMed") to compete with

8  Arriva for the lucrative AAT market. AlphaMed, however, focused on a strain of yeast

9  different than that which Arriva was using for research and development of AAT.

10  Moreover, because of the pending lawsuits filed by Arriva and Wachter against the

11  Lezdey family, AlphaMed was careful to avoid any claimed rights by Arriva under the

12  unauthorized Protease/Arriva license agreement even though Lezdey and AlphaMed knew

13  it was unauthorized.

14        34.    Ultimately, AlphaMed filed a lawsuit against Arriva in the United States

15  District Court for the Southern District of Florida ("Florida Federal Court Case"), which

16  was tried to a jury and resulted in a jury verdict in favor of AlphaMed against Arriva for

17  $78 million, including $30 million in punitive damages. One of the factual findings that

18  the jury made in a special verdict was that Arriva knew that the purported Protease/Arriva

19  license was unauthorized and that by operating its business pursuant to the unauthorized

20  license, Arriva engaged in unfair competition against AlphaMed.[1]  (A true and correct

21  copy of the Jury's verdicts are attached hereto as Exhibit A.)

22        35.    With respect to the other lawsuits that were filed by Arriva and Wachter

23  against Lezdey, his sons, his wife, and the Lezdey Entities, as noted above, an Arizona

24  state court judge had entered a preliminary injunction against Lezdey such that he could

25  not make any decisions or take any actions with respect to Sonoran or Protease without

26  Wachter's agreement. As a result, because Wachter could, did, and continues to block any

27

28  _____
   [1] The final judgment currently is on appeal to the 11th Circuit. The district court entered judgment against the jury's
   verdict ruling that AlphaMed could not recover lost profit damages because it was a start up company, but left
   undisturbed all of the factual findings of the jury, including that the purported Protease/Arriva license was
   unauthorized.

1  and all actions of Sonoran and Protease to protect their interests and business, and because

2  Wachter had a clear conflict of interest between the rights and interests of Sonoran and

3  Protease, on one hand, and Arriva, on the other hand, Lezdey and his entities have earned

4  nothing from the business of Sonoran and Protease. In addition, Wachter's conduct,

5  conspiring with Arriva and Barr, has resulted in Sonoran losing valuable patents and other

6  rights. Wachter has refused to protect Sonoran's and Protease's rights as requested by

7  Lezdey, but instead has acted for Arriva's benefit to Lezdey's, Sonoran's and Protease's

8  detriment.

9      a.  Wachter, with the knowledge and consent of Arriva and Barr, and of other

10      members of Arriva's board of directors, consistently has refused to

11      authorize payment by Protease of necessary fees to maintain Sonoran

12      patents thereby allowing patents to lapse, the result of which is that Arriva is

13      not constrained by the Sonoran patents and will not have to pay Sonoran or

14      Protease;

15      b.  Wachter, with the knowledge and consent of Arriva and Barr, and of other

16      members of Arriva's board of directors, refused to execute a license

17      agreement with Amgen relating to SLPI, which resulted in the loss of

18      revenue to Plaintiffs;

19      c.  Wachter, with the knowledge and consent of Arriva and Barr, and of other

20      members of Arriva's board of directors, caused the Lezdey/Wachter patents

21      held individually by them outside of the United States to be assigned to

22      Sonoran/Protease without Lezdey's knowledge or consent;

23      d.  Wachter's, Arriva's, Barr's, and other members of Arriva's board of

24      director's actions and inactions, without Lezdey's consent, have resulted in

25      the loss of valuable patent rights outside of the United States;

26      e.  Wachter has failed and refused to require Arriva to provide information

27      concerning its purported commercialization efforts for AAT under the

28      unauthorized Protease/Arriva license agreement even though it provides that

- 11 -

1    Arriva must do so and Lezdey has requested that Wachter agree with

2    Lezdey to demand that Arriva provide such information;

3    f.    Wachter has failed and refused to terminate the purported Protease/Arriva

4    license agreement for Arriva's failing to take reasonable steps to

5    commercialize AAT and has produced no income, whatsoever, to Sonoran

6    and Protease, even though Lezdey has demanded that Wachter agree with

7    Lezdey to do so, and even after Arriva's officers testified in the Federal

8    Court Action that Arriva has abandoned its AAT program; and

9    g.    Wachter and Barr (and Plaintiffs are informed and believe, with the

10    knowledge and consent of the remaining members of Arriva's board of

11    directors), authorized spying, computer hacking, burglaries, wrongfully

12    obtaining financial records and telephone records, including hiring an

13    unlicensed private investigator to do so, theft of documents from Lezdey's

14    law offices (including recently stealing a file cabinet containing patent

15    applications and other important documents), and theft of trade secret

16    information, including drafts of patent applications, financial information,

17    telephone records, and other private, proprietary, privileged, and

18    confidential information, and used such wrongfully obtained information to

19    Plaintiffs' detriment and to Arriva's benefit (as found by the Jury in the

20    Federal Court Action.

21

22                        **FIRST CLAIM FOR RELIEF**

23              **(Against All Defendants Except Arriva and Barr**

24                  **for Dissolution of Sonoran & Protease)**

25        36.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through

26    36 above.

27

28    _____

                            - 12 -

37.     Wachter has a conflict of interest between his duties toward Sonoran and Protease, on one hand, and his interest in Arriva, on the other hand.

38.     Wachter has consistently sided with Arriva against the interests of Sonoran and Protease.

39.     Wachter consistently has refused to join with Lezdey to take action to protect the rights and interests of Sonoran and Protease.

40.     Wachter has failed and refused to enforce the rights of Sonoran and Protease to payment of funds (required pursuant to the unauthorized Protease/Arriva license Agreement) from Arriva's joint venture partners and licensees, including Baxter Heath Care and Prometic.

41.     Because of the preliminary injunction issued by the Arizona court, Lezdey can not act on behalf of Sonoran or Protease without Wachter's agreement and consent. Wachter has refused and continues to refuse to agree to take any action to benefit Sonoran and Protease. Wachter has sued Lezdey, and has sided and supported Arriva in suits against Lezdey. Wachter continues to allow Arriva to operate pursuant to the Protease/Arriva license, which he knows is unauthorized as found by the jury in the Federal Court Action. Therefore, irreconcilable differences exist between Lezdey and Wachter relating to the business and operation of Sonoran and Protease and a deadlock situation exists because of the preliminary injunction. As a result, Lezdey has lost control of his patents and other valuable rights, and continues to lose valuable patent rights and income.

42.     By dissolving Sonoran and Protease, Lezdey and Wachter each will separately have the right to deal with the Sonoran patents as joint inventors as they deem appropriate. Therefore, Plaintiffs seek an order dissolving Sonoran and Protease.

43.     That as an actual and proximate cause of Defendants' conduct Plaintiff has suffered monetary damages in excess of $10,000 and additionally suffered damages in the form of lost economic opportunity.

1    44. Defendants' actions have proximately caused Plaintiff to incur attorney fees and

2    Defendants should be required to pay reasonable attorneys fees to Plaintiff therefor as

3    special damages under *Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev.

4    948 (2001).

5

6                              **SECOND CLAIM FOR RELIEF**

7                        **(Against All Defendants for Declaratory Relief)**

8        45.      Plaintiffs reallege and incorporate herein by reference paragraphs 1 through

9    45 above.

10       46.      An actual controversy has arisen and now exists between Plaintiffs, on one

11   hand, and Defendants, on the other hand, concerning the parties' respective rights to the

12   AAT patents and related rights, and the validity of the purported Protease/Arriva license

13   agreement.

14       47.      Plaintiffs contend that the Protease/Arriva license agreement is invalid and

15   of no force and effect because it was not signed or authorized by Lezdey as the President

16   of Protease who was required to execute agreements to bind the company and was not

17   signed by two officers (as found by the jury in the Florida Federal Court Case). Plaintiffs

18   further contend that the agreement is invalid because Protease did not have any right, title,

19   or interest in the AAT patents and related rights, and did not obtain Sonoran's approval to

20   enter into a license agreement with Arriva.

21       48.      Plaintiffs also contend that Defendants' transfer of Lezdey's patents outside

22   of the United States from Lezdey and Wachter, individually, to Sonoran and/or Protease is

23   invalid and of no force and effect because Lezdey did not informed of any such transfer

24   and did not authorize that his patents be transferred.

25       49.      Plaintiffs further contend that any agreements based on the unauthorized

26   Protease/Arriva license likewise are invalid, as Arriva had no right in the AAT patents, or

27   related rights, to sublicense.

28

- 14 -

50.    Plaintiffs further contend that even if the alleged Protease/Arriva license agreement is valid, which they contend it is not, that Arriva breached material terms of said agreement and it was terminated by Sonoran/Protease and is no longer of any force or effect.

51.    Plaintiffs are informed and believe and based thereon allege that Defendants contend to the contrary, instead contending that the purported Protease/Arriva license agreement, and any and all sublicenses derived therefrom are valid and enforceable and the transfer of Lezdey's patents outside of the United States to Sonoran and/or Protease also was valid.

52.    Plaintiffs desire a judicial declaration as to their rights, duties and obligations with respect to the AAT patents and the purported Protease/Arriva license agreement and any sublicense agreements derived therefrom, upon dissolution of Sonoran and Protease.

53.    As an actual and proximate cause of Defendants' conduct Plaintiff has suffered monetary damages in excess of $10,000 and additionally suffered damages in the form of lost economic opportunity.

54.    Defendants' actions have proximately caused Plaintiff to incur attorney fees and Defendants should be required to pay reasonable attorneys fees to Plaintiff therefor as special damages under *Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948 (2001).

## THIRD CLAIM FOR RELIEF

### (Against Defendants Wachter, Arriva, and Barr

### For Breach of Fiduciary Duty)

55.    Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 55 above.

- 15 -

56.     By engaging in the conduct and failing to act as set forth above, the Wachter Defendants have breached their fiduciary duty as a de facto controlling members of Sonoran and Protease and as a result Plaintiffs have been damaged.

57.     Arriva and Barr have conspired with, and aided and abetted the Wachter Defendants in breaching their fiduciary duty to Plaintiffs.

58.     As a direct and proximate result of the Wachter Defendants' breach of fiduciary duty and Arriva's and Barr's complicity in the Wachter Defendants' breach of fiduciary duty, Plaintiffs have been damaged in an amount that currently is unknown, but which will be proven at trial.

59.     The Wachter Defendants', Arriva's, and Barr's conduct was willful, fraudulent, reprehensible, and malicious and as a result, Plaintiffs are entitled to exemplary and punitive damages against the Wachter Defendants, Arriva, and Barr in an amount sufficient to punish them and to deter them, and others, from engaging in such wrongful conduct in the future.

60.     As an actual and proximate cause of Defendants' conduct Plaintiff has suffered monetary damages in excess of $10,000 and additionally suffered damages in the form of lost economic opportunity.

61.     Defendants' actions have proximately caused Plaintiff to incur attorney fees and Defendants should be required to pay reasonable attorneys fees to Plaintiff therefor as special damages under *Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948 (2001).

## FOURTH CLAIM FOR RELIEF

### (Against All Defendants for an Injunction)

62.     Plaintiffs reallege and incorporate herein by reference paragraphs 1 through 62 above.

63.   Plaintiffs have no adequate remedy at law for Defendants' continuing wrongful conduct in that failure to enjoin Defendants from continuing to operate pursuant to the unauthorized Protease/Arriva license will result in the loss of Plaintiffs' rights to control their valuable AAT patents, and related rights.

64.   Therefore, Plaintiffs seek a permanent injunction against Defendants, and each of them, and their agents, servants, or employees, and anyone acting by or through them, from continuing to claim any right, title to, or interest in any patents or other rights under the unauthorized Protease/Arriva license.

65.   As an actual and proximate cause of Defendants' conduct Plaintiff has suffered monetary damages in excess of $10,000 and additionally suffered damages in the form of lost economic opportunity.

66.   Defendants' actions have proximately caused Plaintiff to incur attorney fees and Defendants should be required to pay reasonable attorneys fees to Plaintiff therefor as special damages under *Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948 (2001).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief against Defendants:

1. On the First Claim for Relief, for an order dissolving Sonoran and Protease pursuant to NRS 86.495 and NRS 78.260.

2. On the Second Claim for Relief, for a declaration that the purported Protease/Arriva license agreement is invalid and of no force and effect;

3. On the Third Claim for Relief, for damages in an amount to be proven at trial and for exemplary and punitive damages;

4. On the Fourth Claim for Relief, for a permanent injunction against Defendants, and each of them, and all of their agents, officers, directors, employees, and

- 17 -

1   all others acting on its behalf, or in concert with it, from asserting any rights, whatsoever,

2   in the patents, or other rights, that are the subject of the purported Protease/Arriva license

3   agreement, or any other purported agreement between Protease and Arriva, or Arriva and

4   any third party in connection with patent rights, or related rights that are the subject of the

5   unauthorized Protease/Arriva license; and

6       5. For such other and further relief as the Court deems just and proper.

7

8   DATED: June 11, 2007

9

10  By:

11      MATTHEW Q. CALLISTER, ESQ.
        Bar No. 001396

11      BROOKE A. BOHLKE, ESQ.

12      Bar No. 009774
        823 South Las Vegas Boulevard

13      Las Vegas, Nevada 89101
        Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -

JUN-25-2007  16:00      CALLISTER & REYNOLDS                3867743      P.021

1

DMD
MATTHEW Q. CALLISTER, ESQ.
Nevada Bar No. 001396
BROOKE A. BOHLKE, ESQ.
Nevada Bar No. 009374
CALLISTER & REYNOLDS
823 Las Vegas Boulevard South
Las Vegas, NV 89101
(702) 385-3343
Attorneys for Plaintiffs

**FILED**

JUN 14  11 53 AM '07

CLERK OF THE COURT

2

3

4

5

6

7

8

9

### DISTRICT COURT

### CLARK COUNTY, NEVADA

10

11

12

JOHN LEZDEY, an Individual; J.L.
TECHNOLOGY, L.P., a Nevada limited
partnership; JAMIE HOLDINGS, LLC,

Case No.  **A542981**

Dept. No.  **XI**

13

                    Plaintiffs,

14

         v.

**DEMAND FOR JURY TRIAL**

15

16

17

18

19

20

21

22

ALAN WACHTER, an Individual; SUSAN
WACHTER, an Individual; NATHAN M.
TECHNOLOGIES LIMITED PARTNERSHIP, A
Nevada limited partnership; SETH
CHEMICALS, INC., a Nevada corporation;
ARRIVA PHARMACEUTICALS, INC.
fka ALPHAONE PHARMACEUTICALS,
INC., California corporation; PHILLIP
BARR, an individual; SONORAN DESERT
CHEMICALS, L.L.C., a Nevada limited
liability corporation; PROTEASE
SCIENCE, INC., a Nevada corporation;
and Does 1 through 10,

23

24

                    Defendants.

25

26

AND ALL RELATED MATTERS....

27

28

Law Offices of
Callister & Reynolds
823 Las Vegas Blvd.
South
Las Vegas, Nevada
89101
(702) 385-3343

7:\Lezdey v. Wachter\Pleadings\DemandForJuryTrial.wpd

P.4

TO:    CLERK OF THE ABOVE ENTITLED COURT:

Plaintiffs, by and through their undersigned counsel, pursuant to NRCP 38(b), hereby demands that a trial of the above-entitled action be heard before a Jury.

DATED this __12__ day of June, 2007.

CALLISTER & REYNOLDS

MATTHEW Q. CALLISTER, ESQ.
Nevada Bar No. 001396
BROOKE A. BOHLKE, ESQ.
Nevada Bar No. 009374
823 Las Vegas Blvd., South
Las Vegas, Nevada 89101
(702) 385-3343
Attorneys for Plaintiffs

Law Offices of
Callister & Reynolds
823 Las Vegas Blvd.,
South
Las Vegas, Nevada
89101
(702) 385-3343

2

T:\Lesley v. Wackler\Pleadings\Demand for Jury Trial.wpd

TOTAL P.022

JUN-27-2007  13:06    CALLISTER & REYNOLDS                    3857743    P.002

1  MATTHEW Q. CALLISTER, ESQ.                    FILED
   Nevada Bar No. 001396
2  BROOKE A. BOHLKE, ESQ.                    Jun 03   4 03 AM '07
   Nevada Bar No. 009374
3  CALLISTER & REYNOLDS
4  823 Las Vegas Boulevard South            CLERK OF THE COURT
   Las Vegas, NV 89101
5  (702) 385-3343
6  Attorneys for Plaintiffs

                        DISTRICT COURT
7
8                   CLARK COUNTY, NEVADA

9

10 JOHN LEZDEY, an Individual; J.L.        Case No.    A542981
   TECHNOLOGY, L.P., a Nevada limited
11 partnership; JAMIE HOLDINGS, LLC,        Dept. No.   XI

12                  Plaintiffs,

13 v.

14 ALAN WACHTER, an Individual; SUSAN      ERRATA TO COMPLAINT
   WACHTER, an Individual; NATHAN M.
15 TECHNOLOGIES LIMITED PARTNERSHIP, A
   Nevada limited partnership; SETH
16 CHEMICALS, INC., a Nevada corporation;
   ARRIVA PHARMACEUTICALS, INC.
17 fka ALPHAONE PHARMACEUTICALS,
   INC., California corporation; PHILLIP
18 BARR, an individual; SONORAN DESERT
   CHEMICALS, L.L.C., a Nevada limited
19 liability corporation; PROTEASE
   SCIENCE, INC., a Nevada corporation;
20 and Does 1 through 10,

21
22
23                  Defendants.

24 ───────────────────────────────────
25 AND ALL RELATED MATTERS....

26
27        COMES NOW, Plaintiffs by and through their counsel, MATTHEW Q. CALLISTER,
28

Law Offices of
Callister & Reynolds
823 Las Vegas Blvd.
South
Las Vegas, Nevada
89101
(702) 385-3343

T:\Lezdey v. Wachter\Pleadings\Demand for Jury Trial.wpd

ESQ. and ALISA J. KOOT, ESQ. of the law firm of CALLISTER & REYNOLDS and hereby

submits this Errata to the Complaint which consists of Exhibit "1" which was inadvertently

omitted.

DATED this _____ day of June, 2007.

CALLISTER & REYNOLDS

MATTHEW Q. CALLISTER, ESQ.
Nevada Bar No. 001396
ALISA J. KOOT, ESQ.
Nevada Bar No. 8532
823 Las Vegas Blvd., South
Las Vegas, Nevada 89101
(702) 385-3343
Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Law Offices of
Callister & Reynolds
823 Las Vegas Blvd.
South
Las Vegas, Nevada
89101
(702) 385-3343

2

T:\Leakey v. Wachter\Pleadings\DemandForJuryTrial.wpd

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 03-20078-CIV-ALTONAGA/TURNOFF



ALPHAMED PHARMACEUTICALS CORP.,
a Florida corporation,

    Plaintiff,

vs.

ARRIVA PHARMACEUTICALS, INC.
f/k/a AlphaOne Pharmaceuticals, Inc.,
a California corporation and
SPINELLI CORPORATION f/k/a Spinelli
Investigations, Inc., an Arizona corporation,

    Defendants.
_____/

**VERDICT FORM**
(Punitive Damages)

WE, THE JURY, return the following verdict on punitive damages:

**I.    TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

    1.    Do you unanimously find that Plaintiff AlphaMed proved by clear and convincing evidence that Defendant Arriva was guilty of intentional misconduct or gross negligence in tortiously interfering with AlphaMed's business relationship with Robert Williams?

    Answer:   YES___✓___        NO_____

(If your verdict answer to Question 1 is NO, please proceed to Question 3. If your answer to Question 1 is YES, please proceed to Question 2.)

    2.    What is the amount of punitive damages for tortious interference, if any, that you unanimously find should be assessed against Arriva?

$ 20,000,000.00 (twenty million dollars)

17.    That Defendant, Arriva's communications to FBI Special Agent Conner were not , privileged or justified? [Answering YES to this question means that the communications WERE NOT privileged or justified.  Answering NO to this question means that the communications WERE privileged or justified.]

Answer:    YES  ✓                    NO _____

(If your answer to Question No. 17 is NO, your verdict is for Defendant, Arriva, on this Count, and you should proceed to Question No. 20.  However, if your answer to Question No. 17 is YES, then please proceed to Question No. 18.)

18.    That Defendant, Arriva's conduct led directly to and in natural and continuous sequence produced or contributed substantially to producing lost profits damages of AlphaMed?

Answer:    YES  ✓                    NO _____

(If your answer to Question No. 18 is NO, your verdict is for Defendant, Arriva, on this Count, and you should proceed to Question No. 20.  However, if your answer to Question No. 18 is YES, then please proceed to Question No. 19.)

19.    Do you find that Defendant, Arriva, proved by the preponderance of the evidence that Plaintiff, AlphaMed (1) engaged in wrongdoing (2) that the wrongdoing was directly related to AlphaMed's claim for tortious interference with a business relationship and (3) that Arriva was personally injured by the conduct?

Answer:    YES _____            NO  ✓

(If your answer to Question 19 is YES, then your verdict is for Defendant, Arriva, on this Count.  However, if your answer to Questions 19 is NO, then your verdict is for Plaintiff, AlphaMed on this Count.  In either event, please proceed to Question No. 20.)

III.    COUNT III:  UNFAIR COMPETITION AGAINST DEFENDANT, ARRIVA

Do you find that Plaintiff, AlphaMed, proved by a preponderance of the evidence:

20.    That Defendant, Arriva, committed the tort of unfair competition against Plaintiff, AlphaMed?

Answer:    YES  ✓                    NO _____

(If your answer to Question No. 20 is NO, your verdict is for Defendant, Arriva, and you are to proceed to the end of this Verdict Form, sign it and return it to the Court Security Officer.

7

IV.    DAMAGES (IF ANY) AGAINST DEFENDANT, ARRIVA ON PLAINTIFF'S
       CLAIMS FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
       AND/OR UNFAIR COMPETITION

24.    If your verdict is for Plaintiff, AlphaMed, on its claim for tortious interference with a
business relationship and/or its claim for unfair competition against Defendant, Arriva, has Plaintiff,
AlphaMed, proved by a preponderance of the evidence that AlphaMed is still in business?

       Answer:    YES  √          NO _____

       (If your answer to Question No. 24 is NO, then you cannot award any damages to Plaintiff,
       AlphaMed, and you are to proceed to the end of this Verdict Form, sign it and return it to the
       Court Security Officer.  If your answer to Question No. 24 is YES, then please proceed to
       Question No. 25.)

25.    If your verdict is for Plaintiff, AlphaMed, on its claim for tortious interference with a
business relationship and/or its claim for unfair competition against Defendant, Arriva, has Plaintiff,
AlphaMed, proved to a reasonable certainty the amount of its lost profits damages?

       Answer:    YES  √          NO _____

       (If your answer to Question 25 is NO, then you cannot award any damages to Plaintiff,
       AlphaMed, and you are to proceed to the end of this Verdict Form, sign it and return it to the
       Court Security Officer.  If your answer to Question No. 25 is YES, then please proceed to
       Question 26.)

26.    If your verdict is for Plaintiff, AlphaMed, on its claim for tortious interference with a
business relationship and you answered YES to Question Nos. 24 and 25, then you may award
compensatory damages for any lost profits that you determine were suffered by AlphaMed as a result
of Arriva's conduct.

       What is the amount, if any, of Plaintiff's lost profits damages for its tortious interference
claim?

       Damages $ 26,000,000.00

27.    If your verdict is for Plaintiff, AlphaMed, on its claim for unfair competition, and you have
answered YES to all of Questions Nos. 24 and 25, then you may award compensatory damages for
any lost profits that you determine were suffered by AlphaMed as a result of Arriva's conduct.

       What is the amount, if any, of Plaintiff's lost profits damages for its unfair competition
claim?

       Damages $ 22,000,000.00

                                        9

?? 2. (cont.)
said office and give authority for signing contracts
to the President.

② The Alphamed/Thrive CEO Martin Provenzano contact
of Rein Stricker of Pharming alleging that AlphaMed
had stolen intellectual property and asking for all
Pharming — AlphaMed correspondence was a deliberate
act of unfair competition.

③ The Nevada Federal Court ruling of September 28, 2000,
ordered the Arizona State Court to address the
issue of John Leedey and the obstruction of discovery;
Alan Wachter was not to seek contempt charges;
the Protease Science dispute was to be properly
heard in the Nevada court thus the multiple
court cases which followed this ruling in Arizona
are deemed as tactic of unfair competition.

④ Additionally, the Nevada Federal Court Bankruptcy
settlement of February 12, 2001, is deemed a tactic
of unfair competition as the ruling omits the courts'
previous and favorable ruling from the case history
record; the agreement to pay-off the outside creditors
of Protease Sciences was an act to continue unfair
competition via invalidating the 9/28/00 order by settlement
without following through in compensating Protease creditors
(lawyer were compensated but not other outside creditors).

⑤ The "garbage" spoke for itself as did Spinelli Investigation
documents as to intentionally gathering confidential
and proprietary AlphaMed documents without
demonstrating concern for personal security issues.

<u>**Verdict Form –Defendant, Arriva**</u>
**(Tortious Interference With Business Relationship and Unfair Competition)**

SO SAY WE ALL

Foreperson: ___Krisan Lamberti___ ___Krisan Lamberti___
                  Signature                              Print Name

DATED: ___December 19, 2005___

10

JUN-27-2007  13:11      CALLISTER & REYNOLDS                3957743    P.019

Case 1:03-cv-20078-CMA    Document 887    Entered on FLSD Docket 12/20/2005    Page 1 of 3



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 03-20078-CIV-ALTONAGA/TURNOFF

ALPHAMED PHARMACEUTICALS CORP.,

    Plaintiff,

vs.

ARRIVA PHARMACEUTICALS, INC.
f/k/a AlphaOne Pharmaceuticals, Inc.; and
SPINELLI CORPORATION f/k/a Spinelli
Investigations, Inc.,

    Defendants.

_____/

## JOINT SPECIAL INTERROGATORIES AND VERDICT FORM

28.   If you awarded Plaintiff, AlphaMed, lost profits damages, has AlphaMed proved:

   (a).   That Mr. Williams would have loaned AlphaMed or invested in AlphaMed between $750,000 and $1.5 million in or after April 2001 but for Defendant, Arriva's interference with AlphaMed's business through FBI Agent James R. Conner?

       Answer:   YES __✓__      NO _____

   (b).   That AlphaMed would have used the April 2001 loan or investment proceeds from Mr. Williams to resume the suspended AAT research at the University of Nebraska, and that the University would have used those loan or investment proceeds to successfully devise a method to produce commercial quantities of AAT at sufficiently high purity level for AlphaMed to begin clinical testing in animals and in humans?

       Answer:   YES __✓__      NO _____

   (c).   That but for Defendant Arriva's interference through Agent Conner, AlphaMed would have secured the outside investment capital it needed to fund its Business Plan?

       Answer:   YES __✓__      NO _____

   (d).   That but for Defendant, Arriva's interference through Agent Conner, AlphaMed

would have earned sufficient revenue from its anti-microbial products, and earned profits from the sale of its anti-microbial products?

Answer:    YES ___✓___        NO _____

(e).    That AlphaMed could have legally sold "consumer-ready" AAT and cromolyn products in the United States without obtaining approval from the Food and Drug Administration ("FDA")?

Answer:    YES _____        NO ___✓___

(f).    That AlphaMed could have legally sold "consumer-ready" AAT and cromolyn products in those countries other than the United States in which AlphaMed intended to market those products without obtaining regulatory approval in those countries?

Answer:    YES _____        NO ___✓___

(g).    That AlphaMed would have obtained FDA approval for its proposed AAT products to treat human illnesses by the year 2005, and would have obtained regulatory approval in those countries other than the United States in which AlphaMed intended to market those products by the year 2005?

Answer:    YES *Other Countries* NO *FDA & US Market*
                    *with less regulation*

(h).    That AlphaMed could have legally sold its AAT products to treat human illnesses in those countries other than the United States in which AlphaMed intended to market those products?

Answer:    YES ___✓___        NO _____

(i).    That AlphaMed would have secured a third-party manufacturer that was capable of producing commercial quantities of AAT in compliance with the requirements of good manufacturing practices and at an acceptable cost?

Answer:    YES ___✓___        NO _____

(j).    That AlphaMed would have earned profits from the sale of its proposed AAT products and from its proposed cromolyn products?

Answer:    YES ___✓___        NO _____

29.    In proving its lost profit damages, has AlphaMed proved its expenses in realizing its Business Plan?

Answer:    YES ___✓___        NO _____

2

Case 1:03-cv-20078-CMA    Document 867    Entered on FLSD Docket 12/20/2005    Page 3 of 3

30.    In proving its lost profit damages, has AlphaMed adequately taken into consideration through the discount rate applied by its expert witness the various risks associated with its business as set forth in its Business Plan?

Answer:    YES ___√___                    NO _____

31.    Please identify the amount of lost profits Plaintiff, AlphaMed, suffered in connection with the following products or the percentage of the total sum of lost profits damages you awarded for each product?

Antimicrobial Products         Damages      $ _____

                               Percentage      ___0___ %

"Consumer-ready" AAT           Damages      $ _____

                               Percentage      ___20___ %

Prescription AAT               Damages      $ _____

                               Percentage      ___70___ %

Cromolyn                       Damages      $ _____

                               Percentage      ___10___ %

32.    What is the amount of the expenses AlphaMed would have incurred in realizing its Business Plan?

$ 15,000,000.00

SO SAY WE ALL

Foreperson: _Krisan Lamberti_          _Krisan Lamberti_
                      Signature                     Print Name

DATED: _December 19, 2005_

3

TOTAL P.020

However, if your answer to Question No. 20 is YES, then please proceed to Question No. 21.)

21.    That Defendant Arriva's conduct led directly to and in natural and continuous sequence produced or contributed substantially to producing lost profits damages of Plaintiff, AlphaMed?

Answer:    YES ___✓___    NO _____

(If your answer to Question No. 21 is NO, your verdict is for Defendant, Arriva, and you are to proceed to the end of this Verdict Form, sign it and return it to the Court Security Officer. However, if your answer to Question No. 21 is YES, then please proceed to Question No. 22.)

22.    These are the actions by Defendant, Arriva, that we the jury unanimously find constituted the tort of unfair competition in Count III (Please circle "Yes" or "No," or fill in the blank, as appropriate):

(a)    Arriva's act of misappropriating the trade secrets in AlphaMed's documents (Count I): Yes / No

(b)    Arriva's act of interfering with AlphaMed's business relationship with Robert Williams through FBI Special Agent Conner (Count II): Yes / No

(c)    Some other act or acts by Arriva (please specify in detail those acts which you unanimously agree constitute the tort of unfair competition by Arriva): (1) When AlphaMed/Arriva improperly accepted the signature of Alan Wachtel as Protease Science CEO the process of unfair competition began as the Protease Science by-laws do not provide for (continued on back)

23.    Do you find that Defendants proved by a preponderance of the evidence that Plaintiff, AlphaMed (1) engaged in wrongdoing (2) that the wrongdoing was directly related to AlphaMed's claim for unfair competition and (3) that Arriva was personally injured by the conduct?

Answer:    YES _____    NO ___✓___

(If your answer to Question 23 is YES, then your verdict is for Defendant, Arriva, and you are to proceed to the end of this Verdict Form, sign it and return it to the Court Security Officer. However, if your answer to Question 23 is NO, then your verdict is for Plaintiff, AlphaMed and you should proceed to Question No. 24.)

8

# EXHIBIT K



Entered on Docket
**December 27, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed: December 27, 2007**

_____
**EDWARD D. JELLEN**
**U.S. Bankruptcy Judge**

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2    A Limited Liability Partnership
     Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California 94111-4109
   Telephone:   415-434-9100
8  Facsimile:   415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                      OAKLAND DIVISION
13
    In re                              Case No. 07-42767
14
    ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
15  California corporation,
                                       **ORDER DISALLOWING CLAIM OF**
16              Debtor.                 **ALPHAMED PHARMACEUTICALS**
                                       **CORP. (CLAIM NO. 19)**
17  Tax ID: 94-3287067
                                       Date:      December 13, 2007
18                                     Time:      2:00 p.m.
                                       Place:     United States Bankruptcy Court
19                                                1300 Clay Street, Oakland, CA
                                       Judge:     Hon. Edward D. Jellen
20                                     Ctrm:      215

21

22          On October 11, 2007, AlphaMed Pharmaceuticals Corp. filed a claim (the

23  "AlphaMed Claim") in the amount of $78 million in the above-captioned bankruptcy case

24  (the "Bankruptcy Case"). The AlphaMed Claim was listed as Claim No. 19 on the claims

25  register for the Bankruptcy Case. On November 7, 2007, Arriva Pharmaceuticals, Inc., the

26  debtor in the Bankruptcy Case (the "Debtor") objected to the AlphaMed Claim in its

27  Omnibus Objection to Claims and Alternative Motion to Value Claims at Zero for Voting

28  Purposes and its Memorandum of Points and Authorities in support thereof (collectively,

-1-

1  the "Objection"), filed on the docket for the Bankruptcy Case as #'s 154 and 155,

2  respectively.

3        On December 13, 2007, the Court heard argument on the Objection.  The

4  appearances were as indicated in the record.  For all the reasons stated on the record, which

5  reasons constitute the findings of this Court by Bankruptcy Rule 7052,

6                          **IT IS HEREBY ORDERED THAT**

7        1.     The Objection is sustained.  The AlphaMed Claim is disallowed in its

8  entirety, without leave to amend.

9        2.     Further, in the event that such a ruling becomes necessary, the

10  AlphaMed Claim is estimated at zero for voting purposes under the Debtor's plan as it

11  currently exists or is hereafter amended.

12        3.     This order does not preclude reconsideration under Bankruptcy Code

13  Section 502(j) or otherwise based on further developments in the pending Florida

14  litigation.

15                      ** END OF ORDER **

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER

1

<u>COURT SERVICE LIST</u>

2

3   **1, Counsel for the Official Creditors' Committee**
    Michael D. Cooper
4   Wendel Rosen Black & Dean, LLP
    1111 Broadway, 24th Floor
5   Oakland, CA 94607
    (510) 834-6600

6

7   **2. Office of the U.S. Trustee /Oakland**
    Office of the U.S. Trustee
    Attention: Laurent Chen
8   1301 Clay St. #690N
    Oakland, CA 94612
9   (510) 637-3200

10  **3. Attorneys for AlphaMed Pharmaceuticals Corp.**
    Penn Ayers Butler
11  Squire, Sanders and Dempsey
    600 Hansen Way
12  Palo Alto, CA 94304-1043
    (650) 843-3242

13

14  **4. Stuart M. Brown**
    Edwards, Angell, Palmer & Dodge LLP
15  919 N Market St., 5th Fl.
    Wilmington, DE 19801
    (302) 428-5500

16

17  **5. M. David Minnick**
    Pillsbury Winthrop Shaw Pittman LLP
    50 Fremont Street
18  San Francisco, CA 94105-2228
    (415) 983-1351

19

20  **6. Nicolas De Lancie**
    Jeffer, Mangels, Butler & Marmaro LLP
    Two Embarcadero Center, 5th Floor
21  San Francisco, CA 94111
    (415) 984-9675

22

23  **7. American Express Bank FSB**
    c/o Becket and Lee LLP
    P.O. Box 3001
24  Malvern, PA 19355-0701

25  **8. Baxter Healthcare Corporation**
    c/o David M. Wiseblood
26  Seyfarth Shaw LLP
    560 Mission Street, Suite 3100
27  San Francisco, CA 94105

28

-3-

1    9. **Allan Wachter**
     c/o Chris D. Kuhner
2    Kornfield, Paul & Nyberg, P.C.
     1999 Harrison Street, Suite 2675
3    Oakland, CA 94612

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-



Entered on Docket
**December 27, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: December 27, 2007

_____
EDWARD D. JELLEN
**U.S. Bankruptcy Judge**
_____

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2    A Limited Liability Partnership
     Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California  94111-4109
   Telephone:   415-434-9100
8  Facsimile:   415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11               UNITED STATES BANKRUPTCY COURT
12               NORTHERN DISTRICT OF CALIFORNIA
                       OAKLAND DIVISION
13

14  In re                              Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
    California corporation,
16                                     **ORDER DISALLOWING CLAIM OF**
                        Debtor.        **JAMIE HOLDING COMPANY, LLC**
17                                     **(CLAIM NO. 13)**
    Tax ID: 94-3287067
18                                     Date:      December 13, 2007
                                       Time:      2:00 p.m.
19                                     Place:     United States Bankruptcy Court
                                                  1300 Clay Street, Oakland, CA
20                                     Judge:     Hon. Edward D. Jellen
                                       Ctrm:      215
21

22

23          On October 9, 2007, Jamie Holding Company, LLC filed a claim (the "Jamie

24  Holding Claim") in an undetermined amount in the above-captioned bankruptcy case (the

25  "Bankruptcy Case").  The Jamie Holding Claim was listed as Claim No. 13 on the claims

26  register for the Bankruptcy Case.  On November 7, 2007, Arriva Pharmaceuticals, Inc., the

27  debtor in the Bankruptcy Case (the "Debtor") objected to the Jamie Holding Claim in its

28  Omnibus Objection to Claims and Alternative Motion to Value Claims at Zero for Voting

-1-

1  Purposes and its Memorandum of Points and Authorities in support thereof (collectively,

2  the "Objection"), filed on the docket for the Bankruptcy Case as #'s 154 and 155,

3  respectively.

4      On December 13, 2007, the Court heard argument on the Objection.  The

5  appearances were as indicated in the record.  For all the reasons stated on the record, which

6  reasons constitute the findings of this Court by Bankruptcy Rule 7052,

7                    **IT IS HEREBY ORDERED THAT**

8      1.      The Objection is sustained.  The Jamie Holding Claim is disallowed

9  in its entirety, without leave to amend.

10     2.      Further, in the event that such a ruling becomes necessary, the Jamie

11  Holding Claim is estimated at zero for voting purposes under the Debtor's plan as it

12  currently exists or is hereafter amended.

13

                    ** END OF ORDER **

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

1
<div align="center"><u>COURT SERVICE LIST</u></div>

2

3   **1, Counsel for the Official Creditors' Committee**
Michael D. Cooper
4   Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
5   Oakland, CA 94607
(510) 834-6600
6

7   **2. Office of the U.S. Trustee /Oakland**
Office of the U.S. Trustee
Attention: Laurent Chen
8   1301 Clay St. #690N
Oakland, CA 94612
9   (510) 637-3200

10  **3. Attorneys for Jamie Holding Company, LLC**
Penn Ayers Butler
11  Squire, Sanders and Dempsey
600 Hansen Way
12  Palo Alto, CA 94304-1043
(650) 843-3242
13

14  **4. Stuart M. Brown**
Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
15  Wilmington, DE 19801
(302) 428-5500
16

17  **5. M. David Minnick**
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
18  San Francisco, CA 94105-2228
(415) 983-1351
19

20  **6. Nicolas De Lancie**
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
21  San Francisco, CA 94111
(415) 984-9675
22

23  **7. American Express Bank FSB**
c/o Becket and Lee LLP
P.O. Box 3001
24  Malvern, PA 19355-0701

25  **8. Baxter Healthcare Corporation**
c/o David M. Wiseblood
26  Seyfarth Shaw LLP
560 Mission Street, Suite 3100
27  San Francisco, CA 94105

28

<div align="center">-3-</div>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9. **Allan Wachter**
c/o Chris D. Kuhner
Kornfield, Paul & Nyberg, P.C.
1999 Harrison Street, Suite 2675
Oakland, CA 94612



Entered on Docket
December 27, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: December 27, 2007

_____
EDWARD D. JELLEN
U.S. Bankruptcy Judge

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2    A Limited Liability Partnership
     Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California 94111-4109
   Telephone:  415-434-9100
8  Facsimile:  415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                     OAKLAND DIVISION
13

14  In re                              Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
    California corporation,
16                                     **ORDER DISALLOWING CLAIM OF**
                     Debtor.           **JL TECHNOLOGY LP (CLAIM**
17                                     **NO. 11)**
    Tax ID: 94-3287067
18                                     Date:    December 13, 2007
                                       Time:    2:00 p.m.
19                                     Place:   United States Bankruptcy Court
                                                1300 Clay Street, Oakland, CA
20                                     Judge:   Hon. Edward D. Jellen
                                       Ctrm:    215
21

22

23          On October 9, 2007, JL Technology LP filed a claim (the "JL Claim") in an

24  undetermined amount in the above-captioned bankruptcy case (the "Bankruptcy Case").

25  The JL Claim was listed as Claim No. 11 on the claims register for the Bankruptcy Case.

26  On November 7, 2007, Arriva Pharmaceuticals, Inc., the debtor in the Bankruptcy Case

27  (the "Debtor") objected to the JL Claim in its Omnibus Objection to Claims and

28  Alternative Motion to Value Claims at Zero for Voting Purposes and its Memorandum of

                                      -1-

1  Points and Authorities in support thereof (collectively, the "Objection"), filed on the

2  docket for the Bankruptcy Case as #'s 154 and 155, respectively.

3       On December 13, 2007, the Court heard argument on the Objection. The

4  appearances were as indicated in the record. For all the reasons stated on the record, which

5  reasons constitute the findings of this Court by Bankruptcy Rule 7052,

6                     **IT IS HEREBY ORDERED THAT**

7       1.     The Objection is sustained. The JL Claim is disallowed in its entirety,

8  without leave to amend.

9       2.     Further, in the event that such a ruling becomes necessary, the JL

10  Claim is estimated at zero for voting purposes under the Debtor's plan as it currently exists

11  or is hereafter amended.

12

13                       ** END OF ORDER **

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5MML1\400608725.1

<u>COURT SERVICE LIST</u>

1, **Counsel for the Official Creditors' Committee**
Michael D. Cooper
Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
Oakland, CA 94607
(510) 834-6600

2. **Office of the U.S. Trustee /Oakland**
Office of the U.S. Trustee
Attention: Laurent Chen
1301 Clay St. #690N
Oakland, CA 94612
(510) 637-3200

3. **Attorneys for JL Technology LP**
Penn Ayers Butler
Squire, Sanders and Dempsey
600 Hansen Way
Palo Alto, CA 94304-1043
(650) 843-3242

4. **Stuart M. Brown**
Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
Wilmington, DE 19801
(302) 428-5500

5. **M. David Minnick**
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
(415) 983-1351

6. **Nicolas De Lancie**
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
San Francisco, CA 94111
(415) 984-9675

7. **American Express Bank FSB**
c/o Becket and Lee LLP
P.O. Box 3001
Malvern, PA 19355-0701

8. **Baxter Healthcare Corporation**
c/o David M. Wiseblood
Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105

-3-

9. **Allan Wachter**
c/o Chris D. Kuhner
Kornfield, Paul & Nyberg, P.C.
1999 Harrison Street, Suite 2675
Oakland, CA 94612

W02-WEST:5MML1\400608725.1                                          ORDER



Entered on Docket
December 27, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: December 27, 2007

_____
EDWARD D. JELLEN
U.S. Bankruptcy Judge

1 | SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP
2 | A Limited Liability Partnership
Including Professional Corporations
3 | MICHAEL H. AHRENS,
Cal. Bar No. 44766
4 | ORI KATZ, Cal. Bar No. 209561
MICHAEL M. LAUTER,
5 | Cal Bar No. 246048
TIMOTHY C. PERRY,
6 | Cal. Bar No. 248543
Four Embarcadero Center, 17th Floor
7 | San Francisco, California 94111-4109
Telephone:    415-434-9100
8 | Facsimile:    415-434-3947

9 | Attorneys for Debtor ARRIVA
PHARMACEUTICALS, INC.
10 |

11 | UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
12 | OAKLAND DIVISION

13 |

14 | In re                                              | Case No. 07-42767

15 | ARRIVA PHARMACEUTICALS, INC., a         | Chapter 11
California corporation,
16 |                              Debtor.                | **ORDER DISALLOWING CLAIM OF
JAMIE HOLDING COMPANY, LLC
(CLAIM NO. 13)**
17 | Tax ID: 94-3287067

18 |                                                    | Date:        December 13, 2007
                                                     Time:        2:00 p.m.
19 |                                                    | Place:       United States Bankruptcy Court
                                                                  1300 Clay Street, Oakland, CA
20 |                                                    | Judge:       Hon. Edward D. Jellen
                                                     Ctrm:        215
21 |

22 |

23 |         On October 9, 2007, Jamie Holding Company, LLC filed a claim (the "Jamie

24 | Holding Claim") in an undetermined amount in the above-captioned bankruptcy case (the

25 | "Bankruptcy Case").  The Jamie Holding Claim was listed as Claim No. 13 on the claims

26 | register for the Bankruptcy Case.  On November 7, 2007, Arriva Pharmaceuticals, Inc., the

27 | debtor in the Bankruptcy Case (the "Debtor") objected to the Jamie Holding Claim in its

28 | Omnibus Objection to Claims and Alternative Motion to Value Claims at Zero for Voting

-1-

1  Purposes and its Memorandum of Points and Authorities in support thereof (collectively,

2  the "Objection"), filed on the docket for the Bankruptcy Case as #'s 154 and 155,

3  respectively.

4       On December 13, 2007, the Court heard argument on the Objection.  The

5  appearances were as indicated in the record.  For all the reasons stated on the record, which

6  reasons constitute the findings of this Court by Bankruptcy Rule 7052,

7                    **IT IS HEREBY ORDERED THAT**

8       1.     The Objection is sustained.  The Jamie Holding Claim is disallowed

9  in its entirety, without leave to amend.

10       2.     Further, in the event that such a ruling becomes necessary, the Jamie

11  Holding Claim is estimated at zero for voting purposes under the Debtor's plan as it

12  currently exists or is hereafter amended.

13

14                        ** END OF ORDER **

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5MML1\400609420.1

ORDER

Case: 07-42767    Doc #: 271    Filed: 12/27/2007    Page 2 of 4


1  <u>COURT SERVICE LIST</u>

2

3  **1, Counsel for the Official Creditors' Committee**
Michael D. Cooper
4  Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
5  Oakland, CA 94607
(510) 834-6600
6

**2. Office of the U.S. Trustee /Oakland**
7  Office of the U.S. Trustee
Attention: Laurent Chen
8  1301 Clay St. #690N
Oakland, CA 94612
9  (510) 637-3200

10  **3. Attorneys for Jamie Holding Company, LLC**
Penn Ayers Butler
11  Squire, Sanders and Dempsey
600 Hansen Way
12  Palo Alto, CA 94304-1043
(650) 843-3242
13

**4. Stuart M. Brown**
14  Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
15  Wilmington, DE 19801
(302) 428-5500
16

**5. M. David Minnick**
17  Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
18  San Francisco, CA 94105-2228
(415) 983-1351
19

**6. Nicolas De Lancie**
20  Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
21  San Francisco, CA 94111
(415) 984-9675
22

**7. American Express Bank FSB**
23  c/o Becket and Lee LLP
P.O. Box 3001
24  Malvern, PA 19355-0701

25  **8. Baxter Healthcare Corporation**
c/o David M. Wiseblood
26  Seyfarth Shaw LLP
560 Mission Street, Suite 3100
27  San Francisco, CA 94105

28

-3-

1    9. **Allan Wachter**
     c/o Chris D. Kuhner
2    Kornfield, Paul & Nyberg, P.C.
     1999 Harrison Street, Suite 2675
3    Oakland, CA 94612

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5MML1\400609420.1                                                      ORDER



Entered on Docket
December 27, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: December 27, 2007

_____
EDWARD D. JELLEN
U.S. Bankruptcy Judge

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2    A Limited Liability Partnership
     Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California  94111-4109
   Telephone:   415-434-9100
8  Facsimile:   415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
13

14  In re                            Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a   Chapter 11
    California corporation,
16                                    **ORDER DISALLOWING CLAIM OF
                       Debtor.        PROTEASE SCIENCES, INC. (CLAIM
17                                    NO. 12)**
    Tax ID: 94-3287067
18                                    Date:      December 13, 2007
                                      Time:      2:00 p.m.
19                                    Place:     United States Bankruptcy Court
                                                 1300 Clay Street, Oakland, CA
20                                    Judge:     Hon. Edward D. Jellen
                                      Ctrm:      215
21

22

23          On October 9, 2007, Protease Sciences, Inc. filed a claim (the "Protease Claim") in

24  the amount of $30 million in the above-captioned bankruptcy case (the "Bankruptcy

25  Case").  The Protease Claim was listed as Claim No. 12 on the claims register for the

26  Bankruptcy Case.  On November 7, 2007, Arriva Pharmaceuticals, Inc., the debtor in the

27  Bankruptcy Case (the "Debtor") objected to the Protease Claim in its Omnibus Objection

28  to Claims and Alternative Motion to Value Claims at Zero for Voting Purposes and its

-1-

1 | Memorandum of Points and Authorities in support thereof (collectively, the "Objection"),

2 | filed on the docket for the Bankruptcy Case as #'s 154 and 155, respectively.

3 |      On December 13, 2007, the Court heard argument on the Objection.  The

4 | appearances were as indicated in the record.  For all the reasons stated on the record, which

5 | reasons constitute the findings of this Court by Bankruptcy Rule 7052,

6 | **IT IS HEREBY ORDERED THAT**

7 |      1.    The Objection is sustained.  The Protease Claim is disallowed in its

8 | entirety, without leave to amend.

9 |      2.    Further, in the event that such a ruling becomes necessary, the

10 | Protease Claim is estimated at zero for voting purposes under the Debtor's plan as it

11 | currently exists or is hereafter amended.

12 |

13 | **\*\* END OF ORDER \*\***

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-2-

ORDER

1

<u>COURT SERVICE LIST</u>

2

3  **1, Counsel for the Official Creditors' Committee**
Michael D. Cooper
4  Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
5  Oakland, CA 94607
(510) 834-6600
6

7  2. **Office of the U.S. Trustee /Oakland**
Office of the U.S. Trustee
Attention: Laurent Chen
8  1301 Clay St. #690N
Oakland, CA 94612
9  (510) 637-3200

10  3. **Attorneys for Protease Sciences, Inc.**
Penn Ayers Butler
11  Squire, Sanders and Dempsey
600 Hansen Way
12  Palo Alto, CA 94304-1043
(650) 843-3242
13

14  4. **Stuart M. Brown**
Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
15  Wilmington, DE 19801
(302) 428-5500
16

17  5. **M. David Minnick**
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
18  San Francisco, CA 94105-2228
(415) 983-1351
19

20  6. **Nicolas De Lancie**
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
21  San Francisco, CA 94111
(415) 984-9675
22

23  7. **American Express Bank FSB**
c/o Becket and Lee LLP
P.O. Box 3001
24  Malvern, PA 19355-0701

25  8. **Baxter Healthcare Corporation**
c/o David M. Wiseblood
26  Seyfarth Shaw LLP
560 Mission Street, Suite 3100
27  San Francisco, CA 94105

28

-3-

1 9. **Allan Wachter**
 c/o Chris D. Kuhner
2 Kornfield, Paul & Nyberg, P.C.
 1999 Harrison Street, Suite 2675
3 Oakland, CA 94612



Entered on Docket
**December 27, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed: December 27, 2007**

_____
**EDWARD D. JELLEN**
**U.S. Bankruptcy Judge**

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2     A Limited Liability Partnership
      Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California 94111-4109
   Telephone:   415-434-9100
8  Facsimile:   415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                      OAKLAND DIVISION
13

14  In re                              Case No. 07-42767
15  ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
16  California corporation,
                                       **ORDER DISALLOWING CLAIM OF**
17              Debtor.                 **SONORAN DESERT CHEMICALS,**
                                       **LLC (CLAIM NO. 14)**
18  Tax ID: 94-3287067
                                       Date:      December 13, 2007
19                                     Time:      2:00 p.m.
                                       Place:     United States Bankruptcy Court
20                                                1300 Clay Street, Oakland, CA
                                       Judge:     Hon. Edward D. Jellen
21                                     Ctrm:      215
22

23

24          On October 9, 2007, Sonoran Desert Chemicals, LLC filed a claim (the "Sonoran

25  Claim") in an undetermined amount in the above-captioned bankruptcy case (the

26  "Bankruptcy Case"). The Sonoran Claim was listed as Claim No. 14 on the claims register

27  for the Bankruptcy Case. On November 7, 2007, Arriva Pharmaceuticals, Inc., the debtor

28  in the Bankruptcy Case (the "Debtor") objected to the Sonoran Claim in its Omnibus

                                   -1-

1  Objection to Claims and Alternative Motion to Value Claims at Zero for Voting Purposes

2  and its Memorandum of Points and Authorities in support thereof (collectively, the

3  "Objection"), filed on the docket for the Bankruptcy Case as #'s 154 and 155, respectively.

4       On December 13, 2007, the Court heard argument on the Objection.  The

5  appearances were as indicated in the record.  For all the reasons stated on the record, which

6  reasons constitute the findings of this Court by Bankruptcy Rule 7052,

7               **IT IS HEREBY ORDERED THAT**

8       1.    The Objection is sustained.  The Sonoran Claim is disallowed in its

9  entirety, without leave to amend.

10      2.    Further, in the event that such a ruling becomes necessary, the

11  Sonoran Claim is estimated at zero for voting purposes under the Debtor's plan as it

12  currently exists or is hereafter amended.

13

14                   ** END OF ORDER **

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

1

<u>COURT SERVICE LIST</u>

2

3    1, **Counsel for the Official Creditors' Committee**
     Michael D. Cooper
4    Wendel Rosen Black & Dean, LLP
     1111 Broadway, 24th Floor
5    Oakland, CA 94607
     (510) 834-6600

6

7    2. **Office of the U.S. Trustee /Oakland**
     Office of the U.S. Trustee
     Attention: Laurent Chen
8    1301 Clay St. #690N
     Oakland, CA 94612
9    (510) 637-3200

10   3. **Attorneys for Sonoran Desert Chemicals, LLC**
     Penn Ayers Butler
11   Squire, Sanders and Dempsey
     600 Hansen Way
12   Palo Alto, CA 94304-1043
     (650) 843-3242

13

14   4. **Stuart M. Brown**
     Edwards, Angell, Palmer & Dodge LLP
     919 N Market St., 5th Fl.
15   Wilmington, DE 19801
     (302) 428-5500

16

17   5. **M. David Minnick**
     Pillsbury Winthrop Shaw Pittman LLP
     50 Fremont Street
18   San Francisco, CA 94105-2228
     (415) 983-1351

19

20   6. **Nicolas De Lancie**
     Jeffer, Mangels, Butler & Marmaro LLP
     Two Embarcadero Center, 5th Floor
21   San Francisco, CA 94111
     (415) 984-9675

22

23   7. **American Express Bank FSB**
     c/o Becket and Lee LLP
     P.O. Box 3001
24   Malvern, PA 19355-0701

25   8. **Baxter Healthcare Corporation**
     c/o David M. Wiseblood
26   Seyfarth Shaw LLP
     560 Mission Street, Suite 3100
27   San Francisco, CA 94105

28

-3-

1   9. **Allan Wachter**
    c/o Chris D. Kuhner
2   Kornfield, Paul & Nyberg, P.C.
    1999 Harrison Street, Suite 2675
3   Oakland, CA 94612

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

ORDER

# EXHIBIT L



Entered on Docket
**January 14, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed: January 11, 2008**

_____
**EDWARD D. JELLEN**
**U.S. Bankruptcy Judge**
_____

1   SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2       A Limited Liability Partnership
        Including Professional Corporations
3   MICHAEL H. AHRENS,
    Cal. Bar No. 44766
4   ORI KATZ, Cal. Bar No. 209561
    MICHAEL M. LAUTER,
5   Cal Bar No. 246048
    TIMOTHY C. PERRY,
6   Cal. Bar No. 248543
    Four Embarcadero Center, 17th Floor
7   San Francisco, California  94111-4109
    Telephone:    415-434-9100
8   Facsimile:    415-434-3947

9   Attorneys for Defendant ARRIVA
    PHARMACEUTICALS, INC.
10

11                  UNITED STATES BANKRUPTCY COURT
                   NORTHERN DISTRICT OF CALIFORNIA
12                         OAKLAND DIVISION

13

14  In re                                 Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a       Chapter 11
    California corporation,
16
                        Debtor.
17
    Tax ID: 94-3287067
18  _____

19  ALPHAMED PHARMACEUTICALS           Adv. Pro. No. 07-4181
    CORP.
20                                     **ORDER GRANTING MOTION TO**
                        Plaintiff       **DISMISS ALPHAMED'S COMPLAINT**
21                                      **WITHOUT LEAVE TO AMEND**
    vs.
                                       Date:      December 13, 2007
22  ARRIVA PHARMACEUTICALS, INC., a    Time:      2:00 p.m.
    California corporation             Place:     United States Bankruptcy Court
23                                                1300 Clay Street, Oakland, CA
                        Defendant.     Judge:     Hon. Edward D. Jellen
24                                     Ctrm:      215

25

26

27

28
                                      -1-
    W02-WEST:5TIP1\400608274.1                                    ORDER

1    On October 30, 2007, AlphaMed Pharmaceuticals Corp. ("AlphaMed") initiated the

2  above-captioned adversary case against Arriva Pharmaceuticals, Inc. (the "Debtor").  In

3  response, the Debtor filed its Motion to Dismiss AlphaMed's Complaint (the "Motion").

4    On December 13, 2007, the Court heard argument on the Motion.  The appearances

5  were as indicated in the record.  For all the reasons stated on the record, which reasons

6  constitute the findings of this Court by Bankruptcy Rule 7052,

7    **IT IS HEREBY ORDERED THAT**

8    1.    The Motion is granted.

9

10    2.    AlphaMed's complaint is dismissed with prejudice.

11    ** END OF ORDER **

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>COURT SERVICE LIST</u>

**1, Counsel for the Official Creditors' Committee**
Michael D. Cooper
Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
Oakland, CA 94607
(510) 834-6600

**2. Office of the U.S. Trustee /Oakland**
Office of the U.S. Trustee
Attention: Laurent Chen
1301 Clay St. #690N
Oakland, CA 94612
(510) 637-3200

**3. Attorneys for AlphaMed Pharmaceuticals Corp.**
Penn Ayers Butler
Squire, Sanders and Dempsey
600 Hansen Way
Palo Alto, CA 94304-1043
(650) 843-3242

**4. Stuart M. Brown**
Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
Wilmington, DE 19801
(302) 428-5500

**5. M. David Minnick**
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
(415) 983-1351

**6. Nicolas De Lancie**
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
San Francisco, CA 94111
(415) 984-9675

**7. American Express Bank FSB**
c/o Becket and Lee LLP
P.O. Box 3001
Malvern, PA 19355-0701

**8. Baxter Healthcare Corporation**
c/o David M. Wiseblood
Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105

-3-

1   9. **Allan Wachter**
    c/o Chris D. Kuhner
2   Kornfield, Paul & Nyberg, P.C.
    1999 Harrison Street, Suite 2675
3   Oakland, CA 94612

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

# EXHIBIT M

1

1    UNITED STATES BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    (OAKLAND DIVISION)

4  In re:

5  ARRIVA PHARMACEUTICALS, INC.,        Case No. 07-42767J

6                                       Chapter 11

7                                       Oakland, California
                                        December 13, 2007
8          Debtor.                      3:14 p.m.

9  _____/

10 ALPHAMED PHARMACEUTICALS,

11        Plaintiff,

12    v.                                A.P. No. 07-4181 AJ

13 ARRIVA PHARMACEUTICALS, INC.,

14        Defendant.

   _____/
15

16            TRANSCRIPT OF PROCEEDINGS
              JUDGE'S RULING ONLY
17     1.  MOTION OF JOHN LEZDEY FOR AUTHORITY TO FILE
              LATE PROOF OF CLAIM
18        2.  DEBTOR'S OMNIBUS OBJECTION TO CLAIMS
     3.  DEBTOR'S MOTION FOR ORDER REQUIRING COMPLIANCE WITH
19           FEDERAL RULE OF CIVIL PROCEDURE 2019
          4.  MOTION FOR RELIEF FROM STAY FILED BY
20                ALPHAMED PHARMACEUTICALS
       5.  DEFENDANT'S MOTION TO DISMISS COMPLAINT
21                FILED BY ALPHAMED

22
          BEFORE THE HONORABLE EDWARD D. JELLEN
23           UNITED STATES BANKRUPTCY JUDGE

24

25

2

```
 1   APPEARANCES:

 2   For the Debtor:            SHEPPARD, MULLIN, RICHTER &
                                HAMPTON, LLP
 3                              BY: MICHAEL H AHRENS, ESQ.
                                    TIMOTHY C. PERRY, ESQ.
 4                                  MICHAEL M. LAUTER, ESQ.
                                Four Embarcadero Center, 17th Floor
 5                              San Francisco, California 94111

 6

 7   For the Creditors'        WELNDEL, ROSEN, BLACK & DEAN
     Committee:                BY: MICHAEL COOPER, ESQ.
 8                                  TRACY GREEN, ESQ.
                                1111 Broadway, 24th Floor
 9                              Oakland, California 94607

10

11   For Alphamed:             SQUIRE, SANDERS & DEMPSEY, LLP
                                BY: DOUGLAS J. ROVENS, ESQ.
12                              555 South Flower Street, 31st Floor
                                Los Angeles, California 90071
13
                                         -and-
14
                                SQUIRE, SANDERS & DEMPSEY, LLP
15                              BY: PENN AYERS BUTLER, ESQ.
                                600 Hansen Way
16                              Palo Alto, California 94304

17

18
     For MPM Capital:          EDWARDS & ANGELL, LLP
19                             BY: ERICA LAZAR, ESQ.

20                             (APPEARING TELEPHONICALLY)

21

22

23

24

25
```

3

1

APPEARANCES (CONTINUED):

2

3    Court Recorder:            T. LEYBA
                                UNITED STATES BANKRUPTCY COURT
4                               1300 Clay Street
                                Oakland, California 94612
5

6

7    Transcription Service:     Jo McCall
                                Electronic Court
8                               Recording/Transcribing
                                2868 E. Clifton Court
9                               Gilbert, AZ 85297
                                Telephone: (480) 361-3790
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                  P R O C E E D I N G S

 2   December 13, 2007                      3:14 p.m.

 3                        -oOo-

 4        THE COURT: All right.  I'll call Arriva

 5   Pharmaceuticals.  I understand we have a telephone

 6   appearance.  May I have the telephone appearance first.

 7        MS. LAZAR: Yes, Your Honor.  This is Erica Lazar.

 8   I'm here on behalf of MPM entities.

 9        THE COURT: All right.  Ms. Lazar, could you spell

10   your last name for the record, please?

11        MS. LAZAR: Yes, it's L-a-z-a-r.

12        THE COURT: All right.  Thank you.  And now the in

13   court appearances.

14        MR. AHRENS: Your Honor, Michael Ahrens, Tim Perry

15   and Mike Lauter for the Debtor, of Sheppard Mullin.

16        THE COURT: All right.

17        MR. COOPER: Michael Cooper, Wendel, Rosen, Black

18   and Dean for the Official Creditors' Committee.  With me

19   today, Your Honor, is my colleague, Tracy Green.

20        THE COURT: Okay.  Thank you.

21        MR. ROVENS: Good afternoon, Your Honor, Doug

22   Rovens and Penn Butler on behalf of Alphamed

23   Pharmaceuticals.

24        THE COURT: All right.  Thank you.

25   (Whereupon, the following colloquy is not transcribed and
```

5

1   the matter is recalled at 3:14 p.m. for the ruling.)

2         THE COURT: Okay.  Then I'm recalling Arriva

3   Pharmaceuticals.  Appearances have previously been stated,

4   so there is no need for the parties to restate their

5   appearances.  I believe everybody has been given a chance

6   to have their say, so unless there's somebody who stated an

7   appearance who wants to be heard that hasn't been heard,

8   I'm ready to announce rulings.

9         All right.  With that, let me take what I

10   consider to be the easiest one first, and that's Alphamed's

11   motion for relief from the automatic stay.  I'm going to

12   grant that motion to the extent of permitting the appeals

13   to go forward as far as they might go without prejudice to

14   renewal of the motion or a motion to expand the scope of

15   the relief in the event that a new trial should be ordered,

16   but I would like to retain that discretion, depending on

17   what's going on in the main case at the time.  So the

18   reasons are not very complex.  I just don't think it's the

19   province of a Bankruptcy Court to tell a Court of Appeals

20   that they can't hear a matter when a timely appeal has been

21   filed or requested, and major issues remain to be resolved,

22   especially issues that did not arise under the Bankruptcy

23   Code or in connection with the bankruptcy case.

24         And so I believe Alphamed is entitled to its day

25   in court to get a final decision in the Florida matter so

6

1  Mr. Butler or whoever as the case may be, would you submit

2  an order in that regard.

3          MR. BUTLER: Yes, Your Honor.

4          THE COURT:  All right.

5          The second easiest matter as far as I'm concerned

6  is the Rule 2019 motion which I'm going to deny.  I think

7  the Squires firm has gone on record as to the fact of its

8  representation to the various entities and I think the

9  relationship among them is well known to all the parties in

10  interest.  There's no secret connections here that appear

11  to have surfaced.  I think everybody knows what everybody

12  else's economic incentive is.  I don't think Squires

13  disclosing its particular fee arrangements are going to

14  advance the ball in terms of anything involving a stated

15  administration.  The parties are well known to each other,

16  and I think what has been disclosed is sufficient.  So

17  again, I'll ask Mr. Butler to submit an order denying that

18  motion.

19          MR. BUTLER: Thank you, Your Honor.

20          THE COURT: All right.  As to the Debtor's motion

21  to dismiss Alphamed's complaint, I'm going to grant that

22  motion under Rule 12(b)(6).  First of all, I'm holding that

23  Alphamed has no standing to bring this action.  The

24  gravamen of the action is that they want a ruling that the

25  license is not property of the estate and they've alleged

7

1   no particularized harm.  The standing issue in a bankruptcy

2   case is the leading case is the <u>Fondular</u> case (Phonetic).

3   It's 707 F2d, 441, where to have standing an entity must

4   demonstrate that the order at issue or at issue before the

5   Court may diminish the property of the plaintiff or

6   increase its burdens or detrimentally affect its rights.

7          Subsequent cases, including cases under Circuits,

8   have clarified that the matter can't be one that generally

9   affects creditors.  For example, one court said that,

10  quote:

11          "If a claim is a general one with no

12          particularized injury arising from it, and if

13          that claim could be brought by any creditor of

14          the debtor, the trustee is the proper person to

15          assert the claim and the creditors are bound by

16          the outcome of the trustee's action."

17  That's the <u>Call Vorhes & Company versus American Financial</u>

18  <u>Corp.</u> (Phonetic) 8 F3d, 130, 2nd Circuit ('93).  There are

19  lots and lots of cases along the same lines.  Here, I don't

20  think that there's been any particularized injury alleged

21  at all by Alphamed.  They're not trying to quiet their own

22  title to anything.  In fact, they disclaim any intent of

23  trying to quiet their own title to an asset as against the

24  claim of the estate.  They're not even seeking a ruling as

25  to who if anyone might own the license other than the

8

1   Debtor.  They just want to get it out of the estate.  That

2   sort of cause of action is not particularized, generalized.

3   There's no specific injury.  If there were standing to

4   assert such a cause of action, it would lie in every single

5   creditor in the estate, and the law is that not every

6   single creditor in the estate has the right to prosecute

7   actions to determine what is and isn't property of the

8   estate.  Rather, under Bankruptcy Code Section 323(a), the

9   trustee is the representative of the estate, and here,

10  under Chapter 11, the Debtor in Possession has all the

11  powers of a trustee.

12          I read the Catholic Diocese case, which seemed to

13  suggest that any creditor can bring an action to determine

14  the properties in the estate.  I have two reasons for

15  rejecting that case.  First, it's distinguishable on its

16  facts.  There, it was an action to bring in property of the

17  estate not to exclude property from the estate.  Secondly,

18  at least the party in the Catholic Diocese case was a

19  creditor, where here, based on the record as it now stands,

20  Alphamed is not a creditor.  The judgment of the Florida

21  Court found to the contrary.

22          So those are two major reasons for distinguishing

23  the Catholic Diocese case.  But frankly, to carry it one

24  step further, I just think that case is wrongly decided,

25  and I'm not bound by it, and I don't want to follow it.

9

1  The court did not cite Section 323(a) of the Bankruptcy

2  Code.  The court did not cite the Fondular case.  It didn't

3  cite any of the standing cases in bankruptcy cases that

4  have been resolved by the Ninth Circuit or the Ninth

5  Circuit BAP, recently, the Fulks (Phonetic) case at 211 BR

6  378 where the BAP went through all of the factors that

7  govern standing in bankruptcy cases.

8           If the Catholic Diocese case is correct, then any

9  creditor can bring any action to exclude property or bring

10 property into the estate without any particularized injury

11 whatsoever, and I just don't think that's the law.

12          So to the extent that the Catholic Diocese case

13 is not distinguishable, I just think it violates well

14 established Ninth Circuit law, and I decline to follow it.

15 Moreover, if any creditor could bring actions that affect

16 the estate, notwithstanding 323(a), then who has the

17 authority to settle the case?  Who has the authority to

18 appeal the case?  I think the cases that deal with the

19 standings issue are very well reasoned to the effect that

20 you can only have one party doing that and that's the

21 representative of the estate, in this case the Debtor in

22 Possession, without all of the creditors running around

23 willy-nilly bringing actions to bring in property of the

24 estate or to exclude property of the estate.

25          So to the extent Catholic Diocese would support

10

1  Alphamed's position, I decline to follow it and believe

2  that it is not correctly decided.

3          As an alternate ground for my ruling, I think

4  that Alphamed is indeed subject to the Rucker-Feldman

5  (Phonetic) doctrine.  Recently, the Supreme Court has

6  stated that Rucker-Feldman is a very narrow one.  In the

7  Exxon-Mobile case, at 125 Supreme Court, 1517, they

8  indicated that the Supreme Court has only found the Rucker-

9  Feldman doctrine to be applicable in two cases over the

10 years.  But the two cases involved the situation as noted

11 by the Supreme Court where the party lost in the State

12 Court and then filed a Federal action seeking similar

13 relief and in that specific case, the Federal Court is

14 bound by the State Court ruling.

15         On top of Rucker-Feldman, there is a statute, 28

16 U.S.C. 1738, which is the full faith and credit statute

17 which required Federal Courts to give full faith and credit

18 to decisions of State Courts, and here, I have to give full

19 faith and credit to the Florida Court's ruling.  This of

20 course is all subject to modification should that ruling be

21 overturned on appeal.

22         So Mr. Ahrens, I will ask you to please submit an

23 order granting the motion to dismiss Alphamed's complaint.

24         MR. AHRENS: I will, Your Honor.  Thank you.

25         THE COURT: As to the omnibus objection, the

11

1  omnibus objection will be sustained as to Prodius

2  (Phonetic).  The record is clear that Mr. Lezdey filed the

3  claim on behalf of Prodius.  He filed it in violation of a

4  preliminary injunction.  I do not believe that the

5  injunction in any way restricts or limits Federal Courts or

6  Federal Court jurisdiction.  All it does is restrict Mr.

7  Lezdey from what he can do on behalf of Prodius, and the

8  answer is he can't do anything, and that was a matter of

9  non-bankruptcy State law as to what his authority is, Mr.

10 Lezdey's authority as to Prodius, and so I reject the

11 argument that not letting him file the claim for Prodius is

12 in derogation of any Federal jurisdiction.

13        For the exact same reason I sustain the omnibus

14 objection as to Sonoran.  As to Alphamed, I believe I've

15 discussed my reasons why the objection to its claim is to

16 be sustained, although that ruling is again subject to

17 being revisited -- this ruling is subject to being

18 revisited in the event that the Florida Court ends up

19 finding that Alphamed does have a valid claim against the

20 Debtor.

21        I also sustain the omnibus objection as to Jamie

22 Holding (Phonetic), which I believe is bound by the

23 findings in the Arizona litigation on the theory, if

24 nothing else, that it was in privy with the particular

25 parties.

12

1          And finally, I sustain the objection as to Mr.

2    John Lezdey.   First -- and in doing so, I also deny the

3    motion to allow his late-filed claim.   Everybody here is

4    familiar with the <u>Pioneer</u> case by the Supreme Court which

5    cited a series of factors the court is to look at: the

6    danger of prejudice to the debtor, the length of the delay

7    and its potential impact on judicial proceedings, the

8    reason for the delay including whether it was in the

9    reasonable control of the movant and whether the movant

10   acted in good faith.   Here, although not every one of the

11   factors dictates in favor of the Debtor's objection, I do

12   find that the filing of the claim was under the reasonable

13   control of the movant.   Indeed, Mr. Lezdey was able to file

14   claims on behalf of his other entities on a timely basis,

15   and no explanation, plausible explanation, has been offered

16   as to why if he thought he had a claim, he couldn't do it

17   on behalf of himself.

18          I also find that he did not act in good faith in

19   filing his claim.   Just the claim on its face is lacking in

20   any kind of specificity.   I don't even think it gives

21   reasonable notice as to the basis for the claims, and this

22   is especially true in light of the history of litigation

23   between Mr. Lezdey and the Debtor and the findings of the

24   State Court.

25          On top of denying the motion to file the late

13

```
 1  claim, I would deny the motion on the -- I would disallow
 2  his claim; I'm backing up a little -- based on the shares
 3  and the theft and I.P. loss and the malicious prosecution
 4  claims for the reasons outlined by the Debtor in the
 5  objection which I'm not going to go through.  I reject the
 6  Debtor's arguments that the lack of any records on the
 7  Debtor's part is a basis for disallowing the claim.  I
 8  reject the Debtor's argument that the fact that there's no
 9  judgment is a basis for disallowing the claim.  But as to
10  those three items, I accept the remaining arguments as a
11  basis for disallowing Mr. Lezdey's claim.
12          As to the spinal injury and defamation, the
13  Bankruptcy Court's jurisdiction to rule on personal injury
14  claims is limited.  They seem to be personal injury claims,
15  so that in the event that it turns out that the -- my
16  ruling on the late claim is overturned by a higher court, I
17  believe that the spinal injury and defamation claims would
18  have to be litigated in District Court.  It would be my
19  intention to recommend that the reference be withdrawn as
20  to litigating those matters.
21          I think I've ruled on everything.
22          MR. AHRENS: Your Honor, on J.L. Technology, the
23  ruling is the same as Jamie?
24          THE COURT: Yes.  Yes, thank you.  I'm sorry about
25  that.
```

14

1          MR. AHRENS: We will prepare that order.

2          THE COURT: All right.  And my statements on the

3     record will constitute my findings and conclusions.

4          Oh, there is one motion I didn't rule on, and

5     that's the motion to estimate.  As a backup and alternative

6     ruling, I'm going to estimate each of the claims at issue

7     as zero, based -- for the same reasons I choose to disallow

8     them.  So if a backup ruling on that is needed as an

9     alternative ground, I would estimate them as zero.  I do

10    not believe that I need to make factual findings if the

11    basis for the disallowance is based on law as opposed to

12    findings of fact, and that is I believe the case here.

13         MR. AHRENS: Thank you, Your Honor.  I just have

14    one housekeeping matter.

15         THE COURT: Yes.

16         MR. AHRENS: Yesterday, Mr. Butler and myself and

17    Mr. Cooper all agreed upon the form of the Disclosure

18    Statement and order to be entered.  Should we upload that

19    tonight or do you -- we also have a copy of the Disclosure

20    Statement order.

21         THE COURT: I could -- if you've got a copy right

22    here and it'll move things along, I could sign it.

23         MR. AHRENS: And then per the order of the Court,

24    we will be mailing out the Plan package on Monday.

25         THE COURT: All right.  Did anybody have any

15

1  continuing objections to the Disclosure Statement that have

2  not been resolved, without conceding any confirmation

3  issues, of course?

4          All right, Mr. Ahrens, you've made all the

5  changes that have been ordered?

6          MR. AHRENS: Yes, Your Honor.

7          THE COURT: Okay.

8          MR. AHRENS: Thank you, Your Honor.  I think that

9  concludes the matters for today.

10         THE COURT: All right.  Thank you all.  Madam

11 Deputy, I believe that concludes our court for today.

12         THE CLERK: Yes, Your Honor.

13         THE COURT: All right.  Thank you.

14     (Whereupon, the proceedings are concluded at 3:30

15 p.m.)

16

17

18

19

20

21

22

23

24

25

16

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7

8          I certify that the foregoing is a correct

9    transcript from the digital sound recording of the

10   proceedings in the above-entitled matter.

11

12   DATED: December 29, 2007

13

14                         By:___/s/ Jo McCall_____

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT N**



Entered on Docket
**February 13, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: February 13, 2008

_____
EDWARD D. JELLEN
**U.S. Bankruptcy Judge**

1  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
2    A Limited Liability Partnership
     Including Professional Corporations
3  MICHAEL H. AHRENS,
   Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER,
5  Cal Bar No. 246048
   TIMOTHY C. PERRY,
6  Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
7  San Francisco, California  94111-4109
   Telephone:    415-434-9100
8  Facsimile:    415-434-3947

9  Attorneys for Debtor ARRIVA
   PHARMACEUTICALS, INC.
10

11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
                       OAKLAND DIVISION
13

14  In re                                 Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a       Chapter 11
    California corporation,
16                                        **ORDER (1) DISQUALIFYING VOTE
                    Debtor.               OF JOHN LEZDEY AGAINST THE
17                                        DEBTOR'S PLAN UNDER 11 U.S.C.
    Tax ID: 94-3287067                    § 1126(a); AND (2) DESIGNATING
18                                        JOHN LEZDEY'S VOTE AS IN BAD
                                          FAITH PURSUANT TO 11 U.S.C.
19                                        § 1126(e)**

20                                        Date:      January 16, 2008
                                          Time:      10:00a.m.
21                                        Place:     United States Bankruptcy Court
                                                     1300 Clay Street, Oakland, CA
22                                        Judge:     Hon. Edward D. Jellen
                                          Ctrm:      215
23

24      On January 11, 2008, Arriva Pharmaceuticals, Inc., the debtor and debtor-in-

25  possession in the above-captioned bankruptcy case (the "Debtor"), filed *Debtor's:*

26  *(1) Objection to Vote of John Lezdey and Request to Designate his Vote under Bankruptcy*

27  *Code § 1126(e) and (2) Motion to Strike AlphaMed's Objection to Plan and to Strike*

28

-1-

1  *Declaration of Gary Pekoe* (the "Objection"), as Docket #320. In the Objection, the

2  Debtor requested, among other things, an order of this Court (i) disqualifying the vote of

3  John Lezdey rejecting the Debtor's Fourth Amended Chapter 11 Plan of Reorganization,

4  Dated December 12, 2007 (the "Plan"), and (ii) designating Mr. Lezdey's rejection of the

5  Plan as in bad faith under 11 U.S.C. § 1126(e). On January 16, 2008, the Court heard

6  argument on the Objection. The appearances were as indicated in the record. For all the

7  reasons stated on the record, which reasons constitute the findings of this Court by

8  Bankruptcy Rule 7052,

9  **IT IS HEREBY ORDERED THAT**

10  1.  The vote of John Lezdey rejecting the Debtor's Plan is disqualified

11  because he lacked the requisite status as a creditor under 11 U.S.C. § 1126(a); and

12  2.  John Lezdey's rejection of the Debtor's Plan is designated as in bad

13  faith pursuant to 11 U.S.C. § 1126(e).

14  **\*\* END OF ORDER \*\***

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5MML1\400690680.1

ORDER

1

<u>COURT SERVICE LIST</u>

2

3  **1, Counsel for the Official Creditors' Committee**
Michael D. Cooper
4  Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
5  Oakland, CA 94607
(510) 834-6600
6
**2. Office of the U.S. Trustee /Oakland**
7  Office of the U.S. Trustee
Attention: Laurent Chen
8  1301 Clay St. #690N
Oakland, CA 94612
9  (510) 637-3200

10  **3. Attorneys for John Lezdey**
Daniel P. Balmat
11  Squire, Sanders and Dempsey
One Maritime Plaza, Suite 300
12  San Francisco, CA 94111-3492
(415) 954-0200
13
**4. Attorneys for John Lezdey**
14  Steven Delchin
Squire, Sanders and Dempsey
15  4900 Key Tower
127 Public Square
16  Cleveland, OH 44114-1304
(216) 479-8500
17
**5. Stuart M. Brown**
18  Edwards, Angell, Palmer & Dodge LLP
919 N Market St., 5th Fl.
19  Wilmington, DE 19801
(302) 428-5500
20
**6. M. David Minnick**
21  Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
22  San Francisco, CA 94105-2228
(415) 983-1351
23
**7. Nicolas De Lancie**
24  Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
25  San Francisco, CA 94111
(415) 984-9675
26
**8. American Express Bank FSB**
27  c/o Becket and Lee LLP
P.O. Box 3001
28  Malvern, PA 19355-0701

-3-

9. **Baxter Healthcare Corporation**
c/o David M. Wiseblood
Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105

10. **Allan Wachter**
c/o Chris D. Kuhner
Kornfield, Paul & Nyberg, P.C.
1999 Harrison Street, Suite 2675
Oakland, CA 94612

11. **John Lezdey**
140 Marcdale Blvd.
Indian Rocks Beach, FL 33785-2675

12. **Sacks Tierney P.A.**
Attn: Scott B. Cohen, Esq.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ  85251-3693

-4-