1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER Cal. Bar No. 246048
4  TIMOTHY C. PERRY, Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Attorneys for ARRIVA PHARMACEUTICALS, INC.

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                   (SAN FRANCISCO DIVISION)

11          On Appeal from the United States Bankruptcy Court
                for the Northern District of California
12                   Hon. Edward D. Jellen

13  ALPHAMED PHARMACEUTICALS          No. 08-01279-SI
    CORP.,
14                                    **DECLARATION OF M. SUE PRESTON
                  Claimant-Appellant, IN SUPPORT OF MOTION TO
15                                    DISMISS AS MOOT THE APPEAL OF
                                      ALPHAMED PHARMACEUTICALS
16  v.                                CORP. OF THE PLAN
                                      CONFIRMATION ORDER AND
17  ARRIVA PHARMACEUTICALS, INC.,     MEMORANDUM OF POINTS AND
                                      AUTHORITIES IN SUPPORT
18                  Reorganized Debtor-THEREOF**
                    Appellee.
19                                    Date: May 23, 2008
                                      Time: 9:00 a.m.
20                                    Location: Courtroom 10, 19th Floor
                                                450 Golden Gate Ave.
21                                                San Francisco, CA 94102
22

23

24

25

26

27

28

1

2    I, M. Sue Preston, declare as follows:

3    1.    I am the President and CEO of Arriva Pharmaceuticals, Inc., a California

4    corporation ("Arriva"), the reorganized debtor-appellee in this case. I make this

5    declaration in that capacity. Except for those statements made upon information and

6    belief, the following facts are based upon my personal knowledge and if called to testify, I

7    could and would competently testify to such facts. As to those statements made upon

8    information and belief, I believe them to be true.

9    2.    This declaration is submitted in support of the Motion to Dismiss as Moot

10   the Appeal of AlphaMed Pharmaceuticals Corp. ("AlphaMed") of the Plan Confirmation

11   Order and Memorandum of Points and Authorities in Support Thereof (the "Motion").

12   3.    This declaration principally covers all relevant events from the date of

13   confirmation of Arriva's plan of reorganization until the present day.

14   4.    On August 29, 2007, Arriva filed its Chapter 11 bankruptcy petition in the

15   United States Bankruptcy Court for the Northern District of California. Over the ensuing

16   few months until debtor-in-possession funding was absolutely critical in October, 2007,

17   Arriva approached six potential investors with an eye to negotiating a financing deal

18   within the terms of a plan of reorganization.

19   5.    On January 16 and 17, 2008, the United States Bankruptcy Court for the

20   Northern District of California (the "Bankruptcy Court") held a full trial on plan

21   confirmation, during which attorneys for Arriva and AlphaMed examined two witnesses.

22   The Debtor's Fourth Amended Chapter 11 Plan of Reorganization, Dated December 12,

23   2007 (the "Plan") received 100% approval from the voting creditors—a resounding

24   affirmation of Arriva's promise as a newly reorganized business. A copy of the Plan and

25   relevant portions of its schedules are attached to this declaration as Exhibit A. A copy of

26   the Disclosure Statement for the Debtor's Fourth Amended Chapter 11 Plan of

27   Reorganization Dated December 12, 2007, is attached to this declaration as Exhibit B.

28

-1-

6.     On January 30, 2008, the Bankruptcy Court entered the Order Confirming Debtor's Fourth Amended Chapter 11 Plan of Reorganization Dated December 12, 2007 (the "Plan Confirmation Order").  A copy of this final order is attached as Exhibit C.

7.     On February 7, 2008, AlphaMed appealed the Plan Confirmation Order.

8.     Despite its decision to appeal the Plan Confirmation Order, AlphaMed neither sought, nor obtained, a stay of the Plan Confirmation Order from any court.

9.     Because the Bankruptcy Court issued no such stay, Arriva 's principals duly implemented the Plan, causing the newly reorganized Arriva to "go effective." Thus, on February 13, 2008, Arriva formally emerged from bankruptcy as a reorganized company.

10.    In bringing the Plan effective, Arriva took a number of actions.  Specifically, Arriva:

(a)     Drew down on its $6 million line of credit provided by its lenders, Nordic and MPM[1] (a copy of the relevant disbursement requests are attached to this declaration as Exhibit D, and a copy of the relevant account statements are attached to this declaration as Exhibit E);

(b)     Paid to Nordic and MPM loan principal in the amount of $1.5 million, as well as $41,333.36 of accrued loan interest;

(c)     Filed with the California Secretary of State new Articles of Incorporation and adopted new bylaws (a copy of the Articles of Incorporation is attached to this declaration as Exhibit F);

---

[1] "Nordic" consists of Nordic Biotech Venture Fund II K/S.  "MPM" consists of MPM Bioventures II-QP, L.P.; MPM Bioventures II L.P.; MPM Asset Management Investors II 2002 BVII LLC; and MPM Bioventures GMBH & Co. Parellelbeteiligungs KG.

W02-WEST:5TIP1\400741056.1                                                    DECLARATION

(d) Created a new investors' rights agreement with an eye to making an initial public offering (a copy of this agreement is attached to this declaration as Exhibit G);

(e) Rescinded more than 100,000 shares of old common stock, owned by 18 different shareholders;

(f) Issued 400,000 shares of new common stock to five separate entities comprising Nordic and MPM. MPM and Nordic, as holders of stock, are now free, subject to certain restrictions, to convey portions of those shares to any number of third parties (copies of the stock certificates and the stock purchase agreement are attached to this declaration as Exhibit H and I, respectively);

(g) Rescinded more than 5 million shares of old preferred stock, owned by 65 different individuals and entities;

(h) Issued 1,500 shares of new Series A preferred stock to five separate entities;

(i) Secured settlement with twelve companies and individuals, who withdrew their claims filed in the Bankruptcy Court—worth more than $31.8 million (settlement documents for some of the relevant entities are attached to this declaration as Exhibit J);

(j) Assumed a contract with QSV Biologics, binding both Arriva and QSV Biologics to continue their reciprocal performance of a contract in which QSV manufactures and provides clinical rAAT to Arriva;

W02-WEST:5TIP1\400741056.1

DECLARATION

(k)    In connection with the assumption of the contract with QSV
        Biologics, paid a cure amount exceeding $273,000, and since
        confirmation has gone on to pay more than 648,600, and has been
        recently invoiced more than $121,500 for services rendered (a copy of
        the bank statement reflecting the relevant wire transfers are attached
        to this declaration as Exhibits K);

(l)    Assumed forty executory contracts Arriva had entered into before
        filing for bankruptcy, as enumerated in "Schedule G" submitted to the
        bankruptcy court. By assuming the contracts, Arriva bound itself and
        those companies to continue their reciprocal performance just as they
        had done before Arriva filed for bankruptcy;

(m)    Paid to more than $75,000 to Hefferman Insurance Brokers for its
        director's and officer's insurance (a copy of the relevant invoice is
        attached to this declaration as Exhibit L);

(n)    Funded a pot worth $776,000 from which creditors eventually will
        recover their claims (a copy of the relevant wire transfer is attached to
        this declaration as Exhibit M);

(o)    Commenced distribution of funds from this pot to creditors (a copy of
        the form distribution letter is attached to this declaration as Exhibit
        N);

(p)    Continued to expend funds as part of its monthly operating budget as
        a newly reorganized company. For example, in February, post-
        Effective Date, Arriva spent approximately $170,100 on non-
        bankruptcy-related costs. In March, Arriva spent approximately

-4-

$766,610 on such costs; and Arriva plans to spend approximately $332,000 in April; and approximately $237,000 in May (copies of bank statements for February and March are attached to this declaration as Exhibits E and O);

(q) Received by assignment from Dr. Wachter his interest in the Wachter Judgment. That judgment, initially worth $17 million, has now become an asset of Arriva as a newly reorganized company (a copy of the assignment is attached to this declaration as Exhibit P); and

(r) In connection with all the above activities, sent notice to more than 200 entities and individuals of Arriva's new status as a reorganized company (a copy of the notice and its certificate of service is attached to this declaration as Exhibit Q).

11.     In addition, Nordic created a corporate entity in the Netherlands, named Arriva Pharmaceuticals, B.V., to support the funding of the reorganized Debtor.

12.     Before the Effective Date of the Plan, Nordic was the agent lender to the Debtor under a Debtor-in-Possession Loan to the Debtor ("DIP Loan"). Prior to the February 13, 2008 Effective Date, Nordic and MPM had participated in only a $1.5 million DIP Loan. At that time, Nordic had no shareholder interest in the Debtor; it was just a lender. But then, in reliance on the unstayed Confirmation Order, Nordic and MPM on the Effective Date advanced another $2.5 million to allow the Plan to become effective. Nordic and MPM also advanced on that date $1.5 million to allow the DIP Loan to be paid. In so doing, Nordic and MPM became more than just lenders. Nordic and MPM became equity shareholders of Arriva as a reorganized company. After the Effective Date Nordic and MPM made further advances on the $6 million loan. Specifically, Nordic and MPM advanced $500,000 to the Reorganized Debtor on February 20, 2008 and advanced another $750,000 on March 19, 2008. Arriva anticipates that by the time this Court hears

1   this Motion on May 23, Nordic and MPM will have advanced, on April 30, 2008, another
2   $750,000 to complete the total of the $6 million financing. (a copy of the relevant
3   disbursement requests are attached to this declaration as Exhibit D).

4        13.    Before the Effective Date, MPM was not only the lead shareholder in Arriva,
5   but also enjoyed representation on Arriva's board.  MPM participated in the Nordic DIP
6   Loan and indeed, at the beginning of Arriva's bankruptcy, MPM filed substantial proofs of
7   claim totaling millions of dollars.  But on the Effective Date, all this changed.  MPM
8   relinquished its shareholder interest in Arriva, and dismissed its millions of dollars of
9   claims against the Debtor.  MPM additionally gave up its seats on Arriva's board and
10  participated in additional financing to the Reorganized Debtor.

11

12       I declare under penalty of perjury under the laws of the United States of America
13  that the foregoing is true and correct.  Executed on April 15, 2008, at Alameda,
14  California.

15

16                                                    M. SUE PRESTON
17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5TIP1\400741056.1                                          DECLARATION

# EXHIBIT A (Part 1)

1   SHEPPARD, MULLIN, RICHTER
      & HAMPTON LLP
2     A Limited Liability Partnership
      Including Professional Corporations
3   MICHAEL H. AHRENS,
    Cal. Bar No. 44766
4   ORI KATZ, Cal. Bar No. 209561
    MICHAEL M. LAUTER,
5   Cal. Bar No. 246048
    Four Embarcadero Center, 17th Floor
6   San Francisco, California  94111-4109
    Telephone:    415-434-9100
7   Facsimile:    415-434-3947

8   Attorneys for ARRIVA PHARMACEUTICALS,
    INC.
9

10                  UNITED STATES BANKRUPTCY COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                        OAKLAND DIVISION

13

14  In re                              Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
    California corporation,
16                                     **DEBTOR'S FOURTH AMENDED**
                    Debtor.            **CHAPTER 11 PLAN OF**
17                                     **REORGANIZATION, DATED**
    Tax ID: 94-3287067                 **DECEMBER 12, 2007**
18
                                       Date:       January 16, 2007
19                                     Time:       10:00 a.m.
                                       Place:      United States Bankruptcy Court
20                                                 1300 Clay Street, Oakland, CA
                                       Judge:      Hon. Edward D. Jellen
21                                     Ctrm:       215

22

23

24

25

26

27

28

W02-WEST:FKA\400406510.11                            DEBTOR'S FOURTH AMENDED
                                                     CHAPTER 11 PLAN OF
REORGANIZATION

# INTRODUCTION

Arriva Pharmaceuticals, Inc., the above-captioned debtor and debtor in possession ("Arriva" or the "Debtor"), hereby proposes this Fourth Amended Chapter 11 Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code. Reference is made to the Disclosure Statement[1] for risk factors and a summary and analysis of the Plan and certain related matters. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XI of this Plan, the Debtor expressly reserves the right to alter, amend or modify this Plan, one or more times, before its substantial consummation.

## ARTICLE I

## DEFINITIONS

1.1    **Scope of Definitions**. As used in this Plan, the following terms shall have the respective meanings specified below. Whenever the context requires, such terms shall include the plural as well as the singular, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

1.2    **"Accrued"** shall mean an expense incurred but not yet billed for or paid.

1.3    **"Administrative Claim"** shall mean a Claim under sections 503(b) and 1114(e)(2) of the Bankruptcy Code or determined to be an Allowed Administrative Claim by a Final Order that is entitled to priority under section 507(a)(1) or 507(b) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Case including, without limitation, any actual and necessary expenses of operating the business

---

[1] All capitalized terms not defined in this introduction shall have the meanings set forth in Article I of this Plan.

-1-

1 | of the Debtor or preserving the estate incurred after the Petition Date, and any and all fees

2 | and expenses of Professionals Filed under section 330, 331 or 503 of the Bankruptcy Code.

3 |      1.4    **"Administrative Claim Bar Date"** shall have the meaning set forth

4 | in section 2.3 of the Plan.

5 |      1.5    **"Allowed Claim"** or **"Allowed [    ] Claim"** shall mean: (a) any

6 | Claim, proof of which is/was Filed with the Bankruptcy Court or the Debtor's court-

7 | appointed claims agent on or before the date designated by the Bankruptcy Court as the

8 | last date(s) for Filing proofs of claim with respect to such Claim, or which has been or

9 | hereafter is scheduled by the Debtor as liquidated in amount and not disputed or contingent

10 | and which, in either case, is a Claim as to which no objection to the allowance thereof has

11 | been Filed within the applicable period of limitation (if any) for objection to Claims fixed

12 | by the Bankruptcy Court, or as to which any objection has been determined by a Final

13 | Order of the Bankruptcy Court (allowing such Claim in whole or in part); (b) a Claim that

14 | is allowed (i) in any contract, instrument, or other agreement entered into in connection

15 | with the Plan, (ii) in a Final Order, or (iii) pursuant to the terms of the Plan; (c) a request

16 | for payment of an Administrative Claim, which is made before the Administrative Claims

17 | Bar Date, or otherwise has been deemed timely asserted under applicable law, and is an

18 | Administrative Claim as to which no objection to allowance thereof has been Filed within

19 | the applicable deadline pursuant to section 2.3 of the Plan; or (d) any Claim that pursuant

20 | to Bankruptcy section 502(c) or otherwise is estimated for distribution purposes by the

21 | Bankruptcy Court in an amount in excess of $0.00 by a Final Order.  Except as otherwise

22 | provided herein, in accordance with section 502(d) of the Bankruptcy Code, a Claim held

23 | by any party that is subject to an Avoidance Action shall not be an Allowed Claim until

24 | such time as a Final Order is entered by the Bankruptcy Court on the Avoidance Action

25 | and any judgment entered against such creditor is satisfied.

26

27

28

W02-WEST:FKA\400406510.11

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

1        1.6    **"Arizona Case"** shall mean the case styled *Allan Wachter, et al. v.*

2  *John Lezdey, et al.*, pending before the Superior Court of Arizona, Maricopa County at

3  number CV 1999-009334.

4        1.7    **"Avirra"** shall mean Avirra, Inc., a wholly-owned subsidiary of

5  Arriva and a corporation organized and existing under the laws of the State of Delaware.

6        1.8    **"Avoidance Actions"** shall mean any and all claims and causes of

7  action of the Debtor, arising under the Bankruptcy Code, or other applicable law including,

8  without limitation, sections 544, 545, 547, 548, 549 and 550 thereof, but not including any

9  claim or cause of action against the Professionals.

10       1.9    **"Ballot"** shall mean the form or forms that will be distributed along

11  with the Disclosure Statement to holders of Allowed Claims and Allowed Interests in

12  classes that are Impaired under the Plan and entitled to vote, which the holders of Impaired

13  Claims and Allowed Interests may use to vote to accept or reject the Plan.

14       1.10   **"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978,

15  11 U.S.C. sections 101, <u>et</u>. <u>seq</u>., as in effect on the Petition Date, and is amended effective

16  as of the Petition Date.

17       1.11   **"Bankruptcy Court"** shall mean the United States Bankruptcy Court

18  for the Northern District of California or such other court as may hereafter be granted

19  jurisdiction over the Chapter 11 Case.

20       1.12   **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy

21  Procedure effective August 1, 1996 in accordance with the provisions of 28 U.S.C. section

22  2075, and the local rules of the Bankruptcy Court, as in effect on the Petition Date, and is

23  amended effective as of the Petition Date.

24       1.13   **"Bar Date"** shall mean October 12, 2007, which was the date set by

25  the Bankruptcy Court as the last day to file proofs of Claim.

26       1.14   **"Business Day"** shall mean any day other than a Saturday, Sunday or

27  legal holiday as such term is defined in Bankruptcy Rule 9006.

28

-3-

1.15 **"Cash"** shall mean cash and cash equivalents, including, but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.16 **"Chapter 11 Case"** shall mean the above-captioned chapter 11 case pending for the Debtor.

1.17 **"Claim"** shall mean a claim against the Debtor, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

1.18 **"Class"** shall mean a category of holders of Claims or Interests, as classified pursuant to Article II of the Plan.

1.19 **"Class 6 Interests"** shall mean the Interests in the Debtor held by the Series D Holders.

1.20 **"Class 7 Interests"** shall mean the Interests in the Debtor held by the Series C Holders.

1.21 **"Class 8 Interests"** shall mean the Interests in the Debtor held by the Series B Holders.

1.22 **"Class 9 Interests"** shall mean shall mean the Interests in the Debtor held by the Series A Holders.

1.23 **"Class 10 Interests"** shall mean the common stock Interests in the Debtor.

1.24 **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee and as reconstituted from time to time and existing as of the Confirmation Date, if any.

1.25 **"Confirmation"** shall mean the entry of the Confirmation Order on the docket of the Bankruptcy Court.

1.26 **"Confirmation Date"** shall mean the date of entry of an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of the Bankruptcy Code.

-4-

1    1.27    **"Confirmation Hearing"** shall mean the hearing to confirm the Plan.

2    1.28    **"Confirmation Order"** shall mean the order of the Bankruptcy Court

3    confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

4    1.29    **"Control Account Collateral"** shall mean the $55,620 cash

5    deposited prior to the Petition Date by the Debtor with SVB under a deposit control

6    account agreement, in order to collateralize and secure the Severance Claims.

7    1.30    **"Creditor"** shall mean any person or entity having a Claim against

8    the Debtor, including without limitation a Claim that arose on or before the Petition Date

9    or a Claim against the Debtor's estate of any kind specified in section 502(g), 502(h) or

10   502(i) of the Bankruptcy Code.

11   1.31    **"Cure Escrow"** shall mean the Reserve established and funded by the

12   Reorganized Debtor for the purpose of satisfying the Allowed Claims of non-Debtor

13   parties to executory contracts and unexpired leases assumed pursuant to the Plan, or

14   separate order of the Bankruptcy Court and not otherwise satisfied or provided for as of the

15   Effective Date.  The amount of funds deposited into the Cure Escrow will be in an amount

16   not greater than $274,000 or such lesser amount as determined by the Bankruptcy Court.

17   1.32    **"Debtor"** shall mean Arriva Pharmaceuticals, Inc.

18   1.33    **"Debtor-in-Possession"** shall mean the Debtor in the capacity, and

19   with the status and rights, conferred by sections 1107 and 1108 of the Bankruptcy Code.

20   1.34    **"Deficiency Claim"** shall mean, with respect to a Claim that is a

21   Secured Claim, the amount by which the Allowed amount of such Claim exceeds the value

22   of the property owned or held by the Debtor that collateralizes such Claim.

23   1.35    **"DIP Agent"** shall mean Nordic, in its capacity as administrative and

24   collateral agent under the DIP Agreement.

25   1.36    **"DIP Agreement"** shall mean that certain Debtor-in-Possession Loan

26   and Security Agreement by and among Debtor, as borrower, DIP Agent and the DIP

27   Lender.

28

-5-

1     1.37  **"DIP Claims"** shall mean all obligations of the Debtor under the DIP

2 Agreement and DIP Facility.

3     1.38  **"DIP Facility"** shall mean that certain debtor in possession, super

4 priority, primary first lien loan facility in the original principal amount of $1,500,000,

5 made available by the DIP Agent and DIP Lender and evidenced by, among other things,

6 the DIP Agreement.

7     1.39  **"DIP Lender"** or **"DIP Lenders"** shall mean individually or

8 collectively Nordic and MPM, each in its capacity as a lender and the lender parties to the

9 DIP Agreement.

10     1.40  **"Disclosure Statement"** shall mean the disclosure statement

11 respecting the Plan, as approved by the Bankruptcy Court as containing adequate

12 information in accordance with section 1125 of the Bankruptcy Code, all exhibits and

13 annexes thereto and any amendments or modifications thereof.

14     1.41  **"Disputed Claim"** or **"Disputed [   ] Claim"** shall mean any

15 Claim, including any Administrative Claim, which has not become an Allowed Claim

16 pursuant to the Plan or a Final Order.

17     1.42  **"Effective Date"** shall mean the first business day following the date

18 on which each of the conditions set forth in section 9.2 of the Plan have been satisfied or

19 waived (if waivable).

20     1.43  **"Entity"** shall have the meaning set forth in section 101(15) of the

21 Bankruptcy Code.

22     1.44  **"Estate"** shall mean estate of the Debtor.

23     1.45  **"Exit Facility"** shall mean the secured term loan facility in the

24 maximum principal amount of $6 million provided by the Plan Funders pursuant to the

25 Plan Funders Debt Commitment and the Exit Facility Agreement.

26     1.46  **"Exit Facility Agreement"** shall mean that certain Convertible Loan

27 Agreement and the Security Agreement, each between Reorganized Debtor and the Plan

28

W02-WEST:FKA\400406510.11

DEBTOR'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Funders entered into by the Plan Funders and the Debtor.  The Exit Facility Agreement will be filed as part of the Plan Supplement.

1.47  **"Fee Claim"** shall mean a claim under section 328, 330(a), 503 or 1103 of the Bankruptcy Code for the compensation of a Professional for services rendered or reimbursement of expenses incurred in the Chapter 11 Case on or prior to the Effective Date (including expenses of the members of the Committee).

1.48  **"Fee Claim Bar Date"** shall have the meaning set forth in section 2.4 of the Plan.

1.49  **"File", "Filed", or "Filing"** shall mean file, filed or filing with the United States Bankruptcy Court for the Northern District of California.

1.50  **"Final DIP Order"** shall mean the Order (1) Superseding Prior Order Providing for Post-Petition Financing and (2) Authorizing Debtor to Obtain Post-Petition Senior Secured Super priority Financing pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c)(1), 363(c)(2), 363(c)(3), and 364(e), and (3) Granting related Relief.

1.51  **"Final Order"** shall mean an order entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, as to which either of the following have occurred:  (i) no appeal, certiorari proceeding or other review reconsideration or rehearing has been requested or is still pending, and the time for filing a notice of appeal or petition for certiorari or further review, reconsideration or rehearing has expired; or (ii) if an appeal has been filed as to such order, no stay of the effectiveness of such order has been issued by a court of competent jurisdiction.

1.52  **"General Unsecured Claim"** shall mean any unsecured, non-priority Claim, including, without limitation, any Deficiency Claim or Indemnification Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, Lezdeys Claims, DIP Claim or Secured Claim.

1.53  **"Impaired"** shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

-7-

1        1.54    **"Indemnification Claims"** means Claims for indemnification or

2    advancement.

3        1.55    **"Initial Distribution List"** shall mean the certain list of holders of

4    Allowed Classes 4 and 5 Claims, which list is annexed to the Disclosure Statement, and

5    which list shall be amended from time to time up to the Effective Date to take into

6    consideration Claims that were initially Disputed Claims that subsequently become

7    Allowed Claims as of the Effective Date.

8        1.56    **"Interest"** shall mean, with respect to the Debtor, any equity security

9    or any other security or agreement granting rights to convert to, purchase, hold or own any

10    equity security in Debtor as defined in section 101(16) of the Bankruptcy Code.

11        1.57    **"Lezdeys"** shall mean collectively John Lezdey; Noreen Lezdey;

12    Jarett Lezdey; Darren B. Lezdey; AlphaMed Pharmaceuticals Corp.; J.L. Technology,

13    L.P.; J.L. Technology Ltd.; Jamie Holdings, LLC; Sonoran Desert Chemicals, LLC; J & D

14    Science Inc.; and Protease Sciences, Inc., together with any other Person in which any

15    Lezdey holds an interest and each of their respective successors, assigns, personal

16    representatives, heirs, executors, attorneys, and other professionals or consultants and

17    individually a "Lezdey."

18        1.58    **"Lezdeys Bankruptcies"** shall mean the bankruptcy cases pending in

19    the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, at

20    Case No. 8-05-bk-08711-KRM respecting Jarett Lezdey's case and 8-05-bk-08716-KRM

21    respecting Darren B. Lezdey's case, together with any successor case, or other case

22    commenced under the Bankruptcy Code or other similar insolvency law respecting any of

23    the Lezdeys.

24        1.59    **"Lezdeys Claims"** shall mean any and all Unsecured Claims asserted

25    or assertable by the Lezdeys, or any of them, or any successor or assignee thereof, against

26    or through the Debtor, including, without limitation, the claims asserted in the case styled

27    *AlphaMed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc. and Spinelli*

28

-8-

1  *Corporation*, pending in the United States District Court for the Southern District of

2  Florida and on appeal before the United States Court of Appeals for the Eleventh Circuit at

3  No. 06-13432-II, and in the case styled *John Lezdey, J.L. Technology, L.P. and Jamie*

4  *Holdings, LLC v. Alan Wachter, Susan Wachter, Nathan M. Technologies Limited*

5  *Partnership, Seth Chemicals, Inc., Arriva Pharmaceuticals, Inc. f/k/a AlphaOne*

6  *Pharmaceuticals, Inc., Philip Barr, Sonoran Desert Chemicals, L.L.C., Protease Sciences,*

7  *Inc. and John Does 1 through 10*, pending in the District Court for Clark County, Nevada

8  at No. A542981, the Adversary Complaint filed in this Bankruptcy Case by AlphaMed

9  against the Debtor with respect to the Protease License, any counter-claim or cross-claims

10  asserted in the Lezdeys litigation, and any Indemnification Claims asserted by the Lezdeys,

11  or either of them, that is not an Administrative Claim, Priority Tax Claim, Other Priority

12  Claim, Fee Claim, DIP Claim or Secured Claim.  The Lezdeys Claims are Disputed

13  Claims, unless they become Allowed Claims on or prior to the Effective Date.

14       1.60    **"Lezdeys Litigation"** shall mean any and all claims, causes of action,

15  judgments, Liens, actions, and proceedings, at law, in equity or mixed, relating to any

16  claim of either of the Debtor or Wachter, including, without limitation, the Arizona Case

17  and the Wachter Judgment entered in such case and wherever domesticated, and the

18  adversary proceedings pending in the Lezdeys Bankruptcies at 8:07-ap-00164-KRM and

19  8:07-ap-00164-KRM, together with any other claims of either Debtor against any Lezdey.

20       1.61    **"Lien"** shall mean a valid and enforceable lien, mortgage, security

21  interest, pledge, charge, encumbrance, or other legally cognizable security device of any

22  kind.

23       1.62    **"Management and Employee Incentive Plan"** shall mean the

24  Management and Employee Incentive Plan contemplating performance-based payments,

25  including payments on account of the Severance Claims from the Control Account

26  Collateral, which plan shall be filed with and contained in the Plan Supplement.

27

28

1.63    **"Miscellaneous Secured Claims"** shall mean any and all Secured Claims, but excluding the Secured Claims of the DIP Agent and DIP Lender.

1.64    **"MPM"** means collectively MPM Bioventures II-QP, L.P.; MPM Bioventures II, L.P.; MPM Asset Management Investors II 2002 BVII LLC; and MPM Bioventures GMBH & Co. Parellelbeteiligungs KG.

1.65    **"Net Proceeds"** shall mean the Cash received from the sale, transfer, or collection of Property or the conversion of such Property, including, without limitation, the Proceeds of any License Agreement, to Cash in some other manner as contemplated in this Plan, less the reasonable, necessary and customary expenses attributable to such sale, transfer, collection or conversion, recordation and filing fees, property taxes, brokerage fees and commissions, collection costs and attorneys' and other professional fees and expenses.  In determining Net Proceeds, only costs or expenses related to the Property in question shall be charged against the Proceeds of such Property.

1.66    **"New Common"** shall mean the newly authorized common stock of the Reorganized Debtor, issued and distributed to the Plan Funders pursuant to the Plan and equity securities to be issued and distributed.

1.67    **"New Series A Preferred"** shall mean the newly authorized Series A Preferred stock of the Reorganized Debtor, issued and distributed to the Plan Funders pursuant to the Plan.

1.68    **"Nordic"** shall mean Nordic Biotech Venture Fund II K/S.

1.69    **"Other Priority Claim"** shall mean any Claim against the Debtor other than an Administrative Claim, Fee Claim or Priority Tax Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.70    **"Person"** shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.71    **"Petition Date"** shall mean the date upon which the Debtor filed its petition under Chapter 11 of the Bankruptcy Code, commencing the Chapter 11 case.

-10-

1         1.72  **"Plan"** shall mean this Debtor's Chapter 11 Plan of Reorganization,

2  all exhibits hereto and any amendments or modifications hereof, all as supplemented by

3  the Plan Supplement.

4         1.73  **"Plan Expenses"** shall mean all actual and necessary costs and

5  expenses incurred after the Effective Date in connection with the administration of the

6  Plan, including, but not limited to, (i) the Debtor's and the Reorganized Debtor's costs,

7  expenses and legal fees incurred related to filing and prosecuting objections to Claims,

8  (ii) the Debtor's and the Reorganized Debtor's costs, expenses and legal fees incurred to

9  litigate, estimate and settle the Avoidance Actions and Lezdeys Litigation, including, but

10 not limited to, attorneys' fees, accounting fees, expert witness fees, and all costs relating to

11 obtaining and distributing such recoveries, and (iii) all fees payable pursuant to section

12 1930 of Title 28 of the United States Code.

13        1.74  **"Plan Expense Reserve"** shall mean the sum of $115,000 and has the

14 meaning ascribed to such term in section 7.3 of the Plan.

15        1.75  **"Plan Funders"** shall mean collectively Nordic, MPM and other

16 lender parties to the Plan Funders Debt Commitment, provided, however, that when

17 referring to approvals, consents or other actions by Plan Funders, it shall mean such

18 approvals, consents and other actions taken by the agent for the Plan Funders pursuant to

19 the provisions of the DIP Agreement or the Exit Facility Agreement, in effect at the time,

20 governing the authority of the agent to act on behalf of the Plan Funders.

21        1.76  **"Plan Funders Cash Contribution"** shall have the meaning ascribed

22 to such term in section 6.4 under the Plan.

23        1.77  **"Plan Funders Consideration"** shall have the meaning ascribed to

24 such term in section 6.4 under the Plan.

25        1.78  **"Plan Funders Debt Commitment"** shall mean the debt

26 commitments executed by the Plan Funders in the aggregate principal amount of

27 $6 million, the terms and conditions of which shall be more fully set forth in the Plan

28

-11-

1  Supplement.  The Plan Funders Debt Commitment proceeds shall be used in part to

2  refinance the DIP Obligations due and owing as of the Effective Date under the DIP

3  Facility.

4          1.79  **"Plan Supplement"** shall mean the supplemental appendix filed with

5  the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing that will

6  contain, among other things, Plan Funders Debt Commitment, Management and Employee

7  Incentive Plan, and Shareholder Agreement respecting the Interest holders in the

8  Reorganized Debtor.

9          1.80  **"Priority Tax Claim"** shall mean any Claim for taxes against the

10  Debtor entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy

11  Code.

12          1.81  **"Proceeds"** shall mean the Cash received from the sale, transfer, or

13  collection of Property or the conversion of such Property to Cash in some other manner as

14  contemplated in this Plan, whether received before or after the Effective Date.

15          1.82  **"Professionals"** shall mean those Persons (i) employed pursuant to an

16  order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy

17  Code and to be compensated for services rendered to the Debtor prior to the Effective

18  Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) for

19  which compensation and reimbursement has been allowed by the Bankruptcy Court

20  pursuant to section 503(b)(4) of the Bankruptcy Code.

21          1.83  **"Property"** means all property of the Debtor's Estate of any nature

22  whatsoever, real or personal, tangible or intangible, previously or now owned by the

23  Debtor, or acquired by the Debtor's Estate, as defined in section 541 of the Bankruptcy

24  Code.

25          1.84  **"Pro Rata"** means, as of any distribution date, with respect to any

26  Allowed Claim in any Class, the proportion that such Allowed Claim bears to the

27

28

-12-

1    aggregate amount of all Allowed Claims and Disputed Claims, without duplication, in such

2    Class.

3            1.85    **"Protected Parties"** shall have the meaning ascribed to such term in

4    section 11.9 of the Plan.

5            1.86    **"Remaining Assets"** shall mean all assets of the Debtor of any nature

6    whatsoever, including, without limitation, property of the estate pursuant to section 541 of

7    the Bankruptcy Code, claims of right, interests and property, real and personal, tangible,

8    and intangible, including but not limited to accounts receivable or other rights to receive

9    Proceeds, but excluding the Claims released pursuant to this Plan and/or the Confirmation

10   Order.

11           1.87    **"Reorganized Debtor"** shall mean Arriva Pharmaceuticals, Inc. from

12   and after the Effective Date, pursuant to the amended and restated articles of incorporation,

13   by-laws and other governance documents included in the Plan Supplement.

14           1.88    **"Reserves"** shall mean collectively the Unsecured Claims Pool

15   Escrow, Unsecured Claims Pool, Cure Escrow, and Plan Expense Reserve, together with

16   any other escrow, or reserve established and funded on or before the Effective Date.

17           1.89    **"Reserves Balances"** shall mean the balance of any Reserve after

18   payment of all Allowed Claims with respect to which such Reserve is specifically

19   established.

20           1.90    **"Schedules"** shall mean the Debtor's Schedules of Assets and

21   Liabilities Filed pursuant to Bankruptcy Rule 1007 as they may be amended from time to

22   time.

23           1.91    **"Secured Claim"** shall mean all or a portion of a Claim existing on

24   the Petition Date, as finally Allowed and approved by the Bankruptcy Court, to the extent

25   that such claim is not greater than the value of the Property securing such Secured Claim.

26           1.92    **"Series A Holders"** shall mean collectively the holders of the Series

27   A Preferred stock issued by the Debtor.

28

-13-

1    1.93    **"Series B Holders"** shall mean collectively the holders of the Series

2    B Preferred stock issued by the Debtor.

3    1.94    **"Series C Holders"** shall mean collectively the holders of the Series

4    C Preferred stock issued by the Debtor.

5    1.95    **"Series D Holders"** shall mean collectively the holders of the Series

6    D-1, D-2 and D-3 Preferred stock issued by the Debtor.

7    1.96    **"Severance Claims"** shall mean the severance claims of Alexander

8    Stafford and Rebecca Wheeler against the Debtor.

9    1.97    **"SVB"** shall mean Silicon Valley Bank.

10    1.98    **"SVB Collateral"** shall mean the $400,000 Cash deposit by the

11    Debtor with SVB to cash collateralize the letter of credit issued by SVB for the benefit of

12    the landlord of the Debtor's headquarters.

13    1.99    **"Unimpaired"** shall mean any Claim that is not Impaired within the

14    meaning of section 1124 of the Bankruptcy Code.

15    1.100    **"Unsecured Claims Pool"** shall mean an amount equal to the lesser

16    of $776,000 or the aggregate sum of the Allowed Claims in Class 4, to be used to satisfy

17    Allowed Class 4 and Class 5 Unsecured Claims.

18    1.101    **"Unsecured Claims Pool Escrow"** shall mean the escrow established

19    by the Plan Funders in the amount of the Unsecured Claims Pool for the purpose of

20    making distributions to and satisfying the Allowed Claims of holders of Allowed Class 4

21    General Unsecured Claims and Allowed Class 5 Unsecured Claims.

22    1.102    **"Wachter"** shall mean collectively Allan Wachter, M.D.,

23    individually and on behalf of his marital community; Susan Wachter; Seth Chemicals, Inc.;

24    Nathan M. Technologies Limited Partnership, together with any other Person in which any

25    Wachter holds an interest and each of their respective successors, assigns, personal

26    representatives, heirs, executors, attorneys, and other professionals or consultants and

27    individually a "Wachter."

28

-14-

1.103  **"Wachter Judgment"** shall mean the final, non-appealable judgment entered in the Arizona Case and wherever domesticated, including, without limitation in the Lezdeys Bankruptcies.

All terms not expressly defined herein shall have the respective meanings given to such terms in section 101 of the Bankruptcy Code or as otherwise defined in applicable provisions of the Bankruptcy Code.

Unless otherwise specified herein, any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors, assigns and affiliates pursuant to Bankruptcy Rule 3001(c).

The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS

## AND GENERAL PROVISIONS

2.1    General Rules of Classification.  Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes.  Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2.2    Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims.  Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims have not been classified and are excluded from the Classes set forth below in accordance with section 1123(a)(1) of the Bankruptcy Code.

-15-

2.3    <u>Bar Date for Administrative Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be Filed and served on the Reorganized Debtor, and its counsel, no later than twenty (20) days after the Effective Date (the "Administrative Claim Bar Date").  Any Person that is required to File and serve a request for payment of an Administrative Claim and fails to timely File and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  Objections to requests for payment of Administrative Claims (except for Fee Claims) must be Filed and served on the Reorganized Debtor, and their respective counsel, and the party requesting payment of an Administrative Claim within thirty (30) days after the Filing of such request for payment.

2.4    <u>Bar Date for Fee Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date, must be Filed and served on the Reorganized Debtor and the Plan Funders and their respective counsel no later than forty-five (45) days after the Effective Date (the "Fee Claim Bar Date").  Any Professional that is required to File and serve a request for payment of a Fee Claim and fails to timely File and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof.  Objections to Fee Claims must be filed and served on the Reorganized Debtor, its counsel, and the requesting party by twenty (20) days after the Filing of the applicable request for payment of the Fee Claim.

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.5    The following is the designation of the Classes of Claims and Interests under the Plan:

2.6    Class 1 Claims shall consist of all Other Priority Claims.

2.7    Class 2 Claims shall consist of all Miscellaneous Secured Claims.

2.8    Class 3(a) Claims shall consist of the Secured Claim of SVB.

-16-

2.9    Class 3(b) Claims shall consist of the Severance Claims.

2.10    Class 4 Claims shall consist of all General Unsecured Claims.

2.11    Class 5 Claims shall consist of the Lezdeys Claims.

2.12    Class 6 Interests shall consist of all Interests held by the Series D Holders.

2.13    Class 7 Interests shall consist of all Interests held by the Series C Holders.

2.14    Class 8 Interests shall consist of all Interests held by the Series B Holders.

2.15    Class 9 Interests shall consist of all Interests held by the Series A Holders.

2.16    Class 10 Interests shall consist of all common stock Interests in the Debtor.

## ARTICLE III

## TREATMENT OF UNIMPAIRED CLASSES

3.1    <u>Administrative Claims</u>.  Each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtor prior to the Effective Date and the Reorganized Debtor following the Effective Date might otherwise agree.  The allowance of Administrative Claims shall be subject to approval by the Bankruptcy Court.

3.2    <u>Priority Tax Claims</u>.  Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim in the discretion of the Reorganized Debtor either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective

-17-

Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) in twenty (20) equal quarterly installments with interest commencing on the first day of the first calendar quarter after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (c) such lesser amount as the holder of such Allowed Priority Tax Claim and the Debtor prior to the Effective Date and the Reorganized Debtor following the Effective Date might otherwise agree.

3.3    DIP Claims.  To the extent not otherwise paid prior to the Effective Date, on the Effective Date, the DIP Claims shall be refinanced by the Exit Facility with the Liens held by the DIP Agent being assigned to the Plan Funders.  As of the Effective Date the DIP Claims and Liens held by the DIP Agent for itself and for the DIP Lenders shall be deemed to be assigned to the Plan Funders.  Subject to the terms and conditions of the Plan Funders Debt Commitment, on or before the Effective Date the Plan Funders shall fund their respective Plan Funders Debt Commitment, or a portion thereof.  The Exit Facility shall be a demand note.  The demand note shall be due if there is no demand on June 1, 2009.  Interest, costs and fees accruing under the Exit Facility shall be at the same rates and payable under the same terms and conditions as under the DIP Facility.  The Exit Facility shall be secured by an assignment of the Liens securing the DIP Facility and a first priority lien on all Property of the Reorganized Debtor.  The Plan Funders' Lien shall attach to the Reserves, Avoidance Actions and Lezdeys Litigation and subject to the distributions of the Reserves Balances and the Net Proceeds of the Avoidance Actions and Lezdeys Litigation provided for pursuant to Sections 4.1 and 4.2 hereof, the Reserves Balances, the Net Proceeds of Avoidance Actions and the Net Proceeds of the Lezdeys Litigation when recovered and otherwise available after distributions pursuant to Sections 4.1 and 4.2 shall be payable to the Plan Funders on account of the Exit Facility.  The Liens and property interests of the Plan Funders shall remain perfected from and after the date of

-18-

1  the Confirmation Order without the need of the Plan Funders to take any or further action
2  or File or record any notes with respect thereto. The Confirmation Order shall be
3  sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority
4  of the Plan Funders' Liens without the necessity of Filing or recording the Confirmation
5  Order (other than as docketed in the Chapter 11 Case) or any financing statement,
6  mortgage or other instrument or document which may otherwise be required under the law
7  of any jurisdiction or the taking of any other action to validate or perfect the Plan Funders'
8  Liens, or to entitle the Plan Funders to the priorities granted under the DIP Facility or
9  herein (including, in respect of Cash or deposits or investment property, any requirement
10 that the Plan Funders have possession of or dominion and control over, any such Cash in
11 order to perfect an interest therein); *provided* that the Debtor, Reorganized Debtor or third
12 parties shall execute and deliver to the Reorganized Debtor and Plan Funders and the Plan
13 Funders may File or record financing statements or other instruments further to evidence
14 or further to perfect the Plan Funders' Liens authorized, granted and perfected under the
15 DIP Facility and hereby or to terminate or release Liens held by others; and *provided*
16 *further* that no such Filing or recordation shall be necessary or required in order to create
17 or perfect any such Lien.

18        3.4    Fee Claims. Each holder of an Allowed Fee Claim shall receive
19 100% of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or
20 as soon as practicable after such Fee Claim becomes and Allowed Claim. The allowance
21 of Fee Claims shall be subject to approval by the Bankruptcy Court.

22        3.5    Class 1 Other Priority Claims. Each holder of an Allowed Other
23 Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in
24 Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on
25 which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed
26 upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such
27 Allowed Other Priority Claim and the Debtor prior to the Effective Date and the

28

-19-

1  Reorganized Debtor following the Effective Date might otherwise agree.  The holder of a

2  Claim in this Class is not impaired and, therefore, not entitled to vote.

3      3.6     Class 2 Miscellaneous Secured Claims.  The Debtor believes that

4  there are no valid Miscellaneous Secured Claims in this Class.  To the extent there are any

5  Allowed Secured Claims in this Class, each such Claim shall be deemed to be a separate

6  subclass.  At the option of the Reorganized Debtor, holders of Class 2 Allowed Claims

7  shall receive either the return of the property securing such Allowed Secured Claim or the

8  Net Proceeds realized by the Debtor or Reorganized Debtor from the disposition of the

9  such property securing such Allowed Secured Claim.  The holder of a Claim in this Class

10 is not impaired and, therefore, not entitled to vote.

11     3.7     Class 3(a) SVB Claim.  SVB's prepetition Secured Claim shall be

12 treated as a contingent Secured Claim in an unliquidated amount.  To the extent not

13 already paid in full prior to the Effective Date, on the Effective Date or as soon thereafter

14 as practicable, the SVB Claim shall remain secured by a first priority lien on the SVB

15 Collateral.  SVB from time to time may submit to the Reorganized Debtor detailed

16 invoices for letter of credit or other fees and reasonable expenses coming due under the

17 pre-Petition Date agreements between SVB and the Debtor, and such fees and reasonable

18 expenses shall be paid in full, in Cash, in complete satisfaction of such Claim only from

19 the SVB Collateral.  In the event the Bankruptcy Court enters a Final Order respecting

20 SVB's Claims and Liens prior to the entry of the Confirmation Order, the terms and

21 conditions of such order shall be deemed incorporated herein at length and supersede and

22 govern the treatment of SVB under the Plan.  SVB is not impaired and, therefore, not

23 entitled to vote.

24     3.8     Class 3(b) Severance Claims.  The Severance Claims shall each be

25 treated as an Allowed Secured Claim.  The holders of the Severance Claims are not

26 impaired and, therefore, not entitled to vote.

27

28

W02-WEST:FKA\400406510.11

3.9    <u>Reservation of Rights</u>.  Nothing contained herein shall be deemed to limit the right of any party-in-interest to object to any Claims Filed in this Chapter 11 Case.

**ARTICLE IV**

**<u>TREATMENT OF IMPAIRED CLASSES</u>**

4.1    <u>Class 4 General Unsecured Claims</u>.  This Class shall consist of General Unsecured Claims, excluding the Lezdeys Claims.  Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the Reorganized Debtor, each holder of a General Unsecured Claim shall receive up to 100% of the amount of its respective Allowed Unsecured Claims, as follows: (i) on the Effective Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share of the Unsecured Claims Pool on account of the amount of such Allowed Claim from the Unsecured Claims Pool Escrow; (ii) from time to time each such holder shall receive its Pro Rata share of the Net Proceeds of Avoidance Actions; (iii) each such holder shall receive its Pro Rata share of the Net Proceeds of the Lezdeys Litigation when recovered; and (iv) from time to time each such holder shall receive its Pro Rata share of the Reserves Balances.  On the Effective Date, the Debtor and its Property, and the Reorganized Debtor and its property shall be free and clear of all Class 4 Claims, and be deemed released and discharged from all Class 4 Claims.  The holders of Claims in this Class are impaired and, therefore, entitled to vote.

4.2    <u>Class 5 Lezdeys Claims</u>.  This Class shall consist of the Lezdeys Claims.  The Lezdeys Claims are Disputed Claims.  Unless otherwise agreed to by the Lezdeys, the Debtor or Reorganized Debtor, and the Plan Funders, each holder of a Lezdeys Claim shall receive up to 100% of the amount of their respective Allowed Claims, as follows: (i) on the Effective Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share of the Unsecured Claims Pool on account of the amount of such Allowed Claim from the Unsecured Claims Pool Escrow; (ii) from time to time each

-21-

such holder shall receive its Pro Rata share of the Net Proceeds of Avoidance Actions; (iii) each such holder shall receive its Pro Rata share of the Net Proceeds of the Lezdeys Litigation when recovered; and (iv) from time to time each such holder shall receive its Pro Rata share of the Reserves Balances.  On the Effective Date, the Debtor and its Property and the Reorganized Debtor and its property shall be free and clear of all Lezdeys Claims, and be deemed released and discharged from all Lezdeys Claims.  The holders of Claims in this Class are impaired and, therefore, entitled to vote.

4.3     Pro Rata.  Pro Rata for purposes of Sections 4.1 and 4.2 shall be calculated equal to a ratio the numerator of which shall be equal to the amount of such Allowed Claim and the denominator of which shall be equal to the aggregate of the Allowed General Unsecured Claims and the Allowed Lezdeys Claims.

4.4     Class 6 Series D Interests.  On the Effective Date, the Series D Holders shall receive nothing, and all Class D Interests shall be deemed canceled, null and void and of no force and effect.  Class 6 Interests are deemed to reject the Plan and therefore are not entitled to vote.

4.5     Class 7 Series C Interests.  On the Effective Date, the Series C Holders shall receive nothing, and all Class C Interests shall be deemed canceled, null and void and of no force and effect.  Class 7 Interests are deemed to reject the Plan and therefore are not entitled to vote.

4.6     Class 8 Series B Interests.  On the Effective Date, the Series B Holders shall receive nothing, and all Class B Interests shall be deemed canceled, null and void and of no force and effect.  Class 8 Interests are deemed to reject the Plan and therefore are not entitled to vote.

4.7     Class 9 Series A Interests.  On the Effective Date, the Series A Holders shall receive nothing, and all Class A Interests shall be deemed canceled, null and void and of no force and effect.  Class 9 Interests are deemed to reject the Plan and therefore are not entitled to vote.

-22-

1    4.8    Class 10 Common Interests.  On the Effective Date, all Class 10

2 Interests shall be deemed canceled, null and void and of no force and effect.  Accordingly,

3 the holders of Class 10 Interests are deemed to reject the Plan and, therefore, are not

4 entitled to vote.

5                                         **ARTICLE V**

6                     **MEANS FOR IMPLEMENTATION OF THE PLAN**

7    5.1    Corporate Action.  On the Effective Date and automatically and

8 without further action, (i) each existing member of the board of directors of the Debtor will

9 be deemed to have resigned, (ii) the new board members of the Reorganized Debtor shall

10 be those identified in the Plan Supplement, and (iii) pursuant to California law, the

11 Reorganized Debtor shall be authorized and empowered to take all such actions and

12 measures necessary to implement and administer the terms and conditions of the Plan.  The

13 Debtor's Charter will be amended as of the Effective Date to the extent necessary to

14 incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity

15 securities as required by section 1123(a)(6) of the Bankruptcy Code.  Further, as of the

16 Effective Date the pre-Petition Date Stockholders' Agreement and Investor Rights

17 Agreement shall be deemed null and void and of no further effect.  The rights and interests

18 of the New Common and New Series A Preferred shall be governed by and controlled

19 pursuant to the terms and conditions of the Reorganized Debtor's Charter, Stockholders'

20 Agreement and Investor Rights Agreement, which shall be included in and filed with the

21 Plan Supplement.

22    5.2    Distributions.  On the Effective Date, the Reorganized Debtor shall be

23 responsible for making distributions under this Plan and for litigation claims objections.

24 The Reorganized Debtor shall hold the Reserves provided for in the Plan, and set forth the

25 terms and conditions for distributions from such Reserves.  Wachter shall contribute to the

26 Reorganized Debtor the Wachter Judgment in order that the prosecution of the Wachter

27 Judgment and other Lezdeys Litigation may be coordinated and prosecuted by the Debtor.

28

-23-

1    The Reorganized Debtor shall pursue all rights and benefits of any and all applicable

2    insurance policies that cover any claims asserted or that may be asserted by any holder of

3    any Claim.  The Reorganized Debtor shall hold and administer the following Reserves:

4               (i)      Unsecured Claims Pool Escrow;

5               (ii)     Cure Escrow;

6               (iii)    Plan Expense Reserve;

7               (iv)     SVB Collateral; and

8               (v)      Control Agreement Collateral

9    All of the Reserves shall vest with the Reorganized Debtor on the Effective Date.  All

10   Reserves shall be held in an interest bearing account and such interest shall increase the

11   amount of such Reserve Account.  Any Reserves Balances remaining in any of the

12   Reserves after the payment of all Allowed Claims entitled to receive payments from such

13   Reserve under the Plan, respectively; shall be first, distributed to the holders of Allowed

14   Claims under sections 4.1 and 4.2 under the Plan, then under section 3.3 under the Plan to

15   the extent of such Allowed Claims; and second, distributed to the Reorganized Debtor.

16   The Reorganized Debtor shall be responsible for fees and expenses in connection with the

17   Claims Litigation and the Lezdey Litigation only to the extent of the Plan Expense Reserve

18   and any insurance policy that is readily available for payment of such fees and expenses.

19               5.3     Reorganized Debtor's Responsibility Under Plan.  The Reorganized

20   Debtor shall administer the Plan subject to the foregoing duties and powers, which shall

21   include the following:

22               (a)      To prosecute, compromise or settle objections to Claims and/or

23   Interests (disputed or otherwise) and to make or direct that distributions be made to holders

24   of Allowed Claims;

25               (b)      To make decisions regarding the retention or engagement of

26   Professionals and to pay, without court order, all reasonable fees and expenses incurred

27   after the Effective Date;

28

-24-

1         (c)     To make or direct distributions to holders of Allowed Claims

2   and to otherwise implement and administer the Reserves and the Plan;

3         (d)     To pursue, litigate or settle the Avoidance Actions, Lezdeys

4   Litigation and to collect the Wachter Judgment; provided, however, that neither

5   Reorganized Debtor nor any other Person shall have the power to pursue, litigate or settle

6   Avoidance Actions against any Person who holds a Claim that is Allowed;

7         (e)     To file with the Bankruptcy Court the reports and other

8   documents and to pay any and all fees required by the Plan or otherwise required to close

9   the Chapter 11 Case, including the preparation and filing of a motion for a final decree;

10         (f)     To set off amounts owed to the Debtor against any and all

11   amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan;

12   and

13         (g)     To take all other actions not inconsistent with the provisions of

14   the Plan deemed necessary or desirable in connection with administering the Plan.

15   Notwithstanding any provision of this Plan, the Reorganized Debtor shall have no duty or

16   obligation of any kind to take action which would involve incurring fees, costs or other

17   financial obligations that would exceed the funds available in the Plan Expense Reserve

18   and any insurance policy that is readily available for payment of such fees and expenses,

19   which shall be the sole source for funding such fees, costs and financial obligations.  The

20   Reorganized Debtor shall have no obligation to utilize any assets other than the funds in

21   the Plan Expense Reserve for any aspect of the implementation of this Plan. The

22   Reorganized Debtor may use the funds in the Plan Expense Reserve and any insurance

23   policy that is readily available for payment of such fees and expenses for such purposes in

24   performing its duties under the Plan as the Reorganized Debtor determines in its sole

25   discretion.

26        5.4    <u>Exit Financing</u>.  As of the Effective Date the DIP Facility and the DIP

27   Claims shall be deemed assigned by the DIP Agent and DIP Lenders to the Plan Funders

28

W02-WEST:FKA\400406510.11

1  and refinanced by the Exit Facility.  The terms and conditions of the Exit Facility shall be

2  as set forth in the Exit Facility Agreement, which shall be included in and filed with the

3  Plan Supplement.  The material terms of the Exit Facility are described above in the

4  treatment afforded to the holders of the DIP Claims.  The maximum principal amount of

5  the Exit Facility upon the Effective Date shall be $6 million.  The Exit Facility shall be a

6  demand note.  Except as expressly set forth in the Plan or the Plan Funders Debt

7  Commitment, working capital of the Debtor and Reorganized Debtor together with the

8  proceeds of the Plan Funders Debt Commitment shall be used for general working capital

9  and capital expenditures of the Reorganized Debtor, to fund the Reserves, to pay the

10  Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Claims, and

11  Allowed Other Priority Claims; and shall not be funded, available or used for distributions

12  to holders of other Allowed Claims treated pursuant to the Plan.  In consideration for

13  meeting its funding commitments under the Plan Funders Debt Commitment each Plan

14  Funder from time to time shall together receive additional New Series A Preferred and

15  100% of the New Common in the Reorganized Debtor that are authorized and issued as of

16  the Effective Date.

17          5.5    Permitted Investments.  Cash held by the Reorganized Debtor in any

18  accounts or otherwise shall be invested in U.S. Government-backed securities or mutual

19  funds investing in such securities.

20          5.6    Revesting.  Except as otherwise provided for in any License

21  Agreement, the Plan or the Confirmation Order, on the Effective Date, without any further

22  action, the Reorganized Debtor will be vested with all of the Property of the Debtor's

23  Estate, free and clear of all Claims, Liens and Interests, and shall have all of the powers of

24  a corporation under applicable law.  As of the Effective Date, the Reorganized Debtor may

25  operate its business and use, acquire and dispose of property and settle and compromise

26  claims or interests without the supervision of the Bankruptcy Court or Reorganized

27  Debtor, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

28

5.7    <u>Post-Effective Date Existence of Committee</u>.  The Committee shall continue to act as an advisory committee to the Reorganized Debtor, with the full power to be heard in any matters in the Bankruptcy Court. The Committee and its professionals shall not be entitled to any fees or expenses from the Reorganized Debtor or any assets of the Reorganized Debtor for its post-effective date activities.

**ARTICLE VI**

**<u>RELEASES</u>**

6.1    <u>Application for Approval of Settlement</u>.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes an application for approval of a compromise and settlement of any and all claims, suits and causes of action of the Debtor, the Estate, of their respective successors or assigns, and any Person or Entity claiming a right in a derivative capacity on their behalf (the "Debtor Claimants") against the DIP Agent, DIP Lenders and the Plan Funders, together with all of their current officers, current directors, current attorneys, current advisors and any consultants that performed services after the Petition Date, and Wachter and the Debtor's current officers, current directors, professionals who have been approved by the Bankruptcy Court to represent the Debtor,  and any consultants that performed services after the Petition Date (collectively, the "Released Parties"), as set forth more fully below. Notwithstanding anything herein or elsewhere to the contrary, absent a specific settlement and release entered into with the Lezdeys by the Debtor or the Reorganized Debtor approved by a Final Order by the Court, the Lezdeys, and each of them, in every capacity, are not Released Parties.

6.2    **<u>General Release</u>.  On the Effective Date, the Debtor Claimants are deemed to, with respect to any and all direct and derivative claims, whether or not asserted, unconditionally and irrevocably release the Released Parties from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and**

-27-

1  indemnification, and all other controversies of every type, kind, nature, description

2  or character whatsoever, whether liquidated or unliquidated, fixed or contingent,

3  matured or unmatured, known or unknown, foreseen or unforeseen, asserted,

4  threatened or not, then existing or thereafter arising, in law, equity or otherwise that

5  are based in whole or in part upon any act or omission, transaction, event or other

6  occurrence taking place from the beginning of time to the Effective Date arising from

7  or relating in any way, directly or indirectly, to the Debtor, its Properties, assets,

8  operations or liabilities, the Chapter 11 Case, the Plan, or the Disclosure Statement;

9  *provided however*, that the Debtor Claimants shall not be deemed to have released any

10 rights to enforce the terms of the Plan or their rights to distributions thereunder.

11 The consideration for the releases was given in part in exchange for the release of

12 such claims.  The Debtor Claimants hereby waive any rights or benefits under

13 California Civil Code Section 1542, which provides that:

14          A general release does not extend to claims which the
            creditor does not know or suspect to exist in his favor at the
15          time of executing the release, which if known by him must
            have materially affected his settlement with debtor and any
16          rights or benefits under similar laws.  The Confirmation
            Order shall specifically provide for the foregoing releases.
17

18 Notwithstanding the foregoing, (i) nothing herein or in this Plan shall in any manner

19 release the Released Parties from any liability for their willful misconduct or gross

20 negligence; and (ii) nothing herein shall release any rights under Bankruptcy Code Section

21 1144 to revoke an order of confirmation which could result in a revocation of the releases

22 contained in this Plan.

23          6.3    **Debtor Injunction.  On the Effective Date, the Debtor Claimants**

24 respecting the claims released above shall be permanently enjoined from

25 commencing, conducting or continuing in any manner, directly or indirectly, any suit,

26 action or other proceeding of any kind, asserting any setoff, right of subrogation,

27 contribution, indemnification or recoupment of any kind, directly or indirectly, or

28

-28-

**proceeding in any manner in any place inconsistent with the releases granted to the Released Parties pursuant to the Plan. The Confirmation Order shall specifically provide for such injunction.**

6.4    <u>Release Consideration</u>.  The consideration the Plan Funders shall provide, or have provided, in exchange for the releases described in the Plan and the receipt of the New Common and New Series A Preferred, includes the following (collectively, the "Plan Funders Consideration"):

(a)    To the extent necessary to make distributions in accordance with the Plan to the holders of Allowed Claims in Classes 4 and 5, the Plan Funders acknowledge and agree that any Unsecured Claim they may assert shall be subordinated in time and right of payment to General Unsecured Claims in Class 4, but not the Lezdeys Claims;

(b)    The Plan Funders, as part of the Plan Funders Debt Commitment and not in addition thereto, shall contribute Cash in an amount necessary to ensure that the holders of Allowed Administrative, Priority Tax and Fee Claims and Allowed Claims in Classes 1, 4, and 5 receive the distributions required under the Plan (the "Plan Funders Cash Contribution");

(c)    The Plan Funders, as part of the Plan Funders Debt Commitment and not in addition thereto, shall provide financing under the terms of the Exit Facility in the maximum principal amount of $6 million; and

(d)    The Plan Funders and Wachter shall contribute to the Reorganized Debtor any and all claims they hold against the Lezdeys, including, without limitation, the Wachter Judgment, the Net Proceeds of which shall be distributed to the holders of General Unsecured Claims in Class 4 and the Reorganized Debtor to the extent such Claims are paid in full.

6.5    [Intentionally Omitted].

-29-

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

6.6     <u>No Admissions</u>.  The releases and injunctions granted in favor of the Released Parties are integral parts of the settlement and are necessary to confirm the Plan. The fact that releases are obtained, or that Wachter is contributing the Wachter Judgment in return for the releases shall not be construed as an admission or evidence the Debtor Claimants have valid claims against any of the Released Parties.

<b>ARTICLE VII</b>

<b><u>DISTRIBUTIONS UNDER THE PLAN</u></b>

7.1     <u>Distributions for Claims Allowed as of the Effective Date</u>.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(a)     <u>Reserve Accounts</u>.  On or before the Effective Date, the Reorganized Debtor will establish and maintain the Reserves identified in Section 5.2 above.

7.2     <u>Reserves for Disputed Administrative, Priority Tax and Other Priority Claims</u>.  On or before the Effective Date, the Reorganized Debtor shall establish and maintain a reserve in an amount equal to all Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims in an amount equal to what would be distributed to holders of Disputed Administrative, Disputed Priority Tax, and Disputed Other Priority Claims if their Disputed Claims have been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Reorganized Debtor; provided however, that the Reorganized Debtor shall not be required to reserve funds on account of

-30-

1 employee Claims for paid time off or vacation benefits of employees whose employment

2 was continued by the Reorganized Debtor or any successor thereto. With respect to such

3 Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an

4 Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor

5 shall be distributed by the Reorganized Debtor to the Claimant in a manner consistent with

6 distributions to similarly situated Allowed Claims. The balance of such Cash, if any,

7 remaining after all Disputed Administrative, Disputed Priority Tax, and Disputed Other

8 Priority Claims have been resolved and distributions made in accordance with the Plan,

9 shall be released and distributed to the Reorganized Debtor. No payments or distributions

10 shall be made with respect to a Claim that is a Disputed Claim pending the resolution of

11 the dispute by Final Order.

12        7.3    Reserves for Disputed Claims. On or before the Effective Date, the

13 Reorganized Debtor shall establish and maintain a reserve for all Disputed Claims. For

14 purposes of establishing a reserve for Disputed Claims, Cash will be set aside on or before

15 the Effective Date equal to the amount that would have been distributed to the holders of

16 Disputed Claims had their Disputed Claims been deemed Allowed Claims on the Effective

17 Date or such other amount as may be approved by the Bankruptcy Court. With respect to

18 such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an

19 Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor

20 shall be distributed by the Reorganized Debtor to the Claimant in a manner consistent with

21 distributions to similarly situated Allowed Claims. The balance of such Cash, if any,

22 remaining after all Disputed Claims have been resolved and distributions made in

23 accordance with the Plan, shall be released and returned to the Unsecured Claims Pool.

24 From time to time as additional moneys accumulate in the Unsecured Claims Pool as a

25 result of the disallowance of Claims, the Reorganized Debtor shall make a subsequent

26 distribution to claimants in Classes 4 and 5 of such claimants' Pro Rata share of the

27 Unsecured Claims Pool. No payments or distributions shall be made with respect to a

28

-31-

1   Claim that is a Disputed Claim pending the resolution of the dispute by Final Order.  No

2   payments or distributions shall be made with respect to post-Petition Date interest accruing

3   on any Claim; provided, however, that if the Claims are not paid in full on the Effective

4   Date, then the Allowed Claims shall bear interest at the rate of 7% per annum.  No

5   payments or distributions shall be made with respect to Allowed Claims in an amount in

6   excess of such Allowed Claims.  The Plan Expense Reserve, and any insurance policy that

7   is readily available for the payment of such fees and expenses, is available for the

8   Reorganized Debtor to pursue claims objections, and to assert claims and collect

9   judgments against the Lezdeys.

10          7.4    Claims Objection Deadline.  Objections to Claims shall be filed and

11  served upon each affected Creditor no later than ten (10) days after the Effective Date,

12  provided however, that this deadline may be extended by the Bankruptcy Court upon

13  motion of the Reorganized Debtor, with or without notice or hearing.  Notwithstanding the

14  foregoing, unless an order of the Bankruptcy Court specifically provides for a later date,

15  any proof of, or other assertion of a Claim filed after the Confirmation Date shall be

16  automatically disallowed as a late filed Claim, without any action by the Reorganized

17  Debtor, unless and until the party filing such Claim obtains the written consent of the

18  Reorganized Debtor, or obtains an order of the Bankruptcy Court upon notice to the

19  Reorganized Debtor that permits the late filing of the Claim, and the holder of such

20  disallowed Claim shall be forever barred from asserting such Claim against the Debtor, the

21  Estate or Property, the Reorganized Debtor or its property.  In the event any proof of claim

22  is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy

23  Court, the Reorganized Debtor, shall have sixty (60) days from the filing of such proof of

24  claim or order to object to such Claim, which deadline may be extended by the Bankruptcy

25  Court upon motion of the Reorganized Debtor with or without notice or a hearing.

26          7.5    Settlement of Disputed Claims.  Objections to Claims may be litigated

27  to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court,

28

-32-

1   except to the extent such approval is not necessary as provided in this section.  After the

2   Effective Date, and subject to the terms of this Plan, the Reorganized Debtor may settle

3   any Disputed Claim where the result of the settlement or compromise is an Allowed Claim

4   in an amount not in excess of $25,000 or less without providing any notice or obtaining an

5   order from the Bankruptcy Court.  All proposed settlements of Disputed Claims where the

6   amount to be settled or compromised exceeds $25,000 shall be subject to the approval of

7   the Bankruptcy Court after notice and an opportunity for a hearing.

8              7.6    Unclaimed Property.  If any distribution remains unclaimed for a

9   period of ninety (90) days after it has been delivered (or attempted to be delivered) in

10  accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto,

11  such unclaimed property shall be forfeited by such holder, whereupon all right, title and

12  interest in and to the unclaimed property shall be held in reserve by the Reorganized

13  Debtor to be distributed Pro Rata to holders of Allowed Claims in such Class in

14  accordance with this Plan, or if all Allowed Claims in such Class have been satisfied or

15  reserved for in accordance with the Plan, then such unclaimed property will be distributed

16  to the Reorganized Debtor.

17             7.7    Release of Liens.  Except with respect to the SVB Collateral or as

18  otherwise provided in the Plan or in any contract, instrument or other agreement or

19  document created in connection with the Plan, including, without limitation, SVB's Lien

20  on the SVB Collateral and the Lien securing the DIP Facility and Exit Facility, all of

21  which shall survive Confirmation and shall remain valid, enforceable and perfected Liens

22  against the SVB Collateral and property of the Reorganized Debtor, respectively, on the

23  Effective Date, all mortgages, deeds of trust, Liens or other security interests against the

24  Property of the Debtor's estate shall be released, and all the right, title and interest of any

25  holder of such mortgages, deeds of trust, Liens or other security interests shall revert to

26  Reorganized Debtor and its successors and assigns.

27

28

-33-

1          7.8   <u>Rights of Actions</u>.  On the Effective Date, the Reorganized Debtor

2    shall be vested with the right to pursue the Avoidance Actions, the Lezdeys Litigation and

3    any action that the Debtor may assert against a third party, with the exception of all claims

4    released pursuant to the Plan and Confirmation Order.  The Reorganized Debtor may

5    pursue, settle or release all such actions in accordance with the best interest of and for the

6    benefit of the holders of Allowed Claims and the Reorganized Debtor.

7          7.9   <u>Withholding Taxes</u>.  Any federal, state, or local withholding taxes or

8    other amounts required to be withheld under applicable law shall be deducted from

9    distributions hereunder.  All Persons holding Claims shall be required to provide any

10   information necessary to effect the withholding of such taxes.

11         7.10   <u>Fractional Cents</u>.  Any other provision of this Plan to the contrary

12   notwithstanding, no payment of fractions of cents will be made.  Whenever any payment

13   of a fraction of a cent would otherwise be called for, the actual payment shall reflect a

14   rounding down of such fraction to the nearest whole cent.

15         7.11   <u>Payments of Less than Ten Dollars</u>.  If a cash payment otherwise

16   provided for by this Plan with respect to an Allowed Claim would be less than ten dollars

17   ($10.00) (whether in the aggregate or on any payment date provided in this Plan),

18   notwithstanding any contrary provision of this Plan, the Reorganized Debtor shall not be

19   required to make such payment and such funds shall be otherwise distributed to holders of

20   Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in

21   such Class have been satisfied or reserved for in accordance with the Plan, then such

22   excess fractional dollars will be distributed to the Reorganized Debtor.

23   **ARTICLE VIII**

24   **<u>UNEXPIRED LEASES AND EXECUTORY CONTRACTS</u>**

25         8.1   <u>Rejection of All Agreements</u>.  Any and all pre-petition leases or

26   executory contracts included on Debtor's Schedule G, as such Schedule G may be

27   amended up to and including the Confirmation Date, not previously rejected by the Debtor,

28

-34-

1  unless specifically assumed pursuant to orders of the Bankruptcy Court prior to the

2  Confirmation Date or the subject of a motion to reject pending on the Confirmation Date,

3  shall be deemed assumed by the Debtor effective as of the Confirmation Date, but subject

4  to the occurrence of the Effective Date.  Any and all pre-petition leases and executory

5  contracts not included on Debtor's Schedule G, as such schedule exists on the

6  Confirmation Date, not previously assumed by the Debtor shall be deemed rejected by the

7  Debtor effective as of the Confirmation Date, but subject to the occurrence of the Effective

8  Date.

9          8.2     Claims for Damages.  All proofs of claim with respect to Claims

10 arising from the rejection of executory contracts or leases shall, unless another order of the

11 Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within

12 thirty (30) days after the mailing of notice of entry of the Confirmation Order.  All proofs

13 of claim with respect to Claims arising from the rejection of executory contracts shall be

14 treated as Class 4 General Unsecured Claims or Lezdeys Claims, as applicable, for

15 purposes of a distribution pursuant to the Plan, unless and until the Person or Entity

16 asserting such Claim obtains an order of the Bankruptcy Court upon notice to the Debtor

17 that allows the Claims in another Class under the Plan.  Unless otherwise permitted by

18 Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the

19 Confirmation Hearing (other than those Claims arising from the rejection of executory

20 contracts or leases which may be filed within thirty (30) days after mailing of the notice of

21 entry of Confirmation Order as set forth above) shall automatically be disallowed as a late

22 filed Claim, without any action by the Reorganized Debtor, and the holder of such Claim

23 shall be forever barred from asserting such Claim against the Debtor, the Estate, the

24 Reorganized Debtor or property of Reorganized Debtor.

25

26

27

28

W02-WEST:FKA\400406510.11

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

**ARTICLE IX**

**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

9.1     <u>Conditions to Confirmation of the Plan</u>.  The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by the Debtor and the Plan Funders:

(a)     The Confirmation Order shall be in form and substance satisfactory to the Debtor, DIP Agent and Plan Funders, which Confirmation Order shall approve all provisions, terms and conditions of the Plan; and

(b)     No amendments, modifications, supplements or alterations shall have been made to the Plan or any document delivered in connection therewith, without the express written consent of the Debtor, DIP Agent and Plan Funders (which consent may be granted, withheld, or conditioned in their respective sole discretion).

9.2     <u>Conditions to Effectiveness of the Plan</u>.  The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived:

(a)     The Bankruptcy Court shall have entered the Confirmation Order by January 31, 2008, and such Order shall be in form and substance satisfactory to the Debtor, DIP Agent and Plan Funders;

(b)     All escrow and reserve accounts described in the Plan have been adequately funded;

(c)     An order or judgment has been entered in the Adversary Proceeding filed in this case by AlphaMed against the debtor, AP 07-4181 ("Adversary Proceeding"), which order or judgment has not been stayed, and which order or judgment either (i) dismisses the Adversary Proceeding; or (ii) enters judgment in favor of the Debtor holding that the Debtor's interest in the Protease License is valid.  In addition, in connection with such judgment or order, the Court shall have made findings to the effect that the Debtor has a valid interest in the Protease License; and

1        (d) The Confirmation Order shall have been entered by the

2    Bankruptcy Court and the Confirmation Order has not been stayed.

3        9.3 <u>Effect of Failure of Condition</u>.  In the event that the conditions

4    specified above have not occurred on or before sixty (60) days after the Confirmation

5    Date, unless waived or extended by the Plan Funders, the Confirmation Order may be

6    vacated upon order of the Bankruptcy Court after motion made by the Debtor or any party

7    in interest and an opportunity for parties in interest to be heard.

8                **ARTICLE X**

9           **<u>RETENTION OF JURISDICTION</u>**

10       10.1 Following the Confirmation Date and until such time as all payments

11   and distributions required to be made and all other obligations required to be performed

12   under this Plan have been made and performed by the Reorganized Debtor and the Debtor,

13   as the case may be, the Bankruptcy Court shall retain jurisdiction as is legally permissible,

14   including, without limitation, for the following purposes:

15       (a) <u>Claims</u>.  To determine the allowance, extent, classification, or

16   priority of Claims against the Debtor upon objection by the Reorganized Debtor, the

17   Debtor, or any other party in interest;

18       (b) <u>Injunction, etc</u>.  To issue injunctions or take such other actions

19   or make such other orders as may be necessary or appropriate to restrain interference with

20   the Plan or its execution or implementation by any Person, to construe and to take any

21   other action to enforce and execute the Plan, the Confirmation Order, or any other order of

22   the Bankruptcy Court, to issue such orders as may be necessary for the implementation,

23   execution, performance and consummation of the Plan and all matters referred to herein,

24   and to determine all matters that may be pending before the Bankruptcy Court in the

25   Chapter 11 Case on or before the Effective Date with respect to any Person or Entity;

26

27

28

W02-WEST:FKA\400406510.11

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

          (c)     <u>Professional Fees</u>.  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the Effective Date, and objections thereto, as provided for in the Plan;

          (d)     <u>Certain Priority Claims</u>.  To determine the allowance, extent and classification of any Priority Tax Claims, Other Priority Claims, Administrative Claims or any request for payment of an Administrative Claim;

          (e)     <u>Dispute Resolution</u>.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and/or Confirmation Order and the making of distributions hereunder and thereunder;

          (f)     <u>Executory Contracts and Unexpired Leases</u>.  To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance and extent of any Claims resulting from the rejection of executory contracts and unexpired leases;

          (g)     <u>Actions</u>.  To determine all applications, motions, adversary proceedings, contested matters, estimation proceedings for limited or all purposes, actions, and any other litigated matters instituted in the Chapter 11 Case by or on behalf of the Debtor or the Reorganized Debtor, including, but not limited to, the Avoidance Actions, Lezdeys Claims and Lezdeys Litigation or any claims between two or more non-debtor parties related thereto, and any remands;

          (h)     <u>General Matters</u>.  To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code or other applicable law;

          (i)     <u>Plan Modification</u>.  To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

1             (j)    Aid Consummation.  To issue such orders in aid of

2   consummation of the Plan and the Confirmation Order notwithstanding any otherwise

3   applicable non bankruptcy law, with respect to any Person or Entity, to the full extent

4   authorized by the Bankruptcy Code;

5             (k)    Protect Property.  To protect the Property of the Debtor and

6   Reorganized Debtor from adverse Claims or Liens or interference inconsistent with this

7   Plan, including to hear actions to quiet or otherwise clear title to such property based upon

8   the terms and provisions of this Plan or to determine a purchaser's exclusive ownership of

9   claims and causes of actions retained under this Plan;

10            (l)    Abandonment of Property.  To hear and determine matters

11  pertaining to abandonment of Property of the Estate;

12            (m)    Implementation of Confirmation Order.  To enter and

13  implement such orders as may be appropriate in the event the Confirmation Order is for

14  any reason stayed, revoked, modified or vacated; and

15            (n)    Final Order.  To enter a final order closing the Chapter 11

16  Case.

17  **ARTICLE XI**

18  **MISCELLANEOUS PROVISIONS**

19      11.1   Pre-Confirmation Modification.  On notice to and opportunity to be

20  heard by the United States Trustee, the Plan may be altered, amended or modified by the

21  Debtor before the Confirmation Date as provided in section 1127 of the Bankruptcy Code;

22  *provided, however*, that any such amendment or modification of the Plan must be approved

23  in writing by the Agent, consistent with the terms of the DIP Facility.

24      11.2   Post-Confirmation Immaterial Modification.  With the approval of the

25  Bankruptcy Court and on notice to and an opportunity to be heard by the United States

26  Trustee and without notice to holders of Claims and Interests, the Reorganized Debtor,

27  may, insofar as it does not materially and adversely affect the interest of holders of Claims,

28

-39-

1  correct any defect, omission or inconsistency in the Plan in such manner and to such extent

2  as may be necessary to expedite consummation of this Plan; *provided, however*, that any

3  such amendment or modification of the Plan must be approved in writing by the Agent

4  consistent with the terms of the Exit Facility and the Exit Facility Agreement.

5         11.3   <u>Post-Confirmation Material Modification</u>.  On notice to and an

6  opportunity to be heard by the United States Trustee, the Plan may be altered or amended

7  after the Confirmation Date by the Reorganized Debtor in a manner which, in the opinion

8  of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that

9  such alteration or modification is made after a hearing and otherwise meets the

10  requirements of section 1127 of the Bankruptcy Code; *provided, however*, that any such

11  amendment or modification of the Plan must be approved in writing by the Agent,

12  consistent with the terms of the Exit Facility and Exit Facility Agreement.

13         11.4   <u>Withdrawal or Revocation of the Plan</u>.  The Debtor reserves the right

14  to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or

15  withdraws the Plan, then the Plan shall be deemed null and void.

16         11.5   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930

17  of Title 28 of the United States Code with respect to periods after the Effective Date shall

18  be paid by the Reorganized Debtor when otherwise due out of the Plan Expense Reserve.

19         11.6   <u>Successors and Assigns</u>.  The rights, benefits and obligations of any

20  Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the

21  benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or

22  Entities.

23         11.7   **Exculpation.  On the Effective Date, (a) the Debtor, and the**

24  **Debtor's current officers, current directors, professionals who have been approved by**

25  **the Bankruptcy Court to represent the Debtor,  and any consultants that performed**

26  **services after the Petition Date (solely in their capacities as such, but excluding the**

27  **Lezdeys in every capacity) and (b) the Plan Funders, DIP Agent and DIP Lenders,**

28

1    together with all of their current officers, current directors, current attorneys,

2    current advisors, and any consultants that performed services after the Petition Date,

3    shall be deemed to release each of the other of and from any claims, obligations,

4    rights, causes of action and liabilities for any act or omission occurring solely during

5    the period from the Petition Date through the Effective Date, generally, including,

6    without limitation, any act or omission occurring during the Chapter 11 Case, any act

7    or omission occurring in connection with post-Petition Date sales of Property, the

8    DIP Facility, the Exit Facility, the Plan Funders Debt Commitment, the Disclosure

9    Statement, the pursuit of approval of the Disclosure Statement, the pursuit of

10   confirmation of the Plan, the consummation of the Plan or the administration of the

11   Plan or the property to be distributed under the Plan, except for acts or omissions

12   which constitute willful misconduct or gross negligence, and all such Persons, in all

13   respects, shall be entitled to rely upon the advice of counsel with respect to their

14   duties and responsibilities under the Plan and under the Bankruptcy Code; provided,

15   however, that nothing herein shall release the Debtor, the Reorganized Debtor, or the

16   Plan Funders from their obligations under this Plan or under the DIP Facility, Exit

17   Facility, Confirmation Order or the Plan Funders' Debt Commitment on and after

18   the Effective Date; provided further that nothing herein shall release any rights

19   under Bankruptcy Code Section 1144 to revoke an order of confirmation which could

20   result in a revocation of the exculpation provisions of this Plan.

21          11.8   **Discharge.** Except as otherwise provided for in the Plan or in the

22   Confirmation Order, in accordance with section 1141(d) of the Bankruptcy Code,

23   entry of the Confirmation Order acts as a discharge effective as of the Effective Date

24   of all debts, Claims against, Liens on, and Interests in the Debtor, its assets and

25   Property, which debts, Claims, Liens and Interests arose at any time before the entry

26   of the Confirmation Order.  The discharge of the Debtor shall be effective as to each

27   Claim and Interest, regardless of whether a proof of Claim or Interest was filed or

28

-41-

whether the Claim or Interest was Allowed or whether the holder of the Claim or

Interest votes to accept the Plan.  On the Effective Date, as to each and every

discharged Claim and Interest, any holder of such Claim or Interest shall be

precluded from asserting such Claim or Interest against  the Debtor or Reorganized

Debtor or their assets or properties.

        11.9    **Confirmation Injunction.**  On and after the Confirmation Date,

except to enforce the terms and conditions of the Plan before the Bankruptcy Court,

all Persons or Entities who have held, hold or may hold any Claim against or Interest

in the Debtor including, without limitation, each of the Lezdeys, are permanently

enjoined from and after the Confirmation Date from: (a) commencing, conducting or

continuing in any manner, directly or indirectly, any suit, action or other proceeding

of any kind (including, without limitation, any proceeding in a judicial, arbitral,

administrative or other forum) against the Debtor or Reorganized Debtor or any of

their properties, or any direct or indirect transferee of any property of, or direct or

indirect successor in interest to, any of the foregoing Persons or Entities and all of

their respective current officers, current directors, and any consultants that

performed services after the Petition Date (solely in their capacities as such, but

excluding the Lezdeys in every capacity), the current attorneys and current advisors

of the Plan Funders, and the professionals that have been approved by the

Bankruptcy Court to represent the Debtor, or any property of the foregoing

(collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including,

without limitation, any pre-judgment attachment), collecting or otherwise recovering

by any manner or means whether directly or indirectly, against any of the Protected

Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise

enforcing in any manner, directly or indirectly, any encumbrance of any kind against

any of the Protected Parties; (d) asserting any right of setoff, subrogation, or

recoupment of any kind, directly or indirectly, against any obligation due to any of

-42-

1  the Protected Parties; and (e) taking any actions in any place and in any manner

2  whatsoever that do not conform to or comply with the provisions of the Plan.

3          11.10  **Reservation of Claims.**  Notwithstanding anything herein to the

4  contrary and for the avoidance of doubt, regardless of whether the Lezdeys or any of

5  them fall within the definitions of Released Parties or Protected Parties, the Plan (i)

6  shall not act or be construed to release, discharge or enjoin any claim or action

7  against the Lezdeys, including, without limitation, the Lezdeys Litigation, Wachter

8  Judgment, or any Avoidance Action; (ii) but shall act and be construed to permit the

9  commencement and continued prosecution of any and all claims and actions against

10  the Lezdeys, including, without limitation, the Lezdeys Litigation and Avoidance

11  Actions.  Furthermore, nothing herein is intended to violate or shall constitute a

12  breach of the stay imposed by Bankruptcy Code section 362 in any Lezdeys

13  Bankruptcies.

14          11.11  Preservation of Insurance.  This Plan shall not diminish or impair the

15  enforceability of any insurance policy, right or claim that may cover Claims against the

16  Debtor (including, without limitation, its officers or directors) or any other person or

17  entity.  Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's

18  rights, claims, defenses or disputes under any policy and shall not act to increase or extend

19  any rights of the Debtor or the carriers.  The insurance policies maintained by the Debtor

20  shall be maintained as an expense of the Reorganized Debtor until the later of (a)

21  expiration of such policies or (b) such later dates as the Reorganized Debtor may deem

22  appropriate.   At the Plan Funders' request, the Debtor and Reorganized Debtor shall

23  obtain other, additional or extended insurance policies, which cost shall be borne by the

24  Reorganized Debtor.

25          11.12  Cramdown.  To the extent any Impaired Class of Claims or Interests

26  entitled to vote on the Plan votes to reject the Plan, the Debtor reserves the right to request

27

28

-43-

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

1  confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to

2  such Class(es).

3      11.13  <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code is

4  applicable, the rights and obligations arising under this Plan shall be governed by and

5  construed and enforced in accordance with the laws of the State of California.

6      11.14  <u>Notices</u>.  Any notice required or permitted to be provided under the

7  Plan shall be in writing and served by either (a) certified mail, return receipt requested,

8  postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight

9  prepaid, to be addressed as follows:

10  If to the Debtor:                    M. Sue Preston, President and CEO
                                          Arriva Pharmaceuticals, Inc.
11                                        1010 Atlantic Avenue
                                          Alameda, CA  94501
12
    with a copy to:                      Michael H. Ahrens
13                                        Sheppard Mullin Richter & Hampton LLP
                                          Four Embarcadero Center, 17th Floor
14                                        San Francisco, CA 94111-4109
                                          Telephone – (415) 774-3243
15                                        Facsimile – (415) 434-3947
                                          mahrens@sheppardmullin.com
16
    If to Reorganized Debtor:            M. Sue Preston, President and CEO
17                                        Reorganized Debtor
                                          c/o Arriva Pharmaceuticals, Inc.
18                                        1010 Atlantic Avenue
                                          Alameda, CA  94501
19
    If to Plan Funders:                  Nordic Biotech Venture Fund II K/S
20                                        c/o Nordic Biotech
                                          Ostergade 5,3
21                                        DK-1100 Copenhagen K
                                          Denmark
22                                        Attention: Chief Financial Officer
                                          Facsimile: 45-70-20-12-64
23
24                                        c/o John M. Barberich
25                                        50 Duck Pond Drive
                                          Groton, MA 01450
26

27

28

-44-

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John M. Barberich
Financial Advisor
Nordic Biotech
50 Duck Pond Drive
Groton, MA  01450
Telephone:  (978) 448-3145
jmb@nordicbiotech.com

MPM Asset Management II LLC
Ansbert Gadicke
601 Gateway Boulevard, Suite 350
San Francisco, CA  94080
Telephone:  (650) 553-3300
Facsimile:  (650) 553-3301
ansbert@mpmcapital

and

Ed Mascioli, M.D., Executive Director
200 Clarendon Street, 54th Floor
Boston, MA  02116
Telephone:  (617) 425-9200, Ext. 211
Facsimile:  (617) 425-9201
emascioli@mpmcapital.com

with a copy to:

M. David Minnick
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA  94105-2230
Telephone – (415) 983-1351
Facsimile – (415) 983-1200
dminnick@pillsburylaw.com

James Barrett, Esq.
Edwards Angell Palmer & Dodge, LLP
111 Huntingdon Avenue at Prudential Center
Boston, MA  02199-7613
Telephone:  (617) 239-0385
Facsimile:  (617) 227-4420
JBarrett@EAPDLaw.com

   11.15  <u>Saturday, Sunday or Legal Holiday</u>.  If any payment or act under the

Plan is required to be made or performed on a date that is not a Business Day, then the

making of such payment or the performance of such act may be completed on the next

succeeding Business Day, but shall be deemed to have been completed as of the required

date.

-45-

11.16  <u>Section 1146 Exemption</u>.  Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

11.17  <u>Severability</u>.  If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the Debtor's option remain in full force and effect and not be deemed affected.  However, the Debtor and the Plan Funders each reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.18  <u>Headings</u>.  The headings used in this Plan are inserted for convenience only and neither constitutes a portion of the Plan nor in any manner affect the provisions of the Plan.

W02-WEST:FKA\400406510.11

DEBTOR'S FOURTH AMENDED
CHAPTER 11 PLAN OF
REORGANIZATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARTICLE XII**

**CONFIRMATION REQUEST**

12.1    The Debtor hereby requests confirmation of the Plan pursuant to

sections 1129(a) and (b) of the Bankruptcy Code.

Dated:  December 12, 2007

By    /s/ M. Sue Preston

M. SUE PRESTON
President and CEO of Arriva Pharmaceuticals, Inc.

Dated:  December 12, 2007

Presented by:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By    /s/ Michael H. Ahrens

MICHAEL H. AHRENS
Attorneys for
ARRIVA PHARMACEUTICALS, INC.

-47-

**EXHIBIT A (Part 2)**

Form B6G
(10/05)

**In re Arriva Pharmaceuticals, Inc.,**                      Case No. 07-42767
**Debtor**

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed.R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| 9076-1339 Québec Inc.[1]<br>6100 Royalmount<br>Montreal, Quebec<br>Canada H4P 2R2 | Supply Agreement<br><br>04/13/1999 |
| 9076-1339 Québec Inc.<br>6100 Royalmount<br>Montreal, Quebec<br>Canada H4P 2R2 | License Agreement<br><br>04/13/1999 |
| 9076-1339 Québec Inc.<br>ProMetic BioSciences Inc.<br>ProMetic Pharma Inc.<br>6100 Royalmount<br>Montreal, Quebec<br>Canada H4P 2R2 | Non-Competitive Agreement<br><br>04/13/1999 |

---

[1] References to "9076-1339 Québec Inc." are to the company previously known as 9076-1339 Québec Inc. and also known as: (1) Newco, (2) AlphaOne-ProMetic Inc., and (3) Arriva-ProMetic Inc.

| | |
|---|---|
| ProMetic BioSciences Inc.<br>9076-1339 Québec Inc.<br>6100 Royalmount<br>Montreal, Quebec<br>Canada H4P 2R2 | Shareholders Agreement<br><br>04/13/1999 |
| ADP, Inc.<br>One ADP Boulevard<br>Roseland, NJ 07068 | Payroll Services<br><br>08/29/2007 |
| Alameda Real Estate Investments<br>1150 Marina Village Parkway<br>Suite 100<br>Alameda, CA 94501 | Office Lease (nonresidential real property)<br><br>10/27/2005<br><br><br>Alameda Real Estate Investments acquired by:<br>Legacy Partners I Alameda, LLC<br>c/o Legacy Partners Commercial, LLC<br>4000 East Third Avenue, Suite 600<br>Foster City, CA 94404-4810<br>Attn: Paul J. Meyer |
| Baxter Healthcare Corp. (Purchase Oder)<br>One Baxter Way<br>Westlake Village, CA 91362 | Documentation Transfer<br><br>07/11/2007 |
| Baxter Healthcare Corp.<br>550 North Brand Blvd.<br>Glendale, CA 91203<br><br>Biochemie GmbH<br>Biochemiestrasse 10<br>A-6250 Kundl/Austria | Manufacturing Agreement for AAT<br><br>11/10/2000 |
| Baxter Healthcare Corp.<br>One Baxter Parkway<br>Deerfield, IL 60015 | Termination Agreement with transition<br>conditions and royalty agreement<br><br>03/24/2006 |
| CitiCorp Vendor Finance, Inc.<br>P.O. Box 7247-0322<br>Philadelphia, PA 19170 | Copy Machine Lease<br><br>09/20/2004 |

| David Madden<br>P.O. Box 664<br>Orinda, CA 94563 | Finance & Administration, Treasurer<br><br>01/16/2007 |
|---|---|
| Dr. Philip J. Barr<br>Hillcrest Advisors LLC<br>6114 LaSalle Avenue, Suite 602<br>Oakland, CA 94611 | Chief Scientific Officer, Secretary<br><br>05/03/2006 |
| Fisher Clinical Services Inc.<br>7554 Schantz Road<br>Allentown, PA 18106-9032<br><br>Fisher Clinical Services UK<br>Langhurstwood Road<br>Horsham, West Sussex<br>England RH12 4QD | Packaging of Clinical Trial Items and Related Services<br><br>03/07/2005 |
| Fisher Clinical Services UK (Purchase Order)<br>Langhurstwood Road<br>Horsham, West Sussex<br>England RH12 4QD | GMP Storage for Clinical Supplies<br><br>06/12/2006 |
| GE Ionics, Inc.<br>Attn: Contracts Administrator<br>5900 Silver Creek Valley Road<br>San Jose CA 95138-1009 | Water Purification Service/Maintenance<br><br>06/01/2007 |
| Ife Tayo TL Bonner-Payne<br>1019 Wood Street<br>Oakland, CA 94607 | Documentation Control<br><br>03/01/2007 |
| John McDonald<br>c/o MPM Asset Management<br>200 Clarendon Street<br>Boston, MA 02116 | Business Development<br><br>01/31/2007 |
| Kertzer's Heating & Air Conditioning, Inc.<br>P.O. Box 304<br>Livermore, CA 94551 | HVAC Maintenance<br><br>08/01/2006 |
| Martin Lee<br>3941 Eureka Drive<br>Studio City, California 91604 | Biostatistician<br><br>03/10/2005 |

| | |
|---|---|
| Marvin Garovoy, M.D.<br>9 Dutch Valley Lane<br>San Anselmo, CA 94960 | Acting Chief Medical Officer<br><br>01/11/2007 |
| MDS Pharma<br>6, avenue de la Cristallerie<br>92316 Sevres Cedex<br>France | Supports regulatory filings in Europe<br><br>08/08/2006 |
| NewCal<br>2366 Buskirk Avenue<br>Pleasant Hill, CA 94523 | Copy Machine Maintenance Agreement<br><br>09/03/2004 |
| Patheon Italia S.p.A (Purchase Order)<br>110, Viale G.B. Stucchi<br>20052 Monza (MI)<br>Italy | Destruction of Materials<br><br>02/22/2007 |
| Patheon Italia S.p.A<br>Attn: Aldo Braca, Managing Director<br>110, Viale G.B. Stucchi<br>20052 Monza (MI)<br>Italy<br><br>Baxter Healthcare Corp.<br>24 Lange Allee<br>A-1221 Wien<br>Austria | Proposal to Lyophilize and Store rAAT<br><br>12/05/2003 |
| Philip A. Pemberton, Ph.D.<br>439 Midway Avenue<br>San Mateo, CA 94402 | Chief Technical Officer<br><br>01/30/2007 |
| Protease Sciences, Inc.<br>1034 Laurel Oak Road, Suite 4<br>Voorhees, NJ 08043 | License Agreement for IP, together with all amendments<br><br>04/16/1998 |
| Pyramid Laboratories, Inc. (Purchase Order)<br>3589 Cadillac Avenue<br>Costa Mesa, CA 92626 | Analytical Testing<br><br>08/22/2007 |
| QSV Biologics Ltd.<br>Terry Saxton, Executive VP & CFO<br>1938-94 St., Edmonton Research Park<br>Edmonton, Alberta T6N 1J3 | Master Service and Supply Agreement<br><br>01/17/2007 |

| | |
|---|---|
| Richard S. Schwartz, M.D.<br>1325 Howard Avenue, PMB 712<br>Burlingame, CA 94010 | Medical Writing<br><br>10/23/2006 |
| Richard Turegano<br>25853 Westview Way<br>Hayward, CA 94542 | Technical Development<br><br>03/01/2007 |
| Thermo Electron Corp.<br>401 Millcreek Road<br>PO Box 649<br>Marietta, OH 45750 | Freezer Maintenance<br><br>10/01/2006 |
| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Computer Backup Contract<br><br>07/01/2005 |
| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Computer Server Maintenance<br><br>12/30/2003 |
| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Printer Maintenance Contract<br><br>12/30/2003 |
| Trail Holdings, Ltd.<br>Morana Jovan<br>c/o Laird Strategic<br>20 Upper Grosvenor St., 3rd Fl<br><br>London, W1K 7PB<br>United Kingdom | Investor Relations and Development<br><br>03/17/2004 |
| University of Florida<br>219 Grinter Hall<br>Gainesville, FL 32611 | Clinical Research and Laboratory Services<br>Agreements<br><br>07/19/2002 (and various other dates) |
| VDK Architects<br>360 Seventeenth Street<br>Suite 210<br>Oakland, CA 94612 | Architect Services<br><br>08/19/2005 |

| Waters Corporation<br>Mailstop SA<br>34 Maple Street<br>Milford, MA 01757 | HPLC Maintenance<br><br>09/12/2006 |
|---|---|
| Chiron Corporation<br>4650 Horton St.<br>Emeryville, CA 94608 | Sub-License Agreement |
| Imperial College<br>Professor Terry D. Tetley<br>London, UK | Research Agreement |

Form B6H
(10/05)

In re Arriva Pharmaceuticals, Inc.,          Case No. 07-42767
         **Debtor**                                         **(if known)**

# SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the eight year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state, commonwealth, or territory. Include all names used by the nondebtor spouse during the eight years immediately preceding the commencement of this case. If a minor child is a codebtor or a creditor, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed. Bankr. P. 1007(m).

☐  Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| Avirra, Inc.<br>1010 Atlantic Avenue<br>Alameda, CA 94501 | Legacy Partners I Alameda, LLC<br>1150 Marina Village Parkway, Suite 100<br>Alameda, CA 94501 |

American LegalNet, Inc.
www.USCourtForms.com

IN THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 07-42767 |
| ARRIVA PHARMACEUTICALS, INC. a California corporation, | Chapter 11 |
| Debtor and Debtor-in-Possession. | |

## DECLARATION REGARDING SCHEDULES OF ASSETS AND LIABILITIES

I, M. Sue Preston, president and CEO of Arriva, named as the debtor in this case, declare under penalty of perjury that I have read the foregoing Schedules of Assets and Liabilities, consisting of 24 sheets, and that it is true and correct to the best of my information and belief.

Dated: September 13, 2007

By:  /s/ M. Sue Preston
     M. Sue Preston
     President and CEO



1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   ORI KATZ, Cal. Bar No. 209561
    MICHAEL M. LAUTER, Cal. Bar No. 246048
4   Four Embarcadero Center, 17th Floor
    San Francisco, California  94111-4106
5   Telephone:    415-434-9100
    Facsimile:    415-434-3947
6
7   Attorneys for ARRIVA PHARMACEUTICALS, INC.

8

9                 UNITED STATES BANKRUPTCY COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                      OAKLAND DIVISION

12

13  In re                              Case No. 07-42767

14  ARRIVA PHARMACEUTICALS, INC., a    Chapter 11
    California corporation,
15                                     DEBTOR'S AMENDED: (1) SCHEDULE B,
                       Debtor.         AND (2) SCHEDULE G
16
    Tax ID: 94-3287067
17

18

19

20

21

22

23

24

25

26

27

28

                                   -1-
    W02-WEST:FKA\400612585.1                        AMENDED SCHEDULES

1    Arriva Pharmaceuticals, Inc. (the "Debtor") amends its Schedule B (personal

2  property) and Schedule G (executory contracts and unexpired leases).  The Debtor's

3  Amended Schedule B is attached to this filing as Exhibit 1, and the Debtor's Amended

4  Schedule G is attached to this filing as Exhibit 2.

5    A summary of the changes to the amended schedules is set forth below.

6                          Summary of Changes to Schedule B

7    The Debtor made two changes to Schedule B.  First, the Debtor listed a previously

8  unscheduled claim for costs against Alphamed Pharmaceuticals, Corp., in the approximate

9  amount of $234,318.13, in the action titled Alphamed Pharmaceuticals Corp. v. Arriva

10  Pharmaceuticals, Inc. et al., U.S.D.C., S.D. Fla., Case No. 03-20078-CIV-

11  ALTONAGA/TURNOFF.  This claim appears at Paragraph 21 of Attachment B to the

12  Amended Schedule B.

13    Second, the Debtor listed certain personal property (specifically, rAAT bulk

14  therapeutic product) stored in Italy and the United States which had been inadvertently

15  omitted from its original schedules.  The personal property now appears at Paragraph 35 of

16  Attachment B to the Amended Schedule B.

17                          Summary of Changes to Schedule G

18    The Debtor's Amended Schedule G eliminates certain contracts and leases which

19  should not have been included on the Debtor's original Schedule G.  The eliminated

20  contracts and leases are as follows:

21    ADP, Inc. – contract for payroll services
      Legacy Partners I Alameda, LLC – office lease
22    John McDonald – agreement regarding business development
      Trail Holdings, Ltd. – agreement regarding investor relations and development
23

24    In addition, Amended Schedule G now includes two agreements that the Debtor

25  should have listed on its original Schedule G.  Those two agreements are as follows:

26    Dr. Allan Wachter – agreement and release
      M. Sue Preston – employment agreement
27

28

-2-

1    The Amended Schedule G also reflects that CIT Technology and Financial

2  Services, Inc. is the successor in interest under a copy machine lease with the Debtor dated

3  as of September 20, 2004.

4                                       <u>Notice</u>

5    The Debtor will serve its Amended Schedule B and Amended Schedule G on (1) the

6  parties affected by the changes described above, and (2) parties who have requested notice

7  in this case.

8

9  Dated: December 19, 2007

10                              Respectfully submitted,

11                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

12

13                      By      _____
                                      /s/ Michael H. Ahrens
14                                    MICHAEL H. AHRENS
                                Attorneys for the Debtor Arriva Pharmaceuticals, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-
                                                        AMENDED SCHEDULES

# EXHIBIT 1

Form B6B
(10/05)

In re  Arriva Pharmaceuticals, Inc.,                                    Case No.  07-42767
_____                              _____
              Debtor                                                                  (If known)

# SCHEDULE B - PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "x" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C - Property Claimed as Exempt.

**Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.**

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property." In providing the information requested in this schedule, do not include the name or address of a minor child. Simply state "a minor child."

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1. Cash on hand. | | Petty Cash | | 521.00 |
| 2. Checking, savings or other finan-cial accounts, certificates of deposit-or shares in banks, savings and loan, thrift, building and loan, and home-stead associations, or credit unions, brokerage houses, or cooperatives. | | See Attachment B. | | 1,293,819.00 |
| 3. Security deposits with public util-ities, telephone companies, land-lords, and others. | | Certificate of Deposit with Silicon Valley Bank | | 400,000.00 |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5. Books; pictures and other art objects; antiques; stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | X | | | |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photo-graphic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in an education IRA as defined in 26 U.S.C. § 530(b)(1) or under a qualified State tuition plan as defined in 26 U.S.C. § 529(b)(1). Give particulars. (File separately the record(s) of any such interest(s). 11 U.S.C. § 521(c); Rule 1007(b)). | X | | | |

American LegalNet, Inc.
www.USCourtForms.com

Form B6B-Cont.
(10/05)

In re Arriva Pharmaceuticals, Inc.,                  Case No. 07-42767
           Debtor                                          (If known)

# SCHEDULE B - PERSONAL PROPERTY
## (Continuation Sheet)

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | HUSBAND, WIFE, JOINT, OR COMMUNITY | CURRENT VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITH-OUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 12. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars. | X | | | |
| 13. Stock and interests in incorporated and unincorporated businesses. Itemize. | | See Attachment B. | | |
| 14. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 15. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 16. Accounts receivable. | | Due from deferred sale of equipment to QSV Biologics Ltd. | | 219,004.00 |
| 17. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 18. Other liquidated debts owed to debtor including tax refunds. Give particulars. | X | | | |
| 19. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A - Real Property. | X | | | |
| 20. Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 21. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | | See Attachment B. | | 0.00 |

American LegalNet, Inc.
www.USCourtForms.com

## ATTACHMENT B (to Amended Schedule B)

2.      Money Market Account – State Street Bank & Trust Company - $1,273,108
        Operating Account – Silicon Valley Bank - $11,389
        Ovenight "Sweep" Account – Silicon Valley Bank $0.00

13.     100% ownership interest in Avirra, Inc., a California corporation, and

        Partial interest in a corporation formed in and under the laws of Quebec originally known
        as 9076-1339 Quebec Inc., and also known as Arriva-Prometic, Inc., AlphaOne-Prometic,
        Inc. and "Newco."

21.     Interest in $17 million-plus judgment obtained by Allan Wachter M.D., in *Wachter, et
        al., v Lezdey et. al.*, Superior Court of Arizona, Maricopa County, No CV 99-09334.

        Claim for costs against Alphamed Pharmaceuticals, Corp., in the approximate amount of
        $234,318.13 in the action titled *Alphamed Pharmaceuticals Corp. v. Arriva
        Pharmaceuticals, Inc. et al.*, U.S.D.C., S.D. Fla., Case No. 03-20078-CIV-
        ALTONAGA/TURNOFF.

22.     See list of intellectual property on next 2 pages.

35.     rAAT bulk therapeutic product (the "Product") stored in UK – value unknown
        Product stored in Italy – value unknown (stored with Patheon Italia S.p.A)
        Product stored in the United States (as summarized below) – value unknown
                -approximately 7.2 kg stored at Debtor's headquarters
                -1.25 kg that failed specifications

# ARRIVA PHARMACEUTICALS, INC.
## INTELLECTUAL PROPERTY SUMMARY

### IN-LICENSED PORTFOLIO

| Region/ No. | Licensor | Title | Date |
|---|---|---|---|
| **ALPHA 1-ANTITRYPSIN** | | | |
| U.S. Patent 6,124,257 | Protease Sciences, Inc. | Method of Treatment | 26-Sep-00 |
| U.S. Patent 5,780,440 | Protease Sciences, Inc. | Treatment of pulmonary disease with protease inhibitors | 14-Jul-98 |
| U.S. Patent 5,618,786 | Chiron Corporation | Aerosolization of protein therapeutic agent | 8-Apr-97 |
| U.S. Patent 5,532,215 | Protease Sciences, Inc. | Antiviral compositions and method of use | 2-Jul-96 |
| U.S. Patent 5,492,889 | Protease Sciences, Inc. | Treatment of mast cell tumors (lapsed) | 20-Feb-96 |
| U.S. Patent 5,376,633 | Protease Sciences, Inc. | Method for deactivating viruses in blood component containers (lapsed) | 27-Dec-94 |
| U.S. Patent 5,346,886 | Protease Sciences, Inc. | Topical alpha-1-antitrypsin, non-aqueous lipid miscible, benzalkonium chloride compositions for treating skin (lapsed) | 13-Sep-94 |
| U.S. Patent 5,290,762 | Protease Sciences, Inc. | Treatment of inflammation (lapsed) | 1-Mar-94 |
| U.S. Patent 5,217,951 | Protease Sciences, Inc. | Treatment of inflammation | 8-Jun-93 |
| U.S. Patent 5,215,965 | Protease Sciences, Inc. | Treatment of inflammation | 1-Jun-93 |
| U.S. Patent 5,166,134 | Protease Sciences, Inc. | Treatment of allergic rhinitis | 24-Nov-92 |
| U.S. Patent 5,134,119 | Protease Sciences, Inc. | Treatment of inflammation using 358 substituted alpha-antitrypsin | 28-Jul-92 |
| U.S. Patent 5,093,316 | Protease Sciences, Inc. | Treatment of inflammation | 3-Mar-92 |
| EU Patent EPO 512090 | Protease Sciences, Inc. | Treatment of inflammation (lapsed) | 2-Jan-97 |
| EU Patent EPO 432117 | Protease Sciences, Inc. | Composition for treatment of inflammation (lapsed) | 22-Jun-94 |
| EU Patent EP0 626858 | Protease Sciences, Inc. | Antiviral Agent (lapsed) | 29-Sep-93 |
| Australia Patent 679165 | Protease Sciences, Inc. | Treatment of Inflammation (lapsed) | 26-Jun-97 |
| Australia Patent 677367 | Protease Sciences, Inc. | Antiviral Agent (lapsed) | 24-April-97 |
| Canadian Patent 2,019,974 | Protease Sciences, Inc. | Treatment of Inflammation (lapsed) | 22-Jan-02 |
| Canadian Pat. App 2,091,354 | Protease Sciences, Inc. | Treatment of Inflammation (lapsed) | Filed 26-Sep-91 |
| Canadian Patent 2,129,132 | Protease Sciences, Inc. | Antiviral Agent | Mar-30-04 |
| Korean Patent 358421 | Protease Sciences, Inc. | Topical Preparation with Serine Protease Inhibitors (lapsed) | 14-Oct-02 |

1 of 2

Strictly Confidential
9/13/2007

# ARRIVA PHARMACEUTICALS, INC.
## INTELLECTUAL PROPERTY SUMMARY
## IN-HOUSE PORTFOLIO

| Region/ No. | HEWM Docket No. | Title | Date |
|---|---|---|---|
| **ALPHA 1-ANTITRYPSIN** | | | |
| PCT Patent App. PCT/GB03/05049 | 39042.0027 | Compositions and methods for treating inflammatory disease using protease inhibitors | Filed 20-Nov-03 |
| U.S. Patent App. 10/914,863 | 39042.0012 | Production of proteins in yeast | Filed 9-Aug-04 |
| PCT Patent App. PCT/US2004/025983 | 39042.0012 | Production of proteins in yeast | Filed 9-Aug-04 |
| PCT Patent App. WO 2005/048985 A2 | 39042.0025 | Alpha 1-antitrypsin compositions and treatment method using such compositions (with Baxter) | Filed 11-Nov-04 |
| PCT Patent App. PCT/US2004/038081 | 39042.0026 | Dried protein formulations (with Arriva-ProMetic) | Filed 12-Nov. 04 |
| WO 2005/086915 A2 | 39042.0020 | Treatment of chronic obstructive pulmonary disease by low dose inhalation of protease inhibitor | Filed 9-March-04 |

| | | **FUSION PROTEINS AND OTHER** | |
| **In-House Portfolio** | | | |
| U.S. Patent App. 10/025,514 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease (ISSUED JULY 24,2007) | Filed 18-Dec-01 |
| PCT Application PCT/US01/49256 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease | Filed 18-Dec-01 |
| Canadian Pat. App. 2,430,973 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease | Filed 9-Jun-03 |
| Japanese Pat. App. 2002-552164 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease | Filed 18-Jun-03 |
| EU Patent App. 01988344.6 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease | Filed 25-Jun-03 |
| Australia Pat. App. 2002241661 | 39042.0008 | Multifunctional protease inhibitors and their use in treatment of disease | Filed 27-Jun-03 |
| U.S. Patent App. 10/731,375 | 39042.0014 | Methods and compositions for treatment of otitis media | Filed Dec-8-03 |
| PCT Patent App. PCT/US03/39053 | 39042.0014 | Methods and compositions for treatment of otitis media | Filed Dec-8-03 |

| | | **ILOMASTAT** | |
| **In-House Portfolio** | | | |
| U.S. Patent App. 10/848,594 | | Treatment of respiratory disease associated with matrix metalloproteases by inhalation of synthetic matrix metalloprotease inhibitors | Filed 17-May-04 |
| PCT Patent App. US2004/015449 | | Treatment of respiratory disease associated with matrix metalloproteases by inhalation of synthetic matrix metalloprotease inhibitors | Filed 17-May-04 |

2 of 2

Strictly Confidential
9/13/2007

# EXHIBIT 2

Form B6G
(10/05)

**In re Arriva Pharmaceuticals, Inc.,**           Case No. 07-42767
              **Debtor**

## AMENDED SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed.R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST.  STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY.  STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| 9076-1339 Québec Inc.[1] 6100 Royalmount Montreal, Quebec Canada H4P 2R2 | Supply Agreement 04/13/1999 |
| 9076-1339 Québec Inc. 6100 Royalmount Montreal, Quebec Canada H4P 2R2 | License Agreement 04/13/1999 |
| 9076-1339 Québec Inc. ProMetic BioSciences Inc. ProMetic Pharma Inc. 6100 Royalmount Montreal, Quebec Canada H4P 2R2 | Non-Competitive Agreement 04/13/1999 |

---

[1] References to "9076-1339 Québec Inc."are to the company previously known as 9076-1339 Québec Inc. and also known as: (1) Newco, (2) AlphaOne-ProMetic Inc., and (3) Arriva-ProMetic Inc.

W02-WEST:FKA\400612391.1                              -1-

| | |
|---|---|
| ProMetic BioSciences Inc.<br>9076-1339 Québec Inc.<br>6100 Royalmount<br>Montreal, Quebec<br>Canada H4P 2R2 | Shareholders Agreement<br><br>04/13/1999 |
| Baxter Healthcare Corp. (Purchase Oder)<br>One Baxter Way<br>Westlake Village, CA 91362 | Documentation Transfer<br><br>07/11/2007 |
| Baxter Healthcare Corp.<br>550 North Brand Blvd.<br>Glendale, CA 91203<br><br>Biochemie GmbH<br>Biochemiestrasse 10<br>A-6250 Kundl/Austria | Manufacturing Agreement for AAT<br><br>11/10/2000 |
| Baxter Healthcare Corp.<br>One Baxter Parkway<br>Deerfield, IL 60015 | Termination Agreement with transition<br>conditions and royalty agreement<br><br>03/24/2006 |
| CIT Technology and Financial Services, Inc.<br>PO Box 550599<br>Jacksonville, FL 32255 | Copy Machine Lease<br><br>09/20/2004 |
| David Madden<br>P.O. Box 664<br>Orinda, CA 94563 | Finance & Administration, Treasurer<br><br>01/16/2007 |
| Dr. Philip J. Barr<br>Hillcrest Advisors LLC<br>6114 LaSalle Avenue, Suite 602<br>Oakland, CA 94611 | Chief Scientific Officer, Secretary<br><br>05/03/2006 |
| Fisher Clinical Services Inc.<br>7554 Schantz Road<br>Allentown, PA 18106-9032<br><br>Fisher Clinical Services UK<br>Langhurstwood Road<br>Horsham, West Sussex<br>England RH12 4QD | Packaging of Clinical Trial Items and Related<br>Services<br><br>03/07/2005 |

| | |
|---|---|
| Fisher Clinical Services UK (Purchase Order)<br>Langhurstwood Road<br>Horsham, West Sussex<br>England RH12 4QD | GMP Storage for Clinical Supplies<br><br>06/12/2006 |
| GE Ionics, Inc.<br>Attn: Contracts Administrator<br>5900 Silver Creek Valley Road<br>San Jose CA 95138-1009 | Water Purification Service/Maintenance<br><br>06/01/2007 |
| Ife Tayo TL Bonner-Payne<br>1019 Wood Street<br>Oakland, CA 94607 | Documentation Control<br><br>03/01/2007 |
| Kertzer's Heating & Air Conditioning, Inc.<br>P.O. Box 304<br>Livermore, CA 94551 | HVAC Maintenance<br><br>08/01/2006 |
| Martin Lee<br>3941 Eureka Drive<br>Studio City, California 91604 | Biostatistician<br><br>03/10/2005 |
| Marvin Garovoy, M.D.<br>9 Dutch Valley Lane<br>San Anselmo, CA 94960 | Acting Chief Medical Officer<br><br>01/11/2007 |
| MDS Pharma<br>6, avenue de la Cristallerie<br>92316 Sevres Cedex<br>France | Supports regulatory filings in Europe<br><br>08/08/2006 |
| NewCal<br>2366 Buskirk Avenue<br>Pleasant Hill, CA 94523 | Copy Machine Maintenance Agreement<br><br>09/03/2004 |
| Patheon Italia S.p.A (Purchase Order)<br>110, Viale G.B. Stucchi<br>20052 Monza (MI)<br>Italy | Destruction of Materials<br><br>02/22/2007 |

| | |
|---|---|
| Patheon Italia S.p.A<br>Attn: Aldo Braca, Managing Director<br>110, Viale G.B. Stucchi<br>20052 Monza (MI)<br>Italy<br><br>Baxter Healthcare Corp.<br>24 Lange Allee<br>A-1221 Wien<br>Austria | Proposal to Lyophilize and Store rAAT<br><br>12/05/2003 |
| Philip A. Pemberton, Ph.D.<br>439 Midway Avenue<br>San Mateo, CA 94402 | Chief Technical Officer<br><br>01/30/2007 |
| Protease Sciences, Inc.<br>1034 Laurel Oak Road, Suite 4<br>Voorhees, NJ 08043 | License Agreement for IP, together with all amendments<br><br>04/16/1998 |
| Pyramid Laboratories, Inc. (Purchase Order)<br>3589 Cadillac Avenue<br>Costa Mesa, CA 92626 | Analytical Testing<br><br>08/22/2007 |
| QSV Biologics Ltd.<br>Terry Saxton, Executive VP & CFO<br>1938-94 St., Edmonton Research Park<br>Edmonton, Alberta T6N 1J3 | Master Service and Supply Agreement<br><br>01/17/2007 |
| Richard S. Schwartz, M.D.<br>1325 Howard Avenue, PMB 712<br>Burlingame, CA 94010 | Medical Writing<br><br>10/23/2006 |
| Richard Turegano<br>25853 Westview Way<br>Hayward, CA 94542 | Technical Development<br><br>03/01/2007 |
| Thermo Electron Corp.<br>401 Millcreek Road<br>PO Box 649<br>Marietta, OH 45750 | Freezer Maintenance<br><br>10/01/2006 |
| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Computer Backup Contract<br><br>07/01/2005 |

| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Computer Server Maintenance<br><br>12/30/2003 |
|---|---|
| Track Computers<br>Cord Neal<br>231 Fallon Street<br>Oakland, CA 94607 | Printer Maintenance Contract<br><br>12/30/2003 |
| University of Florida<br>219 Grinter Hall<br>Gainesville, FL 32611 | Clinical Research and Laboratory Services<br>Agreements<br><br>07/19/2002 (and various other dates) |
| VDK Architects<br>360 Seventeenth Street<br>Suite 210<br>Oakland, CA 94612 | Architect Services<br><br>08/19/2005 |
| Waters Corporation<br>Mailstop SA<br>34 Maple Street<br>Milford, MA 01757 | HPLC Maintenance<br><br>09/12/2006 |
| Chiron Corporation<br>4650 Horton St.<br>Emeryville, CA 94608 | Sub-License Agreement |
| Imperial College<br>Professor Terry D. Tetley<br>London, UK | Research Agreement |
| Dr. Allan Wachter<br>c/o KORNFIELD, PAUL & NYBERG, P.C.<br>Attention: Chris Kuhner and Eric A. Nyberg<br>1999 Harrison St., Suite 2675<br>Oakland, CA 94612 | Agreement and Release |
| M. Sue Preston<br>Arriva Pharmaceuticals, Inc.<br>1010 Atlantic Avenue<br>Alameda, CA 94501 | Employment Agreement |

# EXHIBIT B

1  SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
2      A Limited Liability Partnership
        Including Professional Corporations
3  MICHAEL H. AHRENS,
    Cal. Bar No. 44766
4  ORI KATZ, Cal. Bar No. 209561
    MICHAEL M. LAUTER,
5  Cal. Bar. No. 246048
    Four Embarcadero Center, 17th Floor
6  San Francisco, California  94111-4106
    Telephone:    415-434-9100
7  Facsimile:    415-434-3947

8  Attorneys for ARRIVA
    PHARMACEUTICALS, INC.
9

10                UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14  In re                                   | Case No. 07-42767

15  ARRIVA PHARMACEUTICALS, INC.,            | Chapter 11
    a California corporation,
16                                           |
                          Debtor.            | **DISCLOSURE STATEMENT FOR**
17                                           | **THE DEBTOR'S FOURTH AMENDED**
    Tax ID: 94-3287067                       | **CHAPTER 11 PLAN OF**
18                                           | **REORGANIZATION, DATED**
                                             | **DECEMBER 12, 2007**
19
                                             | Date:        December 6, 2007
20                                           | Time:        2:00 p.m.
                                             | Place:       United States Bankruptcy Court
21                                           |              1300 Clay Street, Oakland, CA
                                             | Judge:       Hon. Edward D. Jellen
22                                           | Courtroom: 215

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2
                                                                                  Page

3
4   I.     INTRODUCTION AND SUMMARY ................................................................ 4

5          A.     Disclosure Statement Enclosures ................................................. 5

6          B.     Only Impaired Classes Vote .......................................................... 6

7          C.     Confirmation Hearing .................................................................... 7

8   II.    OVERVIEW OF THE PLAN ........................................................................ 7

9          A.     Executive Summary of Plan .......................................................... 7

10         B.     Summary of Distributions ............................................................. 8

11  III.   OVERVIEW OF CHAPTER 11 .................................................................. 10

12  IV.    DESCRIPTION OF THE DEBTOR'S BUSINESS ....................................... 10

13         A.     The Debtor ..................................................................................... 10

14         B.     rAAT Drug ..................................................................................... 11

15                1.     The Market for the rAAT Drug ........................................... 11

16                2.     Arriva's Past and Future Testing of the rAAT Drug ......... 12

17         C.     Ilomastat Drug ............................................................................... 16

18         D.     SLAPI Drug .................................................................................... 16

19         E.     Intellectual Property ..................................................................... 17

20         F.     Establishment of Arriva and Pre-Petition Capital Structure of Arriva .......... 17

21         G.     The Lezdey Litigation ................................................................... 17

22                1.     The Protease License ........................................................... 18

23                2.     The Arizona Litigation ........................................................ 18

24                3.     The Wachter Judgment ........................................................ 20

25                4.     The Litigation in the Northern District of California Before
                          Judge Illston .......................................................................... 21

26

27

28

-i-

|  |  | 5. | The Florida Litigation | 21 |
|  |  | 6. | The Newly Filed Nevada Suit | 22 |
|  | H. | The Impact of the Lezdey Litigation on the Ability of Arriva to Operate and Raise Capital | | 22 |
| V. | THE CASE | | | 22 |
|  | A. | MPM DIP Financing | | 22 |
|  | B. | New DIP and Plan Financing – Nordic and MPM | | 23 |
|  | C. | Claims Process | | 25 |
|  | D. | Lezdey Claims | | 25 |
| VI. | DESCRIPTION OF SIGNIFICANT LITIGATION | | | 27 |
| VII. | SUMMARY OF PLAN PROVISIONS | | | 27 |
|  | A. | Introduction | | 27 |
|  | B. | Method of Classification of Claims and Interests and General Provisions | | 28 |
|  |  | 1. | General Rules of Classification. | 28 |
|  |  | 2. | Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims. | 28 |
|  |  | 3. | Bar Date for Administrative Claims. | 28 |
|  |  | 4. | Bar Date for Fee Claims. | 29 |
|  | C. | Unclassified Administrative Claims, Priority Tax Claims, DIP Claims and Fee Claims. | | 29 |
|  | D. | Classification and Treatment of Claims and Interests | | 31 |
|  |  | 1. | Class 1 Other Priority Claims. | 31 |
|  |  | 2. | Class 2 Miscellaneous Secured Claims | 32 |
|  |  | 3. | Class 3(a) SVB Claims | 32 |
|  |  | 4. | Class 3(b) Severance Claims | 33 |

-ii-

|  |  |  |  |
|---|---|---|---|
| | 5. | Class 4 General Unsecured Claims | 33 |
| | 6. | Class 5 Lezdey Claims | 34 |
| | 7. | Class 6 Series D Interests | 34 |
| | 8. | Class 7 Series C Interests | 34 |
| | 9. | Class 8 Series B Interests | 34 |
| | 10. | Class 9 Series A Interests | 35 |
| | 11. | Class 10 Common Interests | 35 |
| E. | | Means For Implementation Of The Plan | 35 |
| | 1. | Corporate Action | 35 |
| | 2. | Distributions | 35 |
| | 3. | Reorganized Debtor's Responsibilities Under Plan | 36 |
| | 4. | Exit Financing | 38 |
| | 5. | Revesting | 39 |
| | 6. | Distributions for Claims Allowed as of the Effective Date | 40 |
| | 7. | Reserve Accounts | 40 |
| | 8. | Reserves for Disputed Administrative, Priority Tax and Other Priority Claims | 41 |
| | 9. | Reserves for Other Disputed Claims | 41 |
| | 10. | Claims Objection Deadline | 42 |
| | 11. | Settlement of Disputed Claims | 43 |
| | 12. | Unclaimed Property | 43 |
| | 13. | Release of Liens | 43 |
| | 14. | Rights of Actions | 44 |
| | 15. | Withholding Taxes | 45 |
| | 16. | Fractional Cents | 45 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-iii-

|  |  | 17. | Payments of Less than Ten Dollars | 45 |
|  |  | 18. | Post-Effective Date Existence of Committee | 45 |
|  | F. |  | Treatment of Executory Contracts and Unexpired Leases | 46 |
|  | G. |  | Effect of Confirmation of the Plan | 47 |
|  |  | 1. | General Release and Injunction | 48 |
|  |  | 2. | Exculpation | 50 |
|  |  | 3. | Discharge | 51 |
|  |  | 4. | Injunction | 52 |
|  |  | 5. | Insurance | 52 |
|  | H. |  | Retention of Jurisdiction | 53 |
|  | I. |  | Miscellaneous Provisions | 53 |
|  |  | 1. | Pre-Confirmation Modification | 53 |
|  |  | 2. | Post-Confirmation Immaterial Modification | 53 |
|  |  | 3. | Post-Confirmation Material Modification | 53 |
|  |  | 4. | Withdrawal or Revocation of the Plan | 54 |
|  |  | 5. | Payment of Statutory Fee | 54 |
|  |  | 6. | Successors and Assign | 54 |
|  |  | 7. | Exemption from Transfer Taxes | 54 |
|  |  | 8. | Effectiveness of the Plan | 55 |
| VIII. |  |  | CERTAIN RISK FACTORS TO BE CONSIDERED | 55 |
|  | A. |  | Taxation | 56 |
|  | B. |  | Distributions to Holders of Claims | 57 |
|  | C. |  | Objections to Classification | 57 |
|  | D. |  | Inherent Uncertainty of Financial Projections | 57 |
|  | E. |  | Inherent Uncertainty of Certain Events | 58 |

-iv-

F.    Certain Bankruptcy Law Considerations ....................................................... 59

    1.    Risk of Non-Confirmation of the Plan ............................. 59

    2.    Risk of Non-Occurrence of the Effective Date ................................ 59

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................... 59

    A.    Liquidation Under Chapter 7 ........................................................ 59

    B.    Alternative Plan of Reorganization ............................................... 60

X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... 60

    A.    Federal Income Tax Consequences In General .............................. 60

    B.    Federal Income Tax Consequences to the Debtor -- Cancellation of Indebtedness ................................................................................ 62

    C.    Federal Income Tax Consequences to Holders of Allowed Claims in Classes 2, 3(a), 3(b) 4 and 5 .......................................................... 63

        1.    Receipt of Cash and Property by Holders of Allowed Claims in Classes 2, 3(a), 3(b), 4 and 5 ............................ 63

        2.    Receipt of Interest ........................................................... 63

        3.    Character of Gain or Loss ................................................ 64

        4.    Withholding ...................................................................... 64

    D.    Federal Income Tax Consequences to Holders of Allowed Interests ........... 65

    E.    Importance of Obtaining Professional Tax Assistance ................. 65

XI.    CONCLUSION ............................................................................................... 66

W02-WEST:FME\400406881.15

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION

1    ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND

2  ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN

3  THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

4  BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF

5  ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR

6  INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE

7  INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS

8  CONTAINED IN THIS DISCLOSURE STATEMENT.

9    IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS

10  OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON

11  THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN,

12  INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS

13  DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY

14  LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER

15  SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX

16  ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS

17  DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE

18  TRANSACTIONS CONTEMPLATED THEREBY.

19    PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE

20  STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN

21  THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED

22  TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.

23  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE

24  MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND

25  THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED

26  HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALL

27  CREDITORS AND INTERESTS HOLDERS SHOULD READ CAREFULLY THE

28

1  "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE

2  PLAN.  SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," Article VIII.

3      THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR

4  IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND

5  RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT

6  NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES

7  LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS

8  BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND

9  EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE

10  ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

11      CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED

12  FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS,

13  ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO

14  ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

15      THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING

16  PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE

17  PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY

18  ENTITY FOR ANY OTHER PURPOSE.  THE FACTUAL INFORMATION

19  CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE

20  DESCRIPTION OF THE DEBTOR, ITS BUSINESS, AND EVENTS LEADING TO

21  THE COMMENCEMENT OF THE CASE, HAS BEEN PREPARED AND OBTAINED

22  BY THE DEBTOR AND ITS PROFESSIONALS FROM VARIOUS DOCUMENTS,

23  AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR.  NEITHER

24  THE DEBTOR NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR

25  WARRANTY REGARDING SUCH INFORMATION.

26      THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY

27  INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

28  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO

1  AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN

2  FULL HEREIN.

3       AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND

4  OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS

5  DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS

6  AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR

7  OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL

8  CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT

9  PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION

10  OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE

11  WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE

12  ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY

13  PROCEEDING OR OTHER ACTION  INVOLVING THE DEBTOR OR ANY OTHER

14  PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE

15  ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE

16  PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

17       THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT

18  TO MATERIAL CONDITIONS PRECEDENT.  THERE CAN BE NO ASSURANCE

19  THAT THOSE CONDITIONS WILL BE SATISFIED.

20       THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED

21  BY THE DEBTOR BASED ON INFORMATION AVAILABLE TO THE DEBTOR

22  AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE

23  FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF

24  THE DEBTOR AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE.  THE

25  FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD

26  COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN

27  INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND

28  REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION

W02-WEST:FME\400406881.15                             DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
Case: 07-42767     Doc #: 242     Filed: 12/12/2007     AMENDED PLAN OF REORGANIZATION
Page 9 of 73

1  REGARDING FINANCIAL PROJECTIONS.  FURTHERMORE, THE FINANCIAL

2  PROJECTIONS HAVE NOT BEEN AUDITED.  ALTHOUGH PRESENTED WITH

3  NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON

4  A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED

5  TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT

6  TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE

7  UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE

8  BEYOND THE CONTROL OF THE DEBTOR.  CONSEQUENTLY, THE FINANCIAL

9  PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR

10 WARRANTY BY THE DEBTOR OR ANY OTHER PERSON, THAT THE

11 FINANCIAL PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY

12 VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL

13 PROJECTIONS.

## I.  INTRODUCTION AND SUMMARY

15     Arriva Pharmaceuticals, Inc. ("Arriva"), the above-captioned debtor (the "Debtor"),

16 submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of

17 title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against

18 and Interests in the Debtor in connection with (i) the solicitation of acceptances of the

19 Debtor's Fourth Amended Chapter 11 Plan of Reorganization dated December 12, 2007, as

20 such plan may be amended (the "Plan"), filed by the Debtor with the United States

21 Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), and (ii)

22 the Confirmation Hearing scheduled for January 16, 2008 at 10:00 a.m.  Unless otherwise

23 defined herein, all capitalized terms contained herein have the meanings ascribed to them

24 in the Plan.

25     The following introduction and summary is qualified in its entirety by, and should

26 be read in conjunction with, the more detailed information and financial statements and

27 notes thereto appearing elsewhere in this Disclosure Statement together with any relevant

28 Exhibits and Appendices.

W02-WEST:FME\400406881.15
DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

1        Concurrently with the filing of this Disclosure Statement, the Debtor filed the Plan

2  which sets forth how Claims against and Interests in the Debtor will be treated in this

3  chapter 11 case.  This Disclosure Statement describes certain aspects of the Plan, the

4  Debtor's prior operations, significant events occurring in the Debtor's chapter 11 case and

5  other related matters.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU

6  SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS

7  HERETO AND THERETO IN THEIR ENTIRETY.

8  A.    <u>Disclosure Statement Enclosures</u>

9        Attached as exhibits to this Disclosure Statement are copies of the following:

10       •     The Plan (<u>Exhibit A</u>);

11       •     The Order of the Bankruptcy Court (without exhibits) (the "Solicitation

12               Procedures Order"), which, among other things, approves the Disclosure

13               Statement and establishes certain procedures with respect to the solicitation

14               and tabulation of votes to accept or to reject the Plan (<u>Exhibit B</u>);

15       •     Financial Projections (<u>Exhibit C</u>); and

16       •     Liquidation Analysis (<u>Exhibit D</u>).

17        In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the

18  Disclosure Statement submitted to the holders of Impaired Claims and Interests entitled to

19  vote to accept or reject the Plan.

20        The Solicitation Procedures Order sets forth in detail the deadlines, procedures and

21  instructions for voting to accept or reject the Plan and for filing objections to confirmation

22  of the Plan.  In addition, detailed voting instructions accompany each Ballot.  Each holder

23  of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety

24  the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions

25  accompanying the Ballots before voting on the Plan.  These documents contain, among

26  other things, important information concerning the classification of Claims and Interests

27  for voting purposes and the tabulation of votes.  No solicitation of votes to accept or reject

28

W02-WEST:FME\400406881.15                                    DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
Case: 07-42767      Doc #: 242      Filed: 12/12/2007    AMENDED PLAN OF REORGANIZATION
Page 11 of 75

1  the Plan may be made except pursuant to section 1125 of the Bankruptcy Code and the

2  Solicitation Procedures Order.

3  B.     Only Impaired Classes Vote

4        Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and

5  Interests that are "impaired" under the Plan may vote to accept or reject the Plan.

6  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or

7  contractual rights are changed under such plan.  Notwithstanding, if the holders of claims

8  or interests in an impaired class are not entitled to receive or retain any property under a

9  plan on account of such claims or interests, such impaired class is deemed to reject the

10  Plan.

11        The Bankruptcy Code defines "acceptance" of a plan by a class of claims as

12  acceptance by holders of claims in that class that hold at least two thirds in dollar amount

13  and more than one half in number of the claims that cast ballots for acceptance or rejection

14  of the plan.

15        Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan

16  notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or

17  interests.  Under that section, a plan may be confirmed by a court if (i) at least one class of

18  impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is

19  "fair and equitable" with respect to each non-accepting class.

20        In addition, if any Impaired Class of Claims or Interests entitled to vote shall not

21  accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy

22  Code, the Debtor reserves the right to seek to have the Bankruptcy Court confirm the Plan

23  under section 1129(b) of the Bankruptcy Code.

24        Under the Plan, Claims in Classes 4 and 5 are or may be Impaired and are entitled

25  to vote on the Plan.  Holders of Interests in Classes 6, 7, 8, 9 and 10 will receive no

26  distribution and, accordingly, such holders are deemed to reject the Plan.  Votes from

27  holders of Interests in Classes 6, 7, 8, 9 and 10 are not being solicited.  Under the Plan,

28  Claims in Classes 1, 2, 3(a) and 3(b) are unimpaired, and the holders of Class 1, 2 or 3

-6-

1  Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of

2  the Bankruptcy Code. **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR**

3  **REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF**

4  **CLAIMS IN CLASSES 4 AND 5**.

5       For a summary of the treatment of each Class of Claims and Interests, see

6  "Overview of the Plan" below.

7  C.    Confirmation Hearing

8       The Bankruptcy Court has scheduled the Confirmation Hearing for January 16,

9  2008 at 10:00 a.m. in the United States Bankruptcy Court for the Northern District of

10  California at 1300 Clay Street, Oakland, California.  The Bankruptcy Court has directed

11  that objections, if any, to confirmation of the Plan be served and filed on or before

12  January 8, 2008 at 11:59 p.m. in the manner described in the Notice accompanying this

13  Disclosure Statement.  The date of the Confirmation Hearing may be adjourned from time

14  to time without further notice except for an in court announcement at the Confirmation

15  Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

16                    II. OVERVIEW OF THE PLAN

17  A.    Executive Summary of Plan

18       Under this Plan all of the claims of unsecured claimants are placed into two classes:

19  Class 4 and Class 5.  This plan is a "pot plan" for the unsecured claimants in classes 4 and

20  5.  The "pot" or "Unsecured Claims Pool" amounts to $776,000.  This claims pool will be

21  distributed "pro rata" to the holders of Allowed Claims in Class 4 and Class 5.  Claims in

22  both Classes 4 and 5 may be objected to.  Any claim objected to becomes an "Allowed

23  Claim" when a final order has been entered resolving said dispute.  The Debtor feels that if

24  the Lezdey claims placed in Class 5 are disallowed, the holders of Allowed Claims in

25  Class 4 will either receive 100% of their valid claims or something close to that amount.

26  Those entities described as the "Lezdeys" have filed numerous claims and lawsuits.  The

27  Debtor believes that such claims are without merit and that such claims will be disallowed

28  by the bankruptcy court.  The Debtor can give no assurances that it will prevail in the

W02-WEST:FME\400406881.15

Case: 07-42767      Doc #: 242      Filed: 12/12/2007      Page 15 of 95

1  litigation with the Lezdeys.  If it does not prevail, the return to the creditors will be

2  substantially less than 100%.  However, in any event, the return to creditors under this Plan

3  is much better than the Debtor feels creditors would receive if this case were dismissed or

4  if a Chapter 7 liquidation would follow.  Under this plan all of the preferred stock of the

5  Debtor, classified in Classes 6 to 9, inclusive, are cancelled and the holders of such

6  preferred stock shall receive nothing.  Also, all of the voting common stock of the Debtor,

7  classified in Class 10, is cancelled and such holders shall receive nothing.  On the

8  Effective Date of the Plan all of the new common stock of the Reorganized Debtor shall be

9  issued to the Plan Funders and they will hold 100% of such common stock of the

10  Reorganized Debtor. Also, on or after the Effective Date the Plan Funders may be issued

11  Series A Preferred Stock which is described in this Disclosure Statement.  This summary is

12  only that, a summary, and creditors are urged to read the entire Disclosure Statement.

13  B.    Summary of Distributions

14        The Debtor estimates that all priority claims and expenses of administration will be

15  paid in full.  The claims of the agent and lenders on the DIP Financing will be paid through

16  both the DIP Financing and a refinancing with the Exit Facility that is described in this

17  Disclosure Statement.  The claim of SVB in Class 3(a) is not impaired, and therefore

18  whatever right SVB has with respect to its collateral is not impaired or impacted by the

19  Plan.  Before the filing of the Bankruptcy Case, a severance plan was in place for Rebecca

20  Wheeler and Alexander Stafford, and that severance plan was collateralized by a cash

21  collateral account for their benefit.  These claims and Liens are not impacted by the Plan.

22        It is not possible to determine at this time the amount of claims in Class 4

23  Unsecured Claims.  However, the Debtor has analyzed the schedules and filed claims and

24  believes that the Unsecured Claims Pool of $776,000 may be sufficient to pay all of the

25  Allowed Claims in Class 4 in full as long as the Lezdey claims are not allowed.  Debtor

26  has analyzed the claims filed and the schedules and believes that the total non-insider

27  claims filed and scheduled as undisputed total approximately $1,400,000.  This amount

28  includes a claim by QSV Biologics Ltd. under its contract for pre-petition amounts due of

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

1    $273,273.09.  It is the present intention of the Debtor to assume that contract and use the

2    Cure Fund of $274,000 to cover that claim.  Debtor believes that with objections and

3    settlements of such objections to the remaining insider claims, the Unsecured Claims Pool

4    will be sufficient to cover such non-insider claims.  However, this requires success in the

5    litigation of claims objections and there are no assurances when matters are in litigation

6    (see also Section 3(g) of this Disclosure Statement).

7        The following insiders have filed claims:  Sue Preston [Claim 40] ("Preston Claim")

8    and various MPM entities and officers and directors of MPM [Claims 23-33, inclusive]

9    ("MPM Claims").  Preston has agreed that on the Effective Date of the Plan, the Preston

10   Claim shall be deemed withdrawn.  The MPM Claims include Claims 23-29 for pre-

11   petition costs and attorney fees incurred with respect to claims each holds for indemnity

12   against Debtor arising under various agreements and Debtor's charter, as well as contingent

13   post-petition claims for indemnity ("Indemnity Claims"). The Debtor has entered into an

14   agreement with the MPM entities that filed Claims 23-29 that such entities will not seek

15   any distribution from the Unsecured Creditors Pot or other property of the Debtor or

16   Reorganized Debtor on account of their Indemnity Claims; provided, however, the

17   Indemnity Claims shall survive the entry of the Confirmation Order and be assumed by the

18   Reorganized Debtor (a) with recourse to and payable from only (i) insurance policies of

19   the Debtor in effect prior to the Effective Date that cover such Indemnity Claims, (ii)

20   Reserves Balances refunded to the Reorganized Debtor, (iii) the Reorganized Debtor's net

21   recoveries from third parties on claims that are Property, including, without limitation,

22   from the Lezdeys, under the Wachter Judgment and Avoidance Actions (subject to first

23   applying such funds as required by the Plan), and (b) only after the Reorganized Debtor

24   has recovered and retained from such sources the sum of $500,000. The MPM entities

25   shall provide evidence to the Reorganized Debtor of the outstanding Indemnity Claims.

26       As the Liquidation Analysis sets forth in Exhibit D to this Disclosure Statement, the

27   return to claimants in Class 4 and 5 will be more than on a liquidation in chapter 7.

28

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

1

### III. OVERVIEW OF CHAPTER 11

2      Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or

3 liquidate its business for the benefit of itself, its creditors and interest holders. A goal of

4 chapter 11 is to promote equality of treatment for similarly situated creditors and similarly

5 situated interest holders with respect to the distribution of a debtor's assets.

6      The commencement of a chapter 11 case creates an estate that is comprised of all of

7 the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code

8 provides that the debtor may continue to operate its business and remain in possession of

9 its property as a "debtor-in-possession."

10      The consummation of a chapter 11 plan is the principal objective of a chapter 11

11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a

12 debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon,

13 among others, a debtor, any issuer of securities under the plan, any person acquiring

14 property under the plan and any creditor or interest holder of a debtor whether or not such

15 party voted or voted to accept or reject the Plan.

16      After a plan has been filed and a disclosure statement containing adequate

17 information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor

18 to make an informed judgment about the plan has been approved by the court, the holders

19 of claims against or interests in a debtor may vote to accept or reject the plan under certain

20 circumstances.

21

### IV. DESCRIPTION OF THE DEBTOR'S BUSINESS

22 A.    The Debtor

23      Arriva is a privately held biopharmaceutical company located in Alameda,

24 California, that was founded in 1997 to develop protease inhibitors for treatment of

25 respiratory diseases. Its main product under development is the biotherapeutic

26 recombinant alpha 1-antitrypsin, commonly called "rAAT," which the Company

27 manufactures in engineered yeast cells. It also has been active in developing the protease

28

-10-

1  inhibitors Ilomastat and SLAPI.  Each of these business pursuits of Arriva will be

2  discussed.

3  B.    rAAT Drug

4         1.    The Market for the rAAT Drug

5         Foremost among Arriva's products that are being developed is the rAAT Protease

6  inhibitor.  This large molecule protease inhibitor is being tested in human clinical trials by

7  Arriva as a replacement therapy in individuals with the hereditary form of emphysema.  It

8  was discovered in 1963 that individuals who have greatly reduced levels of circulating

9  AAT have a predisposition to the development of emphysema later in life.  The defect in

10 most individuals with this hereditary form of emphysema results from a mutation in the

11 AAT gene.  The development that Arriva has been pursuing will provide a much better

12 treatment for those who suffer from hereditary emphysema (hereinafter "HE") than is

13 currently available in the market.

14        At the current time, individuals diagnosed with HE have access to various FDA-

15 approved therapies.  These products are fractionated from human blood plasma and

16 delivered by infusion to the patient using huge doses on a weekly basis.  But, only 3500

17 patients can be treated at the current time based on the supply of such products.  And the

18 current market size for these HE infusion therapies is over $350 million annually, with

19 predictions that it will grow to $500 million shortly.  Notwithstanding the size of this

20 market, relatively few patients may be treated currently due to production capacity

21 constraints, potential safety concerns, and the expensive nature of these plasma derived

22 products.  In addition, these products are patient-unfriendly in their delivery, requiring

23 costly weekly infusions.  The rAAT drug that Arriva is developing does not have these

24 constraints.

25        It has been estimated that over 100,000 individuals in the United States suffer from

26 a severe deficiency in AAT.  In addition, it has been estimated that there are another

27 100,000 individuals in Europe with the deficiency.  A large number of these AAT-

28 deficient individuals (15%) exhibit severe symptoms of emphysema because of their

1  genetic deficiency and are candidates for AAT therapy.  Plasma-derived AAT, in addition

2  to being delivered by a particularly patient-unfriendly infusion mechanism, cannot be

3  produced in sufficient quantities to satisfy this market.  Accordingly, there exists a

4  significant unmet need for a modern DNA-based therapeutic that can be delivered by

5  inhalation directly to the lungs of these patients.  Based on this information, the market for

6  rAAT for hereditary emphysema alone has been calculated to be as large as $1 billion

7  annually in the United States and Europe.

8       Arriva's rAAT therapy is the first inhaled formulation that could afford to HE

9  patients a simple inhaled formulation and be cost-effective.  It would also afford to such

10  patients an unrestricted supply of drug that is free from human pathogens.

11       2.    Arriva's Past and Future Testing of the rAAT Drug

12       Since its establishment in 1997, Arriva has developed and maintained the

13  intellectual property necessary to develop the rAAT drugs.  It has done so both through

14  licensing of other technology and development of its own intellectual property and patents.

15  During the 10 years since it was founded Arriva has conducted two human clinical trials

16  for rAAT in HE.  It is estimated that it will take another five years of development before

17  the drug will be ready to be submitted to the FDA for approval followed by eventual

18  marketing and distribution to the public.

19       The first clinical trial in HE was called "Phase 1."  Phase 1 was primarily a safety

20  study.  It was conducted in patients with HE using a dose escalation protocol.  Patients

21  were divided into different dose groups and given escalating doses of rAAT.  In addition to

22  ascertaining safety characteristics, the study was designed to test whether or not the protein

23  was immunogenic and could lead to the development of antibodies following

24  administration over a period of time.  The conclusion of the study in Phase 1 was that the

25  rAAT used was safe and well tolerated in subjects with severe AAT deficiency.

26       In the second trial, "Phase 2," Arriva attempted to measure the levels of active

27  rAAT that could be delivered to the lungs of HE patients.  The efficacy of the delivery of

28  rAAT in the patients in Phase 2 was clearly demonstrated.  After the inhalation of rAAT,

-12-

1    the levels of AAT in the patients' lungs were significantly higher than when compared to

2    the AAT levels in the lungs reported for the commercially available infusion products that

3    are currently on the market.  Hence, Arriva established in Phase 2 that the inhalation

4    process which it had developed is potentially clinically much superior to the much more

5    problematic plasma infusion process that is currently available to assist HE patients.  At

6    the conclusion of the Phase 2 clinical trial, it was concluded that there were no definitively

7    drug-related, serious adverse events in the Phase 2 study.

8            During the Phase 1 and Phase 2 studies, Arriva developed a "product" of yeast cell

9    banks that are maintained by Arriva in cold storage at its offices in Alameda, California

10   ("Product").  This Product will be used in future studies.  In order to obtain FDA approval,

11   it is crucial that Arriva maintain the Product under safe conditions and monitor the Product

12   on a regular basis.  The continual maintenance of the Product by trained knowledgeable

13   consultants and employees to Arriva and maintenance of the testing records is crucial for

14   eventual FDA approval.

15           The development of the Product and other efforts to commercialize the Debtor's

16   rAAT therapy have been delayed by the litigation between certain of Arriva's founders,

17   Allan Wachter and John Lezdey, and between Wachter and Arriva and Lezdey, which will

18   be discussed below.  However, it is estimated by Arriva that if another company had all of

19   the intellectual property of Arriva, and also had the know-how of the employees and

20   consultants of Arriva, it would take over six years[1] for that company to create the clones

21   and Product that Arriva has created, perform the required pharmacological and

22   toxicological studies, and repeat the early phase clinical studies to even approach the

23   current stage of development that Arriva has achieved.  Thus, commercialization of the

24   rAAT would be delayed at least six years without the benefit of Arriva's clones, cell lines,

25   clinical data and proprietary information.

26

27   [1] This estimate is similar to the six or seven years cited by Tufts Center for the Study of
     Drug Development.

28

1       On January 17, 2007, Arriva entered into a Master Service and Supply Agreement

2  with a biotech firm ("Master Services Agreement").  Under the Master Services

3  Agreement, the QSV Biologics Ltd. ("QSV") has agreed to perform development contract

4  manufacturing services for Arriva to continue to develop the rAAT process and the

5  Product toward the goal of submitting the rAAT process to the FDA and proceeding with

6  clinical trials.  After QSV completes the "manufacturing process" set forth in the Master

7  Services Agreement and conducts the next clinical trial, Arriva would schedule a Pre-

8  Phase 3 meeting with the FDA.  It is currently estimated that such a Pre-Phase 3 meeting

9  with the FDA would take place in the fall of 2009.  Then, Arriva estimates that the Phase 3

10  study would take place in 2010 and 2011, with submissions to the FDA in the summer of

11  2012.  It is estimated that approval from the FDA would be forthcoming at the end of

12  2012.

13      When the rAAT drug obtains FDA approval, it is estimated that the market for the

14  rAAT will be immense.  With an estimated 200,000 HE patients in Europe and the United

15  States at this time, the market could be very large and potentially permit Arriva to derive

16  revenues and ultimately in the years to come permit its interest holders to realize a return

17  on their investment.

18      AlphaMed Pharmaceutics Corporation ("AlphaMed"), an alleged creditor who was

19  adverse to the Debtor in the Florida Litigation hereinafter described, contended that certain

20  testimony relating to the rAAT should be included in the Disclosure Statement.  The

21  testimony they wanted included in the Disclosure Statement was testimony given by

22  Robert Williamson, the then CEO and President of the Debtor in January 2006.  At that

23  time, Mr. Williamson stated:"...[W]e have tested Alpha 1 in four different diseases and

24  they have all failed.  We have three human trials.  One in hereditary emphysema.  That did

25  not work."  In further testimony, he testified that he gave zero value to the whole Alpha 1-

26  Antitrypsin program.

27      The Debtor believes that since January 2006, subsequent matters and results have

28  shown that the Alpha 1 - Antitrypsin program has value.  For instance, a Development

1  Advisory Board meeting was held in July 2006.  The meeting was attended by 13 experts

2  representing the fields of asthma, COPD, hereditary emphysema, cystic fibrosis,

3  pulmonology, allergy, dermatology, industry development and biostatistics.

4       The goals for the Development Advisory Board Meeting were the following:

5  (a) determine the optimal development plan(s) for rAAT, including indication(s),

6  endpoints, patient populations and potential of commercial/clinical success; and

7  (b) determine optimal use of product currently available.

8       The conclusions of the experts were as follows:

9  (i)     rAAT remains a worthwhile product to develop, especially because patients

10          are eagerly awaiting an inhaled, recombinant form of AAT that can be

11          administered safely.

12 (ii)    The product should be developed for treating hereditary emphysema.

13 (iii)   There is a large, untapped market for alpha 1-antitrypsin in Europe, but the

14          European regulatory agencies need to see convincing clinical date for HE.

15 (iv)    The Advisory Board ranked Hereditary Emphysema as the indication with

16          the most scientific rationale for long term development.  Asthma was ranked

17          as the indication that would have the potential for the earliest efficacy

18          results.

19 (v)     The Advisory Board reviewed the available safety information from

20          preclinical and clinical trials and did not come to any different conclusions.

21          Safety of the product remains to be proven in additional studies.  The risk is

22          that the benefit ratio of an efficacious product may include some minor

23          discomfort on inhalation.

24 (vi)    All of the members of the Advisory Committee expressed enthusiasm for

25          developing rAAT and believed that it would have clinical and commercial

26          success if it can be administered safely.

27      Further, Nordic Biotech Venture Fund II K/S ("Nordic") and MPM have made

28 substantial economic commitments to the Debtor, and these commitments show that the

-15-

1  program has support.  *See* discussion of commitment of Nordic and MPM at Section V[B]

2  of this Disclosure Statement.

3  C.    Ilomastat Drug

4       Ilomastat is a potent, broad spectrum inhibitor of matrix metalloproteases and has

5  shown to be active in a number of animal model systems of inflammation.  Arriva is

6  pursuing the development of Ilomastat for chronic obstructive pulmonary disease

7  ("COPD") and other respiratory diseases.  COPD affects an estimated 12 to 24 million

8  Americans with many more individuals affected throughout the world where smoking

9  abatement has not been a public health priority.  COPD remains the fourth leading cause of

10 death in the United States.  The total market for COPD drugs in the United States exceeds

11 $10 billion annually.  Because the current therapeutic alternatives relieve only the

12 symptoms, Ilomastat could provide a therapy that prevents further lung function decline.

13 Arriva has conducted studies of Ilomastat and has demonstrated that it can reduce airspace

14 enlargement, the hallmark of emphysema, by more than 90% in a smoking mouse model,

15 the best available animal model for smokers' emphysema in humans.  Ilomastat has also

16 been shown to inhibit adverse reactions associated with chronic childhood middle ear

17 infection.  The development of the Ilomastat drug and the technology that Arriva owns on

18 this project continues.

19 D.    SLAPI Drug

20      SLAPI is a fusion protein that combines Secretory Leukocyte Protease Inhibitor

21 (SLAPI) with rAAT and can be produced in high levels in yeast.  SLAPI has demonstrated

22 twice the anti-protease activity as rAAT in *ex vivo* studies and is targeted to address the

23 asthma market.  There are approximately 15 to 20 million asthmatics in the United States

24 with a therapeutic market of over $10 billion annually.  There are data showing rAAT

25 alone prevents airway hyper-reactivity for at least 24 hours in an animal model of asthma.

26 Data in human trials indicates that plasma-derived AAT caused a statistically significant

27 reduction in airway hypersensitivity over the control.  Since SLAPI is a combination of

28

-16-

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

1 rAAT and another protease inhibitor, it is expected that SLAPI will have twice the

2 effectiveness.

3 E.    Intellectual Property

4        Arriva has its own patents and other license rights needed to develop all of the

5 Inhibitors discussed in the prior section. Arriva has filed a number of patents in the United

6 States and Europe and continues to protect those patents. A broad patent covering SLAPI

7 compositions of matter and methods of use issued in the United States on July 24, 2007.

8 In addition, Arriva has license rights from third parties for the use of the manufacturing

9 process for rAAT along with the existing toxicology and human clinical trial data. Based

10 on patent assignments and in-licensing, Arriva has the freedom to continue to develop the

11 inhibitors that are described above.

12 F.    Establishment of Arriva and Pre-Petition Capital Structure of Arriva

13       Arriva was founded in 1997 by Philip J. Barr, Ph.D., Allan Wachter, M.D., John

14 Lezdey and David Kent. At that time, each of the founders invested $50,000. In 1998, the

15 founders raised another $1.5 million from individual investors and issued a Series A stock.

16 Also, in 1998, a license was entered into with Protease Sciences Inc. ("Protease") whereby

17 Protease licensed certain additional exclusive intellectual property rights to Arriva relating

18 to rAAT ("Protease License"). Protease was owned equally by John Lezdey and Dr.

19 Wachter. In 1999 and 2000, another $10.2 million was raised, and Series B and Series C

20 Stock was issued to Baxter Healthcare. In 2002, in order to finance the continued

21 operations, Series D stock was issued to MPM, Canadian Imperial Bank of Commerce, and

22 AIG, in connection with a further $28 million investment. In 2004, additional Series D

23 stock was issued, and MPM and MedImmune Ventures invested a further $26.1 million in

24 connection with that issuance of stock. Hence to date, a total of $66 million in equity has

25 been invested into Arriva, and still Arriva has yet to derive any revenue from its activities.

26 G.    The Lezdey Litigation

27       Since 1998, Arriva and its former founder and employee, Allan Wachter, have been

28 involved in litigation in various forums with John Lezdey and his sons Darren Lezdey and

-17-

1  Jarett Lezdey, together with their various affiliated companies.  They are collectively

2  called "the Lezdeys."  Arriva and Wachter have prevailed in every litigation.  Wachter

3  holds a $17 million-plus judgment from the Arizona Litigation, in which judgment Arriva

4  has an interest.  Arriva also holds a claim against AlphaMed for approximately $235,000

5  for costs in connection with the Florida Litigation.  The Lezdeys recently filed an action in

6  Nevada state court just two months before the chapter 11 case was filed alleging claims

7  substantially similar, if not the same, to those litigated previously.  In addition, AlphaMed

8  has filed a new adversary complaint in this Bankruptcy Case relating to the Protease

9  License, which complaint Arriva contends is in violation of injunctions issued by the

10  Arizona Court.  In the next section, we will discuss the debilitating impact this on-going

11  litigation has had on Arriva's ability to raise the next round of financing needed to continue

12  its business and develop these potentially life-saving compounds.

13            1.      The Protease License

14            On April 16, 1998, Arriva (then AlphaOne) Pharmaceuticals signed a License

15  Agreement with Protease and obtained access to a portfolio of issued and pending patents

16  for the use of rAAT in the treatment of human diseases.  The License Agreement covers

17  specifically the use of recombinant AAT (as opposed to the use of plasma-derived AAT) in

18  a specified field of use.  This field of use includes all respiratory, dermatological and

19  antiviral indications.  This license is called the "Protease License."

20            The Protease License granted Arriva the exclusive right to use intellectual property

21  relating to the use of rAAT.  The Protease License is signed by Wachter.

22            2.      The Arizona Litigation

23            Dr. Wachter filed a suit in Arizona state court in 1999 against the Lezdeys and

24  various of their affiliated companies.  In the Arizona litigation, Dr. Wachter sought

25  declaratory relief as to certain assertions and claims of the Lezdeys that the Protease

26  License was not properly executed by Protease.  He also sought injunctions against the

27  Lezdeys.

28

-18-

1    On February 3, 2000, following an evidentiary hearing in which John, Darren and

2  Jarett Lezdey testified, the Arizona court entered a Preliminary Injunction against all of the

3  Lezdeys.  The Arizona Court found in the Preliminary Injunction that the Protease License

4  was a valid agreement binding on Protease.  The Arizona Court enjoined all of the Lezdeys

5  from "acting or speaking, or purporting to act or speak, on behalf of Protease or Sonoran

6  without [Dr. Wachter's] express consent."

7    A final judgment was entered against those Lezdeys who were not in bankruptcy as

8  of that time, namely Darren and Jarett Lezdey (the two Lezdey sons) and JL Technology.

9  The preliminary injunction was expanded and made a permanent injunction.  That

10  Permanent Injunction and Judgment was entered on February 22, 2002.  A money

11  judgment was entered at the same time in favor of Dr. Wachter and Wachter plaintiff

12  parties to the Arizona litigation ("Wachter Judgment").  However, the Permanent

13  Injunction and Final Judgment were not issued against John Lezdey since he had filed

14  bankruptcy on the day before the hearing.

15    Although the Permanent Injunction has not technically been entered against John

16  Lezdey, the Preliminary Injunction was not lifted as to him (or as to his sons, for that

17  matter) and remains an effective injunction against him to this day.

18    After the entry of the Permanent Injunction, the Arizona Court entered an "Under

19  Advisement Ruling" against John Lezdey.  In that Ruling, the court noted, among other

20  things, that John Lezdey had failed to pay court fines, failed to cure contempt citations and

21  taken many actions that constituted a violation of the preliminary injunction.  Such actions

22  included, among other things, speaking for Sonoran in a patent interference proceeding in

23  the Patent and Trademark Office, appearing in a European Court of Patent Appeals without

24  Dr. Wachter's consent, and contacting a group of Arriva investors without Wachter's

25  consent.  The Ruling ordered John Lezdey to surrender himself to the Maricopa County

26  Sheriff's Office for incarceration.

27

28

1    John Lezdey's counterclaim in the Arizona lawsuit was dismissed under the

2  "fugitive from justice" doctrine.  That dismissal was entered after he refused to appear in

3  Arizona and after the court issued a warrant for his arrest.

4    Trial on the request of Wachter to make the Preliminary Injunction against John

5  Lezdey a Permanent Injunction was originally set for March 19, 2007.  However, in

6  January 2007, Wachter and John Lezdey agreed to vacate the scheduled trial.  In that

7  stipulation, the parties disclosed that since no monetary relief was sought in the trial, and

8  the only purpose was to make permanent an injunction already in place, there is no current

9  incentive to pursue such trial.  Recently that status conference was rescheduled.

10        3.    The Wachter Judgment

11    In connection with the Arizona Litigation, Dr. Wachter obtained a money judgment

12  against Darren Lezdey, Jarett Lezdey and some of their affiliates, including JL

13  Technology.  With interest, that judgment now exceeds $20 million.  The Wachter

14  Judgment was not entered against John Lezdey since he was in bankruptcy at the time of

15  the judgment.  Arriva has advanced fees and costs in connection with the litigation that

16  resulted in the Wachter Judgment and in attempting to collect on the Wachter Judgment.

17    Arriva advanced fees to Dr. Wachter to pursue his defenses and claims against the

18  Lezdeys since Arriva and Dr. Wachter had a common interest in such litigation.  In return

19  for Arriva's advancement of those fees, Dr. Wachter and Arriva entered into an agreement

20  setting forth the method in which Wachter and Arriva would share in any recovery from

21  the Wachter Judgment.  Under the Wachter Agreement, it was agreed that in return for

22  Arriva's payment of attorney fees and costs paid to obtain and realize on the Wachter

23  Judgment, any recovery on the Wachter Judgment would be split as follows: (a) first, to

24  Arriva up to the amount of all fees and costs paid under the Wachter Agreement; and

25  (b) second, 35% to Arriva and 65% to Wachter.  Under the Plan, the Wachter Judgment is

26  being transferred to the Reorganized Debtor on the Effective Date.

27

28

-20-

4.    The Litigation in the Northern District of California Before Judge Illston

A suit was filed in the District Court for the Northern District of California in 1999 by Arriva against the Lezdeys and various other entities in which the Lezdeys have an interest.  The case was filed by Arriva to obtain relief in connection with the Protease License and a declaration that the Protease License was valid.  The case was held in abeyance as the Arizona Litigation, discussed above, proceeded in Arizona.  Since appropriate relief was obtained in the Arizona litigation against the Lezdeys declaring the Protease License valid, Arriva attempted to dismiss the California Litigation, including the Lezdeys' counterclaims against Arriva.  The Lezdeys opposed the dismissal of their counterclaims with prejudice.

On July 5, 2006, the Hon. Susan Illston, United States District Judge for the Northern District of California, dismissed the Lezdeys' counterclaims against Arriva, holding that the Arizona court found that Protease License to be valid.

5.    The Florida Litigation

AlphaMed is a Florida corporation that was formed by the Lezdeys in 1999 after their separation from Arriva.  AlphaMed filed a lawsuit against Arriva in Miami federal court in January 2003.  The lawsuit went to trial on three claims: misappropriation of trade secrets, tortious interference with business and unfair competition.  The jury trial began in September 2005 and ended in early January 2006.

The jury initially returned a verdict against Arriva in the amount of $78 million.  A judgment, however, was never entered against Arriva.  Instead, Arriva filed a motion to enter judgment in its favor as a matter of law ("JMOL"), and that motion was granted.  The Federal District Judge entered a judgment in favor of Arriva, finding that the Lezdeys should take nothing from Arriva and that Arriva should recover costs from the Lezdeys' entity, AlphaMed.  See AlphaMed v. Arriva, 432 F.Supp.2d 1355 (S.D.Fla. 2006).  AlphaMed appealed the judgment.  The JMOL appeal matter has been fully briefed as of this date, and no ruling was forthcoming from the Eleventh Circuit.

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION

1    6.    The Newly Filed Nevada Suit

2        The Lezdeys filed a suit in state court in Nevada on June 14, 2007 seeking a

3    declaration that the Protease License was invalid.  The Lezdeys sought such a declaration

4    in the Nevada Complaint for the same reasons they advanced in Arizona State Court and in

5    the Northern California District Court.  The Nevada case has been stayed during the

6    Chapter 11.

7    H.    The Impact of the Lezdey Litigation on the Ability of Arriva to Operate and Raise

8        Capital

9        Arriva is running out of money.  The early Lezdey litigations did not hurt Arriva's

10    ability to raise money in the past.  Investors have been ready to invest more money due to

11    the level of development of Arriva's products and the potential market that is available for

12    the products.  With over ten years of testing, only another five years (best case) are needed

13    to obtain FDA approval for the rAAT process.  Yet, the continuing lawsuits by the

14    Lezdeys have now thwarted Arriva's ability to raise capital, as the next steps in the drug

15    development process require larger infusions of capital.  Uncertainty about suits from the

16    Lezdeys was heightened by the Nevada Suit filed in late June 2007.  While Arriva and Dr.

17    Wachter are confident that they would eventually prevail in the litigation in Nevada, such a

18    strategy by the Lezdeys creates uncertainty in the minds of investors, and investment is

19    extraordinarily unlikely until such Lezdey claims are handled and barred.  Arriva has

20    found that its investors are more interested in seeing their resources used for

21    developmental purposes and not litigation.  Until that happens, a meaningful investment to

22    continue the development of rAAT is next to impossible.  Bankruptcy affords a mechanism

23    to deal with such litigants, and obtain the certainty and protections that investors need to

24    invest further moneys.

25                    V.  THE CASE

26    A.    MPM DIP Financing

27        On the date the Petition was filed, the Debtor filed a Motion to approve Debtor- in-

28    Possession Financing ("DIP Financing Motion").  The Debtor had in excess of $1 million

-22-

1    cash when the bankruptcy case was filed, and this cash was the proceeds of a former equity

2    infusion by the existing equity of the Debtor.  However, the Debtor had projected that it

3    would run out of money in a few months after its filing and needed cash before it estimated

4    that it could present the Plan to the Court for confirmation.  Therefore, the DIP Financing

5    Motion was filed when the bankruptcy case was filed in order for the Debtor to increase its

6    liquidity during the case and enhance its employees', vendors' and contract counter-parties'

7    view of the strength of the Debtor.  The proposed agent on the DIP Financing was MPM

8    Asset Management II, LLC and other Lenders all described in the DIP Financing Motion.

9    Pursuant to the DIP Motion, the Debtor sought approval to obtain a loan in the maximum

10   principal amount of $1 million (the "MPM DIP Agreement").  The Debtor filed with the

11   Court projections of the utilization of these proceeds through the end of the year 2007.

12   Debtor estimated that it may not need all of the $1 million line, but that this line would be

13   sufficient to allow it to operate until its Plan could be considered in the calendar year 2007

14   and such added liquidity enhances its prospects for a successful reorganization.

15        On September 27, 2007, a hearing was held on the Debtor's motion for approval of

16   the DIP Financing.  AlphaMed filed objections to approval of the DIP Financing.  The

17   Bankruptcy Court approved the DIP Financing over the objections of AlphaMed.

18   However, the Court conditioned any drawdown of the DIP Financing on approval by the

19   Official Creditors Committee ("Committee").  If the Committee would not approve such

20   draw, the Debtor would have to get approval of the Court.  The Committee did not grant its

21   immediate consent to the MPM financing due to, among other things, a material condition

22   to the MPM exit financing relating to MPM funding a collaborator

23   B.    New DIP and Plan Financing – Nordic and MPM

24        The Debtor attempted to locate a plan funder and contacted over fifty different

25   entities with regard to funding.  Nordic and MPM were the parties who after negotiations

26   agreed to both do a Debtor in Possession financing and Exit Financing as described in this

27   Disclosure Statement.  MPM was at the time of the filing this bankruptcy case a preferred

28   shareholder, holding Series D Preferred Stock.  In early October 2007, the Debtor and

-23-

1   MPM met with the Committee in an attempt to obtain the Committee's consent to the DIP

2   financing by MPM.  Since immediate consent was not obtained from the Committee to the

3   MPM DIP financing, the Debtor sought other sources of both DIP Financing and financing

4   for the Plan.  The Debtor located Nordic. Nordic and the Debtor negotiated concerning a

5   term sheet pursuant to which Nordic would provide the Debtor with DIP Financing and

6   financing for the Plan.  Before the parties reached complete agreement on the term sheet,

7   Nordic and MPM proposed that they would provide financing to the Debtor on a joint

8   basis.  On November 30, 2007, Nordic, MPM and the Debtor executed a Debtor-in-

9   Possession Loan Agreement and related Security Agreement (together, the "Nordic DIP

10  Agreement") and a Convertible Loan Agreement and related Security Agreement

11  (together, the "Exit Financing Agreement"), evidencing the DIP financing and the exit

12  financing, respectively.  The Nordic DIP Agreement provides for DIP financing in the

13  maximum principal amount of $1.5 million.  Under the budget attached to this Disclosure

14  Statement, it is estimated that this amount is sufficient financing to allow the Debtor time

15  to continue to operate and confirm its Plan.

16          In addition to DIP financing, the Exit Financing Agreement provides for Plan

17  Financing in the maximum principal amount of $6 million.  As the financial projections

18  attached as Exhibit C to this Disclosure Statement demonstrate, that Plan Financing is

19  sufficient to allow the Debtor to operate through June of 2008.  Debtor believes that that is

20  sufficient time to allow the Debtor to locate the next round of financing for its continued

21  operations.  Nordic has completed its due diligence, and the Plan Financing is not

22  dependent on any more due diligence.  The only significant outstanding conditions to

23  closing are that the Debtor receive a favorable ruling in one adversary complaint on file in

24  this case relating to the Protease License [See Lezdey Claims, Para. V(D) of this

25  Disclosure Statement], and that the Bankruptcy Court confirm the Plan.

26          The Nordic/MPM DIP Financing evidenced by the Nordic DIP Agreement was

27  approved by a Bankruptcy Court Order entered on November 29, 2007.  The Exit

28  Financing Agreement, which was entered into by and among the Debtor, Nordic and MPM

-24-

W02-WEST:FME\400406881.15                                    DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
                                                             AMENDED PLAN OF REORGANIZATION
Case: 07-42767      Doc #: 242      Filed: 12/12/2007      Page 30 of 73

1    on November 30, 2007, is subject to court approval. The Debtor will seek approval of the

2    terms of the Exit Financing Agreement. The terms of that Exit Financing Agreement will

3    allow the Plan Financing required under the Plan.

4    C.    Claims Process

5          On the filing of the Bankruptcy Case, the Debtor filed its Motion for Order Fixing

6    the Time Within Which Proofs of Claim May Be Filed ("Claims Bar Date Motion"). The

7    Debtor sought an early bar date for the filing of unsecured claims since it is imperative that

8    the Plan Confirmation Hearing commence in January 2008 and the Debtor be afforded a

9    chance to seek confirmation prior to the maturity of the DIP Financing which expires

10    January 31, 2008. The Claims Bar Date Motion was heard on September 5, 2007. A Bar

11    Date Order was entered, ordering that the last date to file an unsecured claim in this case

12    was October 12, 2007. The Bar Date Order should be consulted for any questions

13    regarding filing of proofs of claim.

14    D.    Lezdey Claims

15          By the Bar Date, AlphaMed and four other entities affiliated with the Lezdeys

16    timely filed proofs of claim. After the Bar Date, John Lezdey filed a proof of claim. The

17    six claims filed by AlphaMed and the affiliates of John Lezdey are collectively called the

18    "Lezdeys Claims." The Debtor has objected to all six Lezdey Claims. The Debtor

19    believes that each of the six Lezdey Claims is invalid as a matter of law. A hearing on

20    these objections is set for December 13, 2007. The Debtor hopes that is prevails on these

21    objections. No assurances can be given as to the ultimate result of these objections. The

22    Debtor has requested that if all of the Lezdey Claims are not disallowed, that they at least

23    be valued at zero for voting purposes under the Plan.

24          The Debtor's objection to the AlphaMed claim argues that the claim is based solely

25    on a jury verdict that was overturned. It further is based on the argument that since, as a

26    matter of law, a claim cannot be based on a jury verdict, the entire claim should be

27    disallowed. It urges the Court, since there is a claims deadline and this case is now at an

28    advanced stage, that AlphaMed should not be allowed to amend its claim to cover any

W02-WEST:FME\400406881.15                  DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION
Case: 07-42767     Doc #: 242     Filed: 12/12/2007     Page 31 of 75

1   other theory, and that the Court should recognize that a Judgment on these issues has been

2   entered in Debtor's favor.  If the Court follows the arguments of the Debtor, the appeal in

3   the Eleventh Circuit is not relevant, since AlphaMed did not allege the underlying claims

4   in that action in its claims.  After AlphaMed was served with the Objections, AlphaMed

5   filed a Motion for Relief From Stay for an order that the stay should be lifted so that the

6   Eleventh Circuit appeal would continue.  Debtor will shortly file an Opposition to the

7   AlphaMed Motion for Relief from stay and argue that as a matter of law the AlphaMed

8   Claim should be disallowed, and therefore the Eleventh Circuit appeal should be

9   dismissed.  No hearing on this motion for relief from stay has taken place.  Hearing on this

10  motion is also set for December 13, 2007.

11      AlphaMed has also filed an adversary complaint against the Debtor (07-04181)

12  asserting that the Protease License which was granted by Protease Sciences Inc. to the

13  Debtor is invalid ("AlphaMed Adversary Proceeding").  The Debtor has filed a motion

14  under Rule 12(b)(6) to dismiss the complaint.  The Debtor contends, among other things,

15  that AlphaMed is bound by the prior orders of other courts, that those orders should be

16  given full faith and credit in this case and are binding on AlphaMed.  AlphaMed has filed a

17  memorandum in opposition to the motion to dismiss, in which they dispute the contentions

18  of the Debtor.  The Debtor has filed a reply to such opposition.  A hearing on this objection

19  is set for December 13, 2007.

20      Further, to the extent that the Protease License is an executory contract, it is the

21  position of the Debtor that there are no defaults.  While the Debtor will contest the

22  standing of AlphaMed to dispute this position, AlphaMed's counsel has indicated that it

23  may not agree with this position.

24      Parties who have further questions about the Lezdeys claims, the AlphaMed

25  Adversary Proceeding, or the Debtor's objections to such matters should consult the

26  pleadings on file in the above-captioned Bankruptcy Case and the AlphaMed Adversary

27  Proceeding.

28

W02-WEST:FME\400406881.15

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

## VI.  DESCRIPTION OF SIGNIFICANT LITIGATION

The significant pre-petition litigation with the Lezdeys is described in Section IV of this Disclosure Statement.  As described therein, the Debtor has been unable to raise any additional capital due to the threats and continued new litigation of the Lezdeys.  Debtor was able to obtain agreement of Nordic and MPM to $6 million of Exit Financing to allow the Plan to proceed to address the claims of the Lezdeys.  Without that, Debtor could not continue its business and would run out of money.

The Debtor maintains a Directors and Officers Insurance Policy (the "D&O Policy").  The D&O Policy is scheduled to expire in December 2007.  Claims have been made under this D&O Policy with respect to the recent Nevada Suit filed by the Lezdeys, described in Section IV(G)(6) of this Disclosure Statement.  There are two other policies which the Debtors possess.  One is a former Directors and Officers Policy, and the other is a General Liability Policy.  Claims have also been made with respect to the Nevada Suit on those policies.  Allowed Claims will be reduced by any amounts paid from such insurance on account of such insurance.  Even though claims were made on all three policies in July 2007, when the Nevada suit was filed, to date none of the insurance companies has provided a defense or admitted coverage.  In fact, the insurer that issued the current D&O Policy has denied coverage.  The Florida Action has been defended by a prior insurer under a "reservation of rights" and a certain portion of the fees in that case have been paid by an insurance company.  However, a substantial amount of the fees of the prior Lezdey litigation has not been covered by any insurance company.  The Debtor intends to preserve all of its claims against all insurers under all policies.

## VII.  SUMMARY OF PLAN PROVISIONS

### A.    Introduction

The Plan is the product of diligent efforts by the Debtor to formulate a plan that provides for a fair allocation of the Debtor's assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

1    The Debtor believes that confirmation of the Plan provides the best opportunity for

2  maximum recoveries to the Debtor's creditors and interest holders.  The Debtor believes,

3  and will demonstrate to the Bankruptcy Court, that the Debtor's creditors will receive

4  significantly more value under the Plan than any available alternative.

5    **THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT**

6  **ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED**

7  **IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED**

8  **INFORMATION SET FORTH IN THE PLAN.**

9  B.    Method of Classification of Claims and Interests and General Provisions

10    1.    General Rules of Classification.

11    Generally, a Claim is classified in a particular Class for voting and distribution

12  purposes only to the extent the Claim qualifies within the description of that Class, and is

13  classified in another Class or Classes to the extent any remainder of the Claim qualifies

14  within the description of such other Class or Classes.  Unless otherwise provided, to the

15  extent a Claim qualifies for inclusion in a more specifically defined Class and a more

16  generally-defined Class, it shall be included in the more specifically defined Class.

17    2.    Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims.

18    Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims have not

19  been classified and are excluded from the Classes set forth in Article III of the Plan in

20  accordance with section 1123(a)(1) of the Bankruptcy Code.

21    3.    Bar Date for Administrative Claims.

22    Unless otherwise ordered by the Bankruptcy Court, requests for payment of

23  Administrative Claims (except for Fee Claims) must be filed and served on the

24  Reorganized Debtor, and its counsel, no later than twenty (20) days after the Effective

25  Date (the "Administrative Claim Bar Date").  Any Person that is required to file and serve

26  a request for payment of an Administrative Claim and fails to timely file and serve such

27  request, shall be forever barred, estopped and enjoined from asserting such Claim or

28  participating in distributions under the Plan on account thereof.  Objections to requests for

1  payment of Administrative Claims (except for Fee Claims) must be filed and served on the

2  Reorganized Debtor, and its counsel, and the party requesting payment of an

3  Administrative Claim within thirty (30) days after the filing of such request for payment.

4        4.     Bar Date for Fee Claims.

5        Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee

6  Claims incurred through the Effective Date, must be filed and served on the Reorganized

7  Debtor and the Plan Funders and their counsel no later than forty-five (45) days after the

8  Effective Date (the "Fee Claim Bar Date").  Any Professional that is required to file and

9  serve a request for payment of a Fee Claim and fails to timely file and serve such request

10  shall be forever barred, estopped and enjoined from asserting such Fee Claim or

11  participating in distributions under the Plan on account thereof.  Objections to Fee Claims

12  must be filed and served on the Reorganized Debtor, its counsel, and the requesting party

13  by thirty (30) days after the filing of the applicable request for payment of the Fee Claim.

14  C.     Unclassified Administrative Claims, Priority Tax Claims, DIP Claims and Fee

15       Claims.

16        Administrative Claims, Priority Tax Claims, DIP Claims and Fee Claims are not

17  classified in the Plan.  The treatment of and consideration to be received by holders of

18  Allowed Administrative Claims, Priority Tax Claims, DIP Claims and Fee Claims shall be

19  in full and complete satisfaction, settlement, release and discharge of such Claims.  The

20  Debtor's obligations in respect of such Allowed Administrative Claims, Priority Tax

21  Claims, DIP Claims and Fee Claims shall be satisfied in accordance with the terms of the

22  Plan.

23       Administrative Claims.  Except to the extent the holder of an Allowed

24  Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim

25  shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon

26  as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim

27  becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder

28  of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed

-29-

1  Administrative Claim and the Debtor prior to the Effective Date and the Reorganized

2  Debtor following the Effective Date might otherwise agree.  The total amount of unpaid

3  Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.

4      Priority Tax Claims.  Except as provided herein, each holder of an Allowed Priority

5  Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount

6  thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the

7  later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed

8  Claim or upon such other terms as may be agreed upon by the holder of such Allowed

9  Claim, or (b) such lesser amount as the holder of such Allowed Priority Tax Claim and the

10  Debtor prior to the Effective Date and the Reorganized Debtor following the Effective

11  Date might otherwise agree.

12      DIP Claims.  To the extent not otherwise paid prior to the Effective Date, on the

13  Effective Date, the DIP Claims shall be refinanced by the Exit Facility with the Liens held

14  by the DIP Agent being assigned to the Plan Funders.  As of the Effective Date the DIP

15  Claims and Liens held by the DIP Agent for itself and for the DIP Lenders shall be deemed

16  to be assigned to the Plan Funders.  Subject to the terms and conditions of the Plan Funders

17  Debt Commitment, on or before the Effective Date the Plan Funders shall fund their

18  respective Plan Funders Debt Commitment, or a portion thereof.  The Exit Facility shall be

19  a demand note.  Interest, costs and fees accruing under the Exit Facility shall be at the

20  same rates and payable under the same terms and conditions as under the DIP Facility.

21  The Exit Facility shall be secured by an assignment of the Liens securing the DIP Facility

22  and a first priority lien on all Property of the Reorganized Debtor.  The Plan Funders' Lien

23  shall attach to the Reserves, Avoidance Actions and Lezdeys Litigation and subject to the

24  distributions of the Reserves Balances and the Net Proceeds of the Avoidance Actions and

25  Lezdeys Litigation provided for pursuant to Sections 4.1 and 4.2 of the Plan, the Reserves

26  Balances, the Net Proceeds of Avoidance Actions and the Net Proceeds of the Lezdeys

27  Litigation when recovered and otherwise available after distributions pursuant to Sections

28  4.1 and 4.2 of the Plan shall be payable to the Plan Funders on account of the Exit Facility.

The Liens and property interests of the Plan Funders shall be and remain perfected from and after the date of the Confirmation Order without the need of the Plan Funders to take any or further action or File or record any notes with respect thereto.  The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of the Plan Funders' Liens without the necessity of Filing or recording the Confirmation Order (other than as docketed in the chapter 11 Case) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Plan Funders' Liens, or to entitle the Plan Funders to the priorities granted under the DIP Facility or herein (including, in respect of Cash or deposits or investment property, any requirement that the Plan Funders have possession of or dominion and control over, any such Cash in order to perfect an interest therein); *provided* that the Debtor, Reorganized Debtor or third parties shall execute and deliver to the Reorganized Debtor and Plan Funders and the Plan Funders may File or record financing statements or other instruments further to evidence or further to perfect the Plan Funders' Liens authorized, granted and perfected under the DIP Facility and the Plan and Confirmation Order and Exit Facility Agreement or to terminate or release Liens held by others; and *provided further* that no such Filing or recordation shall be necessary or required in order to create or perfect any such Lien.

Fee Claims.  Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or as soon as practicable after such Fee Claim becomes and Allowed Claim.  The total amount of unpaid Allowed Fee Claims shall be subject to approval by the Bankruptcy Court.

D.    Classification and Treatment of Claims and Interests

1.    Class 1 Other Priority Claims

Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or

-31-

1   upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b)

2   such lesser amount as the holder of such Allowed Other Priority Claim and the Debtor

3   prior to the Effective Date and the Reorganized Debtor following the Effective Date might

4   otherwise agree.  The holder of a Claim in this Class is not impaired and, therefore, not

5   entitled to vote.

6          2.    Class 2 Miscellaneous Secured Claims

7          The Debtor believes that there are no valid Miscellaneous Secured Claims in this

8   Class.  To the extent there are any Allowed Secured Claims in this Class, each such Claim

9   shall be deemed to be a separate subclass.  At the option of the Reorganized Debtor,

10  holders of Class 2 Claims shall receive either the return of the collateral securing such

11  Allowed Secured Claim or the Net Proceeds realized by the Debtor or Reorganized Debtor

12  from the disposition of the collateral securing such Allowed Secured Claim.  The holder of

13  a Claim in this Class is not impaired and, therefore, not entitled to vote.

14         3.    Class 3(a) SVB Claims

15         SVB has issued a letter of credit in favor of a predecessor in interest of Legacy

16  Partners I Alameda, LLC ("Legacy Partners"), the landlord of the Debtor's headquarters.

17  Legacy Partners' predecessor entered into a lease agreement with Avirra, the wholly owned

18  subsidiary of the Debtor.  That lease is guaranteed by the Debtor.  In order to secure the

19  guaranty by the Debtor of the lease obligation of Avirra, SVB issued a letter of credit in

20  favor of Legacy Partners' predecessor.  That letter of credit was issued for the account of

21  Arriva and is secured by the SVB Collateral.  SVB's prepetition Secured Claim shall be

22  treated as a contingent Secured Claim in an unliquidated amount.  To the extent not

23  already paid in full prior to the Effective Date, on the Effective Date or as soon thereafter

24  as practicable, the SVB Claim shall remain secured by a first priority lien on the SVB

25  Collateral.  SVB from time to time may submit to the Reorganized Debtor detailed

26  invoices for letter of credit or other fees and reasonable expenses coming due under the

27  pre-Petition Date agreements between SVB and the Debtor, and such fees and reasonable

28  expenses shall be paid in full, in Cash, in complete satisfaction of such Claim only from

-32-

1  the SVB Collateral.  In the event the Bankruptcy Court enters a Final Order respecting

2  SVB's Claims and Liens prior to the entry of the Confirmation Order, the terms and

3  conditions of such order shall be deemed incorporated herein at length and supersede and

4  govern the treatment of SVB under the Plan.  SVB is not impaired and, therefore, not

5  entitled to vote.

6        4.    Class 3(b) Severance Claims

7        The Severance Claims shall each be treated as an Allowed Secured Claim.  The

8  holders of the Severance Claims are not impaired and, therefore, not entitled to vote.

9        5.    Class 4 General Unsecured Claims

10       This Class consists of General Unsecured Claims, excluding the Lezdeys Claims.

11  Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the

12  Reorganized Debtor, each holder of a General Unsecured Claim shall receive up to 100%

13  of the amount of its respective Allowed Unsecured Claims, as follows: (i) on the Effective

14  Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share

15  of the Unsecured Claims Pool on account of the amount of such Allowed Claim from the

16  Unsecured Claims Pool Escrow; (ii) from time to time each such holder shall receive its

17  Pro Rata share of the Net Proceeds of Avoidance Actions; (iii) each such holder shall

18  receive its Pro Rata share of the Net Proceeds of the Lezdeys Litigation when recovered;

19  and (iv) from time to time each such holder shall receive its Pro Rata share of the Reserves

20  Balances.  On the Effective Date, the Debtor and its Property and the Reorganized Debtor

21  and its property shall be free and clear of all Class 4 Claims, and be deemed released and

22  discharged from all Class 4 Claims.  The holders of Claims in this Class are impaired and,

23  therefore, entitled to vote.

24       It is impossible to determine the return that this class will receive from the creditors

25  pot.  However, the Debtor and the Committee negotiated an increase in the size of the

26  creditors pot.  It is the Debtor's opinion that after litigation of disputed claims, the creditors

27  pot will be sufficient to pay all creditors in this class 100% of their allowed claims.  This

28  assumes that the Lezdey Claims are disallowed.

-33-

1      6.      Class 5 Lezdey Claims

2          This Class consists of the Lezdeys Claims. The Lezdeys Claims are Disputed

3  Claims. Unless otherwise agreed to by the Lezdeys, the Debtor or Reorganized Debtor,

4  and the Plan Funders, each holder of a Lezdeys Claim shall receive up to 100% of the

5  amount of their respective Allowed Claims, as follows: (i) on the Effective Date or as soon

6  as practicable thereafter, each such holder shall receive its Pro Rata share of the Unsecured

7  Claims Pool on account of the amount of such Allowed Claim from the Unsecured Claims

8  Pool Escrow; (ii) from time to time each such holder shall receive its Pro Rata share of the

9  Net Proceeds of Avoidance Actions; (iii) each such holder shall receive its Pro Rata share

10  of the Net Proceeds of the Lezdeys Litigation when recovered; and (iv) from time to time

11  each such holder shall receive its Pro Rata share of the Reserves Balances. On the

12  Effective Date, the Debtor and its Property and the Reorganized Debtor and its property

13  shall be free and clear of all Lezdeys Claims, and be deemed released and discharged from

14  all Lezdeys Claims. The holders of Claims in this Class are impaired and, therefore,

15  entitled to vote.

16      7.      Class 6 Series D Interests

17          On the Effective Date, the Series D Holders shall receive nothing, and all Class D

18  Interests shall be deemed canceled, null and void and of no force and effect. Class 6

19  Interests are deemed to reject the Plan and therefore are not entitled to vote.

20      8.      Class 7 Series C Interests

21          On the Effective Date, the Series C Holders shall receive nothing, and all Class C

22  Interests shall be deemed canceled, null and void and of no force and effect. Class 7

23  Interests are deemed to reject the Plan and therefore are not entitled to vote.

24      9.      Class 8 Series B Interests

25          On the Effective Date, the Series B Holders shall receive nothing, and all Class B

26  Interests shall be deemed canceled, null and void and of no force and effect. Class 8

27  Interests are deemed to reject the Plan and therefore are not entitled to vote.

28

W02-WEST:FME\400406881.15                                 DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

10.    Class 9 Series A Interests

On the Effective Date, the Series A Holders shall receive nothing, and all Class A Interests shall be deemed canceled, null and void and of no force and effect.  Class 9 Interests are deemed to reject the Plan and therefore are not entitled to vote.

11.    Class 10 Common Interests

On the Effective Date, all Class 10 Common Interests shall be deemed canceled, null and void and of no force and effect.  Accordingly, the holders of Class 10 Interests are deemed to reject the Plan and, therefore, are not entitled to vote.

E.    Means For Implementation Of The Plan

1.    Corporate Action

On the Effective Date and automatically and without further action, (i) each existing member of the board of directors of the Debtor will be deemed to have resigned, (ii) the new board members of the Reorganized Debtor shall be those identified in the Plan Supplement, and (iii) the Reorganized Debtor shall be authorized and empowered to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan.  The Debtor's Charter will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code. Further, as of the Effective Date the pre-Petition Date Stockholders' Agreement and Investor Rights Agreement shall be deemed null and void and of no further effect.  The rights and interests of the New Common shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtor's Charter, Stockholders' Agreement and Investor Rights Agreement, which shall be included in and filed with the Plan Supplement.

2.    Distributions

On the Effective Date, the Reorganized Debtor shall be responsible for making distributions under this Plan as soon thereafter as practicable and for litigation of claims objections.  If an objection to a Claim is not sustained by an order of the Bankruptcy

-35-

1   Court, the Reorganized Debtor must reserve the full amount of such claims until an order

2   is obtained with respect to such objection.  This would delay distributions to claimants in

3   Classes 4 and 5 until the resolution of such objection.  The Debtor shall hold the Reserves

4   provided for in the Plan, and set forth the terms and conditions for distributions from such

5   Reserves.  Wachter shall contribute to the Reorganized Debtor the Wachter Judgment in

6   order that the prosecution of the Wachter Judgment and other Lezdeys Litigation may be

7   coordinated and prosecuted by the Debtor.  The Reorganized Debtor shall pursue all rights

8   and benefits of any and all applicable insurance policies that cover any claims asserted or

9   that may be asserted by any holder of any Claim.  The Reorganized Debtor shall hold and

10  administer the following Reserves:

11          (a)     Unsecured Claims Pool Escrow;

12          (b)     Cure Escrow;

13          (c)     Plan Expense Reserve;

14          (d)     SVB Collateral; and

15          (e)     Control Agreement Collateral

16  All of the Reserves shall vest with the Reorganized Debtor on the Effective Date.  Any

17  Reserves Balances remaining in any of the Reserves after the payment of all Allowed

18  Claims entitled to receive payments from such Reserve under the Plan, respectively; shall

19  be first, distributed to the holders of Allowed Claims under sections 4.1 and 4.2 under the

20  Plan, then under section 3.3 under the Plan to the extent of such Allowed Claims; and

21  second, distributed to the Reorganized Debtor.  The Reorganized Debtor shall be

22  responsible for fees and expenses in connection with objections to Claims and the Lezdey

23  Litigation only to the extent of the Plan Expense Reserve.

24          3.      Reorganized Debtor's Responsibilities Under Plan

25          The Reorganized Debtor shall administer the Plan subject to the foregoing duties

26  and powers, which shall include the following:

27

28

1      (a)    To prosecute, compromise or settle objections to Claims and/or

2   Interests (disputed or otherwise) and to make or direct that distributions be made to holders

3   of Allowed Claims;

4      (b)    To make decisions regarding the retention or engagement of

5   Professionals and to pay, without court order, all reasonable fees and expenses incurred

6   after the Effective Date, which fees and expenses shall be paid from the Plan Expense

7   Reserve, subject to the availability of any funds remaining in said Plan Expense Reserve;

8      (c)    To make or direct distributions to holders of Allowed Claims

9   and to otherwise implement and administer the Reserves and the Plan;

10     (d)    To pursue, litigate or settle the Avoidance Actions, Lezdeys

11  Litigation and to collect the Wachter Judgment; provided, however, that the Reorganized

12  Debtor shall not have the power to pursue, litigate or settle Avoidance Actions against any

13  Person who holds a Claim that is Allowed;

14     (e)    To file with the Bankruptcy Court the reports and other

15  documents and to pay any and all fees required by the Plan or otherwise required to close

16  the Chapter 11 Case, including the preparation and filing of a motion for a final decree;

17     (f)    To set off amounts owed to the Debtor against any and all

18  amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan;

19  and

20     (g)    To take all other actions not inconsistent with the provisions of

21  the Plan deemed necessary or desirable in connection with administering the Plan.

22  Notwithstanding any provision of this Plan, the Reorganized Debtor shall have no duty or

23  obligation of any kind to take action which would involve incurring fees, costs or other

24  financial obligations that would exceed the funds available in the Plan Expense Reserve

25  and any insurance policy that is readily available for payment of such fees and expenses,

26  which shall be the sole source for funding such fees, costs and financial obligations.  The

27  Reorganized Debtor shall have no obligation to utilize any assets other than the funds in

28  the Plan Expense Reserve for any aspect of the implementation of this Plan.  The

-37-

1  Reorganized Debtor may use the funds in the Plan Expense Reserve and any insurance

2  policy that is readily available for payment of such fees and expenses for such purposes in

3  performing its duties under the Plan as the Reorganized Debtor determines in its sole

4  discretion.  There is a risk that the funds in the Plan Expense Reserve and any insurance

5  proceeds will not be sufficient to allow the Reorganized Debtor to take all of the actions

6  set forth above.  If such funds are exhausted, this may result in substantial claims being

7  allowed against the Unsecured Claims Pool, thereby significantly reducing the Pro Rata

8  distribution to Class 4 and Class 5 claimants.

9         4.    Exit Financing

10        As of the Effective Date, the DIP Facility and the DIP Claims shall be deemed

11  assigned by the DIP Agent and DIP Lenders to the Plan Funders and refinanced by the Exit

12  Facility.  The Exit Facility shall consist of a loan facility made available by the DIP Agent

13  and DIP Lenders to Debtor in the maximum principal amount of $6.0 million.  The terms

14  and conditions of the Exit Facility shall be as set forth in the Convertible Loan Agreement

15  and related Security Agreement, which shall be included in and filed with the Plan

16  Supplement.  The material terms of the Exit Facility are described above in the treatment

17  afforded to the holders of the DIP Claims.  On the Effective Date, the Exit Facility shall be

18  in the maximum principal amount of $6.0 million.  The Exit Facility shall be a demand

19  note.  Except as expressly set forth in the Plan, or the Plan Funders Debt Commitment,

20  working capital of the Debtor and Reorganized Debtor together with the proceeds of the

21  Plan Funders Debt Commitment shall be used for general working capital and capital

22  expenditures of the Reorganized Debtor, to fund the Reserves, to pay the Allowed

23  Administrative Claims, Allowed Fee Claims, Allowed Priority Claims, and Allowed Other

24  Priority Claims; and shall not be funded, available or used for distributions to holders of

25  other Allowed Claims treated pursuant to the Plan.  In consideration for meeting its

26  funding commitments under the Plan Funders Debt Commitment each Plan Funder from

27  time to time shall receive 100% of the New Common in the Reorganized Debtor that are

28

1  authorized and issued as of the Effective Date, plus issuance of a portion of the New Series

2  A Preferred.

3      Pursuant to the Amended and Restated Articles of Incorporation of the Reorganized

4  Debtor to be adopted on the effective date of the Plan, special rights, preferences and

5  privileges of the Series A Preferred Stock will include:  (i) the right to receive dividends in

6  preference to the holders of common stock in an amount equal to 8% of the issue price of

7  the Series A Preferred, per annum, when, as and if declared by the Reorganized Debtor's

8  board of directors; (ii) the right to receive a liquidation preference equal to three (3) times

9  the issue price of the Series A Preferred Stock upon the dissolution or winding up of the

10  Reorganized Debtor (including a merger or acquisition of the Reorganized Debtor); (iii)

11  the right to convert into Common Stock at any time; (iv) broad based weighted average

12  price based anti-dilution protection against issuances (or deemed issuances) by the

13  Reorganized Debtor of shares of capital stock below the issue price of the Series A

14  Preferred (subject to customary exclusions); (iv) the right to elect three (3) members of the

15  Reorganized Debtor's board of directors; (v) the right to approve certain fundamental

16  corporate actions including, the redemption of shares of capital stock of the Reorganized

17  Debtor, the consummation of a change of control transaction, the authorization or issuance

18  of any senior equity security, a change to the number of the Reorganized Debtor's directors

19  and the payment of dividends on shares of capital stock of the Reorganized Debtor; and

20  (vi) the right to require the Reorganized Debtor to redeem the shares of Series A following

21  November 30, 2014 at a price per share equal to the issue price of the Series A plus

22  accrued and unpaid dividends.

23      5.    <u>Revesting</u>

24      Except as otherwise provided for in the Plan or the Confirmation Order, on the

25  Effective Date, without any further action, the Reorganized Debtor will be vested with all

26  of the Property of the Debtor's Estate, free and clear of all Claims, Liens and Interests,

27  including if not in trust, and shall have all of the powers of a corporation under applicable

28  law.  As of the Effective Date, the Reorganized Debtor may operate its business and use,

-39-

acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable, provided, however, that if the Claims are not paid in full on the Effective Date, then the Allowed Claims shall bear interest at the ratio of 7% per annum. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.    Reserve Accounts

On or before the Effective Date, the Reorganized Debtor will establish and maintain the following reserve accounts:

       (a)    Reserve for Administrative Claims. A reserve (the "Administrative Claims Reserve") for Administrative Claims that may be asserted prior to or on the Administrative Claims Bar Date;

       (b)    Reserve for Plan Expenses. A reserve in an amount equal to the estimated Plan Expenses (the "Plan Expense Reserve"), which may be used by the Reorganized Debtor to cover the fees and expenses of such objections and to assert claims and collect judgments against the Lezdeys. The amount of this reserve is $115,000. The balance of the Plan Expense Reserve, if any, shall be released and distributed to the Reorganized Debtor.

-40-

1      8.    <u>Reserves for Disputed Administrative, Priority Tax and Other Priority</u>

2 <u>Claims</u>

3      On or before the Effective Date, the Reorganized Debtor shall establish and

4 maintain a reserve in an amount equal to all Disputed Administrative Claims, Disputed

5 Priority Tax Claims and Disputed Other Priority Claims in an amount equal to what would

6 be distributed to holders of Disputed Administrative, Disputed Priority Tax, and Disputed

7 Other Priority Claims if their Disputed Claims have been deemed Allowed Claims on the

8 Effective Date or on the Administrative Claims Bar Date or such other amount as may be

9 approved by the Bankruptcy Court upon motion of the Reorganized Debtor; provided

10 however, that the Reorganized Debtor shall not be required to reserve funds on account of

11 employee Claims for paid time off or vacation benefits of employees whose employment

12 was continued by Arriva or will be continued by the Reorganized Debtor. With respect to

13 such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an

14 Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor

15 shall be distributed by the Reorganized Debtor to the Claimant in a manner consistent with

16 distributions on account of similarly situated Allowed Claims. The balance of such Cash,

17 if any, remaining after all Disputed Administrative, Disputed Priority Tax, and Disputed

18 Other Priority Claims have been resolved and distributions made in accordance with the

19 Plan, shall be released and distributed to the Reorganized Debtor. No payments or

20 distributions shall be made with respect to a Claim that is a Disputed Claim pending the

21 resolution of the dispute by Final Order.

22      9.    <u>Reserves for Other Disputed Claims</u>

23      On or before the Effective Date, the Reorganized Debtor shall establish and

24 maintain a reserve for all Disputed Claims, other than those Disputed Claims discussed in

25 section 8 above. For purposes of establishing a reserve for Disputed Claims, Cash will be

26 set aside on or before the Effective Date equal to the amount that would have been

27 distributed to the holders of Disputed Claims had their Disputed Claims been deemed

28 Allowed Claims on the Effective Date or such other amount as may be approved by the

W02-WEST:FME\400406881.15                                          DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
Case: 07-42767    Doc #: 242    Filed: 12/12/2007    AMENDED PLAN OF REORGANIZATION
                                                     Page 47 of 73

1  Bankruptcy Court.  With respect to such Disputed Claims, if, when, and to the extent any

2  such Disputed Claim becomes an Allowed Claim by Order, the relevant portion of the

3  Cash held in reserve therefor shall be distributed by the Reorganized Debtor to the

4  Claimant in a manner consistent with distributions to similarly situated Allowed Claims.

5  The balance of such Cash, if any, remaining after all Disputed Claims have been resolved

6  and distributions made in accordance with the Plan, shall be returned to the Unsecured

7  Claims Pool.  From time to time as additional moneys accumulate in the Unsecured Claims

8  Pool as a result of the disallowance of claims, the Reorganized Debtor shall make a

9  subsequent distribution to claimants in Classes 4 and 5 of such claimants' Pro Rata share of

10  the Unsecured Claims Pool.  No payments or distributions shall be made with respect to a

11  Claim that is a Disputed Claim pending the resolution of the dispute by Final Order.  No

12  payments or distributions shall be made with respect to post-Petition Date interest accruing

13  on any Claim other than the Series A Holders DIP Claims.  No payments or distributions

14  shall be made with respect to Allowed Claims in an amount in excess of such Allowed

15  Claims.

16       10.   Claims Objection Deadline

17       Objections to Claims shall be filed and served upon each affected Creditor no later

18  than ten (10) days after the Effective Date, provided however, that this deadline may be

19  extended by the Bankruptcy Court upon motion of the Reorganized Debtor, with or

20  without notice or hearing.  Notwithstanding the foregoing, unless an order of the

21  Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of

22  a, Claim filed after the Confirmation Date shall be automatically disallowed as a late filed

23  Claim, without any action by the Reorganized Debtor, unless and until the party filing such

24  Claim obtains the written consent of the Reorganized Debtor or obtains an order of the

25  Bankruptcy Court upon notice to the Reorganized Debtor that permits the late filing of the

26  Claim, and the holder of such disallowed Claim shall be forever barred from asserting such

27  Claim against the Debtor, the Estate or Property, Reorganized Debtor or its property.  In

28  the event any proof of claim is permitted to be filed after the Confirmation Date pursuant

-42-

1 | to an order of the Bankruptcy Court, the Reorganized Debtor shall have sixty (60) days

2 | from the filing of such proof of claim or order to object to such Claim, which deadline may

3 | be extended by the Bankruptcy Court upon motion of the Reorganized Debtor with or

4 | without notice or a hearing.

5 |     11.    Settlement of Disputed Claims

6 |         Objections to Claims may be litigated to judgment or withdrawn, and may be settled

7 | with the approval of the Bankruptcy Court, except to the extent such approval is not

8 | necessary as provided in this section.  After the Effective Date, and subject to the terms of

9 | the Plan, the Reorganized Debtor may settle any Disputed Claim where the result of the

10 | settlement or compromise is an Allowed Claim in an amount not in excess of $25,000 or

11 | less without providing any notice or obtaining an order from the Bankruptcy Court.  All

12 | proposed settlements of Disputed Claims where the amount to be settled or compromised

13 | exceeds $25,000 shall be subject to the approval of the Bankruptcy Court after notice and

14 | an opportunity for a hearing.

15 |     12.    Unclaimed Property

16 |         If any distribution remains unclaimed for a period of ninety (90) days after it has

17 | been delivered (or attempted to be delivered) in accordance with the Plan to the holder of

18 | an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited

19 | by such holder, whereupon all right, title and interest in and to the unclaimed property

20 | shall be held in reserve by the Reorganized Debtor to be distributed Pro Rata to holders of

21 | Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in

22 | such Class have been satisfied or reserved for in accordance with the Plan, then such

23 | unclaimed property will be distributed to the Reorganized Debtor.

24 |     13.    Release of Liens

25 |         Except as otherwise provided in the Plan or in any contract, instrument or other

26 | agreement or document created in connection with the Plan (DIP Liens, SVB's Lien and

27 | the lien securing the Secured Claims shall survive Confirmation and shall remain valid,

28 | enforceable and perfected Liens), on the Effective Date, all mortgages, deeds of trust,

1  Liens or other security interests against the Property of the Debtor's estate shall be

2  released, and all the right, title and interest of any holder of such mortgages, deeds of trust,

3  Liens or other security interests shall revert to Reorganized Debtor and its successors and

4  assigns.

5      14.    Rights of Actions

6      On the Effective Date, the Reorganized Debtor shall be vested with the Avoidance

7  Actions and the Lezdey Litigation claims, with the exception of all claims released

8  pursuant to the Plan and Confirmation Order.  The Reorganized Debtor may pursue, settle

9  or release all retained Avoidance Actions, as appropriate, in accordance with the best

10 interest of and for the benefit of the holders of Allowed Claims and the Reorganized

11 Debtor.  If the Allowed Claims are paid in full, then any recovery from the Avoidance

12 Actions or the Litigation Claims will be for the benefit of the Reorganized Debtor.

13     Avoidance Claims include any claims for"preference" recoveries.  Preference

14 recoveries consist of any payments made for or on account of an antecedent debt made

15 while the debtor is insolvent.  A transfer made within 90 days of the filing may be avoided

16 if the transfer is to a non insider.  A transfer to an insider may be avoided if made within

17 one year of the filing.  The Debtor feels that creditors should not rely on any avoidance

18 recoveries.  First, the Debtor feels that since the Lezdey Claims are without merit, it was

19 solvent at all times before the filing of the bankruptcy case.  Since it was solvent, there

20 were no preference claims. The transfers made during the period before bankruptcy are

21 listed in the schedules on Attachment 3.b.  Debtor feels that these payments were made

22 either in advance of the provision of goods and services or in the ordinary course of

23 business according to normal business terms.  As such, any such transfers could not be

24 recovered even if they were a preference under the provisions of the bankruptcy code.

25     There are no assurances that the Reorganized Debtor will recover anything with

26 respect to the Lezdey Litigation claims.  As the Plan sets forth, such claims include any of

27 the following rights:  (a) to execute upon and recover the Wachter Judgment; (b) to pursue

28 affiliates of the Lezdeys in the Lezdeys Bankruptcies; and, (c) to pursue rights in the

1   Arizona Case.  While the Debtor may have significant legal rights, litigation with the

2   Lezdeys has proven frustrating.  Substantial attorneys fees have been expended in an

3   attempt to recover moneys with respect to the Lezdey Litigation claims.  There is a very

4   good possibility that the Reorganized Debtor will decide in its business decision that it will

5   not pursue such claims any further.  Therefore, the Debtor suggests that the creditors do

6   not rely on either the Avoidance Claims or the Lezdey Litigation claims for recovery.

7       15.    <u>Withholding Taxes</u>

8       Any federal, state, or local withholding taxes or other amounts required to be

9   withheld under applicable law shall be deducted from distributions hereunder.  All Persons

10  holding Claims shall be required to provide any information necessary to effect the

11  withholding of such taxes.

12      16.    <u>Fractional Cents</u>

13      Any other provision of the Plan to the contrary notwithstanding, no payment of

14  fractions of cents will be made.  Whenever any payment of a fraction of a cent would

15  otherwise be called for, the actual payment shall reflect a rounding down of such fraction

16  to the nearest whole cent.

17      17.    <u>Payments of Less than Ten Dollars</u>

18      If a cash payment otherwise provided for by the Plan with respect to an Allowed

19  Claim would be less than ten ($10.00) dollars (whether in the aggregate or on any payment

20  date provided in the Plan), notwithstanding any contrary provision of the Plan, the

21  Reorganized Debtor shall not be required to make such payment and such funds shall be

22  otherwise distributed to holders of Allowed Claims in such Class in accordance with the

23  Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in

24  accordance with the Plan, then such excess fractional dollars will be distributed to the

25  Reorganized Debtor.

26      18.    <u>Post-Effective Date Existence of Committee</u>

27      The Committee shall continue to act as an advisory committee to the Reorganized

28  Debtor, with the full power to be heard in any matters in the Bankruptcy Court. The

1  Committee and its professionals shall not be entitled to any fees or expenses from the

2  Reorganized Debtor or any assets of the Reorganized Debtor for its post-effective date

3  activities.  Since the Plan does not provide any funding for professional expenses for the

4  Committee after the Effective Date of the Plan, it is unlikely that such professionals would

5  take a significant role in such matters.

6  F.    Treatment of Executory Contracts and Unexpired Leases

7         Rejection of All Agreements.

8         Any and all pre-petition leases or executory contracts included on the Debtor's

9  Schedule G, as such Schedule G may be amended up to and including the Confirmation

10  Date, not previously rejected by the Debtor, unless specifically assumed pursuant to orders

11  of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to reject

12  pending on the Confirmation Date, shall be deemed assumed by the Debtor effective as of

13  the Confirmation Date, but subject to the occurrence of the Effective Date.  Any and all

14  prepetition leases and executory contracts not included on the Debtor's Schedule G, as

15  such schedule exists on the Confirmation Date, not previously assumed by the Debtor,

16  shall be deemed rejected by the Debtor effective as of the Confirmation Date, but subject

17  to the occurrence of the Effective Date.

18         Prior to Plan Confirmation, the Debtor may serve a notice to parties to executory

19  contracts and unexpired leases whose agreements may be assumed by the Debtor under the

20  Plan.  That notice shall include the proposed cure payment to be made to such party and a

21  means by which such party may receive a package of information regarding the providing

22  of adequate assurance.  The Debtor has listed in excess of thirty executory contacts in the

23  Schedule G on file.  The Debtor has reviewed each of those contracts and has determined

24  as of this date that it will assume all of the contracts that are truly executory.  A few of the

25  contracts are no longer executory and the debtor will amend Schedule G to remove those

26  contracts.  All of the contracts that the Debtor intends to assume, except the contract with

27  QSV, were current as of the filing of the Chapter 11 bankruptcy case.  Therefore, there

28  should be no obligation to cure any prepetition defaults under those contracts when they

1  are assumed.  There is a prepetition amount due and owing to QSV in the amount of

2  $273,273.09 and the Debtor intends to use the Cure Reserve to pay that amount on the

3  Effective Date of the Plan.  The Debtor intends to file a motion to assume all such

4  contracts and set the hearing on such motion for the same time as the hearing on

5  Confirmation of the Plan.  The assumption would be effective as of the Effective Date of

6  the Plan.

7  　　　Claims for Damages.  All proofs of claim with respect to Claims arising from the

8  rejection of executory contracts or leases shall, unless another order of the Bankruptcy

9  Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30)

10  days after the mailing of notice of entry of the Confirmation Order.  All proofs of claim

11  with respect to Claims arising from the rejection of executory contracts shall be treated as

12  Class 4 General Unsecured Claims for purposes of a distribution pursuant to the Plan,

13  unless and until the Person or Entity asserting such Claim obtains an order of the

14  Bankruptcy Court upon notice to the Debtor, that allows the Claims in another Class under

15  the Plan.  Unless otherwise permitted by Final Order, any proof of claim that is not filed

16  before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims

17  arising from the rejection of executory contracts or leases which may be filed within thirty

18  (30) days after mailing of the notice of entry of the Confirmation Order) shall

19  automatically be disallowed as a late filed Claim, without any action by the Reorganized

20  Debtor, and the holder of such Claim shall be forever barred from asserting such Claim

21  against the Debtor, the Estate, the Reorganized Debtor or property of Reorganized Debtor.

22  G.　　Effect of Confirmation of the Plan

23  　　　Read the following provisions of the plan carefully as they result in releases and

24  injunctions in favor of the Debtor and related parties:  Sections 6.1, 6.2, 11.7, 11.8 and

25  11.9.  Without limiting any provision of the Plan, the Plan provides for the following

26  release, exculpation, discharge and injunctions:

27

28

1          1.      General Release and Injunction

2          Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule

3     9019, the Plan constitutes an application for approval of a compromise and settlement of

4     any and all claims, suits and causes of action of the Debtor, the Estate, or their respective

5     successors or assigns, including, without limitation, any Person or Entity claiming a right

6     in a derivative capacity on their behalf (the "Debtor Claimants") against the DIP Agent,

7     DIP Lenders and the Plan Funders, together with their current officers, current directors,

8     current attorneys, current advisors, and any consultants that performed services after the

9     Petition Date, and Wachter and the Debtor's current officers, current directors,

10    professionals who have been approved by the Bankruptcy Court to represent the Debtor,

11    and any consultants that performed services after the Petition Date (collectively, the

12    "Released Parties"), as set forth more fully below.  Notwithstanding anything herein or

13    elsewhere to the contrary, absent a specific settlement and release entered into with the

14    Lezdeys by the Debtor or the Reorganized Debtor and approved by a Final Order by the

15    Court, the Lezdeys, and each of them, in every capacity, are not Released Parties.  The

16    Debtor's current consultants, excluding law firms, are John McDonald, Marvin Garovoy,

17    Phil Pemberton and Richard Turegano.

18         On the Effective Date, the Debtor Claimants are deemed to, with respect to any and

19    all direct and derivative claims, whether or not asserted, unconditionally and irrevocably

20    release the Released Parties from any and all direct, indirect or derivative claims,

21    obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or

22    rights of contribution and indemnification, and all other controversies of every type, kind,

23    nature, description or character whatsoever, whether liquidated or unliquidated, fixed or

24    contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted,

25    threatened or not, then existing or thereafter arising, in law, equity or otherwise that are

26    based in whole or in part upon any act or omission, transaction, event or other occurrence

27    taking place from the beginning of time to the Effective Date arising from or relating in

28    any way, directly or indirectly, to the Debtor, its Properties, assets, operations or liabilities,

-48-

1   the Chapter 11 Case, the Plan, or the Disclosure Statement; provided however, that the

2   Debtor Claimants shall not be deemed to have released any rights to enforce the terms of

3   the Plan or their rights to distributions thereunder.  The consideration for the releases was

4   given in part in exchange for the release of such claims.  The Debtor Claimants hereby

5   waive any rights or benefits under California Civil Code Section 1542, which provides

6   that:

7           A general release does not extend to claims which the creditor
            does not know or suspect to exist in his favor at the time of
8           executing the release, which if known by him must have
            materially affected his settlement with debtor and any rights or
9           benefits under similar laws.  The Confirmation Order shall
            specifically provide for the foregoing releases.
10

11  Notwithstanding the foregoing, (i) nothing herein or in the Plan shall in any manner release

12  the Released Parties from any liability for their willful misconduct or gross negligence;

13  and (ii) nothing herein shall release any rights under Bankruptcy Code Section 1144 to

14  revoke an order of confirmation which could result in a revocation of the releases

15  contained in the Plan.

16          On the Effective Date, the Debtor Claimants respecting the claims released above

17  shall be permanently enjoined from commencing, conducting or continuing in any manner,

18  directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff,

19  right of subrogation, contribution, indemnification or recoupment of any kind, directly or

20  indirectly, or proceeding in any manner in any place inconsistent with the releases granted

21  to the Released Parties pursuant to the Plan.  The Confirmation Order shall specifically

22  provide for such injunction.  Based upon review of the Debtor after consultation with

23  counsel, the Debtor is not aware of any substantial claims of the estate that are being

24  released.

25          The consideration the Plan Funders shall provide, or have provided, in exchange for

26  the releases described in the Plan and the receipt of the New Common and New Series A

27  Preferred, includes the following (collectively, the "Plan Funders Consideration"):

28

(a)    To the extent necessary to make distributions in accordance with the Plan to the holders of Allowed Claims in Classes 4 and 5, the Plan Funders acknowledge and agree that any Unsecured Claim they may assert shall be subordinated in time and right of payment to General Unsecured Claims in Class 4, but not the Lezdeys Claims;

(b)    The Plan Funders, as part of the convertible loans to be made under the Plan Funders Debt Commitment and not in addition thereto, shall contribute Cash in an amount necessary to ensure that the holders of Allowed Administrative, Priority Tax and Fee Claims and Allowed Claims in Classes 1, 4, and 5 receive the distributions required under the Plan (the "Plan Funders Cash Contribution");

(c)    The Plan Funders, as part of the convertible loans to be made under the Plan Funders Debt Commitment and not in addition thereto, shall provide financing under the terms of the Exit Facility in the maximum principal amount of $6 million; and

(d)    The Plan Funders and Wachter shall contribute to the Reorganized Debtor any and all claims they hold against the Lezdeys, including, without limitation, the Wachter Judgment, the Net Proceeds of which shall be distributed to the holders of General Unsecured Claims in Class 4 and the Reorganized Debtor to the extent such Claims are paid in full.

2.    Exculpation

On the Effective Date, (a) the Debtor, and the Debtor's current officers, current directors, professionals who have been approved by the Bankruptcy Court to represent the Debtor,  and any consultants that performed services after the Petition Date (solely in their capacities as such, but excluding the Lezdeys in every capacity) and (b) the Plan Funders, DIP Agent and DIP Lenders, together with all of their current officers, current directors, current attorneys, current advisors, and any consultants that performed services after the

-50-

1  Petition Date, shall be deemed to release each of the other, of and from any claims,

2  obligations, rights, causes of action and liabilities for any act or omission occurring solely

3  during the period from the Petition Date through the Effective Date, generally, including,

4  without limitation, any act or omission occurring during the Chapter 11 Case, any act or

5  omission occurring in connection with post-Petition Date sales of Property, the DIP

6  Facility, the Exit Facility, the Plan Funders Debt Commitment, the Disclosure Statement,

7  the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan,

8  the consummation of the Plan or the administration of the Plan or the property to be

9  distributed under the Plan, except for acts or omissions which constitute willful

10 misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to

11 rely upon the advice of counsel with respect to their duties and responsibilities under the

12 Plan and under the Bankruptcy Code; provided, however, that nothing in the Plan shall

13 release the Debtor or the Plan Funders from their obligations under the Plan or under the

14 DIP Facility, Exit Facility, Confirmation Order, or the Plan Funders Debt Commitment on

15 and after the Effective Date of the Plan; provided further that nothing in the Plan shall

16 release any rights under Bankruptcy Code Section 1144 to revoke an order of confirmation

17 which could result in a revocation of the exculpation provisions of the Plan.

18        3.    Discharge

19        Except as otherwise provided for in the Plan or in the Confirmation Order, in

20 accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order

21 acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on,

22 and Interests in the Debtor, its assets and Property, which debts, Claims, Liens and

23 Interests arose at any time before the entry of the Confirmation Order.  The discharge of

24 the Debtor shall be effective as to each Claim and Interest, regardless of whether a proof of

25 Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the

26 holder of the Claim or Interest votes to accept the Plan.  On the Effective Date, as to each

27 and every discharged Claim and Interest, any holder of such Claim or Interest shall be

28

1 precluded from asserting such Claim or Interest against the Debtor or Reorganized Debtor

2 or their assets or properties.

3     4. <u>Injunction</u>

4     On and after the Confirmation Date, except to enforce the terms and conditions of

5 the Plan before the Bankruptcy Court, all Persons or Entities who have held, hold or may

6 hold any Claim against or Interest in the Debtor, including without limitation each of the

7 Lezdeys, are permanently enjoined from and after the Confirmation Date from: (a)

8 commencing, conducting or continuing in any manner, directly or indirectly, any suit,

9 action or other proceeding of any kind (including, without limitation, any proceeding in a

10 judicial, arbitral, administrative or other forum) against the Debtor or Reorganized Debtor

11 or any of their properties, or any direct or indirect transferee of any property of, or direct or

12 indirect successor in interest to, any of the foregoing Persons or Entities and all of their

13 respective current officers, current directors, and any consultants that performed services

14 after the Petition Date (solely in their capacities as such, but excluding the Lezdeys in

15 every capacity)**,** the current attorneys and current advisors of the Plan Funders, and the

16 professionals that have been approved by the Bankruptcy Court to represent the Debtor, or

17 any property of any of the foregoing (collectively, the "<u>Protected Parties</u>"); (b) enforcing,

18 levying, attaching (including, without limitation, any pre-judgment attachment), collecting

19 or otherwise recovering by any manner or means whether directly or indirectly, against any

20 of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or

21 otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind

22 against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or

23 recoupment of any kind, directly or indirectly, against any obligation due to any of the

24 Protected Parties; and (e) taking any actions in any place and in any manner whatsoever

25 that do not conform to or comply with the provisions of the Plan.

26     5. <u>Insurance</u>

27     The Plan shall not diminish or impair the enforceability of any insurance policy that

28 may cover Claims against the Debtor (including, without limitation, its officers or

W02-WEST:FME\400406881.15             DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION
Case: 07-42767     Doc #: 242     Filed: 12/12/2007     Page 58 of 73

1   directors) or any other person or entity.  The insurance policies maintained by the Debtor

2   shall be maintained as an expense of the Reorganized Debtor until the later of (a)

3   expiration of such policies or (b) such later dates as the Reorganized Debtor may deem

4   appropriate.

5   H.      Retention of Jurisdiction

6          The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out

7   of, and related to, the case and the Plan, to the fullest extent permitted by law pursuant to,

8   and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for

9   the other purposes described in Article X of the Plan.

10  I.      Miscellaneous Provisions

11          1.      Pre-Confirmation Modification

12          On notice to and opportunity to be heard by the United States Trustee and the

13  Committee , the Plan may be altered, amended or modified by the Debtor before the

14  Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided,

15  however, that any such amendment or modification of the Plan must be approved in

16  writing by the Plan Funders.

17          2.      Post-Confirmation Immaterial Modification

18          With the approval of the Bankruptcy Court and on notice to and an opportunity to

19  be heard by the United States Trustee and the Committee, and without notice to holders of

20  Claims and Interests, the Reorganized Debtor, may, insofar as it does not materially and

21  adversely affect the interest of holders of Claims, correct any defect, omission or

22  inconsistency in the Plan in such manner and to such extent as may be necessary to

23  expedite consummation of the Plan; provided, however, that any such amendment or

24  modification of the Plan must be approved in writing by the Plan Funders.

25          3.      Post-Confirmation Material Modification

26          On notice to and an opportunity to be heard by the United States Trustee and the

27  Committee, the Plan may be altered or amended after the Confirmation Date by the

28  Reorganized Debtor in a manner which, in the opinion of the Bankruptcy Court, materially

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders.

4.    Withdrawal or Revocation of the Plan

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan, then the Plan shall be deemed null and void.

5.    Payment of Statutory Fee

All fees payable pursuant to section 1930 of Title 28 of the United States Code but with respect to periods after the Effective Date shall be paid by the Reorganized Debtor when otherwise due out of the Plan Expense Reserve.

6.    Successors and Assign

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7.    Exemption from Transfer Taxes

Pursuant to Bankruptcy Code section 1146(c): (a) the issuance, transfer, or exchange of notes of equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

8.    <u>Effectiveness of the Plan</u>

The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived:

 (a) The Bankruptcy Court shall have entered the Confirmation Order by January 31, 2008 and such Order shall be in form and substance satisfactory to the Debtor, DIP Agent and Plan Funders;

 (b) All escrow and reserve accounts described in the Plan have been adequately funded;

 (c) An order or judgment has been entered in the Adversary Proceeding filed in this case by AlphaMed against the debtor, AP 07-4181 ("Adversary Proceeding"), which order or judgment has not been stayed, and which order or judgment either (i) dismisses the Adversary Proceeding or (ii) enters judgment in favor of the Debtor holding that the Debtor's interest in the Protease License is valid.  In addition, in connection with such judgment or order, the Court shall have made findings to the effect that the Debtor has a valid interest in the Protease License; and

 (d) The Confirmation Order shall have been entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, and the Confirmation Order has not been stayed.

<u>Effect of Failure of Condition</u>.  In the event that the conditions specified above have not occurred on or before sixty (60) days after the Confirmation Date, unless waived or extended by the Plan Funders, the Confirmation Order may be vacated upon order of the Bankruptcy Court after motion made by the Debtor or any party in interest and an opportunity for parties in interest to be heard.

VIII.  <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET

1  FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS

2  DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER

3  HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO

4  ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT,

5  HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED

6  IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

7        The Disclosure Statement and the material incorporated by reference herein (the

8  "Incorporated Materials") include "forward-looking statements" as defined in Section 27A

9  of the Securities Act and Section 21E of the Securities Exchange Act of 1934.  All

10  statements other than statements of historical facts included in this Disclosure Statement

11  and the Incorporated Materials regarding the Debtor's financial position, and plans and

12  objectives, including, but not limited to, statements using words such as "anticipates,"

13  "expects," "estimates," "believes," and "likely" are forward-looking statements.

14  A.    Taxation

15        Pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving cash or

16  property under the Plan will recognize gain or loss equal to the difference between the

17  amount of any cash and the fair market value of any other property received by such holder

18  and the basis which the holder has in such Allowed Claim or Interest.  The character of any

19  recognized gain or loss will depend upon the status of the holder, the nature of the Claim

20  or Interest and the period for which the Claim or Interest was held by the holder.  The basis

21  of a holder in any property received under the Plan will be the fair market value of such

22  property on the Effective Date of the Plan, and the holding period in such property

23  received will begin on the Effective Date.

24        The federal, state and local tax consequences of the Plan are complex and, in some

25  cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal

26  income taxation that may be relevant to a particular holder of an Allowed Claim or Interest

27  in light of its particular circumstances and income tax situation.  Accordingly, each holder

28

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

Case: 07-42767    Doc #: 242    Filed: 12/12/2007    Page 62 of 73

1  of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the

2  federal, state, and local tax consequences of the Plan.

3  B.      Distributions to Holders of Claims

4        The Plan is based on making Distributions as provided under the priority scheme set

5  forth in the Bankruptcy Code.  To this end, the Plan contemplates that all Allowed

6  Administrative Claims, Priority Claims and Secured Claims will be paid or satisfied in full

7  prior to the making of Distributions to holders of Allowed Claims in Classes 4 and 5.

8        The amount of Cash available for distribution to holders of Allowed Claims will

9  depend upon a number of factors.  The Debtor is unable at this time to estimate with any

10  certainty the ultimate resolution of such factors, and thus, the amount of available cash that

11  ultimately will be available for Distribution to holders of Allowed Claims.

12        In addition, the payment of a Distribution to each holder of an Allowed Claim will

13  depend upon the Claims reconciliation and resolution process implemented by the

14  Reorganized Debtor.

15  C.      Objections to Classification

16        Section 1122 of the Bankruptcy Code provides that a plan may place a claim or

17  equity interest in a particular class only if such claim or equity interest is substantially

18  similar to the other claims or equity interests of such class.  The Debtor believes that the

19  classification of Claims and Interests under the Plan complies with the requirements set

20  forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy

21  Court will reach the same conclusion.

22  D.      Inherent Uncertainty of Financial Projections

23        The financial projections attached hereto as Exhibit C demonstrate the Debtor's

24  projections with its operations for the four months during the Chapter 11 Bankruptcy Case.

25  They also demonstrate the Debtor's projections for the utilization of the Exit Financing

26  after the confirmation of the Plan.  The projections assume that the Plan is confirmed in

27  January 2008, and that it becomes effective by the end of January 2008.  The projections

28  demonstrate the utilization of the Exit Financing under the Plan and the operations of the

-57-

1    Debtor using such Exit Financing for the first six months of 2008.  The Debtor believes

2    that with the Discharge and the Discharge Injunction, it will be able to (a) convince either

3    existing Equity or other investors that the threat of continued litigation from the Lezdeys is

4    over, and the Debtor will then be able to obtain other investors to complete its next phases

5    and obtain FDA approval for various drugs, or (b) execute on a collaboration with a third

6    party to exploit and commercialize the reorganized Debtor's assets.

7         The financial projections attached hereto as <u>Exhibit C</u> are based upon numerous

8    assumptions that are an integral part of such financial projections, including Confirmation

9    and consummation of the Plan in accordance with its terms, the anticipated future

10   performance of the Reorganized Debtor, industry performance, general business and

11   economic conditions, competition, adequate financing, absence of material contingent or

12   unliquidated litigation or indemnity claims, and other matters, many of which are beyond

13   the control of the Reorganized Debtor and some or all of which may not materialize.  In

14   addition, unanticipated events and circumstances occurring subsequent to the date of this

15   Disclosure Statement may affect the actual financial results of the Reorganized Debtor's

16   operations.  These variations may be material and may adversely affect the ability of the

17   Reorganized Debtor to pay the obligations owing under the Plan and other post-Effective

18   Date indebtedness.  Because the actual results achieved throughout the periods covered by

19   the financial projections may vary from the projected results, the financial projections

20   should not be relied upon as a guaranty, representation, or other assurance of the actual

21   results that will occur.

22   E.    <u>Inherent Uncertainty of Certain Events</u>

23         Although the Debtor believes that the Plan will satisfy all requirements necessary

24   for confirmation by the Bankruptcy Court and is feasible, there is an inherent uncertainty

25   with respect to the either of (i) the insurance coverage available under the DO Policy, and

26   (ii) the Lezdey Claims, the outcomes of which could have an impact on the distributions

27   under the Plan.

28

W02-WEST:FME\400406881.15

Case: 07-42767     Doc #: 242     Filed: 12/12/2007

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION
Page 64 of 73

F.    Certain Bankruptcy Law Considerations

    1.    Risk of Non-Confirmation of the Plan

    Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

    2.    Risk of Non-Occurrence of the Effective Date

    Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied.

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

    If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization.

A.    Liquidation Under Chapter 7

    If no plan is confirmed, the case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached as Exhibit D to this Disclosure Statement.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because (i) the Debtor's assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be involved in the appointment and activities of a trustee, and (iii) additional expenses and claims, some of which would be entitled to priority,

-59-

1 | would be generated during the liquidation and from the rejection of leases and other

2 | executory contracts in connection with a cessation of the Debtor's operations.

3 | B.     Alternative Plan of Reorganization

4 |       If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan.

5 | The Plan is a reorganization of the Debtor's business and a different plan might involve

6 | some other form of reorganization or liquidation of the Debtor's assets.  The Debtor

7 | believes that the Plan, as described herein, enables creditors to realize the highest and best

8 | value under the circumstances.  The Debtor believes that any liquidation of the Debtor's

9 | assets or alternative form of chapter 11 plan is a much less attractive alternative to

10 | creditors than the Plan because of the far greater returns and certainty provided by the

11 | Plan.  Other alternatives could involve diminished recoveries, significant delay,

12 | uncertainty, and substantial additional administrative costs.  The Debtor believes that their

13 | Plan provides the best recovery to their creditors by providing them with a distribution of

14 | cash rather than diminished recoveries following a liquidation of its assets or distribution

15 | of other property.

16 |       X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

17 | A.     Federal Income Tax Consequences In General

18 |       The following summary addresses certain material federal income tax consequences

19 | of the implementation of the Plan to holders of Allowed Claims in Classes 2, 3(a), 3(b), 4

20 | and 5 and holders of Allowed Interests.  The summary is based upon the Debtor's

21 | interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"),

22 | applicable Treasury Regulations, judicial authority and current administrative rulings and

23 | pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to

24 | change, possibly with retroactive effect.  Due to the complexity of certain aspects of the

25 | Plan and differences in the nature of the Claims and Interests of the various holders

26 | thereof, their taxpayer status, residence and methods of accounting and prior actions taken

27 | by such holders with respect to their Claims and Interests, the tax consequences described

28 |

-60-

1  below are general in nature and are subject to significant considerations applicable to each

2  holder of an Allowed Claim, or an Allowed Interest.

3      The federal income tax consequences of the Plan and the formation and operation of

4  the Reorganized Debtor are complex and subject to significant uncertainties. The Debtor's

5  interpretation of the federal income tax consequences set forth herein is not binding on the

6  IRS, and the Debtor has not requested, and do not intend to request, an administrative

7  ruling from the IRS with respect to any of the federal income tax aspects of the Plan.

8  Consequently, there can be no assurance that the treatment described in this Disclosure

9  Statement will be accepted by the IRS.  No opinion of counsel has either been sought or

10  obtained with respect to the federal, state, local or foreign tax aspects of the Plan.

11  Legislative, judicial or administrative changes or interpretations may be forthcoming that

12  could alter or modify the statements and conclusions set forth herein.  Additionally,

13  changes in the facts or circumstances relating to the consummation or operation of the Plan

14  or the formation or operation of the Reorganized Debtor could likewise affect the tax

15  consequences to such parties.

16      This summary does not address foreign, state or local tax consequences of the Plan

17  or the Reorganized Debtor, nor does it purport to address all of the federal income tax

18  consequences of the Plan or the Reorganized Debtor.  This summary also does not purport

19  to address the federal income tax consequences of the Plan or the Reorganized Debtor to

20  taxpayers subject to special treatment under the federal income tax laws, such as banks,

21  governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt

22  entities, financial institutions, insurance companies, S corporations, small business

23  investment companies, mutual funds, regulated investment companies, foreign

24  corporations, and foreign persons.

25  **ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL**

26  **FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL**

27  **PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX**

28  **PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES**

1  OF A HOLDER OF A CLAIM OR INTEREST.  ANY U.S. TAX ADVICE

2  CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO

3  BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF

4  AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON

5  AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR

6  PROMOTION OF THE PLAN.  EACH HOLDER OF A CLAIM OR INTEREST IS

7  URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE,

8  LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER

9  THE PLAN.

10  B.     Federal Income Tax Consequences to the Debtor -- Cancellation of Indebtedness

11       Under the Tax Code, a taxpayer generally must include in gross income the amount

12  of any cancellation of indebtedness income ("COD income") realized during the taxable

13  year.  Section 108 of the Tax Code provides an exception to this general rule; however, if

14  the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is

15  under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the

16  Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

17       Section 108 of the Tax Code requires the amount of COD income so excluded from

18  gross income to be applied to reduce certain tax attributes of the taxpayer.  The tax

19  attributes that may be subject to reduction include the taxpayer's net operating losses and

20  net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit

21  carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax

22  credit carryovers.  Attribute reduction is calculated only after the tax for the year of

23  discharge has been determined.  Section 108 of the Tax Code further provides that a

24  taxpayer does not realize COD income from cancellation of indebtedness to the extent that

25  payment of such indebtedness would have given rise to a deduction.

26

27

28

W02-WEST:FME\400406881.15

C.   Federal Income Tax Consequences to Holders of Allowed Claims in Classes 2, 3(a), 3(b) 4 and 5

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 2, 3(a), 3(b), 4 or 5 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States.  The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

1.   Receipt of Cash and Property by Holders of Allowed Claims in Classes 2, 3(a), 3(b), 4 and 5

Generally, a holder of an Allowed Claim in Class 2, 3(a), 3(b), 4 or 5 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim.  In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

**HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.**

2.   Receipt of Interest

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on

1    such Allowed Claims may be treated as receiving taxable interest, to the extent of any

2    consideration they receive under the Plan that is allocable to such accrued but unpaid

3    interest. Holders previously required to include in their taxable income any accrued but

4    unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the

5    extent that such accrued but unpaid interest is not satisfied under the Plan.

6    **HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX**

7    **ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND**

8    **INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR**

9    **ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF**

10   **ACCRUED BUT UNPAID INTEREST.**

11        3.    Character of Gain or Loss

12        The character of any gain or loss as capital or ordinary and, in the case of capital

13   gain or loss, as short-term or long-term, will depend on a number of factors, including: (i)

14   the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or

15   business or made for investment purposes may attract differing treatment); (ii) the tax

16   status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of

17   the holder; (iv) whether the Claim has been held by the holder for more than one year; (v)

18   the extent to which the holder previously claimed a loss or a bad debt deduction with

19   respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market

20   discount.

21   **HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX**

22   **ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR**

23   **LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.**

24        4.    Withholding

25        All distributions to holders of Allowed Claims under the Plan are subject to any

26   applicable withholding, including employment tax withholding.

27

28

-64-

DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION

D.     <u>Federal Income Tax Consequences to Holders of Allowed Interests</u>

     The transactions contemplated by the Plan may cause some holders of Interests in the Debtor to recognize income, including cancellation of indebtedness income, with no corresponding cash distribution.

**HOLDERS OF ALLOWED INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.**

E.     <u>Importance of Obtaining Professional Tax Assistance</u>

     **THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.**

     **IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.**

W02-WEST:FME\400406881.15                   DISCLOSURE STATEMENT FOR THE DEBTOR'S FOURTH
AMENDED PLAN OF REORGANIZATION
Case: 07-42767     Doc #: 242     Filed: 12/12/2007     Page 71 of 73

1

## XI.  <u>CONCLUSION</u>

2       The Debtor believes the Plan is in the best interests of all creditors and urge those

3   entitled to vote to accept the Plan.

4   DATED:  December 12, 2007                    Respectfully submitted,

5                                                ARRIVA PHARMACEUTICALS, INC.

6
                                                 By <u>/s/M. Sue Preston</u>
7
                                                 Its <u>President and CEO</u>
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-66-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**The Plan**

A-1

**EXHIBIT C**



Entered on Docket
**January 30, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**Signed: January 30, 2008**

_____
EDWARD D. JELLEN
**U.S. Bankruptcy Judge**

1 SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP
2   A Limited Liability Partnership
    Including         Professional
3   Corporations
MICHAEL H. AHRENS,
4 Cal. Bar No. 44766
ORI KATZ, Cal.
5 Bar No. 209561
Four Embarcadero Center, 17th Floor
6 San Francisco, California    94111-
4109
7 Telephone:    415-434-9100
Facsimile:    415-434-3947
8
Attorneys      for      ARRIVA
9 PHARMACEUTICALS, INC.

10         UNITED STATES BANKRUPTCY COURT

11         NORTHERN DISTRICT OF CALIFORNIA

12              OAKLAND DIVISION

13

14 In re                           | Case No. 07-42767

15 ARRIVA PHARMACEUTICALS, INC., a   Chapter 11
California corporation,
16              Debtor.           **ORDER CONFIRMING DEBTOR'S
                                  FOURTH AMENDED CHAPTER 11
17 Tax ID: 94-3287067             PLAN OF REORGANIZATION
                                  DATED DECEMBER 12, 2007**
18
                                  Date:      January 16, 2008
19                                Time:      10:00 a.m.
                                  Place:     United States Bankruptcy Court
20                                           1300 Clay Street, Oakland, CA
                                  Ctrm:      215
21                                Judge:     Hon. Edward D. Jellen

22

23

24       Arriva Pharmaceuticals, Inc. (the "Debtor"), as debtor and debtor-in-possession in the

25 above-captioned bankruptcy case, having proposed its *Fourth Amended Chapter 11 Plan of*

26 *Reorganization, dated December 12, 2007* (the "Plan"), the Court having conducted a hearing to

27 consider confirmation of the Plan commencing on January 16, 2008, copies of the Plan, the

28 *Disclosure Statement to the Fourth Amended Chapter 11 Plan of Reorganization, dated*

-1-

*December 12, 2007* (the "Disclosure Statement"), and the order approving the Disclosure Statement and providing related relief (the "Disclosure Statement Order") having been provided to creditors and parties-in-interest in accordance with the terms of the Disclosure Statement Order or as otherwise approved by this Court; adequate notice of the hearing having been provided in accordance with Rule 2002(b) of the Federal Rules of Bankruptcy Procedure, to counsel for the official committee of unsecured creditors (the "Committee") appointed in this case, the Office of the United States Trustee, and to all creditors, parties-in-interest and other entities as required to be served in the Disclosure Statement Order and prior orders of this Court; appearances by and on behalf of parties-in-interest having been made at the hearing and noted on the record; the Court having considered the Plan, any objections to confirmation, the arguments of counsel, the evidence submitted at the hearing, the *Debtor's Memorandum of Points and Authorities in Support of Confirmation of Debtor's Fourth Amended Chapter 11 Plan of Reorganization, dated December 12, 2007, and Reply to Objection of AlphaMed Pharmaceuticals Corp. re Same* (the "Memorandum"), and the filed declarations of M. Sue Preston (the "Preston Declaration"), John Barberich (the "Barberich Declaration"), Michael H. Ahrens (the "Ahrens Declaration") and Dawn Whitehead (the "Whitehead Declaration"), the *Request for Judicial Notice in Connection with Confirmation Hearing on Debtor's Plan of Reorganization* (the "Request for Judicial Notice"); the offer of proof made and other evidence introduced at the Confirmation Hearing and noted on the record; the records and files in this chapter 11 case; all documents and testimony admitted into evidence at the Confirmation Hearing; and good cause appearing therefore, the Court orders as follows:

## ORDER

1.     The Plan is confirmed.  The Court finds all of the applicable confirmation requirements set forth in Bankruptcy Code section 1129 have been satisfied.  The Plan is binding upon the Debtor, its creditors and equity interest holders irrespective of (i) whether the claim or interest of such creditor or equity interest holder has been allowed and (ii) whether such creditor or equity interest holder has accepted the Plan.

-2-

2.      Undefined capitalized terms appearing in this order (the "Confirmation Order")
shall have the meanings assigned to such terms in the Plan or the Disclosure Statement.  The Plan
is filed as docket number 241 in this case.

3.      On the Effective Date and automatically and without further action, (i) each
existing member of the board of directors of the Debtor will be deemed to have resigned, (ii) the
new board members of the Reorganized Debtor shall be those identified in the Plan Supplement,
and (iii) pursuant to California law, the Reorganized Debtor shall be authorized and empowered to
take all such actions and measures necessary to implement and administer the terms and
conditions of the Plan.  The Debtor's Articles will be amended as of the Effective Date to the
extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting
equity securities as required by section 1123(a)(6) of the Bankruptcy Code.  Further, as of the
Effective Date the pre-Petition Date Voting Agreement and Investor Rights Agreement shall be
deemed null and void and of no further effect.  The rights and interests of the New Common and
New Series A Preferred shall be governed by and controlled pursuant to the terms and conditions
of the Reorganized Debtor's Articles, Voting Agreement and Investor Rights Agreement, which
are substantially in the form included in and filed with the Plan Supplement.

4.      On the Effective Date, the Reorganized Debtor shall be responsible for making
distributions under the Plan.  The Reorganized Debtor shall hold and administer the Reserves
provided for in the Plan.  Wachter shall contribute to the Reorganized Debtor the Wachter
Judgment in order that the prosecution of the Wachter Judgment and other Lezdeys Litigation may
be coordinated and prosecuted by the Debtor.  The Reorganized Debtor shall pursue all rights and
benefits of any and all applicable insurance policies that cover any claims asserted or that may be
asserted by any holder of any Claim.  On the Effective Date, title to the SVB Collateral and
Control Agreement Collateral shall vest in the Reorganized Debtor subject to the liens existing
immediately prior to the Effective Date, and subject to the provisions of Article 5.2 of the Plan.

5.      All of the Reserves shall vest with the Reorganized Debtor on the Effective Date.
All Reserves shall be held in an interest bearing account and such interest shall increase the
amount of such Reserve Account.  Any Reserves Balances remaining in any of the Reserves after

-3-

1   the payment of all Allowed Claims entitled to receive payments from such Reserve under the Plan,

2   respectively; shall be distributed to the Reorganized Debtor.  The Reorganized Debtor shall be

3   responsible for fees and expenses in connection with the Claims objections filed by the Debtor or

4   Reorganized Debtor, and the Lezdeys Litigation only to the extent of the Plan Expense Reserve

5   and any insurance policy benefits that are readily available for payment of such fees and expenses.

6         6.      The Reorganized Debtor shall administer the Plan subject to the foregoing duties

7   and powers, which shall include the following:

8                 a.      To prosecute, compromise or settle objections to Claims and/or Interests

9                         (disputed or otherwise) and to make or direct that distributions be made to

10                        holders of Allowed Claims;

11                b.      To make decisions regarding the retention or engagement of Professionals

12                        and to pay, without court order, all reasonable fees and expenses incurred

13                        after the Effective Date;

14                c.      To make or direct distributions to holders of Allowed Claims and to

15                        otherwise implement and administer the Reserves and the Plan;

16                d.      To pursue, litigate or settle the Avoidance Actions, Lezdeys Litigation and

17                        to collect the Wachter Judgment; provided, however, that neither

18                        Reorganized Debtor nor any other Person shall have the power to pursue,

19                        litigate or settle Avoidance Actions against any Person who holds a Claim

20                        that is Allowed;

21                e.      To file with the Bankruptcy Court the reports and other documents and to

22                        pay any and all fees required by the Plan or otherwise required to close the

23                        Chapter 11 Case, including the preparation and filing of a motion for a final

24                        decree;

25                f.      To set off amounts owed to the Debtor against any and all amounts

26                        otherwise due to be distributed to the holder of an Allowed Claim under the

27                        Plan; and

28

g.    take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan.

7.    Notwithstanding any provision of the Plan or this Confirmation Order, the Debtor and Reorganized Debtor shall have no duty or obligation of any kind to take action which would involve incurring fees, costs or other financial obligations that would exceed the funds available in the Plan Expense Reserve and any insurance policy benefits that are readily available for payment of such fees and expenses, which shall be the sole source for funding such fees, costs and financial obligations. The Debtor and Reorganized Debtor shall have no obligation to utilize any assets other than the funds in the Plan Expense Reserve for any aspect of the implementation of the Plan. The Reorganized Debtor may use the funds in the Plan Expense Reserve and any insurance policy benefits that are readily available for payment of such fees and expenses for such purposes in performing its duties under the Plan as the Reorganized Debtor determines in its sole discretion.

8.    Except as otherwise provided for in the Plan or this Confirmation Order, on the Effective Date, without any further action, the Reorganized Debtor will be vested with all of the Property of the Debtor's Estate, free and clear of all Claims, Liens and Interests, and shall have all of the powers of a corporation under applicable law. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire and dispose of property and settle and compromise post-Effective Date claims or interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.    The Committee shall continue to act as an advisory committee to the Reorganized Debtor, with the full power to be heard in any matters in the Bankruptcy Court. The Committee and its professionals shall not be entitled to any fees or expenses from the Reorganized Debtor or any assets of the Reorganized Debtor for their post-Effective Date activities.

10.    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Court approves the compromise and settlement embodied in the Plan of any and all claims, suits and causes of action of the Debtor, the Estate, of their respective successors or assigns, and any Person or Entity claiming a right in a derivative capacity on their behalf (the "Debtor Claimants") against the DIP Agent, DIP Lenders and the Plan Funders, together with all

-5-

1  of their current officers, current directors, current attorneys, current advisors and any consultants

2  that performed services after the Petition Date, and Wachter and the Debtor's current officers,

3  current directors, professionals who have been approved by the Bankruptcy Court to represent the

4  Debtor, and any consultants that performed services after the Petition Date (collectively, the

5  "Released Parties"), as set forth more fully below.  Notwithstanding anything herein or elsewhere

6  to the contrary, absent a specific settlement and release entered into with the Lezdeys by the

7  Debtor or the Reorganized Debtor approved by a Final Order by the Court, the Lezdeys, and each

8  of them, in every capacity, are not Released Parties.

9          11.      On the Effective Date, the Debtor Claimants are deemed to, with respect to any and

10  all direct and derivative claims, whether or not asserted, unconditionally and irrevocably release

11  the Released Parties from any and all direct, indirect or derivative claims, obligations, suits,

12  judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and

13  indemnification, and all other controversies of every type, kind, nature, description or character

14  whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known

15  or unknown, foreseen or unforeseen, asserted, threatened or not, then existing or thereafter arising,

16  in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction,

17  event or other occurrence taking place from the beginning of time to the Effective Date arising

18  from or relating in any way, directly or indirectly, to the Debtor, its Properties, assets, operations

19  or liabilities, the Chapter 11 Case, the Plan, or the Disclosure Statement; *provided however*, that

20  the Debtor Claimants shall not be deemed to have released any rights to enforce the terms of the

21  Plan or their rights to distributions thereunder.  The consideration for the releases was given in

22  part in exchange for the release of such claims.  The Debtor Claimants hereby waive any rights or

23  benefits under California Civil Code Section 1542, which provides that:

24
                A general release does not extend to claims which the creditor does
25              not know or suspect to exist in his or her favor at the time of
                executing the release, which if known by him or her must have
26              materially affected his or her settlement with debtor and any rights
                or benefits under similar laws.
27
    The Confirmation Order specifically provides for the foregoing releases.
28

-6-

12.     Notwithstanding the foregoing, (i) nothing herein or in the Plan shall in any manner release the Released Parties from any liability for their willful misconduct or gross negligence; and (ii) nothing herein shall release any rights under Bankruptcy Code Section 1144 to revoke this Confirmation Order, which could result in a revocation of the releases contained in the Plan.

13.     On the Effective Date, the Debtor Claimants respecting the claims released above shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted to the Released Parties pursuant to the Plan.

14.     The consideration the Plan Funders shall provide, or have provided, in exchange for the releases described in the Plan and the receipt of the New Common and New Series A Preferred, is adequate.

15.     The Reorganized Debtor shall make distributions, and establish and maintain Reserves, as set forth in the Plan.  Objections to Claims shall be filed and served as set forth in the Plan, and may be resolved as set forth in the Plan.

16.     Any and all pre-petition leases or executory contracts included on Debtor's existing Schedule G shall be deemed assumed by the Debtor effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.  Any and all pre-petition leases and executory contracts not included on Debtor's existing Schedule G shall be deemed rejected by the Debtor effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.

17.     On the Effective Date, (a) the Debtor, and the Debtor's current officers, current directors, professionals who have been approved by the Bankruptcy Court to represent the Debtor, and any consultants that performed services after the Petition Date (solely in their capacities as such, but excluding the Lezdeys in every capacity) and (b) the Plan Funders, DIP Agent and DIP Lenders, together with all of their current officers, current directors, current attorneys, current advisors, and any consultants that performed services after the Petition Date, shall be deemed to release each of the other of and from any claims, obligations, rights, causes of action and liabilities

-7-

1   for any act or omission occurring solely during the period from the Petition Date through the

2   Effective Date, generally, including, without limitation, any act or omission occurring during the

3   Chapter 11 Case, any act or omission occurring in connection with post-Petition Date sales of

4   Property, the DIP Facility, the Exit Facility, the Plan Funders Debt Commitment, the Disclosure

5   Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the

6   Plan, the consummation of the Plan or the administration of the Plan or the property to be

7   distributed under the Plan, except for acts or omissions which constitute willful misconduct or

8   gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of

9   counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy

10   Code; provided, however, that nothing herein shall release the Debtor, the Reorganized Debtor, or

11   the Plan Funders from their obligations under the Plan or under the DIP Facility, Exit Facility,

12   Confirmation Order or the Plan Funders' Debt Commitment on and after the Effective Date;

13   provided further that nothing herein shall release any rights under Bankruptcy Code Section 1144

14   to revoke an order of confirmation which could result in a revocation of the exculpation provisions

15   of the Plan.

16         18.     Except as otherwise provided for in the Plan or in the Confirmation Order, in

17   accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as

18   a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests

19   in the Debtor, its assets and Property, which debts, Claims, Liens and Interests arose at any time

20   before the entry of the Effective Date. The discharge of the Debtor shall be effective as to each

21   Claim and Interest, regardless of whether a proof of Claim or Interest was filed or whether the

22   Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the

23   Plan. On the Effective Date, as to each and every discharged Claim and Interest, any holder of

24   such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtor

25   or Reorganized Debtor or their assets or properties.

26         19.     On and after the Confirmation Date, except to enforce the terms and conditions of

27   the Plan before the Bankruptcy Court, all Persons or Entities who have held, hold or may hold any

28   Claim arising before the Petition Date against or Interest in the Debtor and all Persons or Entities

-8-

1    who have filed a Proof of Claim in the above-captioned Bankruptcy Case are permanently

2    enjoined from and after the Confirmation Date from:

3        a.    commencing, conducting or continuing in any manner, any suit, action or

4            other proceeding of any kind (including, without limitation, any proceeding

5            in a judicial, arbitral, administrative or other forum) or enforcing, levying,

6            or collecting, against (i) the Debtor or the Reorganized Debtor or their

7            property and (ii) the officers and directors of Arriva for Claims arising after

8            the Petition Date and prior to the Effective Date.

9        b.    Notwithstanding the provisions of the Plan, nothing in the Plan shall be

10            deemed or construed:

11        (1)    To discharge the debt or liability of any person, other than the

12            Debtor and the Reorganized Debtor, for any act, event or Claim

13            arising before the Petition Date.

14        (2)    To enjoin any person from commencing, conducting or continuing

15            in any manner, any suit, action or other proceeding of any kind

16            (including, without limitation, any proceeding in a judicial, arbitral,

17            administrative or other forum) against any person other than the

18            Debtor or the Reorganized Debtor for any act, event or Claim

19            arising before the Petition Date.

20    20.    All objections to confirmation of the Plan or to the relief requested in the Plan, to

21    the extent not withdrawn, waived or settled, and all reservations of rights included in any objection

22    to the Plan, are overruled.

23    21.    This Court shall retain jurisdiction, to the extent permitted by applicable law or

24    Article X of the Plan.

25    22.    Nothing in the Plan or this Order shall be deemed or construed to impair the right

26    of any person to seek revocation of this Order, or the power of the Court to revoke the order of

27    confirmation, pursuant to Section 1144 of the Bankruptcy Code.

28

ORDER CONFIRMING DEBTOR'S FOURTH
AMENDED PLAN DATED DECEMBER 12, 2007

1      23.    Except to the extent that the Bankruptcy Code is applicable, the rights and

2 obligations arising under the Plan shall be governed by and construed and enforced in accordance

3 with the laws of the State of California.

4

5                         ** END OF ORDER **

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

1    COURT SERVICE LIST

2

3    **1. Counsel for the Official Creditors' Committee**
     Michael D. Cooper
4    Wendel Rosen Black & Dean, LLP
     1111 Broadway, 24th Floor
5    Oakland, CA 94607
     (510) 834-6600
6
     **2. Office of the U.S. Trustee /Oakland**
7    Office of the U.S. Trustee
     Attention: Laurent Chen
8    1301 Clay St. #690N
     Oakland, CA 94612
9    (510) 637-3200

10   **3. Attorneys for AlphaMed Pharmaceuticals Corp.**
     Penn Ayers Butler
11   Squire, Sanders and Dempsey
     600 Hansen Way
12   Palo Alto, CA 94304-1043
     (650) 843-3242
13
     **4. Stuart M. Brown**
14   Edwards, Angell, Palmer & Dodge LLP
     919 N Market St., 5th Fl.
15   Wilmington, DE 19801
     (302) 428-5500
16
     **5. M. David Minnick**
17   Pillsbury Winthrop Shaw Pittman LLP
     50 Fremont Street
18   San Francisco, CA 94105-2228
     (415) 983-1351
19
     **6. Counsel for the Debtor**
20   Michael H. Ahrens
     Four Embarcadero Center, Suite 1700
21   San Francisco, CA 94114
     (415) 434-9100
22

23

24

25

26

27

28
                                    -11-

**EXHIBIT D**



*Arriva* Pharmaceuticals, Inc.

1010 Atlantic Avenue, Alameda, CA 94501
Telephone: 510-337-1250 • Fax: 510-337-1251

## BORROWING NOTICE/DISBURSEMENT REQUEST

January 22, 2008

Nordic Biotech Venture Fund II K/S
c/o Nordic Biotech LLC
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer

Re:     Loan Agreement dated as of November 30, 2007 (as in effect from time to time, the "Loan Agreement"), among Arriva Pharmaceuticals, Inc. (the "Borrower"), the Lenders referred to therein and Nordic Biotech Venture Fund II K/S, as Agent for such Lenders.  Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Loan Agreement.

Ladies and Gentlemen:

Pursuant to Section 1.2 of the Loan Agreement, the undersigned Borrower hereby requests that the Lenders make a term loan (i) in the aggregate principal amount of $2,500,000; (ii) on February 11, 2008 (which date shall be a date permitted by Section 1.2 and shall be not sooner than ten Business Days after the date hereof) and (iii) into the account of the Borrower as set forth on Schedule I hereto.

The representations and warranties of the Borrower contained in the Loan Agreement, or which are contained in any Loan Document or document furnished at any time under or in connection with the Loan Agreement, shall be true and correct in all material respects on and as of the date of such borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

No Default or Event of Default shall exist, or would result from such proposed borrowing or from the application of the proceeds thereof.

Per the Commitment Percentages in Schedule A of the Loan Agreement, the amounts due by entity are as follows:

|  | Initial Exit Loan Draw | Funds to EAPD | Funds to Arriva |
|---|---|---|---|
| MPM Bioventures II-QP, L.P. | $563,250 | $101,400 | $461,850 |
| MPM Bioventures II, L.P. | $62,000 | $11,200 | $50,800 |
| MPM Asset Management Investors 2002 BVII LLC | $9,750 | $1,700 | $8,050 |
| MPM Bioventures GMBH & Co. Parallel-Beteiligungs KG | $198,250 | $35,700 | $162,550 |
| MPM Amounts | $833,250 | $150,000 | $683,250 |
| Nordic Amount | $1,666,750 | $0 | $1,666,750 |
| **Total** | **$2,500,000** | **$150,000** | **$2,350,000** |

With this draw, total draws to date excluding interest are as follows:

| | |
|---|---|
| DIP Loan Draw, November 30, 2007 | $1,000,000 |
| DIP Loan Draw, January 28, 2008 | $500,000 |
| Exit Loan Draw, February 11, 2008 | $2,500,000 |
| Total Draws | $4,000,000 |

ARRIVA PHARMACEUTICALS, INC.

By: _M. Sue Preston_____

Name: M. Sue Preston

Title: President & CEO

**Schedule I to Borrowing Notice**

**Bank Account for Receipt of Loan Disbursement**

<u>Wire Instructions</u>

| | |
|---|---|
| Transfer to: | ABA#:  121140399 |
| Bank Name: | Silicon Valley Bank |
| Bank Address: | 3003 Tasman Drive, HG 220 |
| | Santa Clara, CA 95054  USA |
| Account Number: | 3300374574 |
| Account Name: | Arriva Pharmaceuticals Inc. |



*Arriva* Pharmaceuticals, Inc.

1010 Atlantic Avenue, Alameda, CA 94501
Telephone: 510-337-1250 • Fax: 510-337-1251

## BORROWING NOTICE/DISBURSEMENT REQUEST

January 22, 2008

Nordic Biotech Venture Fund II K/S
c/o Nordic Biotech LLC
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer

Re:     Loan Agreement dated as of November 30, 2007 (as in effect from time to time, the "Loan Agreement"), among Arriva Pharmaceuticals, Inc. (the "Borrower"), the Lenders referred to therein and Nordic Biotech Venture Fund II K/S, as Agent for such Lenders.  Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Loan Agreement.

Ladies and Gentlemen:

Pursuant to Section 1.2 of the Loan Agreement, the undersigned Borrower hereby requests that the Lenders make a term loan (i) in the aggregate principal amount of $500,000; (ii) on February 20, 2008 (which date shall be a date permitted by Section 1.2 and shall be not sooner than ten Business Days after the date hereof) and (iii) into the account of the Borrower as set forth on Schedule I hereto.

The representations and warranties of the Borrower contained in the Loan Agreement, or which are contained in any Loan Document or document furnished at any time under or in connection with the Loan Agreement, shall be true and correct in all material respects on and as of the date of such borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

No Default or Event of Default shall exist, or would result from such proposed borrowing or from the application of the proceeds thereof.

Per the Commitment Percentages in Schedule A of the Loan Agreement, the amounts due by entity are as follows:

| | |
|---|---:|
| MPM Bioventures II-QP, L.P. | $112,650 |
| MPM Bioventures II, L.P. | $12,400 |
| MPM Asset Management Investors 2002 BVII LLC | $1,950 |
| MPM Bioventures GMBH & Co. Parallel-Beteiligungs KG | $39,650 |
| MPM Amounts | $166,650 |
| | |
| Nordic Amount | $333,350 |
| | |
| **Total** | **$500,000** |

With this draw, total draws to date excluding interest are as follows:

| | |
|---|---:|
| DIP Loan Draw, November 30, 2007 | $1,000,000 |
| DIP Loan Draw, January 28, 2008 | $500,000 |
| Exit Loan Draw, February 11, 2008 | $2,500,000 |
| Exit Loan Draw, February 20, 2008 | $500,000 |
| Total Draws | $4,500,000 |

ARRIVA PHARMACEUTICALS, INC.

By: _____

Name: M. Sue Preston

Title: President & CEO

**Schedule I to Borrowing Notice**

**Bank Account for Receipt of Loan Disbursement**

<u>Wire Instructions</u>

| | |
|---|---|
| Transfer to: | ABA#: 121140399 |
| Bank Name: | Silicon Valley Bank |
| Bank Address: | 3003 Tasman Drive, HG 220 |
| | Santa Clara, CA 95054  USA |
| Account Number: | 3300374574 |
| Account Name: | Arriva Pharmaceuticals Inc. |

 Pharmaceuticals, Inc.

1010 Atlantic Avenue, Alameda, CA 94501
Telephone: 510-337-1250 • Fax: 510-337-1251

## BORROWING NOTICE/DISBURSEMENT REQUEST

March 4, 2008

Nordic Biotech Venture Fund II K/S
c/o Nordic Biotech LLC
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer

Re:     Loan Agreement dated as of November 30, 2007 (as in effect from time to time, the "Loan Agreement"), among Arriva Pharmaceuticals, Inc. (the "Borrower"), the Lenders referred to therein and Nordic Biotech Venture Fund II K/S, as Agent for such Lenders.  Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Loan Agreement.

Ladies and Gentlemen:

Pursuant to Section 1.2 of the Loan Agreement, the undersigned Borrower hereby requests that the Lenders make a term loan (i) in the aggregate principal amount of $750,000; (ii) on March 19, 2008 (which date shall be a date permitted by Section 1.2 and shall be not sooner than ten Business Days after the date hereof) and (iii) into the account of the Borrower as set forth on Schedule I hereto.

The representations and warranties of the Borrower contained in the Loan Agreement, or which are contained in any Loan Document or document furnished at any time under or in connection with the Loan Agreement, shall be true and correct in all material respects on and as of the date of such borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

No Default or Event of Default shall exist, or would result from such proposed borrowing or from the application of the proceeds thereof.

Per the Commitment Percentages in Schedule A of the Loan Agreement, the amounts due by entity are as follows:

| | |
|---|---|
| MPM Bioventures II-QP, L.P. | $168,975 |
| MPM Bioventures II, L.P. | $18,600 |
| MPM Asset Management Investors 2002 BVII LLC | $2,925 |
| MPM Bioventures GMBH & Co. Parallel-Beteiligungs KG | $59,475 |
| MPM Amounts | $249,975 |
| Nordic Amount | $500,025 |
| **Total** | **$750,000** |

With this draw, total draws to date excluding interest are as follows:

| | |
|---|---|
| DIP Loan Draw, November 30, 2007 | $1,000,000 |
| DIP Loan Draw, January 28, 2008 | $500,000 |
| Exit Loan Draw, February 11, 2008 | $2,500,000 |
| Exit Loan Draw, February 20, 2008 | $500,000 |
| Exit Loan Draw, March 19, 2008 | $750,000 |
| Total Draws | $5,250,000 |

ARRIVA PHARMACEUTICALS, INC.

By: _____

Name: *DAVID MADDEN*

Title: *CFO & TREASURER*

**Schedule I to Borrowing Notice**

**Bank Account for Receipt of Loan Disbursement**

<u>Wire Instructions</u>

| | |
|---|---|
| Transfer to: | ABA#: 121140399 |
| Bank Name: | Silicon Valley Bank |
| Bank Address: | 3003 Tasman Drive, HG 220 |
| | Santa Clara, CA 95054  USA |
| Account Number: | 3300374574 |
| Account Name: | Arriva Pharmaceuticals Inc. |


*Arriva* Pharmaceuticals, Inc.

1010 Atlantic Avenue, Alameda, CA 94501
Telephone: 510-337-1250 • Fax: 510-337-1251

## BORROWING NOTICE/DISBURSEMENT REQUEST

April 4, 2008

Nordic Biotech Venture Fund II K/S
c/o Nordic Biotech LLC
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer

Re:     Loan Agreement dated as of November 30, 2007 (as in effect from time to time, the "Loan Agreement"), among Arriva Pharmaceuticals, Inc. (the "Borrower"), the Lenders referred to therein and Nordic Biotech Venture Fund II K/S, as Agent for such Lenders.  Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Loan Agreement.

Ladies and Gentlemen:

Pursuant to Section 1.2 of the Loan Agreement, the undersigned Borrower hereby requests that the Lenders make a term loan (i) in the aggregate principal amount of $750,000; (ii) on April 30, 2008 (which date shall be a date permitted by Section 1.2 and shall be not sooner than ten Business Days after the date hereof) and (iii) into the account of the Borrower as set forth on Schedule I hereto.

The representations and warranties of the Borrower contained in the Loan Agreement, or which are contained in any Loan Document or document furnished at any time under or in connection with the Loan Agreement, shall be true and correct in all material respects on and as of the date of such borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

No Default or Event of Default shall exist, or would result from such proposed borrowing or from the application of the proceeds thereof.

Per the Commitment Percentages in Schedule A of the Loan Agreement, the amounts due by entity are as follows:

| | |
|---|---:|
| MPM Bioventures II-QP, L.P. | $168,975 |
| MPM Bioventures II, L.P. | $18,600 |
| MPM Asset Management Investors 2002 BVII LLC | $2,925 |
| MPM Bioventures GMBH & Co. Parallel-Beteiligungs KG | $59,475 |
|    MPM Amounts | $249,975 |
| | |
| Nordic Amount | $500,025 |
| | |
| **Total** | **$750,000** |

With this draw, total draws to date excluding interest are as follows:

| | |
|---|---:|
| DIP Loan Draw, November 30, 2007 | $1,000,000 |
| DIP Loan Draw, January 28, 2008 | $500,000 |
| Exit Loan Draw, February 11, 2008 | $2,500,000 |
| Exit Loan Draw, February 20, 2008 | $500,000 |
| Exit Loan Draw, March 19, 2008 | $750,000 |
| Exit Loan Draw, April 30, 2008 | $750,000 |
|    Total Draws | $6,000,000 |

ARRIVA PHARMACEUTICALS, INC.

By: _____

Name: *DAVID MADDEN*

Title: *CFO & TREASURER*

**Schedule I to Borrowing Notice**

**Bank Account for Receipt of Loan Disbursement**

<u>Wire Instructions</u>

| | |
|---|---|
| Transfer to: | ABA#:  121140399 |
| Bank Name: | Silicon Valley Bank |
| Bank Address: | 3003 Tasman Drive, HG 220 |
| | Santa Clara, CA 95054  USA |
| Account Number: | 3300374574 |
| Account Name: | Arriva Pharmaceuticals Inc. |

# EXHIBIT E



**SVB Silicon Valley Bank**
A Member of SVB Financial Group

**Account Details - Multi Day Consolidated**
**Requested Date: From: 02/13/2008 To: 02/13/2008**
**Generated On: 03/20/2008**

## Deposit Account
## Account:3300374574-ARRIVA PHARMACEUTICALS INC - DEBTOR IN POSSESSION

| Account Summary | Amount |
|---|---|
| Opening Ledger Balance (As of 2008-02-13) | $ 150,000.00 |
| Total Credits(6) | $ 2,596,329.89 |
| Total Debits(2) | $ 2,596,329.89 |
| Closing Ledger Balance (As of 2008-02-13) | $ 150,000.00 |

### Detail Credit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/13/2008 | WIRE IN 080213A1B7A31C000072200804403656; ORG MPM ASSET MANAGEMENT INVESTORS;OBI ARRIVA L | 4836 | 0 | $ 8,056.00 |
| 02/13/2008 | WIRE IN 080213A1B7A31C000068200804403649; ORG MPM BIOVENTURES II LP;OBI ARRIVA LOAN 7.44% | 4828 | 0 | $ 50,837.00 |
| 02/13/2008 | WIRE IN 080213A1B7A31C000071200804403653; ORG MPM BIOVENTURES GMBH & CO;OBI ARRIVA LOAN 2 | 4832 | 0 | $ 162,669.00 |
| 02/13/2008 | WIRE IN 080213A1B7A31C000069200804403652; ORG MPM BIOVENTURES II QP;OBI ARRIVA LOAN 67.60 | 4830 | 0 | $ 462,188.00 |
| 02/13/2008 | WIRE IN 080213B1Q8023C005489200804403767; ORG PILLSBURY MADISON SUTRO;OBI BY ORDER OF PIL | 4960 | 0 | $ 1,666,750.00 |
| 02/13/2008 | SWEEP REDEMPTION | 1520 | 0 | $ 245,829.89 |

### Detail Debit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/13/2008 | WIRE OUT 080213L1B77D1C001121200804404031; BNF QSV BIOLOGICSLTD.;OBI QSV BIOLOGICS LTD.CU | 5263 | 0 | $ 273,273.09 |
| 02/13/2008 | SWEEP TO FEDERATED | 6 | 0 | $ 2,323,056.80 |

**SVB › Silicon Valley Bank**
A Member of SVB Financial Group

**Account Details - Multi Day Consolidated**
**Requested Date: From: 02/21/2008 To: 02/21/2008**
**Generated On: 03/20/2008**

## Deposit Account
## Account:3300374574-ARRIVA PHARMACEUTICALS INC - DEBTOR IN POSSESSION

| Account Summary | Amount |
|---|---|
| Opening Ledger Balance (As of 2008-02-21) | $ 150,000.00 |
| Total Credits(2) | $ 995,046.70 |
| Total Debits(9) | $ 995,046.70 |
| Closing Ledger Balance (As of 2008-02-21) | $ 150,000.00 |

### Detail Credit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/21/2008 | WIRE IN 080221B1Q8383C001258200805200582; ORG ARRIVA PHARMACEUTICALS B.V. I.O.;OBI LOAN | 1106 | 0 | $ 334,350.00 |
| 02/21/2008 | SWEEP REDEMPTION | 1520 | 0 | $ 660,696.70 |

### Detail Debit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/21/2008 | CHECK PAID | 601941 | 10296 | $ 10.35 |
| 02/21/2008 | CHECK PAID | 584341 | 10324 | $ 11.66 |
| 02/21/2008 | CHECK PAID | 583756 | 10300 | $ 117.46 |
| 02/21/2008 | CHECK PAID | 579644 | 10297 | $ 160.00 |
| 02/21/2008 | CHECK PAID | 584322 | 10308 | $ 370.98 |
| 02/21/2008 | CHECK PAID | 584171 | 10298 | $ 3,600.00 |
| 02/21/2008 | CHECK PAID | 584324 | 10314 | $ 34,269.56 |
| 02/21/2008 | CHECK PAID | 587023 | 10313 | $ 75,994.38 |
| 02/21/2008 | SWEEP TO FEDERATED | 6 | 0 | $ 880,512.31 |

**SVB** ⟩ Silicon Valley Bank

A Member of SVB Financial Group

**Account Details - Multi Day Consolidated**
**Requested Date: From: 02/26/2008 To: 02/26/2008**
**Generated On: 03/20/2008**

## Deposit Account
## Account:3300374574-ARRIVA PHARMACEUTICALS INC - DEBTOR IN POSSESSION

| Account Summary | Amount |
|---|---|
| Opening Ledger Balance (As of 2008-02-26) | $ 150,000.00 |
| Total Credits(5) | $ 1,033,948.09 |
| Total Debits(7) | $ 1,033,948.09 |
| Closing Ledger Balance (As of 2008-02-26) | $ 150,000.00 |

### Detail Credit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/26/2008 | WIRE IN 080226A1B7A31C000018200805701294; ORG MPM ASSET MANAGEMENT INVESTORS;OBI ARRIVA L | 1882 | 0 | $ 1,950.00 |
| 02/26/2008 | WIRE IN 080226A1B7A31C000014200805701267; ORG MPM BIOVENTURES II LP;OBI ARRIVA LOAN 7.44% | 1854 | 0 | $ 12,400.00 |
| 02/26/2008 | WIRE IN 080226A1B7A31C000017200805701292; ORG MPM BIOVENTURES GMBH & CO;OBI ARRIVA LOAN 2 | 1878 | 0 | $ 39,650.00 |
| 02/26/2008 | WIRE IN 080226A1B7A31C000016200805701272; ORG MPM BIOVENTURES II QP;OBI ARRIVA LOAN 67.60 | 1858 | 0 | $ 112,650.00 |
| 02/26/2008 | SWEEP REDEMPTION | 1520 | 0 | $ 867,298.09 |

### Detail Debit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 02/26/2008 | ARRIVA PHARM OPE CASH DISB PREFUNDING ACH OFFSET | 107 | 0 | $ 2,338.23 |
| 02/26/2008 | WIRE OUT 080226L1B77D1C001312200805704245; BNF QSV BIOLOGICSLTD.;OBI QSV BIOLOGICS LTD.IN | 5223 | 0 | $ 299,204.52 |
| 02/26/2008 | CHECK PAID | 229167 | 10317 | $ 46.84 |
| 02/26/2008 | CHECK PAID | 754619 | 10329 | $ 66.18 |
| 02/26/2008 | CHECK PAID | 760238 | 10330 | $ 750.00 |
| 02/26/2008 | FX 561680 GBP565.00 2.001300 | 3740 | 0 | $ 1,130.73 |
| 02/26/2008 | SWEEP TO FEDERATED | 6 | 0 | $ 730,411.59 |

# EXHIBIT F

A0673801



SMS

# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___20___ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

MAR 0 5 2008

_____

*Debra Bowen*

DEBRA BOWEN
Secretary of State

A0673801

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

FEB 1 3 2008

AMENDED AND RESTATED

ARTICLES OF INCORPORATION

OF

ARRIVA PHARMACEUTICALS, INC.

The undersigned certify that:

1.      They are the duly elected and acting President and Secretary of Arriva Pharmaceuticals, Inc., a California corporation.

2.      The articles of incorporation of the corporation are amended and restated to read as follows:

## ARTICLE I

The name of the corporation is "Arriva Pharmaceuticals, Inc."

## ARTICLE II

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## ARTICLE III

A.      The corporation is authorized to issue two classes of shares to be designated respectively Preferred Stock ("Preferred Stock") and Common Stock ("Common Stock"). The total number of shares of capital stock that the corporation is authorized to issue is eighteen million (18,000,000). The total number of shares of Preferred Stock the corporation shall have authority to issue is eight million (8,000,000) shares. The total number of shares of Common Stock the corporation shall have authority to issue is ten million (10,000,000). Both the Preferred Stock and the Common Stock shall have no par value per share. The corporation is prohibited from issuing nonvoting equity securities.

B.      The Preferred Stock shall be divided into series. The first series shall consist of eight million (8,000,000) shares and is designated "Series A Preferred Stock."

C.      The powers, preferences, rights, restrictions, and other matters relating to the Preferred Stock shall be as follows:

-1-

700872052v4

1.    Dividends.

(a)    The holders of the Series A Preferred Stock shall be entitled to receive dividends at the rate of $0.08 per share (as adjusted for any stock dividends, combinations or splits with respect to such shares) per annum, payable out of funds legally available therefor.  Such dividends shall be payable only when, as, and if declared by the Board of Directors and shall be noncumulative.

(b)    No dividends (other than those payable solely in the Common Stock of the corporation) shall be paid on any Common Stock of the corporation during any fiscal year of the corporation until dividends in the total amount of $0.08 per share (as adjusted for any stock dividends, combinations or splits with respect to such shares) on the Series A Preferred Stock shall have been paid or declared and set apart during that fiscal year, and no dividends shall be paid on any share of Common Stock unless a dividend (in addition to the amount of any dividends paid pursuant to the above provisions of this Section C.1) is paid with respect to all outstanding shares of Series A Preferred Stock in an amount for each such share of Series A Preferred Stock equal to or greater than the aggregate amount of such dividends for all shares of Common Stock into which each such share of Series A Preferred Stock could then be converted.

(c)    The holders of the outstanding Series A Preferred Stock can waive any dividend preference that such holders shall be entitled to receive under this Section C.1 upon the affirmative vote or written consent of the holders of at least seventy (70%) of the Series A Preferred Stock then outstanding. In the event of a conversion of the Series A Preferred Stock pursuant to Section C.3, any accrued and unpaid dividends on such Series A Preferred Stock shall be paid at the election of the holder in cash or Common Stock at its then fair market value, as determined by the Board of Directors.

(d)    As authorized by Section 402.5(c) of the California Corporations Code, Sections 502 and 503 of the California Corporations Code shall not apply with respect to distributions made by the corporation in connection with the repurchase of shares of Common Stock, including the cancellation of indebtedness on account of the repurchase of such Common Stock, issued to or held by employees, consultants, officers and directors upon termination of their employment or services pursuant to duly authorized agreements providing for the right of said repurchase or cancellation of indebtedness.

2.    Liquidation Preference.

(a)    In the event of any liquidation, dissolution or winding up of the corporation, either voluntary or involuntary (a "Liquidation Event"), the holders of Series A Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of the corporation to the holders of Common Stock or other junior equity security by reason of their ownership thereof, an amount per share equal to the sum of (i) the product obtained by multiplying (A) $1.00 (as adjusted for any stock dividends, combinations, splits or other recapitalizations with respect to such shares occurring after the date of the filing of these Amended and Restated Articles of Incorporation) (the "Original Series A Issue Price") for each outstanding share of Series A Preferred Stock times (B) three (3), and (ii) an amount equal to all declared but unpaid dividends on each such share.  If upon the occurrence of such event, the

-2-

assets and funds thus distributed among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire assets and funds of the corporation legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

(b)      After the payment of the full liquidation preferences of the Series A Preferred Stock, as described in subsection (a) above, the assets and funds of the corporation legally remaining available for distribution, if any, shall be distributed among the holders of the Common Stock.

(c)      For purposes of this Section C.2, (i) any acquisition of the corporation by means of merger or other form of corporate reorganization in which the shareholders of the corporation do not own a majority of the outstanding shares of the surviving corporation or (ii) a sale of all or substantially all of the assets of the corporation shall be treated as a Liquidation Event and shall entitle the holders of Series A Preferred Stock and Common Stock to receive at the closing in cash, securities or other property (valued as provided in Section C.2(d) below) amounts as specified in Sections C.2(a) and C.2(b) above.

(d)      In any of the events specified in Section C.2(c) hereof, if the consideration received by the corporation is other than cash or securities (as set forth in Section C.2(d)(i) hereof), its value will be determined at the fair market value, as determined in good faith by the Board of Directors. Any securities to be delivered to the holders of Series A Preferred Stock and Common Stock pursuant to Section C.2(c) above shall be valued as follows:

(i)      Securities not subject to investment letter or other similar restrictions on free marketability covered by (ii) below:

(A)      If traded on a securities exchange or the Nasdaq Global Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30) day period ending three (3) business days prior to the closing;

(B)      If actively traded over-the-counter but not on the Nasdaq Global Market, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty (30) day period ending three (3) business days prior to the closing; and

(C)      If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board of Directors of the corporation.

(ii)      The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a shareholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in clauses

-3-

(i)(A), (B) or (C) to reflect the approximate fair market value thereof, as determined in good faith by the Board of Directors of the corporation.

      (iii)    In the event the requirements of Section C.2(d) are not complied with, the corporation shall forthwith either:

      (A)    cause such closing to be postponed until such time as the requirements of this Section C.2 have been complied with; or

      (B)    cancel such transaction, in which event the rights, preferences and privileges of the holders of the Series A Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section C.2(d)(iv) hereof.

      (iv)    The corporation shall give each holder of record of Series A Preferred Stock written notice of such impending transaction not later than twenty (20) days prior to the shareholders' meeting called to approve such transaction, or twenty (20) days prior to the closing of such transaction, whichever is earlier, and shall also notify such holders in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this Section C.2, and the corporation shall thereafter give such holders prompt notice of any material changes. The transaction shall in no event take place sooner than twenty (20) days after the corporation has given the first notice provided for herein or sooner than ten (10) days after the corporation has given notice of any material changes provided for herein; provided, however, that such periods may be shortened upon the written consent of the holders of Series A Preferred Stock that are entitled to such notice rights or similar notice rights and that represent at least seventy percent (70%) of the voting power of all then outstanding shares of such Series A Preferred Stock.

      3.    <u>Conversion</u>. The holders of the Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

      (a)    <u>Right To Convert</u>. Subject to subsection (d), each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the corporation or any transfer agent for such stock, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Original Series A Issue Price by the Conversion Price (as defined below) in effect at the time that the certificate is surrendered for conversion for the Series A Preferred Stock. The initial Conversion Price per share for shares of Series A Preferred Stock shall be the Original Series A Issue Price subject to adjustment as set forth in subsection (d).

      (b)    <u>Automatic Conversion</u>.

      (i)    <u>Automatic Conversion</u>. Each share of Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price

then in effect upon the earlier of (i) the date specified by vote or written consent or agreement of holders of a majority of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted to Common Stock basis; provided however, that for so long as any convertible promissory notes issued pursuant to that certain Convertible Loan Agreement dated on or about November ___, 2007 between the corporation and the lenders listed therein remain outstanding (the "Convertible Loan Agreement"), the vote or written consent or agreement of holders of at least seventy percent (70%) of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted to Common Stock basis, shall be required to automatically convert such shares of Preferred Stock into Common Stock; provided, further, that for so long as any convertible promissory notes issued pursuant to that certain Convertible Loan Agreement remain outstanding, the outstanding principal and accrued interest on such convertible promissory notes shall be deemed to have been converted into shares of Series A Preferred Stock at the Original Series A Issue Price for purposes of determining whether holders of a majority of the outstanding shares of Preferred Stock have consented or agreed to such conversion pursuant to this Section C.3(b)(i), or (ii) immediately upon the closing of the sale of the corporation's Common Stock in a firm commitment, underwritten public offering registered under the Securities Act of 1933, as amended (the "Securities Act"), other than a registration relating solely to a transaction under Rule 145 under such Act or to an employee benefit plan of the corporation, at a price per share to the public of at least two (2) times the Original Series A Issue Price where the aggregate proceeds to the corporation and/or any selling shareholders (before deduction for underwriters' discounts and expenses) of which exceed $25,000,000 (the "Qualified IPO").

      (ii)     Special Automatic Conversion Upon Financing.

      (A)     In the event that the corporation consummates a Financing, as to which Financing or portion of such Financing the Board of Directors of the corporation determines that this Section C.3(b)(ii) shall apply, and any holder of shares of Series A Preferred Stock (or its Affiliates, designees or successor funds) does not purchase such holder's Required Amount (as defined below) within twenty (20) days of the initial closing thereof (the "Offering Period"), then, effective immediately following the expiration of the Offering Period, all of such holder's shares of Series A Preferred Stock shall automatically and without further action on the part of such holder be converted into Common Stock at the then-applicable Series A Conversion Price, and any shares of Series A Preferred Stock shall, upon such issuance, automatically and without further action on the part of such holder be converted into Common Stock at the Series A Conversion Price, in effect on the date thereof.

      (B)     Upon conversion pursuant to this Section C.3(b)(ii), the shares of Series A Preferred Stock so converted shall be canceled and not subject to reissuance.

-5-

    (C)    For purposes of this Section C.3(b)(ii), the following definitions shall apply:

    (1)    "Affiliate" shall mean, with respect to any person or entity, a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the first person or entity;

    (2)    "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise;

    (3)    "Financing" shall mean the sale of convertible debt or equity securities approved by the Board of Directors of the corporation or a special committee thereof; provided, however, that for purposes of this Section C.3(b)(ii), Financing shall be deemed not to include issuances by the Company of convertible debt or equity securities subsequent to the filing of these Articles of Incorporation in the aggregate amount of $6,000,000, and shall only be deemed to include sales of convertible debt or equity securities in excess of such amount.

    (4)    "Required Amount" of a holder, aggregated with all Affiliates, shall be equal to the lesser of (A) that aggregate dollar amount determined by multiplying (I) the maximum dollar amount to be invested in the corporation by existing shareholders in a particular closing of an applicable Financing by (II) a fraction, (x) the numerator of which shall equal the aggregate number of shares of Series A Preferred Stock held by such holder, aggregated with all Affiliates, and (y) the denominator of which shall equal the aggregate number of shares of Series A Preferred Stock then-outstanding, in each case as of the date of such Financing, and (B) that aggregate dollar amount determined by multiplying (I) the total amount invested by such holder, aggregated with all Affiliates, in connection with the purchase of Series A Preferred Stock, by (II) fifty percent (50%).

    (D)    For the purposes of determining whether a holder has purchased its Required Amount, (x) the aggregate amount of the purchase price of such equity securities or the face value of all such convertible debt securities purchased in the Financing by such holder and all Affiliates of such holder will be aggregated, and (y) the Required Amount of such holder and all Affiliates of such holder will be aggregated.

    (E)    The holder of any shares of Series A Preferred Stock which are converted into shares of Common Stock pursuant to this Section C.3(b)(ii) shall deliver to the corporation during regular business hours at the office of any transfer agent of the corporation for such Series A

-6-

Preferred Stock, or at such other place as may be designated by the corporation, the certificate or certificates representing the shares so converted, duly endorsed or assigned in blank or to the corporation. As promptly thereafter as is practicable, the corporation shall issue and deliver to such holder, at the place designated by such holder, a certificate or certificates for the number of full shares of Common Stock to which such holder is entitled. The person or entity in whose name the certificate for such shares of Common Stock is to be issued shall be deemed to have become a shareholder on the effective date of the conversion pursuant to this Section C.3(b)(ii), unless the transfer books of the corporation are closed on that date, in which case such person shall be deemed to have become a shareholder of record on the next succeeding date on which the transfer books are open. Notwithstanding the foregoing, the failure of a holder of shares of Series A Preferred Stock which are converted into shares of Common Stock pursuant to this Section C.3(b)(ii), to deliver the certificate or certificates representing the shares so converted shall have no effect on the conversion effected pursuant hereto.

(c)     <u>Mechanics of Conversion</u>.

(i)     Before any holder of Preferred Stock shall be entitled voluntarily to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the office of the corporation or of any transfer agent for such stock, and shall give written notice to the corporation at such office that he elects to convert the same and shall state therein the number of shares to be converted and the name or names in which he wishes the certificate or certificates for shares of Common Stock to be issued. The corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(ii)     If the conversion is in connection with an underwritten offering of securities pursuant to the Securities Act, the conversion may, at the option of any holder tendering shares of Preferred Stock for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the person(s) entitled to receive the Common Stock upon conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such sale of securities.

700872052v4

(d)    <u>Conversion Price Adjustments of Preferred Stock for Certain Diluting Issuances</u>.

    (i)    <u>Special Definitions</u>.  For purposes of this Section 3(d), the following definitions apply:

    (A)    "Options" shall mean rights, options, or warrants to subscribe for, purchase or otherwise acquire either Common Stock or Convertible Securities (defined below).

    (B)    "Original Issue Date" shall mean the date on which a share of Series A Preferred Stock was first issued.

    (C)    "Convertible Securities" shall mean any evidences of indebtedness, shares (other than Common Stock or Series A Preferred Stock) or other securities convertible into or exchangeable for Common Stock.

    (D)    "Additional Shares of Common Stock" shall mean all shares of Common Stock issued (or, pursuant to Section 3(d)(iii), deemed to be issued) by the corporation after the Original Issue Date, other than shares of Common Stock issued or issuable:

    (1)    Upon conversion of shares of Series A Preferred Stock;

    (2)    To employees, consultants, officers or directors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors;

    (3)    In connection with any borrowings, direct or indirect, from financial institutions or other persons by the corporation, whether or not presently authorized, including any type of loan or payment evidenced by any type of debt instrument, provided such borrowings are approved by the Board of Directors;

    (4)    To the corporation's landlords, advisors or vendors or to other persons providing goods and services to the corporation if such issuance is approved by the Board of Directors and provided that such securities are issued for other than primarily equity financing purposes;

    (5)    In connection with obtaining lease financing, whether issued to a lessor, guarantor or other person, approved by the Board of Directors;

    (6)    To entities in connection with joint ventures, development projects, acquisitions of another business entity or business segment of any such entity by the corporation by merger, purchase of assets or other reorganization, or other strategic transactions, in each case approved by the Board of Directors;

(7)    In connection with any stock split, stock dividend or recapitalization of the corporation;

(8)    In a Qualified IPO;

(9)    Pursuant to warrants, notes or other rights to acquire securities of the corporation outstanding as of the Original Issue Date; and

(10)    In any other transaction in which exemption from this Section C.3(d) is approved by the affirmative vote of at least seventy percent (70%) of the then outstanding Preferred Stock voting as a single class on an as converted basis.

(ii)    <u>No Adjustment of Conversion Price</u>.  Any provision herein to the contrary notwithstanding, no adjustment in the Conversion Price shall be made in respect of the issuance of Additional Shares of Common Stock unless the consideration per share (determined pursuant to Section C.3(d)(v) hereof) for an Additional Share of Common Stock issued or deemed to be issued by the corporation is less than the Conversion Price in effect on the date of, and immediately prior to, such issue.

(iii)    <u>Deemed Issue of Additional Shares of Common Stock</u>.  In the event the corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities then entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein designed to protect against dilution) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, provided that in any such case in which Additional Shares of Common Stock are deemed to be issued:

(A)    No further adjustments in the Conversion Price shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities;

(B)    If such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the corporation, or decrease or increase in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall,

-9-

upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities (provided, however, that no such adjustment of the Conversion Price shall affect Common Stock previously issued upon conversion of the Preferred Stock);

(C)     Upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if:

(1)     In the case of Convertible Securities or Options for Common Stock the only Additional Shares of Common Stock issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the consideration actually received by the corporation upon such exercise, or for the issue of all such Convertible Securities, plus the additional consideration, if any, actually received by the corporation upon such conversion or exchange; and

(2)     In the case of Options for Convertible Securities only the Additional Shares of Common Stock, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the corporation for the Additional Shares of Common Stock deemed to have been then issued was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the consideration deemed to have been received by the corporation (determined pursuant to Section 3(d)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised;

(D)     No readjustment pursuant to clause (B) or (C) above shall have the effect of increasing the Conversion Price to an amount which exceeds the lower of (a) the Conversion Price on the original adjustment date, or (b) the Conversion Price that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date.

(E)     In the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Conversion Price shall be made until the expiration or exercise of all

such Options, whereupon such adjustment shall be made in the same manner provided in clause (C) above.

(F)    If any such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price which became effective on such record date shall be canceled as of the close of business on such record date, and shall instead be made on the actual date of issuance, if any.

(iv)    <u>Adjustment of Conversion Price of Preferred Stock Upon Issuance of Additional Shares of Common Stock</u>.  In the event the corporation, at any time after the Original Issue Date shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.3(d)(iii)) without consideration or for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then the Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares of Common Stock which the aggregate consideration received by the corporation for the total number of Additional Shares of Common Stock so issued would purchase at such Conversion Price in effect immediately prior to such issuance, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such Additional Shares of Common Stock so issued.  For the purpose of the above calculation, the number of shares of Common Stock outstanding immediately prior to such issue shall be calculated on a fully diluted basis, as if all shares of Series A Preferred Stock and all Convertible Securities had been fully converted into shares of Common Stock immediately prior to such issuance and any outstanding warrants, options or other rights for the purchase of shares of stock or Convertible Securities (including all Options) had been fully exercised immediately prior to such issuance (and the resulting securities fully converted into shares of Common Stock, if so convertible) as of such date, but not including in such calculation any additional shares of Common Stock issuable with respect to shares of Preferred Stock, Convertible Securities, or outstanding options, warrants or other rights for the purchase of shares of stock or convertible securities, solely as a result of the adjustment of the Conversion Price (or other conversion ratios) resulting from the issuance of Additional Shares of Common Stock causing such adjustment.

(v)    <u>Determination of Consideration</u>.  For purposes of this Section C.3(d), the consideration received by the corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

-11-

(A)    Cash and Property. Such consideration shall:

(1)    Insofar as it consists of cash, be computed at the aggregate amount of cash received by the corporation excluding amounts paid or payable for accrued interest or accrued dividends;

(2)    Insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board of Directors; and

(3)    In the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (1) and (2) above, as determined in good faith by the Board of Directors.

(B)    Options and Convertible Securities. The consideration per share received by the corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section C.3(d)(iii), relating to Options and Convertible Securities shall be determined by dividing:

(1)    The total amount, if any, received or receivable by the corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) payable to the corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by

(2)    The maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against the dilution) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities.

(e)    Adjustments to Conversion Prices for Stock Dividends and for Combinations or Subdivisions of Common Stock. In the event that the corporation at any time or from time to time after the Original Issue Date shall declare or pay, without consideration, any dividend on the Common Stock payable in Common Stock or in any right to acquire Common Stock for no consideration, or shall effect a subdivision of the outstanding shares of Common Stock into a greater number of shares of Common Stock (by stock split, reclassification or otherwise than by payment of a dividend in Common Stock or in any right to acquire Common Stock), or in the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, then the Conversion Price

-12-

in effect immediately prior to such event shall, concurrently with the effectiveness of such event, be proportionally decreased or increased, as appropriate.  In the event that the corporation shall declare or pay, without consideration, any dividend on the Common Stock payable in any right to acquire Common Stock for no consideration, then the corporation shall be deemed to have made a dividend payable in Common Stock in an amount of shares equal to the maximum number of shares issuable upon exercise of such rights to acquire Common Stock.

(f)    Adjustments for Reclassification and Reorganization.  If the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for in Section C.3(e) above or a merger or other reorganization referred to in Section C.2(d) above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionally adjusted so that the Preferred Stock shall be convertible into, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Preferred Stock immediately before that change. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section C.3 with respect to the rights of the holders of the Preferred Stock after the recapitalization to the end that the provisions of this Section C.3 (including adjustment of the Conversion Price then in effect and the number of shares purchasable upon conversion of the Preferred Stock) shall be applicable after that event as nearly equivalent as may be practicable.

(g)    Other Distributions.  In the event the corporation shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by the corporation or other persons, assets (excluding cash dividends) or options or rights not referred to in subsection C.3(d), then, in each such case for the purpose of this subsection C.3(g), the holders of the Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock of the corporation into which their shares of Preferred Stock are convertible as of the record date fixed for the determination of the holders of Common Stock of the corporation entitled to receive such distribution.

(h)    No Impairment.  The corporation will not by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section C.3 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Preferred Stock against impairment.

(i)    Certificates as to Adjustments.  Upon the occurrence of each adjustment or readjustment of any Conversion Price pursuant to this Section C.3, the corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Preferred Stock a certificate executed by the corporation's President or Chief Financial Officer setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The corporation shall, upon

-13-

the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of the Preferred Stock.

(j)    Notices of Record Date. In the event that the corporation shall propose at any time: (i) to declare any dividend or distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus; (ii) to offer for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (iii) to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or (iv) to merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; then, in connection with each such event, the corporation shall send to the holders of Preferred Stock:

(A)    At least twenty (20) days' prior written notice of the date on which a record shall be taken for such dividend, distribution or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (iii) and (iv) above; and

(B)    In the case of the matters referred to in (iii) and (iv) above, at least twenty (20) days' prior written notice of the date when the same shall take place (and specifying the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event).

(k)    Issue Taxes. The corporation shall pay any and all issue and other taxes that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of Preferred Stock pursuant hereto; provided, however, that the corporation shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(l)    Reservation of Stock Issuable Upon Conversion. The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Articles of Incorporation.

-14-

(m)     Fractional Shares. No fractional share shall be issued upon the conversion of any share or shares of Preferred Stock. All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Preferred Stock by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after the aforementioned aggregation, the conversion would result in the issuance of a fraction of a share of Common Stock, the corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board of Directors).

(n)     Notices. Any notice required by this Section C.3 to be given to the holders of shares of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address on the books of the corporation.

4.     Voting Rights.

(a)     Voting Other than for Directors. Except as required by law and in Section C.4(b) below, the holder of each share of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Preferred Stock could be converted on the record date for the vote or consent of shareholders and, except as otherwise required by law, shall have voting rights and powers equal to the voting rights and powers of the Common Stock. The holder of each share of Preferred Stock shall be entitled to notice of any shareholders' meeting in accordance with the Bylaws of the corporation and shall vote with holders of the Common Stock upon the election of directors and upon any other matter submitted to a vote of shareholders, except as to those matters required by law or these Amended and Restated Articles of Incorporation to be submitted to a class vote. Fractional votes by the holders of Preferred Stock shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

(b)     Voting for Directors.

(i)     With respect to the election of members of the Board of Directors, (i) three (3) members of the Board of Directors shall be elected by the holders of the Series A Preferred Stock, voting as a separate class (the "Series A Directors"), and (ii) one (1) member of the Board of Directors shall be elected by the holders of the Common Stock, voting as a separate class (the "Common Director"). All remaining member(s) of the Board of Directors shall be elected by holders of a majority of the Series A Preferred Stock and the Common Stock, voting together as a single class (the "Joint Director(s)").

(ii)     Subject to Sections 302, 303(a)(1) and 304 of the California Corporations Code, the Series A Directors may be removed from the Board of Directors, either with or without cause, by the affirmative vote of the holders of a majority of the outstanding Series A Preferred Stock, the Common Directors may be removed from the Board of Directors, either with or without cause, by the

-15-

affirmative vote of the holders of a majority of the outstanding Common Stock, and the Joint Director(s) may be removed from the Board of Directors, either with or without cause, by the affirmative vote of the holders of a majority of the Series A Preferred Stock and the Common Stock, voting together as a single class.

(iii)    Upon the occurrence of a vacancy on the Board of Directors, such vacancy shall be filled by the affirmative vote of the holders of a majority of the shares of that class or series as provided in Section C.4(b)(i) hereof.

5.    <u>Restrictions and Limitations</u>.

(a)    The corporation shall not, directly or indirectly, including without limitation by merger, consolidation, recapitalization, reclassification or otherwise, without the vote or written consent by the holders of a majority of the then outstanding shares of the Preferred Stock, voting as a single class on an as converted basis:

(i)    Except as set forth in Section C.6 hereof, redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose) any share or shares of Preferred Stock otherwise than by conversion in accordance with Section C.3 hereof;

(ii)    Redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any of the Common Stock; provided, however, that this restriction shall not apply to the repurchase of shares of Common Stock from employees, officers, directors, consultants or other persons performing services for the corporation or any subsidiary pursuant to agreements approved by the Board of Directors under which the corporation has the option to repurchase such shares at cost or at cost plus interest upon the occurrence of certain events, such as the termination of employment;

(iii)    Effect, or enter into any agreement to effect or that would result in, (a) any sale, lease, assignment, transfer or other conveyance of all or substantially all of the assets of the corporation, or (b) any consolidation or merger involving the corporation, or any reclassification or other change of any stock, or any recapitalization of the corporation;

(iv)    Authorize, designate or issue, or enter into any agreement to authorize, designate or issue, whether by merger, reclassification or otherwise, any other equity security (including any security convertible into or exercisable for any equity security) senior to the Preferred Stock as to dividend rights, redemption rights, voting rights or liquidation preferences; or

(v)    Increase or decrease the aggregate number of authorized shares of Common Stock or Preferred Stock, or (whether by merger, reclassification or otherwise) alter or change the powers, preferences or special rights of the shares of Preferred Stock;

-16-

(vi)     Increase or decrease the authorized number of members of the corporation's Board of Directors; or

(vii)     Either (i) voluntarily file for bankruptcy or (ii) take any action or permit any action to be taken which would result in any liquidation, dissolution or winding up of the corporation.

(b)     The corporation shall not, directly or indirectly, including without limitation by merger, consolidation, recapitalization, reclassification or otherwise, without the vote or written consent by the holders of at least seventy percent (70%) of the then outstanding shares of the Preferred Stock, voting as a single class on an as converted basis:

(i)     Amend, waive, alter or repeal the preferences, rights, privileges or powers of the Series A Preferred Stock; provided however that this provision shall not apply to the reincorporation of the corporation, so long as such migratory merger does not alter, amend, modify, or rescind any of the rights or terms of the Preferred Stock other than as a result of distinctions between the laws of California and those of the jurisdiction into which the corporation was reincorporated;

(ii)     create, or authorize the creation of, or issue, or authorize the issuance of any debt security or other indebtedness, or permit any subsidiary to take any such action with respect to any debt security or other indebtedness, that is senior to the loans made to the corporation under the Convertible Loan Agreement;

(iii)     Declare, pay or set aside any cash dividend or cash distribution on the capital stock of the corporation or take any action that would result in the foregoing;

(iv)     Redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose) any share or shares of capital stock of the corporation in any transaction (otherwise than by conversion in accordance with Section C.3 hereof) where the holders of such shares of capital stock are not offered the ability to participate in such redemption or purchase, pro-rata, based upon such holder's ownership of the capital stock to be so redeemed or purchased (including for the avoidance of doubt the redemption contemplated in Section C.6 hereof); or

(v)     Change the percentage of the affirmative vote of the Preferred Stock necessary to effect any of the changes enumerated in the foregoing clauses (i) and (ii);

6.     <u>Redemption Request.</u>

(a)     At or at any time after November 30, 2014, upon receipt of a written request for redemption hereunder by the corporation from the holders of a majority of the outstanding shares of the Series A Preferred Stock the corporation shall, at any time it may lawfully do so, redeem on

-17-

a pari passu basis the Series A Preferred Stock by paying in cash therefor a sum equal to (i) the "Original Series A Issue Price" for each such share of Series A Preferred Stock plus all declared but unpaid dividends (in each case as adjusted for any stock dividends, combinations, splits or other recapitalizations with respect to such shares occurring after the date hereof), on each such share of Series A Preferred Stock (such amount being hereafter referred to as the "Redemption Price"). Subject to such extensions of time as required to comply with this Section C.6, such redemption shall be made in three (3) equal annual installments beginning with the first such installment occurring at least thirty (30) days after the receipt by the corporation of such request and not more than one hundred twenty (120) days after such request (each, a "Redemption Date"). The maximum number of shares of Series A Preferred Stock that the corporation shall be required to redeem on any one Redemption Date shall be equal to the amount determined by dividing (i) the aggregate number of shares of Series A Preferred Stock outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). Any redemption of Series A Preferred Stock effected pursuant to this Section 6 shall be made on a pro rata basis among the holders of Series A Preferred Stock in proportion to the aggregate Redemption Price of each such holder of Series A Preferred Stock would otherwise be entitled to receive on the applicable Redemption Date.

(b)    If the funds of the corporation legally available for redemption of the shares of Series A Preferred Stock on any Redemption Date are insufficient to permit payment of the full Redemption Price for each share of Series A Preferred Stock to be redeemed on such Redemption Date, the corporation shall use those funds that are legally available to redeem the maximum possible number of such shares (at the applicable Redemption Price) ratably from among the holders of such shares to be redeemed (based upon the Redemption Price each holder is entitled to receive under Section C.6(a) divided by the total aggregate Redemption Price due to all of the holders under Section C.6(a)). The shares of Series A Preferred Stock not redeemed shall remain outstanding and be entitled to all the rights and preferences provided herein. At any time thereafter, when additional funds of the corporation are legally available for the redemption of shares of Series A Preferred Stock, such funds will immediately be used to redeem the balance of, or if not sufficient to redeem the full balance, redeem at the applicable Redemption Price of such Series A Preferred Stock ratably from among the holders of such shares to be redeemed (based upon the Redemption Price each holder is entitled to receive under Section C.6(a) divided by the total aggregate Redemption Price due to all of the holders under Section C.6(a)), the shares that the corporation has become obligated to redeem on the relevant Redemption Date but which it has not redeemed.

(c)    Redemption Notice. At least fifteen (15) but no more than thirty (30) days prior to any Redemption Date, the corporation shall mail written notice, postage prepaid, to each holder of record (at the close of business on the business day next preceding the day on which notice is given) of the Series A Preferred Stock to be redeemed, at the address last shown on the records of the corporation for such holder or given by the holder to the corporation for the purpose of notice or, if no such address appears or is given, at the place where the principal executive office of the corporation is located (the "Redemption Notice"). The Redemption Notice shall notify such holder of the redemption to be effected, specify the subsection hereof under which such redemption is being effected, the Redemption Date, the applicable Redemption Price, the place at which payment may be obtained and the date on which such holder's conversion rights (as set forth in Section C.3) as to such shares terminate (which date shall in no event be earlier than

-18-

fourteen (14) days' prior to the Redemption Date) and call upon such holder to surrender to the corporation, in the manner and at the place designated, the certificate or certificates representing the shares to be redeemed.

(d)    Surrender of Certificates.  On or before each designated Redemption Date, each holder of Series A Preferred Stock to be redeemed shall (unless such holder has previously exercised his right to convert such shares of Series A Preferred Stock into Common Stock as provided in Section C.3 below), surrender the certificate(s) representing such shares of Series A Preferred Stock to be redeemed to the corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the redemption price for such shares shall be payable to the order of the person whose name appears on such certificate(s) as the owner thereof, and each surrendered certificate shall be canceled and retired.  If less than all of the shares represented by such certificate are redeemed, then the corporation shall promptly issue a new certificate representing the unredeemed shares.

(e)    Effect of Redemption.  If the Redemption Notice shall have been duly given, and if on a Redemption Date, the Redemption Price to be paid on such Redemption Date is either paid or made available for payment through the deposit arrangements specified in subsection (f) below, then notwithstanding that the certificates evidencing any of the shares of Series A Preferred Stock so called for redemption shall not have been surrendered, all dividends with respect to such shares shall cease to accrue after such Redemption Date, such shares shall not thereafter be transferred on the corporation's books and the rights of all of the holders of such shares with respect to such shares shall terminate after such Redemption Date, except only the right of the holders to receive the Redemption Price without interest upon surrender of their certificate(s) therefor.

(f)    Deposit of Redemption Price.  On or prior to the Redemption Date, the corporation shall deposit with a bank or trust company having a capital and surplus of at least $100,000,000, as a trust fund for the benefit of the respective holders of the shares designated for redemption and not yet redeemed, a sum equal to the aggregate Redemption Price (or any such portion thereof that the corporation is legally able to pay) for all shares of Series A Preferred Stock (or an appropriate portion thereof if the aggregate Redemption Price is not legally available at such time) called for redemption and not yet redeemed, with irrevocable instructions and authority to the bank or trust company to pay, on or after the applicable Redemption Date, the Redemption Price (or appropriate portion thereof) to the respective holders upon the surrender of their share certificates.  From and after the date of such deposit, the shares so called for redemption shall be redeemed.  The deposit shall constitute full payment of the shares so redeemed to their holders, and from and after the date of the deposit, the shares shall be deemed to be no longer outstanding, all dividends with respect to such shares so redeemed shall cease to accrue and the holders thereof shall cease to be shareholders with respect to such shares so redeemed and shall have no rights with respect thereto except the right to receive from the bank or trust company payment of the redemption price of the shares so redeemed, without interest, upon surrender of their certificates therefor, and the right to convert such shares so redeemed as provided in Section C.3 below (in which case, upon conversion of the shares of Series A Preferred Stock before redemption, such shares shall not be redeemed).  Any funds so deposited and unclaimed at the end of six (6) months from the applicable Redemption Date shall be released or repaid to the corporation, after which time the holders of shares called for redemption who

-19-

have not claimed such funds shall be entitled to receive payment of the Redemption Price only from the corporation.

7.    <u>No Reissuance of Preferred Stock</u>.  No share or shares of Preferred Stock acquired by the corporation by reason of redemption, purchase, conversion or otherwise shall be reissued, and all such shares shall be canceled, retired and eliminated from the shares which the corporation shall be authorized to issue.

## ARTICLE IV

A.    The liability of directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.  Unless applicable law otherwise provides, any amendment, repeal or modification of this Article IV A shall not adversely affect any right or protection of a director under this Article IV A that existed at or prior to the time of such amendment, repeal or modification.

B.    The corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, to the fullest extent permissible under California law.  Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article IV B shall not adversely affect any contract or other right to indemnification of any agent of the corporation that existed at or prior to the time of such amendment, repeal or modification.

C.    Any amendment, repeal or modification of any provision of the Article IV shall not adversely affect any right or protection of an agent of this corporation existing at the time of such amendment, repeal or modification.

3.    The corporation filed a petition for voluntary bankruptcy under Chapter 11 of the U.S. Bankruptcy Code on August 29, 2007.  Under the Confirmation Order entered January 30, 2008, in respect of its plan of reorganization, the corporation is required (i) to amend its Articles of Incorporation to contain a provision prohibiting the issuance of nonvoting equity securities as required by Section 1123(a)(6) of the Bankruptcy Code and (ii) to amend its Articles of Incorporation in other respects to give effect to its plan of reorganization.  This certificate is made pursuant to the Confirmation Order by the undersigned who has full power and authority to take such action pursuant to the Confirmation Order.

Each of the undersigned further declares under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of her or his own knowledge.

Dated:  February 11, 2008

M. Sue Preston, President

Philip J. Barr, Secretary

-20-

700872052v4

**EXHIBIT G**

*Execution Copy*

# ARRIVA PHARMACEUTICALS, INC.

## INVESTORS' RIGHTS AGREEMENT

THIS INVESTORS' RIGHTS AGREEMENT (this "Agreement") is made and entered into as of the 13th day of February, 2008, by and among Arriva Pharmaceuticals, Inc., a California corporation (the "Company"), each of the persons listed on Schedule A (each, a "*Preferred Investor*" and collectively, the "*Preferred Investors*").

## SECTION 1

### Restrictions On Transferability Of Securities; Registration Rights

1.1 <u>Certain Definitions</u>. As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "*Closing*" shall mean the date of the initial sale of shares of the Company's Series A Preferred Stock.

(b) "*Commission*" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(c) "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(d) "*Holder*" shall mean any person who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with Section 1.11 hereof.

(e) "*Initiating Holders*" shall mean any Holder or Holders who in the aggregate hold not less than twenty percent (20%) of the outstanding Registrable Securities that are issued or issuable upon conversion of the Company's Series A Preferred Stock.

(f) "*Investor*" shall mean the Preferred Investors.

(g) "*Other Shareholders*" shall mean persons other than Holders who, by virtue of agreements with the Company, are entitled to include their securities in certain registrations hereunder.

(h) "*Registrable Securities*" shall mean (i) shares of Common Stock issued or issuable pursuant to the conversion of the Shares; and (ii) any Common Stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in (i) above, provided, however, that Registrable Securities shall not include any shares of Common Stock which have previously been registered or which have been sold to the public.

(i) The terms "*register*," "*registered*" and "*registration*" shall refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act

and applicable rules and regulations thereunder, and the declaration or ordering of the effective-ness of such registration statement.

(j) *"Registration Expenses"* shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, and fees and disbursements of counsel for the Holders not to exceed $25,000 in each instance (but excluding the compensation of regular employees of the Company, which shall be paid in any event by the Company) but shall not include Selling Expenses.

(k) *"Rule 144"* shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(l) *"Rule 145"* shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(m) *"Securities Act"* shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(n) *"Selling Expenses"* shall mean all underwriting discounts and selling commissions applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of counsel included in Registration Expenses).

(o) *"Series A Agreement"* shall mean the Series A Preferred Stock Purchase Agreement between the Company and each of the Preferred Investors.

(p) *"Shares"* shall mean the Company's Series A Preferred Stock.

1.2 <u>Requested Registration</u>.

(a) <u>Request for Registration</u>. If the Company shall receive from Initiating Holders at any time or times not earlier than the earlier of (i) February 13, 2011 or (ii) six (6) months after the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public, a written request that the Company effect any registration with respect to all or a part of the Registrable Securities the aggregate proceeds of which (after deduction for underwriter's discounts and expenses related to the issuance) exceed $10,000,000 the Company will:

(i) within ten (10) days of receipt thereof, give written notice of the proposed registration to all other Holders; and

(ii) as soon as practicable, and in any event within sixty (60) days of receipt of such request, use its best efforts to effect such registration (including,

-2-

without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within twenty (20) days after such written notice from the Company is mailed or delivered.

The Company shall not be obligated to effect, or to take any action to effect, any such registration pursuant to this Section 1.2:

(A) In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(B) After the Company has initiated two (2) such registrations pursuant to this Section 1.2(a) (counting for these purposes only registrations which have been declared or ordered effective and pursuant to which securities have been sold and registrations which have been withdrawn by the Holders as to which the Holders have not elected to bear the Registration Expenses pursuant to Section 1.4 hereof and would, absent such election, have been required to bear such expenses);

(C) During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Company-initiated registration; provided that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; or

(D) If the Initiating Holders propose to dispose of shares of Registrable Securities which may be immediately registered on Form S-3 pursuant to a request made under Section 1.5 hereof.

(b) Registration Statement.    Subject to the foregoing clauses (A) through (D), the Company shall file a registration statement covering the Registrable Securities so requested to be registered as soon as practicable, and in any event within sixty (60) days after receipt of the request or requests of the Initiating Holders; provided, however, that if (i) in the good faith judgment of the Board of Directors of the Company, such registration would be seriously detrimental to the Company and the Board of Directors of the Company concludes, as a result, that it is essential to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, essential to defer the filing of such registration statement, then the

-3-

Company shall have the right to defer such filing for the period during which such disclosure would be seriously detrimental, provided that (except as provided in clause (C) above) the Company may not defer the filing for a period of more than one hundred twenty (120) days after receipt of the request of the Initiating Holders, and, provided further, that the Company shall not defer its obligation in this manner more than once in any twelve (12) month period.

The registration statement filed pursuant to the request of the Initiating Holders may, subject to the provisions of Section 1.2(d) hereof, include other securities of the Company, with respect to which registration rights have been granted, and may include securities of the Company being sold for the account of the Company.

(c) Underwriting. The right of any Holder to registration pursuant to Section 1.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder with respect to such participation and inclusion) to the extent provided herein. A Holder may elect to include in such underwriting all or a part of the Registrable Securities he holds.

(d) Procedures. If the Company shall request inclusion in any registration pursuant to Section 1.2 of securities being sold for its own account, or if other persons shall request inclusion in any registration pursuant to Section 1.2, the Initiating Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and may condition such offer on their acceptance of the further applicable provisions of this Section 1 (including Section 1.12). The Company shall (together with all Holders and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by a majority in interest of the Initiating Holders, which underwriters are reasonably acceptable to the Company. Notwithstanding any other provision of this Section 1.2, if the representative of the underwriters advises the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, then the Initiating Holders shall so advise all holders of Registrable Securities that would otherwise be underwritten, and the number of shares to be included in the underwriting or registration shall be allocated among all Holders thereof, including Initiating Holders, in proportion (as nearly as practicable) to the amount of Registrable Securities of the Company requested for inclusion by such Holder; provided, however, that any such limitation or cut back shall first be applied to all shares proposed to be sold in such underwriting that are not Registrable Securities. If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded there-from by written notice from the Company, the underwriter or the Initiating Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 1.2(d), then the Company shall offer to all Holders who have retained rights to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders requesting additional inclusion in accordance with Section 1.13.

-4-

1.3  Company Registration.

(a)  If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders exercising their respective demand registration rights (other than pursuant to Section 1.2 or 1.5 hereof), other than a registration relating solely to employee benefit plans, or a registration relating solely to a Rule 145 transaction, the Company will:

(i)  promptly give to each Holder written notice thereof; and

(ii)  use its best efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 1.3(b) below, and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made by any Holder and received by the Company within twenty (20) days after the written notice from the Company described in clause (i) above is mailed or delivered by the Company.  Such written request may specify all or a part of a Holder's Registrable Securities.

(b)  Underwriting.  If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 1.3(a).  In such event, the right of any Holder to registration pursuant to this Section 1.3 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders of securities of the Company with registration rights to participate therein distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this Section 1.3, if the representative of the underwriters advises the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the representative may (subject to the limitations set forth below) exclude all Registrable Securities from; or limit the number of Registrable Securities to be included in, the registration and underwriting.  If the registration is the first Company-initiated registered offering of the Company's securities to the general public, the Company may limit, to the extent so advised by the underwriters, the amount of securities (including Registrable Securities) to be included in the registration by the Company's shareholders (including the Holders), or may exclude, to the extent so advised by the underwriters, such underwritten securities entirely from such registration (provided that in such event no other holder of registration rights is entitled to registration of securities in such offering in preference to the Holders).  If such registration is the second or any subsequent Company-initiated registered offering of the Company's securities to the general public, the Company may limit, to the extent so advised by the underwriters, the amount of securities to be included in the registration by the Company's Shareholders (including the Holders); provided, however, that the aggregate value of the Registrable Securities to be included in such registration by the Company's Shareholders (including the Holders) may not be so reduced to less than thirty percent (30%) of the total value

of all securities included in such registration. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated first to the Company for securities being sold for its own account and thereafter as set forth in Section 1.13. If any person does not agree to the terms of any such underwriting, he shall be excluded therefrom by written notice from the Company or the underwriter. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

If shares are so withdrawn from the registration and if the number of shares of Registrable Securities to be included in such registration was previously reduced as a result of marketing factors, the Company shall then offer to all persons who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among the persons requesting additional inclusion in accordance with Section 1.13 hereof.

1.4 <u>Expenses of Registration</u>. All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Sections 1.2, 1.3 and 1.5 hereof shall be borne by the Company; provided, however, that if the Holders bear the Registration Expenses for any registration proceeding begun pursuant to Section 1.2 and subsequently withdrawn by the Holders registering shares therein, such registration proceeding shall not be counted as a requested registration pursuant to Section 1.2 hereof, except in the event that such withdrawal is based upon material adverse information relating to the Company that is different from the information known or available (upon request from the Company or otherwise) to the Holders requesting registration at the time of their request for registration under Section 1.2, in which event such registration shall not be treated as a counted registration for purposes of Section 1.2 hereof, even though the Holders do not bear the Registration Expenses for such registration. All Selling Expenses relating to securities so registered shall be borne by the holders of such securities pro rata on the basis of the number of shares of securities so registered on their behalf.

1.5 <u>Registration on Form S-3</u>.

(a) After its initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 or any comparable or successor form or forms. After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this Section 1, the Holders of Registrable Securities shall have the right to request registrations on Form S-3 (such requests shall be in writing and shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Holder or Holders); provided, however, that the Company shall not be obligated to effect any such registration if (i) the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) on Form S-3 at an aggregate price to the public of less than $1,000,000, (ii) in the event that the Company shall furnish the certification described in paragraph 1.2(b)(ii) (but subject to the limitations set forth therein) or (iii) in a given twelve (12) month period, after the Company has effected one (1) such registration in any such period or (v) it is to be effected more than five (5) years after the Company's initial public offering.

-6-

(b) If a request complying with the requirements of Section 1.5(a) hereof is delivered to the Company, the provisions of Sections 1.2(a)(i) and (ii) and Section 1.2(b) hereof shall apply to such registration. If the registration is for an underwritten offering, the provisions of Sections 1.2(c) and 1.2(d) hereof shall apply to such registration.

1.6 <u>Registration Procedures</u>. In the case of each registration effected by the Company pursuant to Section 1, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, the Company will use its best efforts to:

(a) Keep such registration effective for a period of one hundred twenty (120) days or until the Holder or Holders have completed the distribution described in the registration statement relating thereto, whichever first occurs; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock (or other securities) of the Company; and (ii) in the case of any registration of Registrable Securities on Form S-3 which are intended to be offered on a continuous or delayed basis, such one hundred twenty (120) day period shall be extended, if necessary, to keep the registration statement effective until all such Registrable Securities are sold, provided that Rule 415, or any successor rule under the Securities Act, permits an offering on a continuous or delayed basis, and provided further that applicable rules under the Securities Act governing the obligation to file a post-effective amendment permit, in lieu of filing a post-effective amendment that (A) includes any prospectus required by Section 10(a)(3) of the Securities Act or (B) reflects facts or events representing a material or fundamental change in the information set forth in the registration statement, the incorporation by reference of information required to be included in (A) and (B) above to be contained in periodic reports filed pursuant to Section 13 or 15(d) of the Exchange Act in the registration statement;

(b) Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(c) Furnish such number of prospectuses and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d) Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing, and at the request of any such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material

-7-

fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing;

(e) Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed;

(f) Provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(g) In connection with any underwritten offering pursuant to a registration statement filed pursuant to Section 1.2 hereof, the Company will enter into an underwriting agreement reasonably necessary to effect the offer and sale of Common Stock, provided such underwriting agreement contains customary underwriting provisions and provided further that if the underwriter so requests the underwriting agreement will contain customary contribution provisions.

(h) Furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to this Section 1, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Section 1, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities.

(i) Register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

1.7 <u>Indemnification</u>.

(a) The Company will indemnify each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this Section 1, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, or other document (including any

-8-

related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of the Securities Act or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, qualification, or compliance, and will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action, provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or expense arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder or underwriter and stated to be specifically for use therein.  It is agreed that the indemnity agreement contained in this Section 1.7(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent has not been unreasonably withheld).

(b) Each Holder will, if Registrable Securities held by him are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder and Other Shareholder, and each of their officers, directors, and partners, and each person controlling such Holder or Other Shareholder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular, or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, Other Shareholders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld).  In no event shall any indemnity under this subSection 1.7(b) exceed the gross proceeds from the offering received by such Holder.

(c) Each party entitled to indemnification under this Section 1.7 (the *"Indemnified Party"*) shall give notice to the party required to provide indemnification (the *"Indemnifying Party"*) promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such

claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense, and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 1, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d) If the indemnification provided for in this Section 1.7 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations; provided, however, that in no event shall any contribution by a Holder under this subSection 1.7(d) exceed the gross proceeds from the offering received by such Holder. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e) Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f) The obligations of the Company and Holders under this Section 1.7 shall survive the completion of any offering of Registrable Securities in a registration statement under this Section 1, and otherwise.

1.8 Information by Holder. Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this Section 1.

1.9 Limitations on Registration of Issues of Securities. From and after the date of this Agreement, the Company shall not, without the prior written consent of holders of a majority in interest of the Shares, enter into any agreement with any holder or prospective holder of any

securities of the Company giving such holder or prospective holder any registration rights the terms of which are more favorable than the registration rights granted to the Holders hereunder.

1.10 <u>Rule 144 Reporting</u>. With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to use its best efforts to:

(a) Make and keep public information regarding the Company available as those terms are understood and defined in Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b) File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements;

(c) So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

1.11 <u>Transfer or Assignment of Registration Rights</u>. The rights to cause the Company to register securities granted to a Holder by the Company under this Section 1 may be transferred or assigned by a Holder only to (a) a transferee or assignee of not less than 500,000 shares of Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like); (b) partners, retired partners or affiliates of such Holder; or (c) members of such Holder's immediate family or a trust for the benefit of such Holder, provided that the Company is given written notice at the time of or within a reasonable time after such transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are being transferred or assigned, and, provided further, that the transferee or assignee of such rights assumes the obligations of such Holder under this Section 1.

1.12 <u>"Market Stand-Off" Agreement</u>. If requested by the Company and an underwriter of Common Stock (or other securities) of the Company, a Holder shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) for a specified period not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act, provided that such agreement shall only apply to the first such registration statement of the Company, including securities to be sold on its behalf to the public in an underwritten offering. The foregoing provisions of this Section 1.12 shall not apply to the sale of any shares to an

-11-

underwriter pursuant to an underwriting agreement and shall only be applicable to the Holders if all officers and directors and greater than five percent (5%) shareholders of the Company enter into similar agreements. The underwriters in connection with the Company's initial public offering are intended third party beneficiaries of this Section 1.12 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

The obligations described in this Section 1.12 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares (or securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period.

1.13 _Allocation of Registration Opportunities_. In any circumstance in which all of the Registrable Securities and other shares of Common Stock of the Company (including shares of Common Stock issued or issuable upon conversion of shares of any currently unissued series of Preferred Stock of the Company) with registration rights (the _**"Other Shares"**_) requested to be included in a registration on behalf of the Holders or other selling Shareholders cannot be so included as a result of limitations of the aggregate number of shares of Registrable Securities and Other Shares that may be so included, the number of shares of Other Shares shall be excluded, pro rata, until the aggregate number of shares of Registrable Securities and Other Shares may be included in such registration. If, after the complete exclusion of Other Shares from such registration, the aggregate number of shares of Registrable Securities cannot be so included as a result of such limitations, the shares of Registrable Securities shall be excluded, pro rata, until the aggregate number of shares of Registrable Securities may be included in such registration. In no event shall shares of Registrable Securities held by the Preferred Investors be excluded from such registration unless all Other Shares have been completely excluded from such registration.

1.14 _Delay of Registration_. No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 1.

1.15 _Termination of Registration Rights_. The right of any Holder to request registration or inclusion in any registration pursuant to Section 1.2, 1.3 or 1.5 shall terminate upon the earlier of (i) at such time when all shares of Registrable Securities held or entitled to be held upon conversion by such Holder may immediately be sold under Rule 144 during any ninety (90) day period; provided, however, that the provisions of this Section 1.15 shall not apply to any Holder who owns more than two percent (2%) of the Company's outstanding stock until the earlier of (x) such time as such Holder owns less than two percent (2%) of the outstanding stock of the Company, or (y) the expiration of five (5) years after the closing of the first registered public offering of Common Stock of the Company or (ii) the expiration of five (5) years after the closing of the first registered public offering of Common Stock of the Company.

SECTION 2

Covenants of the Company

-12-

The Company hereby covenants and agrees, so long as a Holder owns any Registrable Securities, as follows:

2.1  Basic Financial Information.  Unless otherwise determined by the Company's Board of Directors, beginning with the Company's fiscal year ended December 31, 2008, the Company will furnish to each Holder as soon as practicable after the end of each fiscal year of the Company, and in any event within one hundred twenty (120) days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as at the end of such fiscal year, and consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such year, prepared in accordance with generally accepted accounting principles consistently applied and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and certified by independent public accountants of recognized standing selected by the Company.

2.2  Additional Information and Rights.

(a)  The Company will furnish to a Preferred Investor, so long as such Preferred Investor holds at least 1,000,000 Shares (including Common Stock issued upon conversion of such Shares, or any combination thereof (as presently constituted and subject to subsequent adjustment for stock splits, stock dividends, reverse stock splits, recapitalizations and the like) and including any Shares issueable upon conversion of the outstanding principal and accrued interest on the convertible promissory notes (the "*Convertible Notes*") issued pursuant to that certain Convertible Loan Agreement dated on or about November 30, 2007, assuming for this purpose a conversion price equal to the Original Series A Issue Price (as such term is defined in the Company's Amended and Restated Articles of Incorporation) (a *"Major Holder"*) as soon as practicable after the end of the first, second, and third quarterly accounting periods in each fiscal year of the Company, and in any event within thirty (30) days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of each such quarterly period, and consolidated statements of income and cash flows of the Company and its subsidiaries for such period and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied and setting forth in comparative form the figures for the corresponding periods of the previous fiscal year, subject to changes resulting from normal year-end audit adjustments, all in reasonable detail, except that such financial statements need not contain the notes required by generally accepted accounting principles; and

(b)  The Company will permit a Preferred Investor, so long as such remains a Major Holder, to visit and inspect the properties of the Company, to examine its books of account and records and to discuss its affairs, finances and accounts with the Company's officers and its independent public accountants, all at such reasonable times as may reasonably be requested; provided, however, that the Company shall not be obligated pursuant to this Section 2.2 to provide access to any information that it reasonably considers to be a trade secret or similar confidential information, unless such Major Holder enters into a confidentiality agreement in form and substance satisfactory to the Company.

2.3  Right of First Refusal.  The Company hereby grants to each Major Holder the right of first refusal to purchase a pro rata share of New Securities (as defined in this Section 2.3) which the Company may, from time to time, propose to sell and issue.  A Holder's pro rata share,

-13-

for purposes of this right of first refusal, is the ratio of the number of shares of Common Stock owned by such Holder immediately prior to the issuance of New Securities, assuming full conversion of the Shares (and the Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price) and exercise of options or warrants held by such Holder, to the total number of shares of Common Stock outstanding immediately prior to the issuance of New Securities, assuming full conversion of the Shares (and the Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price) and exercise of all outstanding rights, options and warrants to acquire Common Stock of the Company. This right of first refusal shall be subject to the following provisions:

(a) *"New Securities"* shall mean (A) any capital stock (including Common Stock and/or Preferred Stock) of the Company whether now authorized or not, (B) rights, options or warrants to purchase such capital stock and securities of any type whatsoever that are, or may become, convertible into capital stock, and (C) debt securities issued by the Company; provided that the term *"New Securities"* does not include (i) securities purchased under the Series A Agreement; (ii) securities issued upon conversion of the Series A Preferred Stock or the Shares; (iii) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all the assets or other reorganization approved by the Board of Directors whereby the Company will own more than fifty percent (50%) of the voting power of such business entity or business segment of any such entity; (iv) any borrowings, direct or indirect, from financial institutions or other persons by the Company approved by the Board of Directors, whether or not presently authorized, including any type of loan or payment evidenced by any type of debt instrument, provided such borrowings are not convertible into capital stock of the Company; (v) securities issued to employees, consultants, officers or directors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors; (vi) securities issued to the Company's landlords, advisors or vendors or to other persons providing goods and services to the Company if such issuance is approved by the Board of Directors and provided that such securities are issued for other than primarily equity financing purposes; (vii) securities issued in connection with obtaining lease financing, whether issued to a lessor, guarantor or other person approved by the Board of Directors; (viii) securities issued in a Qualified IPO (as defined in the Company's Amended and Restated Articles of Incorporation) pursuant to a registration under the Securities Act with an aggregate offering price to the public of at least $10,000,000; (ix) securities issued in connection with any stock split, stock dividend or recapitalization of the Company; (x) securities issued to entities in connection with joint ventures, development projects, acquisitions of another business entity or business segment of any such entity by the Company by merger, purchase of assets or other reorganization, or other strategic transactions, in each case approved by the Board of Directors; (ix) securities issued pursuant to the exercise or conversion of warrants, notes or other rights to acquire securities of the Company outstanding as of the date hereof and (xii) any right, option or warrant to acquire any security convertible into the securities excluded from the definition of New Securities pursuant to subsections (i) through (xi) above.

(b) In the event the Company proposes to undertake an issuance of New Securities, it shall give each Holder written notice of its intention, describing the type of New Securities, and

-14-

their price and the general terms upon which the Company proposes to issue the same. Each Holder shall have fifteen (15) days after any such notice is mailed or delivered to agree to purchase such Holder's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased. The Company shall promptly, in writing, inform each Holder that elects to purchase all the shares available to it (a *"Fully-Exercising Investor"*) of any other Holder's failure to do likewise. During the ten (10) day period commencing after such information is given, each Fully-Exercising Investor may elect to purchase that portion of the Shares for which Holders were entitled to subscribe but which were not subscribed for by the Holders that is equal to the proportion that the number of shares of Common Stock issued and held, or issuable upon conversion of Series A Preferred Stock then held, by such Fully-Exercising Investor bears to the total number of shares of Common Stock issued and held, or issuable upon conversion of the Series A Preferred Stock then held, by all Fully-Exercising Investors who wish to purchase some of the unsubscribed shares.

(c) In the event the Holders fail to exercise fully the right of first refusal within such fifteen (15) day period, the Company shall have one hundred twenty (120) days thereafter to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within one hundred twenty (120) days from the date of such agreement) to sell the New Securities respecting which the Holders' right of first refusal option set forth in this Section 2.3 was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice to Holders pursuant to Section 2.3(b). In the event the Company has not sold within such one hundred twenty (120) day period or entered into an agreement to sell the New Securities in accordance with the foregoing within one hundred twenty (120) days from the date of such agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Holders in the manner provided in Section 2.3(b) above.

(d) The right of first refusal set forth in this Section 2.3 may not be assigned or transferred, except that (i) such right is assignable by each Holder to any affiliate, wholly owned subsidiary or parent of, or to any corporation or entity that is, within the meaning of the Securities Act, controlling, controlled by or under common control with, any such Holder, and (ii) such right is assignable between and among any of the Holders.

2.4 <u>Stock Option Pool; Vesting</u>. Unless otherwise approved by the Company's Board of Directors, all service providers, including but not limited to employees and consultants, of the Company who shall purchase or receive options to purchase shares of the Company's Common Stock following the date hereof shall be required to execute stock purchase or option agreements in a form approved by the Board of Directors providing for vesting of such shares over a forty-eight (48) month period at the rate of twenty-five percent (25%) of the shares one year from the date of hire and 1/48th of the shares per month thereafter and providing further for a right of repurchase in favor of the Company or its assigns with respect to future sales of such Common Stock by such persons.

2.5 <u>Board of Director Meetings; Expenses</u>. The Company shall reimburse non-employee directors for their out-of-pocket travel expenses reasonably incurred in connection with

attendance at board meetings or committees thereof or any activities which are required and/or requested in accordance with standard Company procedures.

2.6 <u>Termination of Covenants</u>.  The covenants set forth in this Section 2 shall terminate and be of no further force and effect upon (and, if applicable, shall not apply to) the earliest to occur of (i) the closing of a Qualified IPO, (ii) the closing of a reorganization, merger, consolidation or other transaction or series of related transactions of the Company with or into another corporation or entity, in which fifty percent (50%) or more of the Company's outstanding voting stock is transferred to holders different from those who held the stock immediately prior to such merger or transaction, (iii) the closing of the sale of all or substantially all of the assets of the Company, (iv) the Company becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, and (v) the dissolution of the Company pursuant to action validly taken by the shareholders of the Company in accordance with applicable state law.

## SECTION 3

## Miscellaneous

3.1 <u>Governing law</u>.  This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

3.2 <u>Successors and Assigns</u>.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including permitted transferees of any shares of Series A Preferred Stock sold hereunder or any Common Stock issued upon conversion thereof).  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

3.3 <u>Entire Agreement; Amendment; Waiver</u>.  This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.  Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated, except by a written instrument signed by the Company and by holders of a majority of the Registrable Securities; provided, however, that (i) any amendment to the definition of Major Investor shall require the written consent of the Company and holders of at least seventy percent (70%) of the Registrable Securities, and (ii) any waiver or amendment that would materially and adversely change a specifically enumerated right or obligation hereunder of one or more of the Preferred Investors in a way that is materially disproportionate to the change such waiver or amendment would effect on such specifically enumerated rights of other Preferred Investors that hold the same such specifically enumerated rights (each such Preferred Investor whose specifically enumerated rights are being so disproportionately changed is referred to as a "***Disproportionately Treated Investor***"), such amendment or waiver shall not be effective as to any Disproportionately Treated Investor unless consented to by Disproportionately Treated Investors holding a majority of the Registrable Securities held by all Disproportionately Treated Investors.  Any such amendment, waiver, discharge or termination shall be binding on all the

-16-

Holders, but in no event shall the obligation of any Holder hereunder be materially increased, except upon the written consent of such Holder. For purposes of this Section 3.3, the term Registrable Securities shall include Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price.

3.4 <u>Notices, etc.</u> All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by United States first-class mail, postage prepaid, or delivered personally by hand or nationally recognized courier addressed (a) if to a Holder, as indicated on the list of Holders attached hereto as <u>Schedule A</u>, or at such other address as such holder or permitted assignee shall have furnished to the Company in writing, or (b) if to the Company, to its principal office, Attention: Chief Executive Officer, or at such other address as the Company shall have furnished to each holder in writing. Notices sent by mail shall be deemed to have been given upon personal delivery, on the third business day after deposit in the U.S. mail, and upon the day following deposit with an overnight courier.

3.5 <u>Delays or Omissions.</u> No delay or omission to exercise any right, power or remedy accruing to any Holder, upon any breach or default of the Company under this Agreement shall impair any such right, power or remedy of such Holder nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any Holder of any breach or default under this Agreement or any waiver on the part of any Holder of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Holder, shall be cumulative and not alternative.

3.6 <u>Rights; Separability.</u> Unless otherwise expressly provided herein, a Holder's rights hereunder are several rights, not rights jointly held with any of the other Holders. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

3.7 <u>Information Confidential.</u> Each Holder acknowledges that the information received by them pursuant hereto may be confidential and for its use only, and it will not use such confidential information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than its employees or agents having a need to know the contents of such information, and its attorneys), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally or such Holder is required to disclose such information by a governmental body.

3.8 <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

3.9 <u>Counterparts; Facsimile Signatures.</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall

constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party. The original signature copy shall be delivered to the other party by express overnight delivery. The failure to deliver the original signature copy and/or the non-receipt of the original signature copy shall have no effect upon the binding and enforceable nature of this Agreement.

3.11 <u>Aggregation of Stock</u>. All shares of Registrable Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

3.12 <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

3.13 <u>Subsequent Closings</u>. In the event that the Company shall conduct subsequent sales of Series A Preferred Stock pursuant to and in accordance with the terms of Section 1.3 of the Series A Agreement, any holder of such Shares shall be deemed a Holder with all of the rights of a Holder under this Agreement; provided that as a condition thereto such Holder and the Company shall sign a counterpart signature page to this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Investors' Rights Agreement effective as of the day and year first above written.

**ARRIVA PHARMACEUTICALS, INC.,**
a California corporation


By _Nolan Preston_____

Its _President & CEO_____

**ARRIVA PHARMACEUTICALS B.V.**

By _____

Its _____

By _____

Its _____

MPM BIOVENTURES II-QP, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner

By: Ansbert Gadicke
Title: Manager


MPM BIOVENTURES II, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner

By: Ansbert Gadicke
Title:  Manager


MPM ASSET MANAGEMENT INVESTORS 2002 BVII LLC

By:  Ansbert Gadicke
Title:  Manager


MPM BIOVENTURES GMBH & CO.
PARALLEL-BETEILIGUNGS KG

By:  MPM Asset Management II, L.P.,
       in its capacity as the Special Limited Partner
By:  MPM Asset Management II LLC, its General Partner

By:  Ansbert Gadicke
Title:  Manager

# SCHEDULE A

## PREFERRED INVESTORS

| Name | Class of Stock | Number of Shares |
| --- | --- | --- |
| Arriva Pharmaceuticals B.V.<br>c/o Nordic Biotech Advisors Aps<br>Ostergade 5,3<br>DK-1100 Copenhagen K<br>Denmark<br>Attention : Chief Financial Officer<br>Facsimile: 45-70-20-12-64 | Series A Preferred | 1,000 |
| MPM Bioventures II-QP, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Series A Preferred | 338 |
| MPM Bioventures II, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Series A Preferred | 37 |
| MPM Asset Management Investors<br>2002 BVII LLC<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Series A Preferred | 6 |
| MPM Bioventures GMBH & CO.<br>Parallel-Beteiligungs KG<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Series A Preferred | 119 |
| **Total** | | 1,500 |

700871712v5

# EXHIBIT H



© GOES 722
All Rights Reserved

ARRIVA PHARMACEUTICALS, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

AUTHORIZED: 18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER
1

SHARES
266,680

This Certifies that

Arriva Pharmaceuticals B.V.

is the registered holder of

Two Hundred Sixty-Six Thousand Six Hundred Eighty          Shares

COMMON STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this 13th day of February A.D. 20 08.

Phillip Barr, SECRETARY

M. Sue Preston, PRESIDENT



© GOES 722
All Rights Reserved

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

NUMBER
2

SHARES
90,120

10,000,000 SHARES COMMON STOCK

ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED: 18,000,000 SHARES OF CAPITAL STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

This Certifies that

MPM Bioventures II-QP, L.P.

is the registered holder of

Ninety Thousand One Hundred Twenty     Shares

COMMON STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this 13th day of February A.D. 20 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



© GOES 722
All Rights Reserved

NUMBER
3

10,000,000 SHARES COMMON STOCK

ARRIVA PHARMACEUTICALS, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

AUTHORIZED 18,000,000 SHARES OF CAPITAL STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

SHARES
9,920

This Certifies that

MPM Bioventures II, L.P.

is the registered holder of

Nine Thousand Nine Hundred Twenty                    Shares

COMMON STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this 13th day of February A.D. 20 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



© GOES 722
All Rights Reserved

10,000,000 SHARES COMMON STOCK

ARRIVA PHARMACEUTICALS, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

AUTHORIZED: 18,000,000 SHARES OF CAPITAL STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

Number
4

Shares
1,560

This Certifies that

registered holder

MPM Asset Management Investors 2002 BVII LLC

is the

One Thousand Five Hundred Sixty

Shares

COMMON STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this    13th    day of    February    A.D. 20 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED 18,000,000 SHARES OF CAPITAL STOCK

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER
5

SHARES
31,720

This Certifies that

MPM Bioventures GMBH & CO. Parallel-Beteiligungs KG

is the registered holder of

Thirty-One Thousand Seven Hundred Twenty                Shares

COMMON STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this          13th          day of          February          A.D. 20  08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT

© DCES 722
All Rights Reserved



ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED - 18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER
1

SHARES
1,000

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

This Certifies that

Arriva Pharmaceuticals B. V.

is the registered holder of

One Thousand _____ Shares

SERIES A PREFERRED STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this ____ 13th ____ day of ____ February ____ A.D. 19 02 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED - 18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER 2

SHARES 338

This Certifies that

MPM Bioventures II-QP, L.P.

registered holder of

Three Hundred Thirty-Eight

Shares

SERIES A PREFERRED STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this _____ 13th _____ day of _____ February _____ A.D., 20 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED: 18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER 3

SHARES 37

This Certifies that

MPM Bioventures II, L.P.

registered holder of

Thirty-Seven

Shares

SERIES A PREFERRED STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed.

This 13th day of February A.D. 08

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



ARRIVA PHARMACEUTICALS, INC.

AUTHORIZED - 18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER
4

SHARES
6

This Certifies that

MPM Asset Management Investors 2002 BVII LLC

is the registered holder of

Six

Shares

SERIES A PREFERRED STOCK

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this _____ 13th _____ day of _____ February _____ A. D. 20 08.

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT



**ARRIVA PHARMACEUTICALS, INC.**

AUTHORIZED  18,000,000 SHARES OF CAPITAL STOCK

10,000,000 SHARES COMMON STOCK

8,000,000 SHARES SERIES A PREFERRED STOCK

NUMBER
5

SHARES
119

This Certifies that

MPM Bioventures GMBH & CO. Parallel-Beteiligungs KG

is the registered holder of

One Hundred Nineteen ———————————— Shares

**SERIES A PREFERRED STOCK**

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this ——— 13th ——— day of ——— February ——— A.D. 20. 08.

Philip J. Barr, SECRETARY

M. Sue Preston, PRESIDENT

# EXHIBIT I (Part 1)

*EXECUTION COPY*

# ARRIVA PHARMACEUTICALS, INC.

## Series A Preferred Stock

## Purchase Agreement

# TABLE OF CONTENTS

Page

1.  Purchase and Sale of Stock. ........................................................................ 1

    1.1    Sale and Issuance of Series A Preferred Stock. ................................... 1
    1.2    Closing. ............................................................................................. 1
    1.3    Additional Closings ........................................................................... 1
    1.4    Commitment by MPM ........................................................................ 2

2.  Representations and Warranties of the Company. ...................................... 2

    2.1    Organization; Good Standing; Qualification. ..................................... 2
    2.2    Authorization. .................................................................................... 2
    2.3    Valid Issuance of Preferred and Common Stock. ............................... 2
    2.4    Governmental Consents. .................................................................... 3
    2.5    Capitalization and Voting Rights. ...................................................... 3
    2.6    Subsidiaries. ...................................................................................... 4
    2.7    Agreements; Action. .......................................................................... 4
    2.8    Related-Party Transactions. ............................................................... 4
    2.9    Registration Rights. ........................................................................... 5
    2.10   Permits. .............................................................................................. 5
    2.11   Compliance With Other Instruments. ................................................. 5
    2.12   Litigation. .......................................................................................... 5
    2.13   Title to Property and Assets; Leases. ................................................. 6
    2.14   Material Liabilities. ........................................................................... 6
    2.15   Changes. ............................................................................................ 6
    2.16   Intellectual Property. ......................................................................... 7
    2.17   Manufacturing and Marketing Rights. ................................................ 9
    2.18   Employees. ........................................................................................ 9
    2.19   Proprietary Information and Inventions Agreements. ....................... 10
    2.20   Tax Returns, Payments and Elections. ............................................. 10
    2.21   Insurance. ........................................................................................ 10
    2.22   Environmental and Safety Laws. ..................................................... 10
    2.23   Disclosure. ...................................................................................... 10
    2.24   Offering. .......................................................................................... 11
    2.25   Section 83(b) Elections. .................................................................. 11
    2.26   Real Property Holding Corporation. ................................................ 11
    2.27   Corporate Documents; Minute Books. .............................................. 11
    2.28   Brokers. ........................................................................................... 11

3.  Representations and Warranties of the Investors. ..................................... 11

    3.1    Authorization. .................................................................................. 11
    3.2    Purchase Entirely for Own Account. ................................................ 11
    3.3    Reliance Upon the Investors' Representations. ................................. 12
    3.4    Receipt of Information. .................................................................... 12
    3.5    Investment Experience. .................................................................... 12

|   | 3.6 | Accredited Investor. | 12 |
|---|-----|----------------------|----|
|   | 3.7 | Restricted Securities. | 12 |
|   | 3.8 | Legends. | 13 |
| 4. | | Conditions of the Investors' Obligations at Closing. | 13 |
|   | 4.1 | Representations and Warranties. | 13 |
|   | 4.2 | Performance | 13 |
|   | 4.3 | Compliance Certificate. | 13 |
|   | 4.4 | Qualifications. | 13 |
|   | 4.5 | Proceedings and Documents. | 13 |
|   | 4.6 | Investors' Rights Agreement. | 14 |
|   | 4.7 | Voting Agreement. | 14 |
|   | 4.8 | Board of Directors. | 14 |
|   | 4.9 | Director Indemnification Agreements. | 14 |
| 5. | | Conditions of the Company's Obligations at Closing. | 14 |
|   | 5.1 | Representations and Warranties. | 14 |
|   | 5.2 | Qualifications. | 14 |
|   | 5.3 | Investors' Rights Agreement. | 14 |
|   | 5.4 | Voting Agreement. | 14 |
|   | 5.5 | Restated Articles | 14 |
| 6. | | Miscellaneous. | 15 |
|   | 6.1 | Entire Agreement. | 15 |
|   | 6.2 | Survival of Warranties. | 15 |
|   | 6.3 | Successors and Assigns. | 15 |
|   | 6.4 | Governing Law | 15 |
|   | 6.5 | Counterparts; Facsimile Signatures. | 15 |
|   | 6.6 | Titles and Subtitles. | 15 |
|   | 6.7 | Notices. | 15 |
|   | 6.8 | Finders' Fees. | 15 |
|   | 6.9 | Expenses. | 16 |
|   | 6.10 | Attorneys' Fees. | 16 |
|   | 6.11 | Amendments and Waivers. | 16 |
|   | 6.12 | Severability. | 16 |
|   | 6.13 | California Corporate Securities Law. | 16 |
|   | 6.14 | Effect of Amendment or Waiver. | 17 |

Schedule A     -     List of Investors
Exhibit A      -     Restated Articles
Exhibit B      -     Schedule of Exceptions
Exhibit C      -     Investors' Rights Agreement
Exhibit D      -     Voting Agreement

# ARRIVA PHARMACEUTICALS, INC.

## SERIES A PREFERRED STOCK

## PURCHASE AGREEMENT

THIS SERIES A PREFERRED STOCK PURCHASE AGREEMENT (this *"Agreement"*) is made as of the 13th day of February, 2008, by and between Arriva Pharmaceuticals, Inc., a California corporation (the *"Company"*), and each of the persons listed on Schedule A hereto, each of which is herein referred to as an *"Investor."*

WHEREAS, concurrently with the execution of this Agreement, the Company and certain Investors are entering into a Convertible Loan Agreement pursuant to which the Company shall issue promissory notes (the "*Notes*") convertible into shares of Series A Preferred Stock:

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.    Purchase and Sale of Stock.

1.1    Sale and Issuance of Series A Preferred Stock.

(a)    The Company shall adopt and file with the Secretary of State of California on or before the Closing (as defined below) an Amended and Restated Articles of Incorporation in the form attached hereto as Exhibit A (the *"Restated Articles"*).

(b)    Subject to the terms and conditions of this Agreement, each Investor agrees to purchase at the Closing and the Company agrees to sell and issue to each Investor, severally and not jointly, at the Closing that number of shares of the Company's Series A Preferred Stock set forth opposite each Investor's name on Schedule A hereto at a price of $1.00 per share.

1.2    Closing.  The purchase and sale of the Series A Preferred Stock shall take place at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2475 Hanover Street, Palo Alto, California, at 9:00 a.m. on February 13, 2008, or at such other time and place as the Company and the Investors shall mutually agree, either orally or in writing (which time and place are designated as the *"Closing"*).  At the Closing, the Company shall deliver to each Investor a certificate representing the shares of Series A Preferred Stock that such Investor is purchasing against payment of the purchase price therefor by check, wire transfer or cancellation of indebtedness.

1.3    Additional Closings.  The Company shall at all times keep available from its issued and outstanding shares of Series A Preferred Stock sufficient shares of Series A Preferred Stock necessary to effect the conversion of the Notes and all interest accrued thereon.  Upon such conversion or conversions from time to time, Schedule A shall be amended to include the names of such former Note holders and the number of shares of Series A Preferred Stock issued upon conversion thereof (each such Note conversion shall be an "*Additional Closing*").  Upon such conversion, each former Note holder shall be required to execute counterpart signature pages to this Agreement, the Investors' Rights Agreement (as defined herein) and the Voting

Agreement (as defined herein). The former holders of the Notes so acquiring shares of Series A Preferred Stock shall be considered an "Investor" for purposes of this Agreement and all other agreements contemplated hereby.

      1.4    <u>Commitment by MPM</u>. MPM Bioventures II-QP, L.P., MPM Bioventures II, L.P., MPM Asset Management Investors 2002 BVII LLC, and MPM Bioventures GmbH & Co. Parallel-Beteiligungs KG (collectively, "MPM") commit to purchase up to an aggregate of $1,000,000 to meet their Required Amount in a Financing (as such terms are defined in the Restated Articles) that both (a) the Board of Directors of the Company has determined that Section C.3(b)(ii) of Article Fourth of the Restated Articles shall apply and (b) MPM, in its sole discretion, deems satisfactory.

      2.    <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to each Investor that, except as disclosed in the Company's recent bankruptcy proceedings, or as set forth on a Schedule of Exceptions furnished to each Investor and special counsel for the Investors and attached hereto as <u>Exhibit B</u>, specifically identifying the relevant subparagraph(s) hereof, which exceptions shall be deemed to be representations and warranties as if made hereunder:

      2.1    <u>Organization; Good Standing; Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California, has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted, to execute and deliver this Agreement, that certain Investors' Rights Agreement, the form of which is attached hereto as <u>Exhibit C</u> (the ***"Investors' Rights Agreement"***) and that certain Voting Agreement, the form of which is attached hereto as <u>Exhibit D</u> (the ***"Voting Agreement"***), to issue and sell the Series A Preferred Stock and the Common Stock issuable upon conversion thereof, and to carry out the provisions of this Agreement, the Investors' Rights Agreement, the Voting Agreement and the Restated Articles. The Company is not qualified to transact business as a foreign corporation in any other jurisdiction and such qualification is not now required.

      2.2    <u>Authorization</u>. All corporate action on the part of the Company, its officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement, the Investors' Rights Agreement, the Voting Agreement, the performance of all obligations of the Company hereunder and thereunder at the Closing and the authorization, issuance (or reservation for issuance), sale and delivery of the Series A Preferred Stock being sold hereunder and the Common Stock issuable upon conversion thereof has been taken or will be taken prior to the Closing, and this Agreement and the Investors' Rights Agreement constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

      2.3    <u>Valid Issuance of Preferred and Common Stock</u>. The Series A Preferred Stock that is being purchased by the Investors hereunder, when issued, sold and delivered in

accordance with the terms of this Agreement for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable, and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and the Investors' Rights Agreement and under applicable state and federal securities laws. The Common Stock issuable upon conversion of the Series A Preferred Stock purchased under this Agreement has been duly and validly reserved for issuance and, upon issuance in accordance with the terms of the Restated Articles, will be duly and validly issued, fully paid and nonassessable, and will be free of restrictions on transfer other than restrictions on transfer under this Agreement, the Investors' Rights Agreement and the Voting Agreement and under applicable state and federal securities laws.

2.4    <u>Governmental Consents.</u>    No consent, approval, qualification, order or authorization of, or filing with, any local, state or federal governmental authority is required on the part of the Company in connection with the Company's valid execution, delivery or performance of this agreement, the offer, sale or issuance of the Series A Preferred Stock by the Company or the issuance of Common Stock upon conversion of the Series A Preferred Stock, except (a) the filing of the Restated Articles with the Secretary of State of the State of California, and (b) such filings as have been made prior to the Closing, except that any notices of sale required to be filed with the Securities and Exchange Commission under Regulation D of the Securities Act of 1933, as amended (the *"Securities Act"*), or such post-closing filings as may be required under applicable state securities laws, which will be timely filed within the applicable periods therefor.

2.5    <u>Capitalization and Voting Rights.</u>    The authorized capital of the Company consists, or will consist prior to the Closing, of:

(a)    <u>Preferred Stock.</u>    8,000,000 shares of Preferred Stock, no par value (the *"Preferred Stock"*), all of which have been designated Series A Preferred Stock, none of which is issued and outstanding and all of which will be sold pursuant to this Agreement. The rights, privileges and preferences of the Series A Preferred Stock will be as stated in the Restated Articles.

(b)    <u>Common Stock.</u>    10,000,000 shares of common stock (*"Common Stock"*), no par value, 400,000 shares of which are issued and outstanding.

The outstanding shares of Common Stock are all duly and validly authorized and issued, fully paid and nonassessable, and have been issued in accordance with the registration or qualification provisions of the Securities Act and any relevant state securities laws or pursuant to valid exemptions therefrom. The Company has reserved 8,000,000 shares of Common Stock for issuance upon conversion of the Series A Preferred Stock. Except for (i) the conversion privileges of the Series A Preferred Stock and (ii) the rights provided in Section 1 of the Investors' Rights Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights), commitments or agreements, orally or in writing, to purchase or acquire from the Company any shares of Common Stock or Series A Preferred Stock, or any securities convertible into or exchangeable for shares of Common Stock or Series A Preferred Stock. Other than the Voting Agreement, the Company is not a party or subject to any agreement or understanding, and, to the best of the Company's knowledge, there is no agreement or understanding between any persons, that affects

- 3 -

or relates to the voting or giving of written consents with respect to any security or the voting by a director of the Company.

2.6    Subsidiaries.    The Company does not own or control, directly or indirectly, any interest in any other corporation, association or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

2.7    Agreements; Action.

(a)    Except for agreements explicitly contemplated hereby and by the Investors' Rights Agreement and the Voting Agreement, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, affiliates, or any affiliate thereof.

(b)    There are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound that may involve (i) obligations (contingent or otherwise) of, or payments to the Company in excess of, $10,000, or (ii) the license of any patent, copyright, trade secret or other proprietary right to or from the Company (other than the license of the Company's software and products in the ordinary course of business), or (iii) provisions restricting or affecting the development, manufacture or distribution of the Company's products or services, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(c)    Since December 31, 2007, the Company has not (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or any other liabilities individually in excess of $10,000 or, in the case of indebtedness and/or liabilities individually greater than $5,000, or in excess of $25,000 in the aggregate, (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.

(d)    For the purposes of subsections (b) and (c) above, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same person or entity (including persons or entities the Company has reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

(e)    None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events.

2.8    Related-Party Transactions.    No employee, officer or director of the Company or member of his or her immediate family is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them.  To the best of the Company's knowledge, none of such persons has any direct or indirect ownership in any firm or corporation with which the Company is affiliated or with which the Company has a

business relationship, or any firm or corporation that competes with the Company, except that employees, officers or directors of the Company and members of their immediate families may own stock in publicly traded companies that may compete with the Company. To the best of the Company's knowledge, no officer or director or any member of their immediate families is, directly or indirectly, interested in any material contract with the Company.

2.9     Registration Rights.    Except as provided in the Investors' Rights Agreement, the Company is not obligated to register under the Securities Act any of its presently outstanding securities or any of its securities that may subsequently be issued.

2.10     Permits.        The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could materially and adversely affect the business, properties, prospects or financial condition of the Company and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.11     Compliance With Other Instruments. The Company is not in violation or default in any material respect of any provision of its Restated Articles or Bylaws or in any material respect of any provision of any mortgage, agreement, instrument or contract to which it is a party or by which it is bound or, to the best of its knowledge, of any federal or state judgment, order, writ, decree, statute, rule or regulation applicable to the Company. The execution, delivery and performance by the Company of this Agreement, the Investors' Rights Agreement and the Voting Agreement, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation or be in material conflict with or constitute, with or without the passage of time or giving of notice, either a material default under any such provision or an event that results in the creation of any material lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

2.12     Litigation.        There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, currently threatened against the Company that questions the validity of this Agreement, the Investors' Rights Agreement or the Voting Agreement or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that might result, either individually or in the aggregate, in any material adverse change in the assets, business, properties, prospects or financial condition of the Company, or in any material change in the current equity ownership of the Company nor is the Company aware that there is any basis for the foregoing. The foregoing includes, without limitation, any action, suit, proceeding or investigation pending or currently threatened (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, their obligations under any agreements with prior employers, or negotiations by the Company with potential backers of, or investors in, the Company or its proposed business. The Company is not a party to, or to the best of its knowledge, named in any order, writ, injunction, judgment or decree of any court, government agency or instrumentality.

- 5 -

There is no action, suit or proceeding by the Company currently pending or that the Company currently intends to initiate.

2.13    Title to Property and Assets; Leases.    Except (a) for liens for current taxes not yet delinquent, (b) for liens imposed by law and incurred in the ordinary course of business for obligations not past due to carriers, warehousemen, laborers, materialmen and the like, (c) for liens in respect of pledges or deposits under workers' compensation laws or similar legislation, or (d) for minor defects in title, none of which, individually or in the aggregate, materially interferes with the use of such property, the Company owns its property and assets free and clear of all mortgages, liens, claims and encumbrances.    With respect to the property and assets it leases, the Company is in compliance with such leases and, to the best of its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances, subject to clauses (a)-(d) above.

2.14    Material Liabilities.    The Company has no material liability or obligation, absolute or contingent (individually or in the aggregate), except (i) obligations and liabilities incurred after the date of incorporation in the ordinary course of business that are not material, individually or in the aggregate, and (ii) obligations under contracts made in the ordinary course of business that would not be required to be reflected in financial statements prepared in accordance with generally accepted accounting principles.

2.15    Changes.    Since November 21, 2007, there has not been:

(a)    any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operating results or business of the Company;

(b)    any waiver by the Company of a valuable right or of a debt owed to it;

(c)    any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the assets, properties, financial condition, operating results or business of the Company;

(d)    any change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject and that is described in Section 2.7;

(e)    any change in any compensation arrangement or agreement with any employee;

(f)    any sale, assignment or transfer of any patents or patent applications, trademarks or trademark applications, service marks, trade names, corporate names, copyrights or copyright registrations, trade secrets or other intangible assets, or disclosure of any proprietary confidential information to any person;

(g)    any resignation or termination of employment of any key officer of the Company; and the Company, to the best of its knowledge, does not know of the impending resignation or termination of employment of any such officer;

- 6 -

(h)     any declaration, payment, setting aside or other distribution of cash or other property to its shareholders with respect to its capital stock or other equity securities;

(i)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its properties or assets, except liens for taxes not yet due or payable;

(j)     receipt of notice that there has been a loss of, or order cancellation by, any major customer of the Company;

(k)     made capital expenditures or commitments therefor that aggregate in excess of $15,000;

(l)     made any loans or advances to, guarantees for the benefit of, or any investments in, any person (including but not limited to any of the Company's employees, officers or directors, or any members of their immediate families), corporation, partnership, joint venture or other entity;

(m)     any other event or condition of any character that might materially and adversely affect the assets, properties, financial condition, operating results or business of the Company; or

(n)     any agreement or commitment by the Company to do any of the things described in this Section 2.15.

2.16     Intellectual Property.  The Company owns or has the right to use all licenses, patents, patent applications and patent rights, trademarks, service marks, trademark rights, trade names, trade name rights, copyrights, trade secrets, know-how, inventions, designs, proprietary rights and processes, works of authorship, computer programs and technical data and information utilized in, or necessary for, the conduct of its business as now conducted or as is presently contemplated (collectively, the "*Intellectual Property*"), without infringing upon or otherwise acting adversely to the right or claimed right of any person, corporation or other entity under or with respect to any of the foregoing.

(b)     The Company has not violated and, by conducting its business as presently contemplated, will not violate, any of the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of any other person or entity.  The Company has not received any communication(s), or otherwise received any information, asserting a claim by any person to the ownership of or right to use the Intellectual Property, or alleging that the Company has violated, or by conducting its business would violate, any of the licenses, patents, patent applications and patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, know-how, inventions, designs, proprietary rights and processes, works of authorship, computer programs and technical data and information of any other person or entity, and the Company does not know of any basis for any such claim. The Company does not believe it is utilizing, or will need to utilize, any inventions of any of its employees (or people it currently intends to hire) made prior to their employment by the Company.

(c)     The Company is not obligated, or under any liability whatsoever, to make any payments by way of royalties, fees or otherwise, to any owner or licensor of, or other claimant to, any licenses, patents, patent applications, patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, know-how, inventions, designs, proprietary rights and processes, works of authorship, computer programs and technical data and information with respect to the use thereof or in connection with the conduct of its business or otherwise (other than licenses of "off-the-shelf" products in the ordinary course of business). The Company is not a party to any agreement concerning the Intellectual Property or any other intellectual property used or to be used by the Company in its business as conducted (other than licenses of "off-the-shelf" products in the ordinary course of business). No shareholder, director, officer or current or former employee of the Company has any interest in the Intellectual Property.

(d)     The Company has the exclusive ownership of all rights arising from or associated with the research and development efforts of the Company, its founders, employees and independent contractors relating to the Intellectual Property, and any licenses, patents, patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, know-how, inventions, designs, proprietary rights and processes, works of authorship, computer programs and technical data and information conceived as a result of such efforts to manufacture, use, market and sell any product or process based thereon without infringing or violating the rights of any third parties and without impediment, restriction or the payment of royalties. No claim is being asserted against the Company by any person to the ownership of or right to use any of the Intellectual Property or challenging or questioning the validity or effectiveness of any of the Intellectual Property, and the Company is not aware of any basis for any such claim. The Company does not, and does not have any plan to, manufacture, use, sell or license anything (including any technology) which, to the best of the Company's knowledge, would violate or infringe any licenses, patents, patent applications, patent rights, trademarks, trademark rights, trade names, trade name rights, copyrights, trade secrets, know-how, inventions, designs, proprietary rights and processes, works of authorship, computer programs and technical data and information conceived as a result of such efforts, of any other person, firm or corporation or which would require a license under any such patent, patent right, copyright, trade secret, trademark, trademark right or proprietary right. Commercially reasonable security measures have been taken by the Company to protect the secrecy, confidentiality and value of any proprietary information and, to the extent deemed appropriate by the Company, the Intellectual Property.

(e)     All data, written or oral status reports and other representations and information that the Company provided to Investors pertaining to the Intellectual Property were truthful and accurate in all respects at the time at which they were provided, and there was no omission therefrom which made such information misleading, inaccurate or incomplete in any material way, and since such time there has been no change in any of the foregoing.

(f)     All present and prior versions of the works of authorship (collectively, the "*Copyrighted Material*") offered for license or lease by the Company are original works of authorship written, compiled or prepared by employees of or consultants to the Company within the scope of their employment or consultancy, respectively, and constitute "works made for hire" within the meaning of the Copyright Act of 1976, as amended, or have been assigned to the

- 8 -

Company without reservation of rights; all versions of such Copyrighted Material are proprietary to the Company; all right, title and interest, including, without limitation, all Intellectual Property, in and with respect to such Copyrighted Material are vested solely in the Company and no royalties or other payments are due with respect to any thereof; and the Company has all documentation necessary to enforce its proprietary rights in such Copyrighted Material. The use or exploitation of such Copyrighted Material does not infringe the rights of any other person, firm, corporation, government or governmental or public agency and no third party has the right to use or exploit, or is using or exploiting such Copyrighted Material except pursuant to a non-exclusive lease or license entered into by the Company in the ordinary course of business.

(g)     The conduct of the Company's business, including, but not limited to, the licensing of its technologies to third party collaboration partners and end-users, the manufacture, use and sale of instruments, kits, reagents and other products incorporating its technologies, the provision of services based on its technologies, and other commercialization of its technologies as presently contemplated, would not violate the patents, trademarks, service marks, trade names, copyrights or trade secrets or other proprietary rights of any other person or entity.

(h)     To the knowledge of the Company, the Company's employees are not obligated under any contract or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of such employee's best efforts to promote the interests of the Company or that would conflict with the Company's business as presently conducted and as currently proposed to be conducted. Neither the execution nor delivery of this Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as presently conducted and as currently proposed to be conducted, will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees is now obligated.

2.17   <u>Manufacturing and Marketing Rights</u>.       The Company has not granted rights to manufacture, produce, assemble, license, market, or sell its products to any other person and is not bound by any agreement that affects the Company's exclusive right to develop, manufacture, assemble, distribute, market, or sell its products.

2.18   <u>Employees</u>.   To the best of the Company's knowledge, there is no strike, or labor dispute or union organization activities pending or threatened between it and its employees. None of the Company's employees belongs to any union or collective bargaining unit. The Company has complied in all material respects with all applicable state and federal equal opportunity and other laws related to employment. To the best of the Company's knowledge, no employee of the Company is or will be in violation of any judgment, decree or order, or any term of any employment contract, patent disclosure agreement, or other contract or agreement relating to the relationship of any such employee with the Company or any other party because of the nature of the business conducted or to be conducted by the Company or to the use by the employee of his best efforts with respect to such business. Subject to general principles related to wrongful termination of employees, the employment of each officer and employee of the Company is terminable at the will of the Company. The Company is not aware that any officer or key employee, or that any group of employees, intends to terminate their employment with the

Company; nor does the Company have a present intention to terminate the employment of the foregoing.

2.19    Proprietary Information and Inventions Agreements.    Each    current    and former employee, consultant and officer of the Company has executed a Proprietary Information and Inventions Agreement substantially in the form or forms which have been delivered or made available to the Investors.  The Company, after reasonable investigation, is not aware that any of its employees, officers or consultants are in violation thereof, and the Company will take reasonable efforts to prevent such violation.

2.20    Tax Returns, Payments and Elections.    The  Company  has  filed  all  tax returns and reports as required by law or received timely extensions therefor.  These returns and reports are true and correct in all material respects.  The Company has paid all taxes and other assessments due, except those contested by it in good faith.  The Company has not elected pursuant to the Internal Revenue Code of 1986, as amended (*"Code"*), to be treated as an S corporation or a collapsible corporation pursuant to section 341(f) or section 1362(a) of the Code, nor has it made any other elections pursuant to the Code (other than elections that relate solely to methods of accounting, depreciation or amortization) that would have a material effect on the business, properties, prospects or financial condition of the Company.  The Company has never had any tax deficiency proposed or assessed against it and has not executed any waiver of any statute of limitations on the assessment or collection of any tax or governmental charge.  None of the Company's federal income tax returns and none of its state income or franchise tax or sales or use tax returns has ever been audited by governmental authorities.  The Company has withheld or collected from each payment made to each of its employees, the amount of all taxes, including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or authorized depositaries.

2.21    Insurance.    The  Company  has  in  full  force  and  effect  fire  and  casualty insurance policies, with extended coverage, sufficient in amount (subject to reasonable deductibles) to allow it to replace any of its properties that might be damaged or destroyed.  The Company is not in default with respect to its obligations under any insurance policy maintained by it.

2.22    Environmental and Safety Laws.    To the best of its knowledge, the Company is not in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to the best of its knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law or regulation.  The Company has not received any citation, directive, letter or other communication, written or oral, or any notice of any proceeding, claim or lawsuit, from any person arising out of the ownership or occupation of any of its premises, or the conduct of its operations, and the Company is not aware of any basis therefore.

2.23    Disclosure.    The  Company  has  made  available  to  the  Investors  all  the information reasonably available to the Company that the Investors have requested for deciding whether to acquire the Shares.  No representation or warranty of the Company contained in this agreement (taking into account any knowledge qualifier contained in such representation or

warranty), as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

2.24    Offering.    Subject in part to the truth and accuracy of each Investors' representations set forth in this Agreement, the offer, sale and issuance of the Series A Preferred Stock as contemplated by this Agreement are exempt from the registration requirements of the Securities Act, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

2.25    Section 83(b) Elections.    To the best of the Company's knowledge, all individuals who have purchased shares of the Company's Common Stock have timely filed elections under section 83(b) of the Internal Revenue Code and any analogous provisions of applicable state tax laws.

2.26    Real Property Holding Corporation.    The Company is not a "United States real property holding corporation" within the meaning of Internal Revenue Code section 897(c)(2) and any regulations promulgated thereunder.

2.27    Corporate Documents; Minute Books.    Except for amendments necessary to satisfy representations and warranties or conditions contained herein (the forms of which amendments have been approved by the Investors), the Restated Articles and Bylaws of the Company are in the form previously provided to special counsel for the Investors.  The minute books of the Company provided to each Investor contain a complete summary of all meetings and/or consents of directors and shareholders since the time of incorporation and reflect all transactions referred to in such minutes or consents accurately in all material respects.

2.28    Brokers.    The Company has no contract, arrangement or understanding with any broker, finder or similar agent with respect to the transactions contemplated by this Agreement.

3.    Representations and Warranties of the Investors.    Each    Investor    hereby represents and warrants, severally and not jointly, to the Company, that:

3.1    Authorization. Such Investor has full power and authority to enter into this Agreement and that this Agreement constitutes a valid and legally binding obligation of such Investor, enforceable in accordance with its term, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2    Purchase Entirely for Own Account. This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Series A Preferred Stock to be purchased by such Investor and the Common Stock issuable upon conversion thereof

- 11 -

(collectively, the *"Securities"*) will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.

      3.3    Reliance Upon the Investors' Representations.    Such Investor understands that the Series A Preferred Stock is not, and any Common Stock acquired on conversion thereof at the time of issuance may not be, registered under the Securities Act on the ground that the sale provided for in this Agreement and the issuance of securities hereunder is exempt from registration under the Securities Act pursuant to section 4(2) thereof, and that the Company's reliance on such exemption is based on the Investors' representations set forth herein. Such Investor realizes that the basis for the exemption may not be present if, notwithstanding such representations, such Investor has in mind merely acquiring the Securities for a fixed or determinable period in the future, or for a market rise, or for sale if the market does not rise. Such Investor has no such intention.

      3.4    Receipt of Information.    Such Investor believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Series A Preferred Stock. Such Investor further represents that through its representatives it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Series A Preferred Stock and the business, properties, prospects and financial condition of the Company and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Investors to rely thereon.

      3.5    Investment Experience.    Such Investor is experienced in evaluating and investing in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the investment in the Series A Preferred Stock. If other than an individual, such Investor also represents it has not been organized for the purpose of acquiring the Series A Preferred Stock.

      3.6    Accredited Investor.  Such Investor represents and warrants that it is an "Accredited Investor," as such term is defined in Rule 501(a) of Regulation D of the Securities Act.

      3.7    Restricted Securities.  Such Investor understands that the Series A Preferred Stock (and any Common Stock issued on conversion thereof) may not be sold, transferred or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the Series A Preferred Stock (or the Common Stock issued on conversion thereof) or an available exemption from registration under the Securities Act, the Series A Preferred Stock (and any Common Stock issued on conversion

- 12 -

thereof) must be held indefinitely. In particular, such Investor is aware that the Series A Preferred Stock (and any Common Stock issued on conversion thereof) may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of that Rule are met. Among the conditions for use of Rule 144 is the availability of current information to the public about the Company. Such information is not now available and the Company has no present plans to make such information available.

3.8    Legends.    To the extent applicable, each certificate or other document evidencing any of the Series A Preferred Stock or any Common Stock issued upon conversion thereof shall be endorsed with the legend set forth below, and such Investor covenants that, except to the extent such restrictions are waived by the Company, such Investor shall not transfer the shares represented by any such certificate without complying with the restrictions on transfer described in the legends endorsed on such certificate:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE, AND MAY BE OFFERED AND SOLD ONLY IF REGISTERED AND QUALIFIED PURSU-ANT TO THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS OR IF THE COMPANY IS PROVIDED AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRA-TION AND QUALIFICATION UNDER FEDERAL AND STATE SECURITIES LAWS IS NOT REQUIRED."

4.    Conditions of the Investors' Obligations at Closing. The obligations of each investor under subparagraph 1.1(b) of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions, the waiver of which shall not be effective against any Investor who does not consent unless in writing thereto:

4.1    Representations and Warranties.    The representations and warranties of the Company contained in Section 2 shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

4.2    Performance.    The Company shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

4.3    Compliance Certificate.    The President of the Company shall deliver to the Investors at the Closing a certificate certifying that the conditions specified in Sections 4.1, 4.2 and 4.4 have been fulfilled.

4.4    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Stock pursuant to this Agreement shall be duly obtained and effective as of the Closing.

4.5    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be

reasonably satisfactory in form and substance to the Investors' counsel, which shall have received (a) certified copies of the resolutions duly adopted by the Company's board of directors authorizing the execution, delivery and performance of this Agreement, the Investors' Rights Agreement and the Voting Agreement, the issuance and sale of the Series A Preferred Stock and the consummation of all other transactions contemplated by this Agreement; (b) certified copies of the Restated Articles and the Company's Bylaws, each as in effect at the Closing; and (c) certificates of good standing issued by the secretary of state for each where the Company is authorized to do business.

     4.6    <u>Investors' Rights Agreement.</u> The Company and each Investor shall have entered into the Investors' Rights Agreement in the form attached as <u>Exhibit C</u>.

     4.7    <u>Voting Agreement.</u> The Company, the Shareholders (as that term is defined in the Voting Agreement) and each Investor shall have entered into the Voting Agreement in the form attached hereto as <u>Exhibit D</u> .

     4.8    <u>Board of Directors.</u>    The directors of the Company shall be John M. Barberich, Christian Hansen, Florian Schönharting and M. Sue Preston and there shall be two (2) vacancies on the Board of Directors.

     4.9    <u>Director Indemnification Agreements.</u> The Company shall have entered into indemnification agreements in the form reasonably satisfactory to the Investors with each of the Company's directors.

     5.    <u>Conditions of the Company's Obligations at Closing.</u>    The obligations of the Company to each Investor under this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions by each Investor:

     5.1    <u>Representations and Warranties.</u>    The representations and warranties of each Investor contained in Section 3 shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

     5.2    <u>Qualifications.</u> All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Series A Preferred Stock pursuant to this Agreement shall be duly obtained and effective as of the Closing.

     5.3    <u>Investors' Rights Agreement.</u> The Company and each Investor shall have entered into the Investors' Rights Agreement in the form attached as <u>Exhibit C</u>.

     5.4    <u>Voting Agreement.</u>The Company, the Shareholders (as that term is defined in the Voting Agreement) and each Investor shall have entered into the Voting Agreement in the form attached hereto as <u>Exhibit D</u>.

     5.5    <u>Restated Articles.</u>  The Restated Articles shall have been filed with the California Secretary of State and shall continue to be in full force and effect as of the Closing Date.

6.    Miscellaneous.

6.1    Entire Agreement.    This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein.

6.2    Survival of Warranties.    The warranties, representations and covenants of the Company and each Investor contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

6.3    Successors and Assigns.    Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including permitted transferees of any shares of Series A Preferred Stock sold hereunder or any Common Stock issued upon conversion thereof). Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.4    Governing Law.    This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

6.5    Counterparts; Facsimile Signatures.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party. The original signature copy shall be delivered to the other party by express overnight delivery. The failure to deliver the original signature copy and/or the non-receipt of the original signature copy shall have no effect upon the binding and enforceable nature of this Agreement.

6.6    Titles and Subtitles.    The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.7    Notices.    Any notice required or permitted by this Agreement shall be in writing and shall be personally delivered, delivered by overnight courier, or sent prepaid registered or certified mail, return receipt requested, addressed to the other party at the address set forth on Schedule A attached hereto or at such other address for which such party gives notice hereunder. Notices sent by mail shall be deemed to have been given upon personal delivery, on the third business day after deposit in the U.S. mail, and upon the day following deposit with an overnight courier.

6.8    Finders' Fees. Each party represents that it neither is nor will be obligated for any finders' fee or commission in connection with this transaction. Each Investor agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which such Investor is responsible. The Company agrees to indemnify and

- 15 -

hold harmless each Investor from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.9    Expenses.    Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement.

6.10    Attorneys' Fees.    If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the Investors' Rights Agreement, the Voting Agreement or the Restated Articles, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

6.11    Amendments and Waivers.    Any term of this Agreement may be amended (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the holders of more than seventy percent (70%) of the Common Stock not previously sold to the public that is issued or issuable upon conversion of the Series A Preferred Stock. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the holders of more than a majority of the Common Stock not previously sold to the public that is issued or issuable upon conversion of the Series A Preferred Stock. Any amendment or waiver effected in accordance with this section shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted), each future holder of all such securities and the Company.

6.12    Severability.    If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.13    California Corporate Securities Law. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION FOR SUCH SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

700871702v6

6.14    Effect of Amendment or Waiver.    Each Investor acknowledges that by the operation of Section 6.11 hereof the holders of more than a majority of the Common Stock not previously sold to the public that is issued or issuable upon conversion of the Series A Preferred Stock will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

[Remainder of This Page Intentionally Left Blank]

- 17 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**ARRIVA PHARMACEUTICALS, INC.**,
a California corporation

By _____

Its _____

**ARRIVA PHARMACEUTICALS B.V.**

By _____

Its _____

By _____

Its _____

MPM BIOVENTURES II-QP, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner

By: Ansbert Gadicke
Title: Manager


MPM BIOVENTURES II, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner

By: Ansbert Gadicke
Title:  Manager


MPM ASSET MANAGEMENT INVESTORS 2002 BVII LLC

By:  Ansbert Gadicke
Title:  Manager


MPM BIOVENTURES GMBH & CO.
PARALLEL-BETEILIGUNGS KG

By:  MPM Asset Management II, L.P.,
       in its capacity as the Special Limited Partner
By:  MPM Asset Management II LLC, its General Partner

By: Ansbert Gadicke
Title:  Manager

# SCHEDULE A

## LIST OF INVESTORS

| Name | Number of Series A Shares | Purchase Price |
|------|---------------------------|----------------|
| Arriva Pharmaceuticals B.V.<br>c/o Nordic Biotech Advisors Aps<br>Ostergade 5,3<br>DK-1100 Copenhagen K<br>Denmark<br>Attention : Chief Financial Officer<br>Facsimile: 45-70-20-12-64 | 1,000 | $1,000.00 |
| MPM Bioventures II-QP, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | 338 | $338.00 |
| MPM Bioventures II, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | 37 | $37.00 |
| MPM Asset Management Investors 2002 BVII LLC<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | 6 | $6.00 |
| MPM Bioventures GMBH & CO.<br>Parallel-Beteiligungs KG<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | 119 | $119.00 |
| Total | 1,500 | $1,500.00 |

SA-1

**EXHIBIT A**

**RESTATED ARTICLES**

700871702v6

AMENDED AND RESTATED

ARTICLES OF INCORPORATION

OF

ARRIVA PHARMACEUTICALS, INC.

The undersigned certify that:

1.      They are the duly elected and acting President and Secretary of Arriva Pharmaceuticals, Inc., a California corporation.

2.      The articles of incorporation of the corporation are amended and restated to read as follows:

## ARTICLE I

The name of the corporation is "Arriva Pharmaceuticals, Inc."

## ARTICLE II

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## ARTICLE III

A.      The corporation is authorized to issue two classes of shares to be designated respectively Preferred Stock ("Preferred Stock") and Common Stock ("Common Stock"). The total number of shares of capital stock that the corporation is authorized to issue is eighteen million (18,000,000). The total number of shares of Preferred Stock the corporation shall have authority to issue is eight million (8,000,000) shares. The total number of shares of Common Stock the corporation shall have authority to issue is ten million (10,000,000). Both the Preferred Stock and the Common Stock shall have no par value per share. The corporation is prohibited from issuing nonvoting equity securities.

B.      The Preferred Stock shall be divided into series. The first series shall consist of eight million (8,000,000) shares and is designated "Series A Preferred Stock."

C.      The powers, preferences, rights, restrictions, and other matters relating to the Preferred Stock shall be as follows:

-1-

1.    Dividends.

(a)    The holders of the Series A Preferred Stock shall be entitled to receive dividends at the rate of $0.08 per share (as adjusted for any stock dividends, combinations or splits with respect to such shares) per annum, payable out of funds legally available therefor. Such dividends shall be payable only when, as, and if declared by the Board of Directors and shall be noncumulative.

(b)    No dividends (other than those payable solely in the Common Stock of the corporation) shall be paid on any Common Stock of the corporation during any fiscal year of the corporation until dividends in the total amount of $0.08 per share (as adjusted for any stock dividends, combinations or splits with respect to such shares) on the Series A Preferred Stock shall have been paid or declared and set apart during that fiscal year, and no dividends shall be paid on any share of Common Stock unless a dividend (in addition to the amount of any dividends paid pursuant to the above provisions of this Section C.1) is paid with respect to all outstanding shares of Series A Preferred Stock in an amount for each such share of Series A Preferred Stock equal to or greater than the aggregate amount of such dividends for all shares of Common Stock into which each such share of Series A Preferred Stock could then be converted.

(c)    The holders of the outstanding Series A Preferred Stock can waive any dividend preference that such holders shall be entitled to receive under this Section C.1 upon the affirmative vote or written consent of the holders of at least seventy (70%) of the Series A Preferred Stock then outstanding. In the event of a conversion of the Series A Preferred Stock pursuant to Section C.3, any accrued and unpaid dividends on such Series A Preferred Stock shall be paid at the election of the holder in cash or Common Stock at its then fair market value, as determined by the Board of Directors.

(d)    As authorized by Section 402.5(c) of the California Corporations Code, Sections 502 and 503 of the California Corporations Code shall not apply with respect to distributions made by the corporation in connection with the repurchase of shares of Common Stock, including the cancellation of indebtedness on account of the repurchase of such Common Stock, issued to or held by employees, consultants, officers and directors upon termination of their employment or services pursuant to duly authorized agreements providing for the right of said repurchase or cancellation of indebtedness.

2.    Liquidation Preference.

(a)    In the event of any liquidation, dissolution or winding up of the corporation, either voluntary or involuntary (a "Liquidation Event"), the holders of Series A Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of the corporation to the holders of Common Stock or other junior equity security by reason of their ownership thereof, an amount per share equal to the sum of (i) the product obtained by multiplying (A) $1.00 (as adjusted for any stock dividends, combinations, splits or other recapitalizations with respect to such shares occurring after the date of the filing of these Amended and Restated Articles of Incorporation) (the "Original Series A Issue Price") for each outstanding share of Series A Preferred Stock <u>times</u> (B) three (3), and (ii) an amount equal to all declared but unpaid dividends on each such share. If upon the occurrence of such event, the

-2-

assets and funds thus distributed among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire assets and funds of the corporation legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

(b)     After the payment of the full liquidation preferences of the Series A Preferred Stock, as described in subsection (a) above, the assets and funds of the corporation legally remaining available for distribution, if any, shall be distributed among the holders of the Common Stock.

(c)     For purposes of this Section C.2, (i) any acquisition of the corporation by means of merger or other form of corporate reorganization in which the shareholders of the corporation do not own a majority of the outstanding shares of the surviving corporation or (ii) a sale of all or substantially all of the assets of the corporation shall be treated as a Liquidation Event and shall entitle the holders of Series A Preferred Stock and Common Stock to receive at the closing in cash, securities or other property (valued as provided in Section C.2(d) below) amounts as specified in Sections C.2(a) and C.2(b) above.

(d)     In any of the events specified in Section C.2(c) hereof, if the consideration received by the corporation is other than cash or securities (as set forth in Section C.2(d)(i) hereof), its value will be determined at the fair market value, as determined in good faith by the Board of Directors. Any securities to be delivered to the holders of Series A Preferred Stock and Common Stock pursuant to Section C.2(c) above shall be valued as follows:

(i)     Securities not subject to investment letter or other similar restrictions on free marketability covered by (ii) below:

(A)     If traded on a securities exchange or the Nasdaq Global Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30) day period ending three (3) business days prior to the closing;

(B)     If actively traded over-the-counter but not on the Nasdaq Global Market, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty (30) day period ending three (3) business days prior to the closing; and

(C)     If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board of Directors of the corporation.

(ii)     The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a shareholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in clauses

(i)(A), (B) or (C) to reflect the approximate fair market value thereof, as determined in good faith by the Board of Directors of the corporation.

      (iii)     In the event the requirements of Section C.2(d) are not complied with, the corporation shall forthwith either:

      (A)     cause such closing to be postponed until such time as the requirements of this Section C.2 have been complied with; or

      (B)     cancel such transaction, in which event the rights, preferences and privileges of the holders of the Series A Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section C.2(d)(iv) hereof.

      (iv)     The corporation shall give each holder of record of Series A Preferred Stock written notice of such impending transaction not later than twenty (20) days prior to the shareholders' meeting called to approve such transaction, or twenty (20) days prior to the closing of such transaction, whichever is earlier, and shall also notify such holders in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this Section C.2, and the corporation shall thereafter give such holders prompt notice of any material changes. The transaction shall in no event take place sooner than twenty (20) days after the corporation has given the first notice provided for herein or sooner than ten (10) days after the corporation has given notice of any material changes provided for herein; provided, however, that such periods may be shortened upon the written consent of the holders of Series A Preferred Stock that are entitled to such notice rights or similar notice rights and that represent at least seventy percent (70%) of the voting power of all then outstanding shares of such Series A Preferred Stock.

      3.     <u>Conversion</u>. The holders of the Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

      (a)     <u>Right To Convert</u>. Subject to subsection (d), each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the corporation or any transfer agent for such stock, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Original Series A Issue Price by the Conversion Price (as defined below) in effect at the time that the certificate is surrendered for conversion for the Series A Preferred Stock. The initial Conversion Price per share for shares of Series A Preferred Stock shall be the Original Series A Issue Price subject to adjustment as set forth in subsection (d).

      (b)     <u>Automatic Conversion</u>.

      (i)     <u>Automatic Conversion</u>. Each share of Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price

then in effect upon the earlier of (i) the date specified by vote or written consent or agreement of holders of a majority of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted to Common Stock basis; provided however, that for so long as any convertible promissory notes issued pursuant to that certain Convertible Loan Agreement dated on or about November 30, 2007 between the corporation and the lenders listed therein remain outstanding (the "Convertible Loan Agreement"), the vote or written consent or agreement of holders of at least seventy percent (70%) of the outstanding shares of Preferred Stock, voting together as a single class on an as-converted to Common Stock basis, shall be required to automatically convert such shares of Preferred Stock into Common Stock; provided, further, that for so long as any convertible promissory notes issued pursuant to that certain Convertible Loan Agreement remain outstanding, the outstanding principal and accrued interest on such convertible promissory notes shall be deemed to have been converted into shares of Series A Preferred Stock at the Original Series A Issue Price for purposes of determining whether holders of a majority of the outstanding shares of Preferred Stock have consented or agreed to such conversion pursuant to this Section C.3(b)(i), or (ii) immediately upon the closing of the sale of the corporation's Common Stock in a firm commitment, underwritten public offering registered under the Securities Act of 1933, as amended (the "Securities Act"), other than a registration relating solely to a transaction under Rule 145 under such Act or to an employee benefit plan of the corporation, at a price per share to the public of at least two (2) times the Original Series A Issue Price where the aggregate proceeds to the corporation and/or any selling shareholders (before deduction for underwriters' discounts and expenses) of which exceed $25,000,000 (the "Qualified IPO").

(ii)     Special Automatic Conversion Upon Financing.

(A)     In the event that the corporation consummates a Financing, as to which Financing or portion of such Financing the Board of Directors of the corporation determines that this Section C.3(b)(ii) shall apply, and any holder of shares of Series A Preferred Stock (or its Affiliates, designees or successor funds) does not purchase such holder's Required Amount (as defined below) within twenty (20) days of the initial closing thereof (the "Offering Period"), then, effective immediately following the expiration of the Offering Period, all of such holder's shares of Series A Preferred Stock shall automatically and without further action on the part of such holder be converted into Common Stock at the then-applicable Series A Conversion Price, and any shares of Series A Preferred Stock shall, upon such issuance, automatically and without further action on the part of such holder be converted into Common Stock at the Series A Conversion Price, in effect on the date thereof.

(B)     Upon conversion pursuant to this Section C.3(b)(ii), the shares of Series A Preferred Stock so converted shall be canceled and not subject to reissuance.

700872052v4

(C)    For purposes of this Section C.3(b)(ii), the following definitions shall apply:

(1)    "Affiliate" shall mean, with respect to any person or entity, a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the first person or entity;

(2)    "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise;

(3)    "Financing" shall mean the sale of convertible debt or equity securities approved by the Board of Directors of the corporation or a special committee thereof; provided, however, that for purposes of this Section C.3(b)(ii), Financing shall be deemed not to include issuances by the Company of convertible debt or equity securities subsequent to the filing of these Articles of Incorporation in the aggregate amount of $6,000,000, and shall only be deemed to include sales of convertible debt or equity securities in excess of such amount.

(4)    "Required Amount" of a holder, aggregated with all Affiliates, shall be equal to the lesser of (A) that aggregate dollar amount determined by multiplying (I) the maximum dollar amount to be invested in the corporation by existing shareholders in a particular closing of an applicable Financing by (II) a fraction, (x) the numerator of which shall equal the aggregate number of shares of Series A Preferred Stock held by such holder, aggregated with all Affiliates, and (y) the denominator of which shall equal the aggregate number of shares of Series A Preferred Stock then-outstanding, in each case as of the date of such Financing, and (B) that aggregate dollar amount determined by multiplying (I) the total amount invested by such holder, aggregated with all Affiliates, in connection with the purchase of Series A Preferred Stock, by (II) fifty percent (50%).

(D)    For the purposes of determining whether a holder has purchased its Required Amount, (x) the aggregate amount of the purchase price of such equity securities or the face value of all such convertible debt securities purchased in the Financing by such holder and all Affiliates of such holder will be aggregated, and (y) the Required Amount of such holder and all Affiliates of such holder will be aggregated.

(E)    The holder of any shares of Series A Preferred Stock which are converted into shares of Common Stock pursuant to this Section C.3(b)(ii) shall deliver to the corporation during regular business hours at the office of any transfer agent of the corporation for such Series A

-6-

Preferred Stock, or at such other place as may be designated by the corporation, the certificate or certificates representing the shares so converted, duly endorsed or assigned in blank or to the corporation. As promptly thereafter as is practicable, the corporation shall issue and deliver to such holder, at the place designated by such holder, a certificate or certificates for the number of full shares of Common Stock to which such holder is entitled. The person or entity in whose name the certificate for such shares of Common Stock is to be issued shall be deemed to have become a shareholder on the effective date of the conversion pursuant to this Section C.3(b)(ii), unless the transfer books of the corporation are closed on that date, in which case such person shall be deemed to have become a shareholder of record on the next succeeding date on which the transfer books are open. Notwithstanding the foregoing, the failure of a holder of shares of Series A Preferred Stock which are converted into shares of Common Stock pursuant to this Section C.3(b)(ii), to deliver the certificate or certificates representing the shares so converted shall have no effect on the conversion effected pursuant hereto.

(c)    <u>Mechanics of Conversion</u>.

(i)    Before any holder of Preferred Stock shall be entitled voluntarily to convert the same into shares of Common Stock, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the office of the corporation or of any transfer agent for such stock, and shall give written notice to the corporation at such office that he elects to convert the same and shall state therein the number of shares to be converted and the name or names in which he wishes the certificate or certificates for shares of Common Stock to be issued. The corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(ii)    If the conversion is in connection with an underwritten offering of securities pursuant to the Securities Act, the conversion may, at the option of any holder tendering shares of Preferred Stock for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the person(s) entitled to receive the Common Stock upon conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such sale of securities.

(d)     Conversion Price Adjustments of Preferred Stock for Certain Diluting Issuances.

(i)     Special Definitions. For purposes of this Section 3(d), the following definitions apply:

(A)     "Options" shall mean rights, options, or warrants to subscribe for, purchase or otherwise acquire either Common Stock or Convertible Securities (defined below).

(B)     "Original Issue Date" shall mean the date on which a share of Series A Preferred Stock was first issued.

(C)     "Convertible Securities" shall mean any evidences of indebtedness, shares (other than Common Stock or Series A Preferred Stock) or other securities convertible into or exchangeable for Common Stock.

(D)     "Additional Shares of Common Stock" shall mean all shares of Common Stock issued (or, pursuant to Section 3(d)(iii), deemed to be issued) by the corporation after the Original Issue Date, other than shares of Common Stock issued or issuable:

(1)     Upon conversion of shares of Series A Preferred Stock;

(2)     To employees, consultants, officers or directors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors;

(3)     In connection with any borrowings, direct or indirect, from financial institutions or other persons by the corporation, whether or not presently authorized, including any type of loan or payment evidenced by any type of debt instrument, provided such borrowings are approved by the Board of Directors;

(4)     To the corporation's landlords, advisors or vendors or to other persons providing goods and services to the corporation if such issuance is approved by the Board of Directors and provided that such securities are issued for other than primarily equity financing purposes;

(5)     In connection with obtaining lease financing, whether issued to a lessor, guarantor or other person, approved by the Board of Directors;

(6)     To entities in connection with joint ventures, development projects, acquisitions of another business entity or business segment of any such entity by the corporation by merger, purchase of assets or other reorganization, or other strategic transactions, in each case approved by the Board of Directors;

-8-

(7)     In connection with any stock split, stock dividend or recapitalization of the corporation;

(8)     In a Qualified IPO;

(9)     Pursuant to warrants, notes or other rights to acquire securities of the corporation outstanding as of the Original Issue Date; and

(10)     In any other transaction in which exemption from this Section C.3(d) is approved by the affirmative vote of at least seventy percent (70%) of the then outstanding Preferred Stock voting as a single class on an as converted basis.

(ii)     No Adjustment of Conversion Price.  Any provision herein to the contrary notwithstanding, no adjustment in the Conversion Price shall be made in respect of the issuance of Additional Shares of Common Stock unless the consideration per share (determined pursuant to Section C.3(d)(v) hereof) for an Additional Share of Common Stock issued or deemed to be issued by the corporation is less than the Conversion Price in effect on the date of, and immediately prior to, such issue.

(iii)     Deemed Issue of Additional Shares of Common Stock.  In the event the corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities then entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein designed to protect against dilution) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, provided that in any such case in which Additional Shares of Common Stock are deemed to be issued:

(A)     No further adjustments in the Conversion Price shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities;

(B)     If such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the corporation, or decrease or increase in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall,

700872052v4

upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities (provided, however, that no such adjustment of the Conversion Price shall affect Common Stock previously issued upon conversion of the Preferred Stock);

(C)     Upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if:

(1)     In the case of Convertible Securities or Options for Common Stock the only Additional Shares of Common Stock issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the consideration actually received by the corporation upon such exercise, or for the issue of all such Convertible Securities, plus the additional consideration, if any, actually received by the corporation upon such conversion or exchange; and

(2)     In the case of Options for Convertible Securities only the Additional Shares of Common Stock, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the corporation for the Additional Shares of Common Stock deemed to have been then issued was the consideration actually received by the corporation for the issue of all such Options, whether or not exercised, plus the consideration deemed to have been received by the corporation (determined pursuant to Section 3(d)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised;

(D)     No readjustment pursuant to clause (B) or (C) above shall have the effect of increasing the Conversion Price to an amount which exceeds the lower of (a) the Conversion Price on the original adjustment date, or (b) the Conversion Price that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date.

(E)     In the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Conversion Price shall be made until the expiration or exercise of all

-10-

such Options, whereupon such adjustment shall be made in the same manner provided in clause (C) above.

(F)    If any such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price which became effective on such record date shall be canceled as of the close of business on such record date, and shall instead be made on the actual date of issuance, if any.

(iv)    Adjustment of Conversion Price of Preferred Stock Upon Issuance of Additional Shares of Common Stock.  In the event the corporation, at any time after the Original Issue Date shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.3(d)(iii)) without consideration or for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then the Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares of Common Stock which the aggregate consideration received by the corporation for the total number of Additional Shares of Common Stock so issued would purchase at such Conversion Price in effect immediately prior to such issuance, and the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of such Additional Shares of Common Stock so issued.  For the purpose of the above calculation, the number of shares of Common Stock outstanding immediately prior to such issue shall be calculated on a fully diluted basis, as if all shares of Series A Preferred Stock and all Convertible Securities had been fully converted into shares of Common Stock immediately prior to such issuance and any outstanding warrants, options or other rights for the purchase of shares of stock or Convertible Securities (including all Options) had been fully exercised immediately prior to such issuance (and the resulting securities fully converted into shares of Common Stock, if so convertible) as of such date, but not including in such calculation any additional shares of Common Stock issuable with respect to shares of Preferred Stock, Convertible Securities, or outstanding options, warrants or other rights for the purchase of shares of stock or convertible securities, solely as a result of the adjustment of the Conversion Price (or other conversion ratios) resulting from the issuance of Additional Shares of Common Stock causing such adjustment.

(v)    Determination of Consideration.  For purposes of this Section C.3(d), the consideration received by the corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(A)    <u>Cash and Property</u>.  Such consideration shall:

(1)    Insofar as it consists of cash, be computed at the aggregate amount of cash received by the corporation excluding amounts paid or payable for accrued interest or accrued dividends;

(2)    Insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board of Directors; and

(3)    In the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (1) and (2) above, as determined in good faith by the Board of Directors.

(B)    <u>Options and Convertible Securities</u>.  The consideration per share received by the corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section C.3(d)(iii), relating to Options and Convertible Securities shall be determined by dividing:

(1)    The total amount, if any, received or receivable by the corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) payable to the corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by

(2)    The maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against the dilution) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities.

(e)    <u>Adjustments to Conversion Prices for Stock Dividends and for Combinations or Subdivisions of Common Stock</u>.  In the event that the corporation at any time or from time to time after the Original Issue Date shall declare or pay, without consideration, any dividend on the Common Stock payable in Common Stock or in any right to acquire Common Stock for no consideration, or shall effect a subdivision of the outstanding shares of Common Stock into a greater number of shares of Common Stock (by stock split, reclassification or otherwise than by payment of a dividend in Common Stock or in any right to acquire Common Stock), or in the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, then the Conversion Price

700872052v4

in effect immediately prior to such event shall, concurrently with the effectiveness of such event, be proportionately decreased or increased, as appropriate. In the event that the corporation shall declare or pay, without consideration, any dividend on the Common Stock payable in any right to acquire Common Stock for no consideration, then the corporation shall be deemed to have made a dividend payable in Common Stock in an amount of shares equal to the maximum number of shares issuable upon exercise of such rights to acquire Common Stock.

(f)    Adjustments for Reclassification and Reorganization. If the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for in Section C.3(e) above or a merger or other reorganization referred to in Section C.2(d) above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionately adjusted so that the Preferred Stock shall be convertible into, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Preferred Stock immediately before that change. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section C.3 with respect to the rights of the holders of the Preferred Stock after the recapitalization to the end that the provisions of this Section C.3 (including adjustment of the Conversion Price then in effect and the number of shares purchasable upon conversion of the Preferred Stock) shall be applicable after that event as nearly equivalent as may be practicable.

(g)    Other Distributions. In the event the corporation shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by the corporation or other persons, assets (excluding cash dividends) or options or rights not referred to in subsection C.3(d), then, in each such case for the purpose of this subsection C.3(g), the holders of the Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock of the corporation into which their shares of Preferred Stock are convertible as of the record date fixed for the determination of the holders of Common Stock of the corporation entitled to receive such distribution.

(h)    No Impairment. The corporation will not by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section C.3 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Preferred Stock against impairment.

(i)    Certificates as to Adjustments. Upon the occurrence of each adjustment or readjustment of any Conversion Price pursuant to this Section C.3, the corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Preferred Stock a certificate executed by the corporation's President or Chief Financial Officer setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The corporation shall, upon

-13-

the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of the Preferred Stock.

(j)     Notices of Record Date.  In the event that the corporation shall propose at any time:  (i) to declare any dividend or distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus; (ii) to offer for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (iii) to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or (iv) to merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; then, in connection with each such event, the corporation shall send to the holders of Preferred Stock:

(A)     At least twenty (20) days' prior written notice of the date on which a record shall be taken for such dividend, distribution or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (iii) and (iv) above; and

(B)     In the case of the matters referred to in (iii) and (iv) above, at least twenty (20) days' prior written notice of the date when the same shall take place (and specifying the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event).

(k)     Issue Taxes.  The corporation shall pay any and all issue and other taxes that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of Preferred Stock pursuant hereto; provided, however, that the corporation shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(l)     Reservation of Stock Issuable Upon Conversion.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Articles of Incorporation.

(m)   Fractional Shares.  No fractional share shall be issued upon the conversion of any share or shares of Preferred Stock.  All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Preferred Stock by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share.  If, after the aforementioned aggregation, the conversion would result in the issuance of a fraction of a share of Common Stock, the corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board of Directors).

(n)   Notices.  Any notice required by this Section C.3 to be given to the holders of shares of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address on the books of the corporation.

4.   Voting Rights.

(a)   Voting Other than for Directors.  Except as required by law and in Section C.4(b) below, the holder of each share of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Preferred Stock could be converted on the record date for the vote or consent of shareholders and, except as otherwise required by law, shall have voting rights and powers equal to the voting rights and powers of the Common Stock.  The holder of each share of Preferred Stock shall be entitled to notice of any shareholders' meeting in accordance with the Bylaws of the corporation and shall vote with holders of the Common Stock upon the election of directors and upon any other matter submitted to a vote of shareholders, except as to those matters required by law or these Amended and Restated Articles of Incorporation to be submitted to a class vote.  Fractional votes by the holders of Preferred Stock shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

(b)   Voting for Directors.

(i)   With respect to the election of members of the Board of Directors, (i) three (3) members of the Board of Directors shall be elected by the holders of the Series A Preferred Stock, voting as a separate class (the "Series A Directors"), and (ii) one (1) member of the Board of Directors shall be elected by the holders of the Common Stock, voting as a separate class (the "Common Director").  All remaining member(s) of the Board of Directors shall be elected by holders of a majority of the Series A Preferred Stock and the Common Stock, voting together as a single class (the "Joint Director(s)").

(ii)   Subject to Sections 302, 303(a)(1) and 304 of the California Corporations Code, the Series A Directors may be removed from the Board of Directors, either with or without cause, by the affirmative vote of the holders of a majority of the outstanding Series A Preferred Stock, the Common Directors may be removed from the Board of Directors, either with or without cause, by the

700872052v4

affirmative vote of the holders of a majority of the outstanding Common Stock, and the Joint Director(s) may be removed from the Board of Directors, either with or without cause, by the affirmative vote of the holders of a majority of the Series A Preferred Stock and the Common Stock, voting together as a single class.

      (iii)    Upon the occurrence of a vacancy on the Board of Directors, such vacancy shall be filled by the affirmative vote of the holders of a majority of the shares of that class or series as provided in Section C.4(b)(i) hereof.

5.      <u>Restrictions and Limitations</u>.

    (a)    The corporation shall not, directly or indirectly, including without limitation by merger, consolidation, recapitalization, reclassification or otherwise, without the vote or written consent by the holders of a majority of the then outstanding shares of the Preferred Stock, voting as a single class on an as converted basis:

      (i)    Except as set forth in Section C.6 hereof, redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose) any share or shares of Preferred Stock otherwise than by conversion in accordance with Section C.3 hereof;

      (ii)    Redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any of the Common Stock; provided, however, that this restriction shall not apply to the repurchase of shares of Common Stock from employees, officers, directors, consultants or other persons performing services for the corporation or any subsidiary pursuant to agreements approved by the Board of Directors under which the corporation has the option to repurchase such shares at cost or at cost plus interest upon the occurrence of certain events, such as the termination of employment;

      (iii)    Effect, or enter into any agreement to effect or that would result in, (a) any sale, lease, assignment, transfer or other conveyance of all or substantially all of the assets of the corporation, or (b) any consolidation or merger involving the corporation, or any reclassification or other change of any stock, or any recapitalization of the corporation;

      (iv)    Authorize, designate or issue, or enter into any agreement to authorize, designate or issue, whether by merger, reclassification or otherwise, any other equity security (including any security convertible into or exercisable for any equity security) senior to the Preferred Stock as to dividend rights, redemption rights, voting rights or liquidation preferences; or

      (v)    Increase or decrease the aggregate number of authorized shares of Common Stock or Preferred Stock, or (whether by merger, reclassification or otherwise) alter or change the powers, preferences or special rights of the shares of Preferred Stock;

(vi)   Increase or decrease the authorized number of members of the corporation's Board of Directors; or

(vii)   Either (i) voluntarily file for bankruptcy or (ii) take any action or permit any action to be taken which would result in any liquidation, dissolution or winding up of the corporation.

(b)   The corporation shall not, directly or indirectly, including without limitation by merger, consolidation, recapitalization, reclassification or otherwise, without the vote or written consent by the holders of at least seventy percent (70%) of the then outstanding shares of the Preferred Stock, voting as a single class on an as converted basis:

(i)   Amend, waive, alter or repeal the preferences, rights, privileges or powers of the Series A Preferred Stock; provided however that this provision shall not apply to the reincorporation of the corporation, so long as such migratory merger does not alter, amend, modify, or rescind any of the rights or terms of the Preferred Stock other than as a result of distinctions between the laws of California and those of the jurisdiction into which the corporation was reincorporated;

(ii)   create, or authorize the creation of, or issue, or authorize the issuance of any debt security or other indebtedness, or permit any subsidiary to take any such action with respect to any debt security or other indebtedness, that is senior to the loans made to the corporation under the Convertible Loan Agreement;

(iii)   Declare, pay or set aside any cash dividend or cash distribution on the capital stock of the corporation or take any action that would result in the foregoing;

(iv)   Redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose) any share or shares of capital stock of the corporation in any transaction (otherwise than by conversion in accordance with Section C.3 hereof) where the holders of such shares of capital stock are not offered the ability to participate in such redemption or purchase, pro-rata, based upon such holder's ownership of the capital stock to be so redeemed or purchased (including for the avoidance of doubt the redemption contemplated in Section C.6 hereof); or

(v)   Change the percentage of the affirmative vote of the Preferred Stock necessary to effect any of the changes enumerated in the foregoing clauses (i) and (ii);

6.   Redemption Request.

(a)   At or at any time after November 30, 2014, upon receipt of a written request for redemption hereunder by the corporation from the holders of a majority of the outstanding shares of the Series A Preferred Stock the corporation shall, at any time it may lawfully do so, redeem on

-17-

a pari passu basis the Series A Preferred Stock by paying in cash therefor a sum equal to (i) the "Original Series A Issue Price" for each such share of Series A Preferred Stock plus all declared but unpaid dividends (in each case as adjusted for any stock dividends, combinations, splits or other recapitalizations with respect to such shares occurring after the date hereof), on each such share of Series A Preferred Stock (such amount being hereafter referred to as the "Redemption Price"). Subject to such extensions of time as required to comply with this Section C.6, such redemption shall be made in three (3) equal annual installments beginning with the first such installment occurring at least thirty (30) days after the receipt by the corporation of such request and not more than one hundred twenty (120) days after such request (each, a "Redemption Date"). The maximum number of shares of Series A Preferred Stock that the corporation shall be required to redeem on any one Redemption Date shall be equal to the amount determined by dividing (i) the aggregate number of shares of Series A Preferred Stock outstanding immediately prior to such Redemption Date by (ii) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). Any redemption of Series A Preferred Stock effected pursuant to this Section 6 shall be made on a pro rata basis among the holders of Series A Preferred Stock in proportion to the aggregate Redemption Price of each such holder of Series A Preferred Stock would otherwise be entitled to receive on the applicable Redemption Date.

(b)     If the funds of the corporation legally available for redemption of the shares of Series A Preferred Stock on any Redemption Date are insufficient to permit payment of the full Redemption Price for each share of Series A Preferred Stock to be redeemed on such Redemption Date, the corporation shall use those funds that are legally available to redeem the maximum possible number of such shares (at the applicable Redemption Price) ratably from among the holders of such shares to be redeemed (based upon the Redemption Price each holder is entitled to receive under Section C.6(a) divided by the total aggregate Redemption Price due to all of the holders under Section C.6(a)). The shares of Series A Preferred Stock not redeemed shall remain outstanding and be entitled to all the rights and preferences provided herein. At any time thereafter, when additional funds of the corporation are legally available for the redemption of shares of Series A Preferred Stock, such funds will immediately be used to redeem the balance of, or if not sufficient to redeem the full balance, redeem at the applicable Redemption Price of such Series A Preferred Stock ratably from among the holders of such shares to be redeemed (based upon the Redemption Price each holder is entitled to receive under Section C.6(a) divided by the total aggregate Redemption Price due to all of the holders under Section C.6(a)), the shares that the corporation has become obligated to redeem on the relevant Redemption Date but which it has not redeemed.

(c)     Redemption Notice. At least fifteen (15) but no more than thirty (30) days prior to any Redemption Date, the corporation shall mail written notice, postage prepaid, to each holder of record (at the close of business on the business day next preceding the day on which notice is given) of the Series A Preferred Stock to be redeemed, at the address last shown on the records of the corporation for such holder or given by the holder to the corporation for the purpose of notice or, if no such address appears or is given, at the place where the principal executive office of the corporation is located (the "Redemption Notice"). The Redemption Notice shall notify such holder of the redemption to be effected, specify the subsection hereof under which such redemption is being effected, the Redemption Date, the applicable Redemption Price, the place at which payment may be obtained and the date on which such holder's conversion rights (as set forth in Section C.3) as to such shares terminate (which date shall in no event be earlier than

-18-

fourteen (14) days' prior to the Redemption Date) and call upon such holder to surrender to the corporation, in the manner and at the place designated, the certificate or certificates representing the shares to be redeemed.

(d)    Surrender of Certificates.  On or before each designated Redemption Date, each holder of Series A Preferred Stock to be redeemed shall (unless such holder has previously exercised his right to convert such shares of Series A Preferred Stock into Common Stock as provided in Section C.3 below), surrender the certificate(s) representing such shares of Series A Preferred Stock to be redeemed to the corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the redemption price for such shares shall be payable to the order of the person whose name appears on such certificate(s) as the owner thereof, and each surrendered certificate shall be canceled and retired.  If less than all of the shares represented by such certificate are redeemed, then the corporation shall promptly issue a new certificate representing the unredeemed shares.

(e)    Effect of Redemption.  If the Redemption Notice shall have been duly given, and if on a Redemption Date, the Redemption Price to be paid on such Redemption Date is either paid or made available for payment through the deposit arrangements specified in subsection (f) below, then notwithstanding that the certificates evidencing any of the shares of Series A Preferred Stock so called for redemption shall not have been surrendered, all dividends with respect to such shares shall cease to accrue after such Redemption Date, such shares shall not thereafter be transferred on the corporation's books and the rights of all of the holders of such shares with respect to such shares shall terminate after such Redemption Date, except only the right of the holders to receive the Redemption Price without interest upon surrender of their certificate(s) therefor.

(f)    Deposit of Redemption Price.  On or prior to the Redemption Date, the corporation shall deposit with a bank or trust company having a capital and surplus of at least $100,000,000, as a trust fund for the benefit of the respective holders of the shares designated for redemption and not yet redeemed, a sum equal to the aggregate Redemption Price (or any such portion thereof that the corporation is legally able to pay) for all shares of Series A Preferred Stock (or an appropriate portion thereof if the aggregate Redemption Price is not legally available at such time) called for redemption and not yet redeemed, with irrevocable instructions and authority to the bank or trust company to pay, on or after the applicable Redemption Date, the Redemption Price (or appropriate portion thereof) to the respective holders upon the surrender of their share certificates.  From and after the date of such deposit, the shares so called for redemption shall be redeemed.  The deposit shall constitute full payment of the shares so redeemed to their holders, and from and after the date of the deposit, the shares shall be deemed to be no longer outstanding, all dividends with respect to such shares so redeemed shall cease to accrue and the holders thereof shall cease to be shareholders with respect to such shares so redeemed and shall have no rights with respect thereto except the right to receive from the bank or trust company payment of the redemption price of the shares so redeemed, without interest, upon surrender of their certificates therefor, and the right to convert such shares so redeemed as provided in Section C.3 below (in which case, upon conversion of the shares of Series A Preferred Stock before redemption, such shares shall not be redeemed).  Any funds so deposited and unclaimed at the end of six (6) months from the applicable Redemption Date shall be released or repaid to the corporation, after which time the holders of shares called for redemption who

-19-

have not claimed such funds shall be entitled to receive payment of the Redemption Price only from the corporation.

       7.    <u>No Reissuance of Preferred Stock</u>.  No share or shares of Preferred Stock acquired by the corporation by reason of redemption, purchase, conversion or otherwise shall be reissued, and all such shares shall be canceled, retired and eliminated from the shares which the corporation shall be authorized to issue.

ARTICLE IV

       A.    The liability of directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.  Unless applicable law otherwise provides, any amendment, repeal or modification of this Article IV A shall not adversely affect any right or protection of a director under this Article IV A that existed at or prior to the time of such amendment, repeal or modification.

       B.    The corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, to the fullest extent permissible under California law.  Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article IV B shall not adversely affect any contract or other right to indemnification of any agent of the corporation that existed at or prior to the time of such amendment, repeal or modification.

       C.    Any amendment, repeal or modification of any provision of the Article IV shall not adversely affect any right or protection of an agent of this corporation existing at the time of such amendment, repeal or modification.

3.    The corporation filed a petition for voluntary bankruptcy under Chapter 11 of the U.S. Bankruptcy Code on August 29, 2007.  Under the Confirmation Order entered January 30, 2008, in respect of its plan of reorganization, the corporation is required (i) to amend its Articles of Incorporation to contain a provision prohibiting the issuance of nonvoting equity securities as required by Section 1123(a)(6) of the Bankruptcy Code and (ii) to amend its Articles of Incorporation in other respects to give effect to its plan of reorganization.  This certificate is made pursuant to the Confirmation Order by the undersigned who has full power and authority to take such action pursuant to the Confirmation Order.

Each of the undersigned further declares under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of her or his own knowledge.

Dated:  February 11, 2008

                                     _____
                                       M. Sue Preston, President

                                       _____
                                       Philip J. Barr, Secretary

700872052v4

**EXHIBIT B**

**SCHEDULE OF EXCEPTIONS**

**Section 2.25 Section 83(b) Elections:**

The Company understands this representation to relate only to its Common Stock outstanding immediately after the effective date of its Plan of Reorganization, none of which was purchased by individuals.

**EXHIBIT C**

**INVESTORS' RIGHTS AGREEMENT**

700871702v6

# EXHIBIT I (Part 2)

*Execution Copy*

## ARRIVA PHARMACEUTICALS, INC.

## INVESTORS' RIGHTS AGREEMENT

THIS INVESTORS' RIGHTS AGREEMENT (this "Agreement") is made and entered into as of the 13th day of February, 2008, by and among Arriva Pharmaceuticals, Inc., a California corporation (the "Company"), each of the persons listed on Schedule A (each, a "*Preferred Investor*" and collectively, the "*Preferred Investors*").

### SECTION 1

### Restrictions On Transferability Of Securities; Registration Rights

1.1 Certain Definitions. As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "*Closing*" shall mean the date of the initial sale of shares of the Company's Series A Preferred Stock.

(b) "*Commission*" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(c) "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(d) "*Holder*" shall mean any person who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with Section 1.11 hereof.

(e) "*Initiating Holders*" shall mean any Holder or Holders who in the aggregate hold not less than twenty percent (20%) of the outstanding Registrable Securities that are issued or issuable upon conversion of the Company's Series A Preferred Stock.

(f) "*Investor*" shall mean the Preferred Investors.

(g) "*Other Shareholders*" shall mean persons other than Holders who, by virtue of agreements with the Company, are entitled to include their securities in certain registrations hereunder.

(h) "*Registrable Securities*" shall mean (i) shares of Common Stock issued or issuable pursuant to the conversion of the Shares; and (ii) any Common Stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in (i) above, provided, however, that Registrable Securities shall not include any shares of Common Stock which have previously been registered or which have been sold to the public.

(i) The terms "*register,*" "*registered*" and "*registration*" shall refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act

and applicable rules and regulations thereunder, and the declaration or ordering of the effective-ness of such registration statement.

(j) *"Registration Expenses"* shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, and fees and disbursements of counsel for the Holders not to exceed $25,000 in each instance (but excluding the compensation of regular employees of the Company, which shall be paid in any event by the Company) but shall not include Selling Expenses.

(k) *"Rule 144"* shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(l) *"Rule 145"* shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(m) *"Securities Act"* shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(n) *"Selling Expenses"* shall mean all underwriting discounts and selling commissions applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of counsel included in Registration Expenses).

(o) *"Series A Agreement"* shall mean the Series A Preferred Stock Purchase Agreement between the Company and each of the Preferred Investors.

(p) *"Shares"* shall mean the Company's Series A Preferred Stock.

1.2   Requested Registration.

(a)   Request for Registration. If the Company shall receive from Initiating Holders at any time or times not earlier than the earlier of (i) February 13, 2011 or (ii) six (6) months after the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public, a written request that the Company effect any registration with respect to all or a part of the Registrable Securities the aggregate proceeds of which (after deduction for underwriter's discounts and expenses related to the issuance) exceed $10,000,000 the Company will:

(i)   within ten (10) days of receipt thereof, give written notice of the proposed registration to all other Holders; and

(ii)   as soon as practicable, and in any event within sixty (60) days of receipt of such request, use its best efforts to effect such registration (including,

without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and as would permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within twenty (20) days after such written notice from the Company is mailed or delivered.

The Company shall not be obligated to effect, or to take any action to effect, any such registration pursuant to this Section 1.2:

(A) In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(B) After the Company has initiated two (2) such registrations pursuant to this Section 1.2(a) (counting for these purposes only registrations which have been declared or ordered effective and pursuant to which securities have been sold and registrations which have been withdrawn by the Holders as to which the Holders have not elected to bear the Registration Expenses pursuant to Section 1.4 hereof and would, absent such election, have been required to bear such expenses);

(C) During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Company-initiated registration; provided that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective; or

(D) If the Initiating Holders propose to dispose of shares of Registrable Securities which may be immediately registered on Form S-3 pursuant to a request made under Section 1.5 hereof.

(b) <u>Registration Statement</u>.  Subject to the foregoing clauses (A) through (D), the Company shall file a registration statement covering the Registrable Securities so requested to be registered as soon as practicable, and in any event within sixty (60) days after receipt of the request or requests of the Initiating Holders; provided, however, that if (i) in the good faith judgment of the Board of Directors of the Company, such registration would be seriously detrimental to the Company and the Board of Directors of the Company concludes, as a result, that it is essential to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, essential to defer the filing of such registration statement, then the

Company shall have the right to defer such filing for the period during which such disclosure would be seriously detrimental, provided that (except as provided in clause (C) above) the Company may not defer the filing for a period of more than one hundred twenty (120) days after receipt of the request of the Initiating Holders, and, provided further, that the Company shall not defer its obligation in this manner more than once in any twelve (12) month period.

The registration statement filed pursuant to the request of the Initiating Holders may, subject to the provisions of Section 1.2(d) hereof, include other securities of the Company, with respect to which registration rights have been granted, and may include securities of the Company being sold for the account of the Company.

(c) Underwriting. The right of any Holder to registration pursuant to Section 1.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder with respect to such participation and inclusion) to the extent provided herein. A Holder may elect to include in such underwriting all or a part of the Registrable Securities he holds.

(d) Procedures. If the Company shall request inclusion in any registration pursuant to Section 1.2 of securities being sold for its own account, or if other persons shall request inclusion in any registration pursuant to Section 1.2, the Initiating Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and may condition such offer on their acceptance of the further applicable provisions of this Section 1 (including Section 1.12). The Company shall (together with all Holders and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by a majority in interest of the Initiating Holders, which underwriters are reasonably acceptable to the Company. Notwithstanding any other provision of this Section 1.2, if the representative of the underwriters advises the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, then the Initiating Holders shall so advise all holders of Registrable Securities that would otherwise be underwritten, and the number of shares to be included in the underwriting or registration shall be allocated among all Holders thereof, including Initiating Holders, in proportion (as nearly as practicable) to the amount of Registrable Securities of the Company requested for inclusion by such Holder; provided, however, that any such limitation or cut back shall first be applied to all shares proposed to be sold in such underwriting that are not Registrable Securities. If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the underwriter or the Initiating Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 1.2(d), then the Company shall offer to all Holders who have retained rights to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders requesting additional inclusion in accordance with Section 1.13.

1.3  Company Registration.

(a)  If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders exercising their respective demand registration rights (other than pursuant to Section 1.2 or 1.5 hereof), other than a registration relating solely to employee benefit plans, or a registration relating solely to a Rule 145 transaction, the Company will:

(i)  promptly give to each Holder written notice thereof; and

(ii)  use its best efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 1.3(b) below, and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests, made by any Holder and received by the Company within twenty (20) days after the written notice from the Company described in clause (i) above is mailed or delivered by the Company.   Such written request may specify all or a part of a Holder's Registrable Securities.

(b)  Underwriting.   If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 1.3(a)(i).  In such event, the right of any Holder to registration pursuant to this Section 1.3 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.   All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders of securities of the Company with registration rights to participate therein distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this Section 1.3, if the representative of the underwriters advises the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the representative may (subject to the limitations set forth below) exclude all Registrable Securities from, or limit the number of Registrable Securities to be included in, the registration and underwriting. If the registration is the first Company-initiated registered offering of the Company's securities to the general public, the Company may limit, to the extent so advised by the underwriters, the amount of securities (including Registrable Securities) to be included in the registration by the Company's shareholders (including the Holders), or may exclude, to the extent so advised by the underwriters, such underwritten securities entirely from such registration (provided that in such event no other holder of registration rights is entitled to registration of securities in such offering in preference to the Holders).  If such registration is the second or any subsequent Company-initiated registered offering of the Company's securities to the general public, the Company may limit, to the extent so advised by the underwriters, the amount of securities to be included in the registration by the Company's Shareholders (including the Holders); provided, however, that the aggregate value of the Registrable Securities to be included in such registration by the Company's Shareholders (including the Holders) may not be so reduced to less than thirty percent (30%) of the total value

-5-

of all securities included in such registration. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated first to the Company for securities being sold for its own account and thereafter as set forth in Section 1.13. If any person does not agree to the terms of any such underwriting, he shall be excluded therefrom by written notice from the Company or the underwriter. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration.

If shares are so withdrawn from the registration and if the number of shares of Registrable Securities to be included in such registration was previously reduced as a result of marketing factors, the Company shall then offer to all persons who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among the persons requesting additional inclusion in accordance with Section 1.13 hereof.

1.4 <u>Expenses of Registration</u>. All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Sections 1.2, 1.3 and 1.5 hereof shall be borne by the Company; provided, however, that if the Holders bear the Registration Expenses for any registration proceeding begun pursuant to Section 1.2 and subsequently withdrawn by the Holders registering shares therein, such registration proceeding shall not be counted as a requested registration pursuant to Section 1.2 hereof, except in the event that such withdrawal is based upon material adverse information relating to the Company that is different from the information known or available (upon request from the Company or otherwise) to the Holders requesting registration at the time of their request for registration under Section 1.2, in which event such registration shall not be treated as a counted registration for purposes of Section 1.2 hereof, even though the Holders do not bear the Registration Expenses for such registration. All Selling Expenses relating to securities so registered shall be borne by the holders of such securities pro rata on the basis of the number of shares of securities so registered on their behalf.

1.5 <u>Registration on Form S-3</u>.

(a) After its initial public offering, the Company shall use its best efforts to qualify for registration on Form S-3 or any comparable or successor form or forms. After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this Section 1, the Holders of Registrable Securities shall have the right to request registrations on Form S-3 (such requests shall be in writing and shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Holder or Holders); provided, however, that the Company shall not be obligated to effect any such registration if (i) the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) on Form S-3 at an aggregate price to the public of less than $1,000,000, (ii) in the event that the Company shall furnish the certification described in paragraph 1.2(b)(ii) (but subject to the limitations set forth therein) or (iii) in a given twelve (12) month period, after the Company has effected one (1) such registration in any such period or (v) it is to be effected more than five (5) years after the Company's initial public offering.

(b)  If a request complying with the requirements of Section 1.5(a) hereof is delivered to the Company, the provisions of Sections 1.2(a)(i) and (ii) and Section 1.2(b) hereof shall apply to such registration.  If the registration is for an underwritten offering, the provisions of Sections 1.2(c) and 1.2(d) hereof shall apply to such registration.

1.6  <u>Registration Procedures</u>.  In the case of each registration effected by the Company pursuant to Section 1, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof.  At its expense, the Company will use its best efforts to:

(a)  Keep such registration effective for a period of one hundred twenty (120) days or until the Holder or Holders have completed the distribution described in the registration statement relating thereto, whichever first occurs; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock (or other securities) of the Company; and (ii) in the case of any registration of Registrable Securities on Form S-3 which are intended to be offered on a continuous or delayed basis, such one hundred twenty (120) day period shall be extended, if necessary, to keep the registration statement effective until all such Registrable Securities are sold, provided that Rule 415, or any successor rule under the Securities Act, permits an offering on a continuous or delayed basis, and provided further that applicable rules under the Securities Act governing the obligation to file a post-effective amendment permit, in lieu of filing a post-effective amendment that (A) includes any prospectus required by Section 10(a)(3) of the Securities Act or (B) reflects facts or events representing a material or fundamental change in the information set forth in the registration statement, the incorporation by reference of information required to be included in (A) and (B) above to be contained in periodic reports filed pursuant to Section 13 or 15(d) of the Exchange Act in the registration statement;

(b)  Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(c)  Furnish such number of prospectuses and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d)  Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing, and at the request of any such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material

fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in the light of the circumstances then existing;

(e) Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed;

(f) Provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(g) In connection with any underwritten offering pursuant to a registration statement filed pursuant to Section 1.2 hereof, the Company will enter into an underwriting agreement reasonably necessary to effect the offer and sale of Common Stock, provided such underwriting agreement contains customary underwriting provisions and provided further that if the underwriter so requests the underwriting agreement will contain customary contribution provisions.

(h) Furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to this Section 1, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Section 1, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities.

(i) Register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

1.7   Indemnification.

(a) The Company will indemnify each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this Section 1, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, or other document (including any

-8-

related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of the Securities Act or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, qualification, or compliance, and will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action, provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or expense arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder or underwriter and stated to be specifically for use therein.  It is agreed that the indemnity agreement contained in this Section 1.7(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent has not been unreasonably withheld).

(b) Each Holder will, if Registrable Securities held by him are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder and Other Shareholder, and each of their officers, directors, and partners, and each person controlling such Holder or Other Shareholder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular, or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, Other Shareholders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld).  In no event shall any indemnity under this subSection 1.7(b) exceed the gross proceeds from the offering received by such Holder.

(c) Each party entitled to indemnification under this Section 1.7 (the *"Indemnified Party"*) shall give notice to the party required to provide indemnification (the *"Indemnifying Party"*) promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such

claim or any litigation resulting therefrom, provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such party's expense, and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 1, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d) If the indemnification provided for in this Section 1.7 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations; provided, however, that in no event shall any contribution by a Holder under this subSection 1.7(d) exceed the gross proceeds from the offering received by such Holder. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e) Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f) The obligations of the Company and Holders under this Section 1.7 shall survive the completion of any offering of Registrable Securities in a registration statement under this Section 1, and otherwise.

1.8 <u>Information by Holder</u>. Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this Section 1.

1.9 <u>Limitations on Registration of Issues of Securities</u>. From and after the date of this Agreement, the Company shall not, without the prior written consent of holders of a majority in interest of the Shares, enter into any agreement with any holder or prospective holder of any

-10-

securities of the Company giving such holder or prospective holder any registration rights the terms of which are more favorable than the registration rights granted to the Holders hereunder.

    1.10 <u>Rule 144 Reporting</u>.  With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to use its best efforts to:

    (a)  Make and keep public information regarding the Company available as those terms are understood and defined in Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

    (b)  File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements;

    (c)  So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

    1.11 <u>Transfer or Assignment of Registration Rights</u>.  The rights to cause the Company to register securities granted to a Holder by the Company under this Section 1 may be transferred or assigned by a Holder only to (a) a transferee or assignee of not less than 500,000 shares of Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like); (b) partners, retired partners or affiliates of such Holder; or (c) members of such Holder's immediate family or a trust for the benefit of such Holder, provided that the Company is given written notice at the time of or within a reasonable time after such transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are being transferred or assigned, and, provided further, that the transferee or assignee of such rights assumes the obligations of such Holder under this Section 1.

    1.12 <u>"Market Stand-Off" Agreement</u>.  If requested by the Company and an underwriter of Common Stock (or other securities) of the Company, a Holder shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) for a specified period not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act, provided that such agreement shall only apply to the first such registration statement of the Company, including securities to be sold on its behalf to the public in an underwritten offering.  The foregoing provisions of this Section 1.12 shall not apply to the sale of any shares to an

-11-

underwriter pursuant to an underwriting agreement and shall only be applicable to the Holders if all officers and directors and greater than five percent (5%) shareholders of the Company enter into similar agreements. The underwriters in connection with the Company's initial public offering are intended third party beneficiaries of this Section 1.12 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

The obligations described in this Section 1.12 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares (or securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period.

1.13  <u>Allocation of Registration Opportunities</u>. In any circumstance in which all of the Registrable Securities and other shares of Common Stock of the Company (including shares of Common Stock issued or issuable upon conversion of shares of any currently unissued series of Preferred Stock of the Company) with registration rights (the ***"Other Shares"***) requested to be included in a registration on behalf of the Holders or other selling Shareholders cannot be so included as a result of limitations of the aggregate number of shares of Registrable Securities and Other Shares that may be so included, the number of shares of Other Shares shall be excluded, pro rata, until the aggregate number of shares of Registrable Securities and Other Shares may be included in such registration. If, after the complete exclusion of Other Shares from such registration, the aggregate number of shares of Registrable Securities cannot be so included as a result of such limitations, the shares of Registrable Securities shall be excluded, pro rata, until the aggregate number of shares of Registrable Securities may be included in such registration. In no event shall shares of Registrable Securities held by the Preferred Investors be excluded from such registration unless all Other Shares have been completely excluded from such registration.

1.14  <u>Delay of Registration</u>. No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 1.

1.15  <u>Termination of Registration Rights</u>. The right of any Holder to request registration or inclusion in any registration pursuant to Section 1.2, 1.3 or 1.5 shall terminate upon the earlier of (i) at such time when all shares of Registrable Securities held or entitled to be held upon conversion by such Holder may immediately be sold under Rule 144 during any ninety (90) day period; provided, however, that the provisions of this Section 1.15 shall not apply to any Holder who owns more than two percent (2%) of the Company's outstanding stock until the earlier of (x) such time as such Holder owns less than two percent (2%) of the outstanding stock of the Company, or (y) the expiration of five (5) years after the closing of the first registered public offering of Common Stock of the Company or (ii) the expiration of five (5) years after the closing of the first registered public offering of Common Stock of the Company.

SECTION 2

<u>Covenants of the Company</u>

-12-

The Company hereby covenants and agrees, so long as a Holder owns any Registrable Securities, as follows:

2.1 <u>Basic Financial Information</u>.  Unless otherwise determined by the Company's Board of Directors, beginning with the Company's fiscal year ended December 31, 2008, the Company will furnish to each Holder as soon as practicable after the end of each fiscal year of the Company, and in any event within one hundred twenty (120) days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as at the end of such fiscal year, and consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such year, prepared in accordance with generally accepted accounting principles consistently applied and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and certified by independent public accountants of recognized standing selected by the Company.

2.2 <u>Additional Information and Rights</u>.

(a) The Company will furnish to a Preferred Investor, so long as such Preferred Investor holds at least 1,000,000 Shares (including Common Stock issued upon conversion of such Shares, or any combination thereof (as presently constituted and subject to subsequent adjustment for stock splits, stock dividends, reverse stock splits, recapitalizations and the like) and including any Shares issueable upon conversion of the outstanding principal and accrued interest on the convertible promissory notes (the "***Convertible Notes***") issued pursuant to that certain Convertible Loan Agreement dated on or about November 30, 2007, assuming for this purpose a conversion price equal to the Original Series A Issue Price (as such term is defined in the Company's Amended and Restated Articles of Incorporation) (a "***Major Holder***") as soon as practicable after the end of the first, second, and third quarterly accounting periods in each fiscal year of the Company, and in any event within thirty (30) days thereafter, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of each such quarterly period, and consolidated statements of income and cash flows of the Company and its subsidiaries for such period and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied and setting forth in comparative form the figures for the corresponding periods of the previous fiscal year, subject to changes resulting from normal year-end audit adjustments, all in reasonable detail, except that such financial statements need not contain the notes required by generally accepted accounting principles; and

(b) The Company will permit a Preferred Investor, so long as such remains a Major Holder, to visit and inspect the properties of the Company, to examine its books of account and records and to discuss its affairs, finances and accounts with the Company's officers and its independent public accountants, all at such reasonable times as may reasonably be requested; provided, however, that the Company shall not be obligated pursuant to this Section 2.2 to provide access to any information that it reasonably considers to be a trade secret or similar confidential information, unless such Major Holder enters into a confidentiality agreement in form and substance satisfactory to the Company.

2.3 <u>Right of First Refusal</u>.  The Company hereby grants to each Major Holder the right of first refusal to purchase a pro rata share of New Securities (as defined in this Section 2.3) which the Company may, from time to time, propose to sell and issue.  A Holder's pro rata share,

for purposes of this right of first refusal, is the ratio of the number of shares of Common Stock owned by such Holder immediately prior to the issuance of New Securities, assuming full conversion of the Shares (and the Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price) and exercise of options or warrants held by such Holder, to the total number of shares of Common Stock outstanding immediately prior to the issuance of New Securities, assuming full conversion of the Shares (and the Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price) and exercise of all outstanding rights, options and warrants to acquire Common Stock of the Company. This right of first refusal shall be subject to the following provisions:

(a) *"New Securities"* shall mean (A) any capital stock (including Common Stock and/or Preferred Stock) of the Company whether now authorized or not, (B) rights, options or warrants to purchase such capital stock and securities of any type whatsoever that are, or may become, convertible into capital stock, and (C) debt securities issued by the Company; provided that the term *"New Securities"* does not include (i) securities purchased under the Series A Agreement; (ii) securities issued upon conversion of the Series A Preferred Stock or the Shares; (iii) securities issued pursuant to the acquisition of another business entity or business segment of any such entity by the Company by merger, purchase of substantially all the assets or other reorganization approved by the Board of Directors whereby the Company will own more than fifty percent (50%) of the voting power of such business entity or business segment of any such entity; (iv) any borrowings, direct or indirect, from financial institutions or other persons by the Company approved by the Board of Directors, whether or not presently authorized, including any type of loan or payment evidenced by any type of debt instrument, provided such borrowings are not convertible into capital stock of the Company; (v) securities issued to employees, consultants, officers or directors of the Company pursuant to any stock option, stock purchase or stock bonus plan, agreement or arrangement approved by the Board of Directors; (vi) securities issued to the Company's landlords, advisors or vendors or to other persons providing goods and services to the Company if such issuance is approved by the Board of Directors and provided that such securities are issued for other than primarily equity financing purposes; (vii) securities issued in connection with obtaining lease financing, whether issued to a lessor, guarantor or other person approved by the Board of Directors; (viii) securities issued in a Qualified IPO (as defined in the Company's Amended and Restated Articles of Incorporation) pursuant to a registration under the Securities Act with an aggregate offering price to the public of at least $10,000,000; (ix) securities issued in connection with any stock split, stock dividend or recapitalization of the Company; (x) securities issued to entities in connection with joint ventures, development projects, acquisitions of another business entity or business segment of any such entity by the Company by merger, purchase of assets or other reorganization, or other strategic transactions, in each case approved by the Board of Directors; (ix) securities issued pursuant to the exercise or conversion of warrants, notes or other rights to acquire securities of the Company outstanding as of the date hereof and (xii) any right, option or warrant to acquire any security convertible into the securities excluded from the definition of New Securities pursuant to subsections (i) through (xi) above.

(b) In the event the Company proposes to undertake an issuance of New Securities, it shall give each Holder written notice of its intention, describing the type of New Securities, and

-14-

their price and the general terms upon which the Company proposes to issue the same. Each Holder shall have fifteen (15) days after any such notice is mailed or delivered to agree to purchase such Holder's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased. The Company shall promptly, in writing, inform each Holder that elects to purchase all the shares available to it (a *"Fully-Exercising Investor"*) of any other Holder's failure to do likewise. During the ten (10) day period commencing after such information is given, each Fully-Exercising Investor may elect to purchase that portion of the Shares for which Holders were entitled to subscribe but which were not subscribed for by the Holders that is equal to the proportion that the number of shares of Common Stock issued and held, or issuable upon conversion of Series A Preferred Stock then held, by such Fully-Exercising Investor bears to the total number of shares of Common Stock issued and held, or issuable upon conversion of the Series A Preferred Stock then held, by all Fully-Exercising Investors who wish to purchase some of the unsubscribed shares.

(c) In the event the Holders fail to exercise fully the right of first refusal within such fifteen (15) day period, the Company shall have one hundred twenty (120) days thereafter to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within one hundred twenty (120) days from the date of such agreement) to sell the New Securities respecting which the Holders' right of first refusal option set forth in this Section 2.3 was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice to Holders pursuant to Section 2.3(b). In the event the Company has not sold within such one hundred twenty (120) day period or entered into an agreement to sell the New Securities in accordance with the foregoing within one hundred twenty (120) days from the date of such agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Holders in the manner provided in Section 2.3(b) above.

(d) The right of first refusal set forth in this Section 2.3 may not be assigned or transferred, except that (i) such right is assignable by each Holder to any affiliate, wholly owned subsidiary or parent of, or to any corporation or entity that is, within the meaning of the Securities Act, controlling, controlled by or under common control with, any such Holder, and (ii) such right is assignable between and among any of the Holders.

2.4 <u>Stock Option Pool; Vesting</u>. Unless otherwise approved by the Company's Board of Directors, all service providers, including but not limited to employees and consultants, of the Company who shall purchase or receive options to purchase shares of the Company's Common Stock following the date hereof shall be required to execute stock purchase or option agreements in a form approved by the Board of Directors providing for vesting of such shares over a forty-eight (48) month period at the rate of twenty-five percent (25%) of the shares one year from the date of hire and 1/48th of the shares per month thereafter and providing further for a right of repurchase in favor of the Company or its assigns with respect to future sales of such Common Stock by such persons.

2.5 <u>Board of Director Meetings; Expenses</u>. The Company shall reimburse non-employee directors for their out-of-pocket travel expenses reasonably incurred in connection with

-15-

attendance at board meetings or committees thereof or any activities which are required and/or requested in accordance with standard Company procedures.

2.6 <u>Termination of Covenants</u>.  The covenants set forth in this Section 2 shall terminate and be of no further force and effect upon (and, if applicable, shall not apply to) the earliest to occur of (i) the closing of a Qualified IPO, (ii) the closing of a reorganization, merger, consolidation or other transaction or series of related transactions of the Company with or into another corporation or entity, in which fifty percent (50%) or more of the Company's outstanding voting stock is transferred to holders different from those who held the stock immediately prior to such merger or transaction, (iii) the closing of the sale of all or substantially all of the assets of the Company, (iv) the Company becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, and (v) the dissolution of the Company pursuant to action validly taken by the shareholders of the Company in accordance with applicable state law.

SECTION 3

Miscellaneous

3.1 <u>Governing law</u>.  This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

3.2 <u>Successors and Assigns</u>.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including permitted transferees of any shares of Series A Preferred Stock sold hereunder or any Common Stock issued upon conversion thereof).  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

3.3 <u>Entire Agreement; Amendment; Waiver</u>.  This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.  Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated, except by a written instrument signed by the Company and by holders of a majority of the Registrable Securities; provided, however, that (i) any amendment to the definition of Major Investor shall require the written consent of the Company and holders of at least seventy percent (70%) of the Registrable Securities, and (ii) any waiver or amendment that would materially and adversely change a specifically enumerated right or obligation hereunder of one or more of the Preferred Investors in a way that is materially disproportionate to the change such waiver or amendment would effect on such specifically enumerated rights of other Preferred Investors that hold the same such specifically enumerated rights (each such Preferred Investor whose specifically enumerated rights are being so disproportionately changed is referred to as a "***Disproportionately Treated Investor***"), such amendment or waiver shall not be effective as to any Disproportionately Treated Investor unless consented to by Disproportionately Treated Investors holding a majority of the Registrable Securities held by all Disproportionately Treated Investors.  Any such amendment, waiver, discharge or termination shall be binding on all the

-16-

Holders, but in no event shall the obligation of any Holder hereunder be materially increased, except upon the written consent of such Holder. For purposes of this Section 3.3, the term Registrable Securities shall include Shares issuable upon conversion of the outstanding principal and accrued interest on the Convertible Notes, assuming for this purpose a conversion price equal to the Original Series A Issue Price.

3.4 <u>Notices, etc.</u> All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by United States first-class mail, postage prepaid, or delivered personally by hand or nationally recognized courier addressed (a) if to a Holder, as indicated on the list of Holders attached hereto as <u>Schedule A</u>, or at such other address as such holder or permitted assignee shall have furnished to the Company in writing, or (b) if to the Company, to its principal office, Attention: Chief Executive Officer, or at such other address as the Company shall have furnished to each holder in writing. Notices sent by mail shall be deemed to have been given upon personal delivery, on the third business day after deposit in the U.S. mail, and upon the day following deposit with an overnight courier.

3.5 <u>Delays or Omissions.</u> No delay or omission to exercise any right, power or remedy accruing to any Holder, upon any breach or default of the Company under this Agreement shall impair any such right, power or remedy of such Holder nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default therefore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any Holder of any breach or default under this Agreement or any waiver on the part of any Holder of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any Holder, shall be cumulative and not alternative.

3.6 <u>Rights; Separability.</u> Unless otherwise expressly provided herein, a Holder's rights hereunder are several rights, not rights jointly held with any of the other Holders. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

3.7 <u>Information Confidential.</u> Each Holder acknowledges that the information received by them pursuant hereto may be confidential and for its use only, and it will not use such confidential information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than its employees or agents having a need to know the contents of such information, and its attorneys), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally or such Holder is required to disclose such information by a governmental body.

3.8 <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

3.9 <u>Counterparts; Facsimile Signatures.</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall

-17-

constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party. The original signature copy shall be delivered to the other party by express overnight delivery. The failure to deliver the original signature copy and/or the non-receipt of the original signature copy shall have no effect upon the binding and enforceable nature of this Agreement.

3.11 <u>Aggregation of Stock</u>. All shares of Registrable Securities held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

3.12 <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

3.13 <u>Subsequent Closings</u>. In the event that the Company shall conduct subsequent sales of Series A Preferred Stock pursuant to and in accordance with the terms of Section 1.3 of the Series A Agreement, any holder of such Shares shall be deemed a Holder with all of the rights of a Holder under this Agreement; provided that as a condition thereto such Holder and the Company shall sign a counterpart signature page to this Agreement.

[Remainder of Page Intentionally Left Blank]

700871712v5

IN WITNESS WHEREOF, the parties hereto have executed this Investors' Rights Agreement effective as of the day and year first above written.

**ARRIVA PHARMACEUTICALS, INC.,**
a California corporation


By _____

Its _____

**ARRIVA PHARMACEUTICALS B.V.**

By _____

Its _____


By _____

Its _____

MPM BIOVENTURES II-QP, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner


_____

By:
Title:


MPM BIOVENTURES II, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner


_____

By:
Title:


MPM ASSET MANAGEMENT INVESTORS 2002 BVII LLC


_____

By:
Title:


MPM BIOVENTURES GMBH & CO.

PARALLEL-BETEILIGUNGS KG

By:  MPM Asset Management II, L.P.,
       in its capacity as the Special Limited Partner
By:  MPM Asset Management II, LLC, its General Partner


_____

By:
Title:

## SCHEDULE A

## PREFERRED INVESTORS

| Name | Class of Stock | Number of Shares |
|---|---|---|
| Arriva Pharmaceuticals B.V.<br>c/o Nordic Biotech Advisors Aps<br>Ostergade 5,3<br>DK-1100 Copenhagen K<br>Denmark<br>Attention :  Chief Financial Officer<br>Facsimile:  45-70-20-12-64 | Series A Preferred | 1,000 |
| MPM Bioventures II-QP, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 338 |
| MPM Bioventures II, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 37 |
| MPM Asset Management Investors<br>2002 BVII LLC<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 6 |
| MPM Bioventures GMBH & CO.<br>Parallel-Beteiligungs KG<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 119 |
| **Total** | | 1,500 |

**EXHIBIT D**

**VOTING AGREEMENT**

D-1

*Execution Copy*

## ARRIVA PHARMACEUTICALS, INC.

## VOTING AGREEMENT

This Voting Agreement (this "*Agreement*") is made and entered into as of February 13, 2008, (the "*Effective Date*") by and among Arriva Pharmaceuticals, Inc., a California corporation (the "*Corporation*"), the parties listed on Exhibit A attached hereto (the "*Investors*") and the parties listed on Exhibit B attached hereto (the "*Shareholders*"). The Investors and the Shareholders are sometimes hereinafter collectively referred to as the "*Holders.*"

A.    Concurrently herewith, the Investors are purchasing from the Corporation shares of its Series A Preferred Stock (the "*Purchased Shares*") pursuant to a Series A Preferred Stock Purchase Agreement dated of even date herewith between the Corporation and the Investors, as amended from time to time (the "*Purchase Agreement*").

B.    As an inducement to the Investors to purchase the Purchased Shares pursuant to the Purchase Agreement, the Investors, the Shareholders and the Corporation desire to enter into this Agreement to set forth their agreements and understandings with respect to how shares of the Corporation's capital stock held by them will be voted with respect to the election of members of the Board of Directors of the Corporation.

**NOW THEREFORE**, in consideration of the above recitals and the mutual covenants made herein, the parties hereby agree as follows.

1.    Election of Board of Directors.

1.1    Voting; Board Composition.   During the term of this Agreement, each Holder agrees to vote all shares of capital stock of the Corporation now or hereafter directly or indirectly owned (of record or beneficially) by such Holder in such manner as may be necessary to elect (and maintain in office) as members of the Corporation's Board of Directors the following five (5) individuals:

(a)    For the three (3) directors to be elected pursuant to Article III, Section 4(b)(i) of the Corporation's Amended and Restated Articles of Incorporation (the "*Articles*") by the holders of Series A Preferred Stock voting as a separate class, three (3) individuals designated from time to time in a writing delivered to the Corporation and signed by Arriva Pharmaceuticals B.V. (the "*Nordic Designees*");

(b)    For the one (1) director to be elected pursuant to Article III, Section 4(b)(i) of the Articles by the holders of Common Stock voting as a separate class, one (1) individual designated from time to time in a writing delivered to the Corporation and signed by Holders who, at the time of question, hold shares of issued and outstanding Common Stock of the Corporation representing at least a majority of the voting power of all issued and outstanding shares of Common Stock of the Corporation then held by all Holders, *provided that* such director is the person who is from time-to-time then serving as the Corporation's duly elected Chief Executive Officer (the "*CEO Common Designee*"); and

(c)    For the director to be elected pursuant to Article III, Section 4(b)(i) of the Articles by the holders of a majority of the Series A Preferred Stock and a majority of the Common Stock, voting together as a single class, one (1) individual designated from time to time in a writing delivered to the Corporation and signed by Investors and Shareholders who, at the time in question, hold shares of issued and outstanding Purchased Shares and shares of issued and outstanding Common Stock of the Corporation representing at least a majority of the voting power of each of all issued and outstanding Purchased Shares and all issued and outstanding Common Stock of the Corporation then outstanding, each voting as a separate class (the "*Independent Director*"), which designee shall be an individual not otherwise affiliated with or employed by the Corporation.

For purposes of this Agreement: (i) any individual who is designated for election to the Corporation's Board of Directors pursuant to the foregoing provisions of this Section 1.1 is hereinafter referred to as a "*Board Designee*"; and (ii) any individual, entity, or group of individuals and/or entities who has the right to designate one (1) or more Board Designees for election to the Corporation's Board of Directors pursuant to the foregoing provisions of this Section 1.1 is hereinafter referred to as a "*Designator*" or as "*Designators*," as applicable.

1.2    Initial Board Members and Vacancy.    Upon the Effective Date: (i) the initial Nordic Designees shall be John M. Barberich, Christian Hansen and Florian Schönharting; (ii) the initial CEO Common Designee shall be M. Sue Preston, it being acknowledged and agreed that as of the Effective Date that such person is the Chief Executive Officer of the Corporation and (iii) there shall be one (1) vacancy in the Independent Director seat.

1.3    Changes in Board Designees.    From time to time during the term of this Agreement, a Designator or Designators may, in their sole discretion:

(a)    elect to remove from the Corporation's Board of Directors any incumbent Board Designee who occupies a Board seat for which such Designator or Designators are entitled to designate the Board Designee under Section 1.1; and/or

(b)    designate a new Board Designee for election to a Board seat for which such Designator or Designators are entitled to designate the Board Designee under Section 1.1 (whether to replace a prior Board Designee or to fill a vacancy in such Board seat);

provided such removal and/or designation of a Board Designee is approved in a writing signed by Designators who are entitled to designate such Board Designee under Section 1.1, in which case such election to remove a Board Designee and/or elect a new Board Designee will be binding on all such Designators. In the event of such a removal and/or designation of a Board Designee under this Section 1.3, the Holders shall vote their shares of the Corporation's capital stock as provided in Section 1.1 to cause: (a) the removal from the Corporation's Board of Directors of the Board Designee or Designees so designated for removal by the appropriate Designators or Designators; and (b) the election to the Corporation's Board Directors of any new Board Designee or Designees so designated for election to the Corporation's Board of Directors by the appropriate Designator or Designators.

700871719v4

1.4    Notice; Covenant to Vote in Accord.  The Corporation shall promptly give each of the Holders written notice of any change in composition of the Corporation's Board of Directors and of any proposal by a Designator or Designators to remove or elect a new Board Designee.  In any election of directors pursuant to this Section 1, the Holders shall vote their shares in a manner sufficient to elect to the Corporation's Board of Directors the individuals to be elected thereto as provided in this Section 1.

2.    Further Assurances; Enforcement.  Each of the Holders and the Corporation agree not to vote any shares of Corporation's capital stock, or to take any other actions, that would in any manner defeat, impair, be inconsistent with or adversely affect the stated intentions of the parties under Section 1 of this Agreement; provided, however, that the Corporation shall have no obligation to enforce any right among the Holders in this agreement, to arbitrate any dispute or to reject any vote of any party otherwise in accordance with applicable corporate law, absent a court order to do so.

3.    Transferees; Legends on Certificates.

3.1    Effect on Transferees.  Each and every transferee or assignee of any shares of capital stock of the Corporation from any Holder shall be bound by and subject to the terms and conditions of this Agreement that are applicable to the transferor or assignor of such shares, and the Corporation shall require, as a condition precedent to the transfer of any shares of capital stock of the Corporation subject to this Agreement, that the transferee agrees in writing to be bound by, and subject to, all the terms and conditions of this Agreement.

3.2    Legend.  The Holders agree that all Corporation share certificates now or hereafter held by them that represent shares of capital stock of the Corporation subject to this Agreement will be stamped or otherwise imprinted with a legend to substantially read as follows:

**"THE SHARES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO AGREEMENTS AND RESTRICTIONS WITH REGARD TO THE VOTING OF SUCH SHARES AND THEIR TRANSFER, AS PROVIDED IN THE PROVISIONS OF A VOTING AGREEMENT, A COPY OF WHICH IS ON FILE IN THE OFFICE OF THE SECRETARY OF THE CORPORATION."**

4.    Enforcement of Agreement.  Each of the Holders acknowledge and agree that any breach by any of them of this Agreement shall cause the other Holders irreparable harm which may not be adequately compensable by money damages.  Accordingly, in the event of a breach or threatened breach by a Holder of any provision of this Agreement, the Corporation and each other Holder shall each be entitled to the remedies of specific performance, injunction or other preliminary or equitable relief, including the right to compel any such breaching Holder, as appropriate, to vote such Holder's shares of capital stock of the Corporation in accordance with the provisions of this Agreement, in addition to such other rights remedies as may be available to the Corporation or any Holder for any such breach or threatened breach, including but not limited to the recovery of money damages.

700871719v4

5.    Term.  This Agreement shall commence on the Effective Date and shall terminate upon the first to occur of the following:

(a)    The execution by (i) Investors holding at least a majority of the shares of the Corporation's then issued and outstanding Purchased Shares and/or Common Stock acquired on conversion of such Purchased Shares then held by all Investors and (ii) Shareholders holding capital stock of the Corporation representing at least a majority of the voting power of all the Corporation's then issued and outstanding Common Stock held by the Shareholders, of a written agreement to terminate this Agreement;

(b)    The consummation of the first sale of securities of the Corporation to the public pursuant to an effective registration statement filed by the Corporation under the Securities Act of 1933, as amended; or

(c)    Immediately prior to the closing of (i) any consolidation or merger of the Corporation with or into any other entity or entities in which the holders of the Corporation's issued and outstanding shares immediately before such consolidation or merger do not, immediately after such consolidation or merger, retain equity interest representing a majority of the voting power of the surviving entity of such consolidation or merger or stock representing a majority of the voting power of an entity that wholly owns, directly or indirectly, the surviving entity of such consolidation or merger; or (ii) the sale, transfer or assignment of securities of the Corporation representing a majority of the voting power of all the Corporation's issued and outstanding voting securities by the holders thereof to an acquiring party in a single transaction or series of related transactions.

6.    General Provisions.

6.1    Notices.  Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following: (i) at the time of personal delivery, if delivery is in person; (ii) at the time of transmission by facsimile, addressed to the other party at its facsimile number specified herein (or hereafter modified by subsequent notice to the parties hereto), with confirmation of receipt made by both telephone and printed confirmation sheet verifying successful transmission of the facsimile; (iii) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States, with proof of delivery from the courier requested; or (iv) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by facsimile or by express courier. Notices by facsimile shall be machine verified as received.  All notices not delivered personally or by facsimile will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address or facsimile number as follows, or at such other address or facsimile number as such other party may designate by one of the indicated means of notice herein to the other parties hereto as follows:

(a)    if to an Investor, at such Investor's address on Exhibit A hereto;

(b)    if to the Corporation, to its principal office, Attention:    Chief Executive Officer;

(c)    if to a Shareholder, at such Shareholder's address on <u>Exhibit B</u> hereto.

6.2    <u>Entire Agreement</u>.  This Agreement and the documents referred to herein, together with all the Exhibits hereto, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede any and all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

6.3    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to that body of laws pertaining to conflict of laws.

6.4    <u>Severability</u>.  If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.  Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

6.5    <u>Third Parties</u>.  Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties hereto and their successors and assigns, any rights or remedies under or by reason of this Agreement.

6.6    <u>Successors And Assigns</u>.  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.

6.7    <u>Titles and Headings</u>.  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

6.8    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

6.9    <u>Costs And Attorneys' Fees</u>.  In the event that any action, suit or other proceeding is instituted concerning or arising out of this Agreement or any transaction contemplated hereunder, the prevailing party shall recover all of such party's costs and attorneys'

700871719v4

fees incurred in each such action, suit or other proceeding, including any and all appeals or petitions therefrom.

      6.10   <u>Adjustments for Stock Splits, Etc.</u>  Wherever in this Agreement there is a reference to a specific number of shares of Common Stock or Preferred Stock of the Corporation of any class or series, then, upon the occurrence of any subdivision, combination or stock dividend of such class or series of stock, the specific number of shares so referenced in this Agreement shall automatically be proportionally adjusted to reflect the affect on the outstanding shares of such class or series of stock by such subdivision, combination or stock dividend.

      6.11   <u>Further Assurances.</u>  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

      6.12   <u>Facsimile Signatures.</u>  This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

      6.13   <u>Amendment and Waivers.</u>  This Agreement may be amended only by a written agreement executed by the Corporation and the holders of at least a majority of the Corporation's Common Stock, issued or issuable upon conversion of all issued and outstanding Purchased Shares held by the Investors and by the holders of at least a majority of the Corporation's Common Stock held by the Shareholders. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

      6.14   <u>Subsequent Closings.</u>  In the event that the Corporation shall conduct subsequent sales of Series A Preferred Stock pursuant to and in accordance with the terms of Section 1.3 of the Purchase Agreement, any holder of such shares of Series A Preferred Stock shall be deemed an Investor with all of the rights and obligations of an Investor under this Agreement; provided that as a condition thereto such Investor and the Company shall sign a counterpart signature page to this Agreement.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the parties have executed this Voting Agreement on the date and year first written above.

**ARRIVA PHARMACEUTICALS, INC.,**
a California corporation


By _____

Its _____

**ARRIVA PHARMACEUTICALS B.V.**

By _____

Its _____


By _____

Its _____

MPM BIOVENTURES II-QP, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner


_____

By:
Title:


MPM BIOVENTURES II, L.P.

By:  MPM Asset Management II, L.P., its General Partner
By:  MPM Asset Management II LLC, its General Partner


_____

By:
Title:


MPM ASSET MANAGEMENT INVESTORS 2002 BVII LLC


_____

By:
Title:


MPM BIOVENTURES GMBH & CO.
PARALLEL-BETEILIGUNGS KG

By:  MPM Asset Management II, L.P.,
     in its capacity as the Special Limited Partner
By:  MPM Asset Management II, LLC, its General Partner


_____

By:
Title:

# EXHIBIT A

## INVESTORS

| Name | Class of Stock | Number of Shares |
|------|----------------|------------------|
| Arriva Pharmaceuticals B.V.<br>c/o Nordic Biotech Advisors Aps<br>Ostergade 5,3<br>DK-1100 Copenhagen K<br>Denmark<br>Attention : Chief Financial Officer<br>Facsimile: 45-70-20-12-64 | Series A Preferred | 1,000 |
| MPM Bioventures II-QP, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 338 |
| MPM Bioventures II, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 37 |
| MPM Asset Management Investors<br>2002 BVII LLC<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 6 |
| MPM Bioventures GMBH & CO.<br>Parallel-Beteiligungs KG<br>200 Clarendon Street, 54th Floor<br>Boston, MA  02116<br>Attention:  Ansbert K. Gadicke, MD<br>Facsimile:  (617) 425-9201 | Series A Preferred | 119 |
| **Total** | | **1,500** |

A-1

## EXHIBIT B

## SHAREHOLDERS

| Name | Class of Stock | Number of Shares |
|------|----------------|------------------|
| Arriva Pharmaceuticals B.V.<br>c/o Nordic Biotech Advisors Aps<br>Ostergade 5,3<br>DK-1100 Copenhagen K<br>Denmark<br>Attention : Chief Financial Officer<br>Facsimile: 45-70-20-12-64 | Common | 266,680 |
| MPM Bioventures II-QP, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Common | 90,120 |
| MPM Bioventures II, L.P.<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Common | 9,920 |
| MPM Asset Management Investors<br>2002 BVII LLC<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Common | 1,560 |
| MPM Bioventures GMBH & CO.<br>Parallel-Beteiligungs KG<br>200 Clarendon Street, 54th Floor<br>Boston, MA 02116<br>Attention: Ansbert K. Gadicke, MD<br>Facsimile: (617) 425-9201 | Common | 31,720 |
| **Total** | | **400,000** |

700871719v4

**EXHIBIT J**

```
 1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
 2     Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
 3  ORI KATZ, Cal. Bar No. 209561
    MICHAEL M. LAUTER Cal. Bar No. 246048
 4  TIMOTHY C. PERRY, Cal. Bar No. 248543
    Four Embarcadero Center, 17th Floor
 5  San Francisco, California  94111-4106
    Telephone:   415-434-9100
 6  Facsimile:   415-434-3947

 7  Attorneys for ARRIVA PHARMACEUTICALS, INC.

 8
                 UNITED STATES BANKRUPTCY COURT
 9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                        OAKLAND DIVISION
11

12
    In re                              Case No. 07-42767
13
    ARRIVA PHARMACEUTICALS, INC., a     STIPULATION
14  California corporation,
                                        Date:    January 16, 2008
15                  Debtor.             Time:    10:00 a.m.
                                        Place:   United States Bankruptcy Court
16  Tax ID: 94-3287067                           1300 Clay Street, Oakland, CA
                                        Judge:   Edward D. Jellen
17                                      Ctrm:    215

18

19       This Stipulation (the "Stipulation") is made and executed as of January 11, 2008, by

20  and among Arriva Pharmaceuticals, Inc. ("Arriva"), and Dr. Ansbert Gadicke, Dr. Edward

21  Mascioli, MPM Asset Management Investors 2002 BVII LLC, MPM Bioventures GmbH

22  & Co. Parallel-Beteiligungs KG, MPM Bioventures II, L.P., MPM Bioventures II-QP,

23  L.P., and MPM Capital L.P. (collectively, "MPM"), by and through their respective

24  undersigned counsel.

25       In this Stipulation Arriva and MPM may each be referred to as a "Party" and

26  together as the "Parties."

27

28
```

-1-

# RECITALS

A.    The On August 29, 2007 (the "Petition Date"), Arriva filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Arriva's bankruptcy case (the "Bankruptcy Case") is pending before the United States Bankruptcy Court, Northern District of California, Oakland Division (the "Bankruptcy Court"), Case No. 07-42767.

B.    The above-listed MPM entities, as well as two of its officers and directors, Dr. Ansbert Gadicke and Dr. Edward Mascioli, have filed claims (the "MPM Claims") in Arriva's Bankruptcy Case.  The claims are listed as Claim Numbers 23 through 33, inclusive, in the Bankruptcy Case.

C.    The MPM Claims include Claim Numbers 23-29 for a liquidated amount of $141,972.53 with respect to attorney fees incurred prepetition with respect to indemnity claims ("Liquidated MPM Claim") as well as a contingent MPM claim for indemnity. ("Contingent MPM Indemnity Claim").  The MPM Claims also include claims 30 through 33, which assert unsecured claims based on a liquidation preference arising out of MPM's ownership of Series D preferred stock in Arriva.

D.    MPM Asset Management LLP filed a separate claim, Claim Number 34, in the liquidated amount of $49,500 ("Asset Management Claim").  Nothing in this Stipulation impacts the Asset Management Claim.

E.    On November 30, 2007, MPM, Arriva and Nordic Biotech Venture Fund II K/S ("Nordic") entered into that certain Debtor-in-Possession Loan Agreement and related Security Agreement (collectively, the "DIP Loan Agreement"), which, among other things, provided Arriva with debtor-in-possession financing in the maximum principal amount of $1,500,000 (the "DIP Loan").  In conjunction with the DIP Loan and concurrently with the DIP Loan Agreement, MPM, Arriva and Nordic entered into that certain Convertible Loan Agreement and related Security Agreement, which, among other things and subject to approval by the Court and confirmation of the Plan, as defined below, provide Arriva with

-2-

1  a total exit financing in the maximum principal amount of $6,000,000 (the "Exit

2  Financing").

3       F.     Pursuant to the DIP Loan Agreement and Exit Financing, Arriva shall pay

4  $150,000 on the closing date of the DIP Loan and an additional $150,000 on the closing of

5  the Exit Financing to MPM for legal fees incurred by MPM and asserted by MPM in the

6  Liquidated MPM Claim and Contingent MPM Indemnity Claim (the "MPM Fee

7  Payment").

8       G.     In connection with the DIP Loan and the Exit Financing, Arriva and MPM

9  have agreed to fully and finally resolve all of the MPM Claims, as set forth below.

10       NOW THEREFORE, in consideration of the recitals above and other good and

11  valuable consideration, the Parties agree as follows:

12  **STIPULATION**

13       1.     <u>Waiver of Distribution under Confirmed Plan on account of the Liquidated</u>

14  <u>MPM Claim</u>.  In consideration of confirmation of Arriva's Second Amended Plan of

15  Reorganization ("Plan") and the indefeasible receipt of the MPM Fee Payment on the

16  Effective Date of the Plan, MPM agrees that it shall waive all rights to distribution from

17  Arriva, as debtor and reorganized debtor, and from the Unsecured Creditor Pot, on account

18  of the Liquidated MPM Claim and the Contingent MPM Claim.  Nothing herein shall in

19  any manner release or waive any claims that MPM may have against Arriva's insurance

20  company.  In the event the Plan is not confirmed or MPM shall not indefeasibly receive the

21  MPM Fee Payment on the Effective Date, this Stipulation shall be null and void.

22       2.     <u>Final Stipulation</u>.  It is expressly understood and agreed that this Stipulation

23  constitutes the complete and final agreement between the Parties hereto regarding the

24  matters described above and there are no claims or promises not expressed in this

25  Stipulation.  This Stipulation contains the entire agreement among the Parties hereto with

26  respect to the matters covered hereby and supersedes all prior negotiations or agreements,

27  written or oral, among the Parties.  No other agreement, statement, or promise made by

28

1  any party hereto which is not contained herein shall be binding or valid.  This Stipulation

2  may only be modified in writing and signed by all Parties hereto.

3        3.  <u>Successors and Assigns</u>.  This Stipulation and the covenants and conditions

4  contained herein shall apply to, be binding upon, and inure to the benefit of the respective

5  heirs, administrators, executors, legal representatives, assignees, and successors of the

6  parties hereto and covered hereby.

7        4.  <u>Interpretation</u>.  This Stipulation shall, in all respects, be interpreted,

8  enforced, and governed by and under the laws of the State of California.  This Stipulation

9  is to be deemed to have been jointly prepared by all of the parties to, and covered by, this

10  Stipulation, and any uncertainty or ambiguity existing herein shall not be interpreted

11  against any parties, but according to the application of the rules of interpretation of

12  contracts, if any such uncertainty or ambiguity exists.

13        5.  <u>Counterparts</u>.  This Stipulation may be executed in one or more counterparts,

14  all of which, together, shall constitute one and the same instrument.  This Stipulation may

15  be executed by facsimile, with such facsimile signatures to have the same force and effect

16  as original signatures.

17        6.  <u>Further Actions</u>.  The Parties agree to promptly perform such further acts and

18  to execute and deliver any and all further documents that may reasonably be necessary or

19  desirable to effectuate the purpose of this Stipulation.

20        7.  <u>Bankruptcy Court Jurisdiction</u>.  The Parties consent to the jurisdiction of the

21  Bankruptcy Court to interpret and enforce this Stipulation.

22  //

23  //

24  //

25  //

26  //

27

28

1    DATED: January 11, 2008

2

3                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

4                          By    _____

5                                             ORI KATZ

6                              Attorneys for Arriva Pharmaceuticals, Inc.

7

8

9                           EDWARDS ANGELL PALMER & DODGE LLP

10

11                          By    _____

12                            STUART M. BROWN, Admitted Pro Hac Vice

13                           Attorneys for Dr. Ansbert Gadicke, Dr. Edward

14                           Mascioli, MPM Asset Management Investors 2002
                               BVII LLC, MPM Bioventures GmbH & Co.

15                           Parallel-Beteiligungs KG, MPM Bioventures II,
                             L.P., MPM Bioventures II-QP, L.P., and MPM

16                                    Capital L.P.

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

12

| | |
|---|---|
| In re | Case No. 07-42767 |
| ARRIVA PHARMACEUTICALS, INC., a California corporation, | Chapter 11 |
| Debtor. | **WITHDRAWAL OF PRESTON CLAIM (CLAIM NO. 40)** |
| Tax ID: 94-3287067 | |

13
14
15
16
17
18
19
20
21
22
23

On October 12, 2007, M. Sue Preston ("Preston") filed a proof of claim which was designated as Claim No. 40 in the above-captioned bankruptcy case (the "Claim"). The Claim sought payment of $318,793.27 in severance and vacation pay, contingent upon Preston's termination. A true and correct copy of the Claim is attached hereto as Exhibit A.

24
25
26
27
28

Pursuant to that certain Agreement (the "Agreement") dated as of January 10, 2008, by and between Preston and Arriva Pharmaceuticals, Inc., the debtor in the above-captioned bankruptcy case ("Debtor"), Preston agreed to withdraw the Claim on the effective date of the Debtor's Fourth Amended Chapter 11 Plan of Reorganization, Dated

-1-

1  December 12, 2007.  A true and correct copy of the fully-executed Agreement was filed as

2  Exhibit F to the Declaration of M. Sue Preston in Support of Confirmation of Debtor's

3  Plan, filed on January 11, 2008 as part of Docket No. 321.

4

5          As of the date hereof, Preston hereby withdraws the Claim in its entirety and

6  with prejudice.

7

8  DATED:  February 13, 2008

9

10  _____

11  M. Sue Preston

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# *Arriva*
## Pharmaceuticals, Inc.

> 1010 Atlantic Avenue
> Alameda, CA 94501
> 510-337-1250

February 13, 2008

Nordic Biotech Venture Fund II K/S
c/o Nordic Biotech
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer

Re:     Reservation of Rights Regarding Transfer of Claims Against Lezdeys
        Pursuant to the Debtor's Fourth Amended Chapter 11 Plan of
        Reorganization, Dated December 12, 2007 (the "Plan")

Dear Sir or Madam:

Pursuant to Section 6.4(d) of the above-mentioned Plan, Nordic Biotech Advisors II K/S ("Nordic") is to transfer to Arriva Pharmaceuticals, Inc. ("Arriva"), any and all claims it holds against the Lezdeys (as defined in the Plan). By this letter, Arriva informs Nordic that it reserves all of its rights under Section 6.4(d) of the Plan to receive such transfer, but chooses to defer receiving such transfer for the time being.

Please indicate your acknowledgment to the foregoing by signing below.

Sincerely,

Arriva Pharmaceuticals, Inc., a California
corporation

By:     _____
Name:  M. Sue Preston, President and CEO

cc:     John Barberich
        M. David Minnick, Esq.
        Michael H. Ahrens, Esq.

**EXHIBIT K**

# SVB › Silicon Valley Bank

A Member of SVB Financial Group

## INITIATE OUTGOING WIRE Confirmation

You have successfully initiated a wire.

The SVBeConnect Transaction ID for the wire is  200802131013453

Number of approvals required before sending : **0**

### Wire Information

|  |  |
|---|---|
| **Template Code:** | QSV |
| **Template Name:** | QSV Biologics Ltd. |
| **Wire Type:** | US Dollar |
| **Transaction ID:** | 200802131013453 |
| **Wire Processing Date:** | 02/13/2008 |
| **Debiting Account:** | 3300374574 DEBTOR IN POSSESSION |
| **Transaction Amount:** | 273,273.09 -  United States Dollars |

### Beneficiary Information

|  |  |
|---|---|
| **Beneficiary's Account:** | 400 321 6 |
| **Beneficiary's Name:** | QSV Biologics Ltd. |
| **Address:** | Edmonton Research Park |
|  | 1938-94 Street |
|  | Edmonton, Alberta, Canada T6N 1J3 |

### Beneficiary Bank Information

|  |  |
|---|---|
| **Bank Name:** | Royal Bank of Canada |
| **Bank City/State:** | Edmonton, Alberta |
| **Bank Country:** | Canada |
| **ABA/ BIC Code:** | ROYCCAT2 |

### Instructions

|  |  |
|---|---|
| **Originator-to-Beneficiary Instructions:** | QSV Biologics Ltd. Cure |
| **Bank-to-Bank Instructions:** | Bank Number: 003 Transit Number: 05259 |

Click here to initiate a new wire.

© 2008 Silicon Valley Bank. SVB.com . Legal Disclosures

# QSV BIOLOGICS LTD.

Edmonton Research Park, 1938-94 Street, Edmonton, Alberta, Canada T6N 1J3
Tel: (780) 438-5722  Fax: (780) 434-0838

## INVOICE

| | | | |
|---|---|---|---|
| Client: | Arriva<br>1010 Atlantic Avenue<br>Alameda, CA, 94501<br>USA | Date: | July 31, 2007 |
| | | Billing Period: | July 1-31, 2007 |
| Client Contact: | | Invoice #: | API-07-006 |

| | | | |
|---|---|---|---|
| SERVICES | per Agreement Dated Jan17, 2007 | Previously Billed | $ 8,965.00 USD |
| | | Currently Billed | $ 8,896.42 USD |
| | | Total Materials | $17,861.42 USD |

## SERVICES:

### Acquisition of Materials, including 15% as per Section 1.1

| | |
|---|---|
| Consumable Materials and Delivery charges | 8,415.35 |
| Contracted Services | 481.07 |
| Shipping Charges | 0.00 |

### BALANCE DUE (in US Dollars)    $8,896.42

Upon Receipt of Invoice, in US dollars, by Direct Wire Transfer to: QSV Biologics Ltd.

BANKING INFORMATION:

| | | | | | |
|---|---|---|---|---|---|
| Account Name: | QSV Biologics Ltd. | | | | |
| Account #: | 400 321 6 | Bank Number: | 003 | Transit Number: | 05259 |
| Bank: | Royal Bank of Canada | | | | |
| Bank Address: | Mayfield Pointe West BB Centre | | | | |
| | Edmonton, Alberta, Canada, T5P 4Y5 | | | | |
| Swift Code: | ROYCCAT2 | | | | |

# QSV BIOLOGICS LTD.

Edmonton Research Park, 1938-94 Street, Edmonton, Alberta, Canada T6N 1J3
Tel: (780) 438-5722  Fax: (780) 434-0838

## INVOICE

| | | | | |
|---|---|---|---|---|
| Client: | Arriva<br>1010 Atlantic Avenue<br>Alameda, CA, 94501<br>USA | | Date: | July 31, 2007 |
| | | | Billing Period | July 1-31, 2007 |
| Client Contact: | | | Invoice #: | API-07-005 |

| | | |
|---|---|---|
| SERVICES per Agreement Dated Jan 17, 2007 | Previously Billed: | $ 57,923.00 USD |
| | Current Invoice: | $ 51,000.00 USD |
| Contract Value: 1,687,000.00 USD | Total Billed: | $108,923.00 USD |

SERVICES:

Fees for Project Services provided July 1-31, 2007

| | Hours | |
|---|---|---|
| 0Project Management | 39.0 | 4,290.00 |
| Assay Development | 133.5 | 14,685.00 |
| Process Development | 183.0 | 32,025.00 |
| | 355.5 | 51,000.00 |

| | |
|---|---|
| BALANCE DUE (in US Dollars) | $51,000.00 |

Within 30 Days of Receipt of Invoice, in US dollars, by Direct Wire Transfer to: QSV Biologics Ltd.

BANKING INFORMATION:

| | | | | | |
|---|---|---|---|---|---|
| Account Name: | QSV Biologics Ltd. | | | | |
| Account #: | 400 321 6 | Bank Number: | 003 | Transit Number: | 05259 |
| Bank: | Royal Bank of Canada | | | | |
| Bank Address: | Mayfield Pointe West BB Centre<br>Edmonton, Alberta, Canada, T5P 4Y5 | | | | |

# QSV BIOLOGICS LTD.

Edmonton Research Park, 1938-94 Street, Edmonton, Alberta, Canada T6N 1J3
Tel: (780) 438-5722   Fax: (780) 434-0838

## INVOICE

| | | | |
|---|---|---|---|
| Client: | Arriva<br>1010 Atlantic Avenue<br>Alameda, CA, 94501 | Date: | June 30, 2007 |
| | | Billing Period: | June 1-30, 2007 |
| | USA | | |
| Client Contact: | | Invoice #: | API-07-004 |

| | | | |
|---|---|---|---|
| SERVICES | per Agreement Dated Jan17, 2007 | Previously Billed | $ 7,965.13 USD |
| | | Currently Billed | $ 1,289.87 USD |
| | | Total Materials | $ 8,965.00 USD |

## SERVICES:

### Acquisition of Materials, including 15% as per Section 1.1

| | |
|---|---|
| Consumable Materials and Delivery charges | 1,289.87 |
| Contracted Services | 0.00 |
| Shipping Charges | 0.00 |

**BALANCE DUE (in US Dollars)**      **$ 1,289.87**

Upon Receipt of Invoice, in US dollars, by Direct Wire Transfer to: QSV Biologics Ltd.

BANKING INFORMATION:

| | | | | |
|---|---|---|---|---|
| Account Name: | QSV Biologics Ltd. | | | |
| Account #: | 400 321 6 | Bank Number: | 003 | Transit Number: 05259 |
| Bank: | Royal Bank of Canada | | | |
| Bank Address: | Mayfield Pointe West BB Centre | | | |
| | Edmonton, Alberta, Canada, T5P 4Y5 | | | |
| Swift Code: | ROYCCAT2 | | | |

# QSV BIOLOGICS LTD.

Edmonton Research Park, 1938-94 Street, Edmonton, Alberta, Canada T6N 1J3
Tel: (780) 438-5722  Fax: (780) 434-0838

## INVOICE

| | | | | |
|---|---|---|---|---|
| Client: | Arriva | | Date: | June 30, 2007 |
| | 1010 Atlantic Avenue | | | |
| | Alameda, CA, 94501 | | Billing Period | June 1-30, 2007 |
| USA | | | | |
| Client Contact: | | | Invoice #: | API-07-003 |

| | |
|---|---|
| SERVICES per Agreement Dated Jan 17, 2007 | Previously Billed:  $19,790.00 USD |
| | Current invoice:  $38,133.00 USD |
| Contract Value:  1,687,000.00 USD | Total Billed:  $57,923.00 USD |

SERVICES:

Fees for Project Services provided June 1-30, 2007

| | Hours | |
|---|---|---|
| Project Management | 27.5 | 3,025.00 |
| Assay Development | 84.5 | 9,295.00 |
| Process Development | 147.5 | 25,813.00 |
| | 259.5 | 38,133.00 |

**BALANCE DUE (in US Dollars)**          $38,133.00

Within 30 Days of Receipt of Invoice, in US dollars, by Direct Wire Transfer to: QSV Biologics Ltd.

BANKING INFORMATION:

| | | | | |
|---|---|---|---|---|
| Account Name: | QSV Biologics Ltd. | | | |
| Account #: | 400 321 6 | Bank Number: | 003 | Transit Number: 05259 |
| Bank: | Royal Bank of Canada | | | |
| Bank Address: | Mayfield Pointe West BB Centre | | | |
| | Edmonton, Alberta, Canada, T5P 4Y5 | | | |

OUTGOING WIRE - Confirmation

https://www.svbconnect.com/wires/outgoing/confirm.jsp

## SVB › Silicon Valley Bank
A Member of SVB Financial Group

## INITIATE OUTGOING WIRE
## Confirmation

You have successfully initiated a wire.

The SVBeConnect Transaction ID for the wire is  200802261028098

Number of approvals required before sending : **0**

### Wire Information

| | |
|---|---|
| Template Code: | QSV |
| Template Name: | QSV Biologics Ltd. |
| Wire Type: | US Dollar |
| Transaction ID: | 200802261028098 |
| Wire Processing Date: | 02/26/2008 |
| Debiting Account: | 3300374574 DEBTOR IN POSSESSION |
| Transaction Amount: | 299,204.52 -  United States Dollars |

### Beneficiary Information

| | |
|---|---|
| Beneficiary's Account: | 400 321 6 |
| Beneficiary's Name: | QSV Biologics Ltd. |
| Address: | Edmonton Research Park |
| | 1938-94 Street |
| | Edmonton, Alberta, Canada T6N 1J3 |

### Beneficiary Bank Information

| | |
|---|---|
| Bank Name: | Royal Bank of Canada |
| Bank City/State: | Edmonton, Alberta |
| Bank Country: | Canada |
| ABA/ BIC Code: | ROYCCAT2 |

### Instructions

| | |
|---|---|
| Originator-to-Beneficiary Instructions: | QSV Biologics Ltd. |
| | Inv. API-07-019 |
| Bank-to-Bank Instructions: | Bank Number: 003 |
| | Transit Number: 05259 |

Click here to initiate a new wire.

© 2008 Silicon Valley Bank. SVB.com . Legal Disclosures

# QSV BIOLOGICS LTD.

Edmonton Research Park, 1938-94 Street, Edmonton, Alberta, Canada T6N 1J3
Tel: (780) 438-5722   Fax: (780) 434-0838

## INVOICE

| | | | |
|---|---|---|---|
| Client: | Arriva<br>1010 Atlantic Avenue<br>Alameda, CA, 94501<br>USA | Date: | Jan 31, 2008 |
| | | Billing Period: | Jan 1 – 31, 2008 |
| Client Contact: | David Madden | Invoice #: | API-07-019 |

| | | |
|---|---|---|
| SERVICES | per Agreement Dated Jan17, 2007 | Previously Billed  $ 309,674.52 USD<br>Currently Billed   $ 299,204.52 USD<br>Total Materials    $ 608,879.03 USD |

## SERVICES:

### Acquisition of Materials, including 15% as per Section 1.1

| | |
|---|---|
| Consumable Materials and Delivery charges | 249,198.74 |
| Contracted Services | 28,779.64 |
| Shipping Charges | 1,226.14 |
| | 279,204.52 |

### Clean Room Wearables, as per Section 1.1

| | |
|---|---|
| 20 days of Suite Occupancy @1,000.00 per day | 20,000.00 |

| | |
|---|---|
| **BALANCE DUE (in US Dollars)** | **$ 299,204.52** |

Upon Receipt of Invoice, in US dollars, by Direct Wire Transfer to: QSV Biologics Ltd.

BANKING INFORMATION:

| | |
|---|---|
| Account Name: | QSV Biologics Ltd. |
| Account #: | 400 321 6    Bank Number:  003    Transit Number: 05259 |
| Bank: | Royal Bank of Canada |
| Bank Address: | Mayfield Pointe West BB Centre<br>Edmonton, Alberta, Canada, T5P 4Y5 |
| Swift Code: | ROYCCAT2 |

*[signature]* 26th Feb, 2008

OUTGOING WIRE - Confirmation                                      Page 1 of 1

**SVB › Silicon Valley Bank**
A Member of SVB Financial Group

## INITIATE OUTGOING WIRE
## Confirmation

You have successfully initiated a wire.

The SVBeConnect Transaction ID for the wire is  200804031077771

Number of approvals required before sending : **0**

## Wire Information

| | |
|---|---|
| **Template Code:** | QSV |
| **Template Name:** | QSV Biologics Ltd. |
| **Wire Type:** | US Dollar |
| **Transaction ID:** | 200804031077771 |
| **Wire Processing Date:** | 04/04/2008 |
| **Debiting Account:** | 3300374574 DEBTOR IN POSSESSION |
| **Transaction Amount:** | 349,682.22 - United States Dollars |

## Beneficiary Information

| | |
|---|---|
| **Beneficiary's Account:** | 400 321 6 |
| **Beneficiary's Name:** | QSV Biologics Ltd. |
| **Address:** | Edmonton Research Park |
| | 1938-94 Street |
| | Edmonton, Alberta, Canada T6N 1J3 |

## Beneficiary Bank Information

| | |
|---|---|
| **Bank Name:** | Royal Bank of Canada |
| **Bank City/State:** | Edmonton, Alberta |
| **Bank Country:** | Canada |
| **ABA/ BIC Code:** | ROYCCAT2 |

## Instructions

| | |
|---|---|
| **Originator-to-Beneficiary Instructions:** | Invs. API-07-020, API-07-021, API-07-022, API-07-023, API-07-024 |
| **Bank-to-Bank Instructions:** | Bank Number: 003 Transit Number: 05259 |

Click here to initiate a new wire.

© 2008 Silicon Valley Bank . SVB.com . Legal Disclosures

# EXHIBIT L

10313

**ARRIVA PHARMACEUTICALS, INC.**
DEBTOR IN POSSESSION
1010 ATLANTIC AVENUE
ALAMEDA, CA  94501-1147

SILICON VALLEY BANK
SANTA CLARA, CALIFORNIA  95054
90-4039-1211

2/15/2008

PAY TO THE
ORDER OF    Heffernan Insurance Brokers                                                    $ **75,994.38

Seventy-Five Thousand Nine Hundred Ninety-Four and 38/100**********************************************    DOLLARS

Heffernan Insurance Brokers
120 Howard St., Suite 550
San Francisco, CA 94105

MEMO

MP

⑈010313⑈ ⑆121140399⑆    3300374574⑈

---

**ARRIVA PHARMACEUTICALS, INC.**                                              10313

Heffernan Insurance Brokers                                    2/15/2008

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 2/13/2008 | Bill | 14MGUO8A16194 | 40,000.00 | 40,000.00 | | 40,000.00 |
| 2/13/2008 | Bill | 14MGUO6A13664 | 35,994.38 | 35,994.38 | | 35,994.38 |
| | | | | Check Amount | | 75,994.38 |

SVB-Operating                                                            75,994.38

---

**ARRIVA PHARMACEUTICALS, INC.**                                              10313

Heffernan Insurance Brokers                                    2/15/2008

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 2/13/2008 | Bill | 14MGUO8A16194 | 40,000.00 | 40,000.00 | | 40,000.00 |
| 2/13/2008 | Bill | 14MGUO6A13664 | 35,994.38 | 35,994.38 | | 35,994.38 |
| | | | | Check Amount | | 75,994.38 |

SVB-Operating                                                            75,994.38

DELUXE BUSINESS FORMS  1+800-328-0304  www.deluxeforms.com

**(SF) Heffernan Insurance Brkrs**
120 Howard Street, Suite 550
San Francisco, CA  94105
Phone : 415-778-0300

| I N V O I C E # | 175544 | Page  1 |
|---|---|---|

| ACCOUNT NO. | OP | DATE |
|---|---|---|
| ARRIV01 | GX | 02/13/08 |

| Directors & Officers Liability |
|---|
| POLICY # |
| 14MGUO8A16194 |
| COMPANY |
| US Specialty Insurance Co. |

| EFFECTIVE | EXPIRATION | BALANCE DUE ON |
|---|---|---|
| 02/13/08 | 02/13/09 | 02/13/08 |

**Arriva Pharmaceuticals, Inc.**
David Madden
1010 Atlantic Avenue
Alameda, CA  94501

| Itm # | Eff Date | Trn | Description | Amount |
|---|---|---|---|---|
| 99DJK2 | 02/13/08 | NEW | 08/09 D&O Policy | $    40,000.00 |
| | | | **Invoice Balance:** | **$    40,000.00** |

*** PLEASE RETURN ONE COPY WITH YOUR REMITTANCE ***

**(SF) Heffernan Insurance Brkrs**
120 Howard Street, Suite 550
San Francisco, CA  94105
Phone : 415-778-0300

| I N V O I C E # | 175545 | | Page 1 |
|---|---|---|---|
| ACCOUNT NO. | OP | DATE | |
| ARRIV01 | GX | 02/13/08 | |
| Directors & Officers Liability | | | |
| POLICY # | | | |
| 14MGU06A13664 | | | |
| COMPANY | | | |
| US Specialty Insurance Co. | | | |
| EFFECTIVE | EXPIRATION | BALANCE DUE ON | |
| 02/13/08 | 02/13/09 | 02/13/08 | |

**Arriva Pharmaceuticals, Inc.**
David Madden
1010 Atlantic Avenue
Alameda, CA  94501

| Itm # | Eff Date | Trn | Description | | Amount |
|---|---|---|---|---|---|
| 99DJKL | 02/13/08 | +EN | D&O run-off endorsement | $ | 35,994.38 |
| | | | **Invoice Balance:** | **$** | **35,994.38** |

# EXHIBIT M

# SVB ⟩ Silicon Valley Bank
A Member of SVB Financial Group

## INITIATE OUTGOING WIRE Confirmation

You have successfully initiated a wire.

The SVBeConnect Transaction ID for the wire is  200802131013474

Number of approvals required before sending : **0**

## Wire Information

|  |  |
|---|---|
| **Template Code:** | Reserve Account |
| **Template Name:** | State Street Escrow |
| **Wire Type:** | US Dollar |
| **Transaction ID:** | 200802131013474 |
| **Wire Processing Date:** | 02/14/2008 |
| **Debiting Account:** | 3300374574 DEBTOR IN POSSESSION |
| **Transaction Amount:** | 1,429,869.63 -  United States Dollars |

## Beneficiary Information

|  |  |
|---|---|
| **Beneficiary's Account:** | 17039843 |
| **Beneficiary's Name:** | State Street Bank and Trust -DE2026 |
| **Address:** | 1200 Crown Colony Park |
|  | Quincy, MA 02169-0938 |

## Beneficiary Bank Information

|  |  |
|---|---|
| **Bank Name:** | STATE STREET BOSTON |
| **Bank City/State:** | BOSTON |
| **Bank Country:** |  |
| **ABA/ BIC Code:** | 011000028 |

## Instructions

|  |  |
|---|---|
| **Originator-to-Beneficiary Instructions:** | ARRIVA PHARMACEUTICALS (2) DE2026 Attn: James Hall |
| **Bank-to-Bank Instructions:** |  |

Click here to initiate a new wire.

© 2008 Silicon Valley Bank. SVB.com . Legal Disclosures

| Date | Activity | Amount | Unsecured Claims Pool Escrow | | | | Fee Claim Reserve Escrow | | | | Plan Expense Reserve Escrow | | | | All Escrows |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Activity | Funded Bal. | Accr. Int. Bal. | Total Bal. | Activity | Funded Bal. | Accr. Int. Bal. | Total Bal. | Activity | Funded Bal. | Accr. Int. Bal. | Total Bal. | Total Bal. |
| 13-Feb-08 | Initial Funding | 1,431,519.70 | 776,000.00 | 776,000.00 | 0.00 | 776,000.00 | 540,519.70 | 540,519.70 | 0.00 | 540,519.70 | 115,000.00 | 115,000.00 | 0.00 | 115,000.00 | 1,431,519.70 |
| 13-Feb-08 | Initial Distribution | (1,650.07) | (1,650.07) | 774,349.93 | 0.00 | 774,349.93 | | 540,519.70 | 0.00 | 540,519.70 | | 115,000.00 | 0.00 | 115,000.00 | 1,429,869.63 |
| 29-Feb-08 | Interest | 2,335.11 | 1,264.59 | 774,349.93 | 1,264.59 | 775,614.52 | 882.71 | 540,519.70 | 882.71 | 541,402.41 | 187.81 | 115,000.00 | 187.81 | 115,187.81 | 1,432,204.74 |

# EXHIBIT N

February 13, 2008


Name
Address #1
Address #2
Address #3


Re:   In re Arriva Pharmaceuticals, Inc.,
      U.S.B.C., N.D. Cal., Case No. 07-42767


Dear Name:

Arriva Pharmaceuticals, Inc. filed its chapter 11 bankruptcy case on August 29, 2007.  During that case Arriva filed a chapter 11 plan of reorganization, dated December 12, 2007.  The bankruptcy court entered its order confirming the Plan on January 30, 2008.

You are receiving this letter because: (1) you hold an allowed unsecured claim against Arriva, (2) the Plan requires Arriva to make distributions to the holders of allowed unsecured claims on the Effective Date (as that term is defined in the Plan) so long as that payment is no less than $10, and (3) the Effective Date occurred on February 13, 2008.

Under the Plan, a total of $776,000 has been established to pay allowed unsecured claims.  The Plan, however, also requires Arriva to reserve for certain disputed claims.  As a result of this requirement, the initial distribution allowed unsecured claims constitutes 0.9814% of each allowed unsecured claim.  Depending on the resolution of certain of the disputed claims, unsecured creditors may receive a subsequent distribution which will be in addition to this initial distribution.  The attachment to this letter lists creditors, the allowed unsecured claims, the initial distributions, and the remaining claim amounts.

Please feel free to contact Arriva with any questions.

Sincerely,



David Madden
CFO & Treasurer

## ARRIVA PHARMACEUTICALS, INC.
## INITIAL DISTRIBUTION LIST

### *ALLOWED CLAIMS*

| Creditor | Allowed Amount | Initial Distribution | Remainder of Claim |
|---|---|---|---|
| Akerman, Senterfitt & Edison, P.A. | 4,898.43 | 48.07 | 4,850.36 |
| Alameda County Industries | 295.45 | - | 295.45 |
| Alameda Power & Telecom | 5,375.59 | 52.75 | 5,322.84 |
| Alston & Bird LLP | 4,773.67 | 46.84 | 4,726.83 |
| American Express | 797.33 | - | 797.33 |
| Aramark Uniform Services, Inc. | 320.79 | - | 320.79 |
| Arrowhead Mountain Spring Water | 169.52 | - | 169.52 |
| AT&T | 1,975.36 | 19.38 | 1,955.98 |
| Bay Area Modular | 900.00 | - | 900.00 |
| C&R Cleaning Services | 540.00 | - | 540.00 |
| Chipman Moving & Storage | 40.00 | - | 40.00 |
| CIT Technology Financing | 276.23 | - | 276.23 |
| Cobra Biologics | 4,275.00 | 41.95 | 4,233.05 |
| Computer Patent Annuities | 2212.94 | 21.71 | 2,191.23 |
| Covad Wireless | 399.00 | - | 399.00 |
| Federal Express | 402.31 | - | 402.31 |
| Fennemore Craig | 5,075.53 | 49.81 | 5,025.72 |
| Glenn Rasmussen Fogarty & Hooker, PA | 75,304.26 | 739.02 | 74,565.24 |
| Infobond, Inc. | 1,419.19 | 13.92 | 1,405.27 |
| InterCall | 181.68 | - | 181.68 |
| Morrison and Foerster | 1,188.18 | 11.66 | 1,176.52 |
| MPM Aset Management LLP | 49,500.00 | 485.78 | 49,014.22 |
| NewCal Industries | 66.18 | - | 66.18 |
| Office Depot | 507.94 | - | 507.94 |
| PG & E | 698.05 | - | 698.05 |
| Sprint PCS | 265.35 | - | 265.35 |
| T-Mobile | 1,635.55 | 16.05 | 1,619.50 |
| VWR Scientific | 808.50 | - | 808.50 |
| World Courier | 10,509.30 | 103.13 | 10,406.17 |
| **ALLOWED CLAIM TOTAL** | **174,811.33** | **1,650.07** | **173,161.26** |

### *RESERVED AMOUNT*

| Creditor | Reserved Amount |
|---|---|
| Alphamed Pharmaceuticals | 78,000,000.00 |
| Gregory Ikonen | 150,397.41 |
| Jamie Holding Company, LLC | - |
| JL Technology LP | - |
| John Lezdey | - |
| Protease Sciences, Inc. | - |
| Robert Williamson | 304,903.95 |
| Sacks Tierney P.A. Lawyers | 441,552.88 |
| Sonoran Desert Chemicals, LLC | - |
| **RESERVE TOTAL** | **78,896,854.24** |

### *INITIAL PAYMENT CALCULATION*

| | |
|---|---|
| Unsecured Claims Pool | 776,000.00 |
| Allowed Claim Total + Reserve Total | 79,071,665.57 |
| **% OF ALLOWED CLAIM PAID IN INITIAL DISTRIBUTION** | **0.9814%** |

# EXHIBIT O

**SVB › Silicon Valley Bank**
A Member of SVB Financial Group

Account Details - Multi Day Consolidated
Requested Date: From: 03/19/2008 To: 03/19/2008
Generated On: 03/20/2008

## Deposit Account
## Account:3300374574-ARRIVA PHARMACEUTICALS INC - DEBTOR IN POSSESSION

| Account Summary | Amount |
|---|---|
| Opening Ledger Balance (As of 2008-03-19) | $ 91,610.88 |
| Total Credits(6) | $ 750,000.00 |
| Total Debits(2) | $ 691,610.88 |
| Closing Ledger Balance (As of 2008-03-19) | $ 150,000.00 |

### Detail Credit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 03/19/2008 | WIRE IN 080319A1B7A31C000013200807901171; ORG MPM ASSET MANAGEMENT INVESTORS;OBI ARRIVA L | 1836 | 0 | $ 2,925.00 |
| 03/19/2008 | WIRE IN 080319A1B7A31C000010200807901159; ORG MPM BIOVENTURES II LP;OBI ARRIVA LOAN MPM B | 1812 | 0 | $ 18,600.00 |
| 03/19/2008 | WIRE IN 080319A1B7A31C000012200807901166; ORG MPM BIOVENTURES GMBH & CO;OBI ARRIVA LOAN M | 1826 | 0 | $ 59,475.00 |
| 03/19/2008 | WIRE IN 080319A1B7A31C000011200807901163; ORG MPM BIOVENTURES II QP;OBI ARRIVA LOAN MPM B | 1820 | 0 | $ 168,975.00 |
| 03/19/2008 | WIRE IN 080319B1Q8384C000741200807900644; ORG ARRIVA PHARMACEUTICALS B.V.;OBI INVESTMENT/ | 1086 | 0 | $ 500,025.00 |
| 03/19/2008 | SWEEP REDEMPTION | 1520 | 0 | $ 0.00 |

### Detail Debit Transactions

| Date | Transaction Description | Bank Ref# | Cust Ref# | Amount |
|---|---|---|---|---|
| 03/19/2008 | CHECK PAID | 123934 | 10379 | $ 108.27 |
| 03/19/2008 | SWEEP TO FEDERATED | 6 | 0 | $ 691,502.61 |

**EXHIBIT P**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Arriva Pharmaceuticals, Inc.
1010 Atlantic Avenue
Alameda, California 94501
Attention: M. Sue Preston

---

## Space above this line for Recorder's Use

## ASSIGNMENT OF JUDGMENT

On February 22, 2002, judgment (the "Wachter Judgment") was entered in the Superior

Court of the State of Arizona, in and for the County of Maricopa, Case No. CV 99-09334, in

favor of Allan Wachter, M.D., an individual and on behalf of his marital community, Seth

Chemicals, Inc., a Nevada corporation, and Nathan M. Technologies Limited Partnership, a

Nevada limited partnership (collectively, the "Judgment Creditors"), and against Noreen Lezdey,

Darren Lezdey, Jarett Lezdey, and J.L. Technology Limited Partnership, a Nevada limited

partnership (collectively, the "Judgment Debtors"), jointly and severally. Among other things,

the Wachter Judgment granted the Judgment Creditors compensatory damages in the principal

sum of eleven million, six hundred twenty-nine thousand, nine hundred sixty-six dollars

($11,629,966.00), with interest thereon from January 15, 2002, and punitive damages in the

amount of five million, eight hundred fourteen thousand, nine hundred eighty-three dollars

($5,814,983.00), with interest thereon from January 15, 2002. A true and correct copy of the

Wachter Judgment is attached hereto as Exhibit A.

Arriva Pharmaceuticals, a California corporation (the "Debtor"), filed a Chapter 11

bankruptcy case in the Bankruptcy Court for Northern District of California, Case No. 07-42767

("Bankruptcy Case"). On January 30, 2008, an order was entered in the Bankruptcy Case confirming the Debtor's Fourth Amended Chapter 11 Plan of Reorganization, dated December 12, 2007 ("Plan"). Pursuant to the Plan, Debtor agreed to assume an executory contract entitled Agreement and Release, dated as of June 2007 by and between the Debtor and Allan Wachter, Susan Wachter, Nathan M. Technologies Limited Partnership and Seth Chemicals, Inc. (the "Agreement"). The Agreement provides for certain indemnities. The Plan provides for the assignment of the Judgment.

Pursuant to the Plan, the Judgment Creditors acknowledge that for valuable consideration, Judgment Creditors hereby assign, transfer and convey the Wachter Judgment and all right, title and interest to any sums of money due by reason of the Wachter Judgment to Arriva Pharmaceuticals, Inc., a California corporation, located at 1010 Atlantic Avenue, Alameda, California 94501, Attention: M. Sue Preston.

The undersigned Judgment Creditors agree to execute such further documents as are appropriate to confirm this assignment and/or permit the Debtor to execute upon the Judgment, and give to Debtor the right to sign in the name of the undersigned further documents as the undersigned's attorney in fact to confirm and further perfect this assignment. The parties agree that any question concerning this assignment or rights under this assignment shall be governed by the laws of the State of California, and that the Bankruptcy Court having jurisdiction of the Bankruptcy Case shall decide any disputes hereunder.

*[Signature Page Following]*

IN WITNESS WHEREOF, the Judgment Creditors have executed this agreement effective as of February 13, 2008.

**JUDGMENT CREDITORS**:                    ALLAN WACHTER, M.D., an individual and on behalf of his marital community

_Allan Wachter, M.D._

SETH CHEMICALS, INC., a Nevada Corporation

By:     _Allan Wachter_
Name:   _Allan Wachter_
Title:  _Officer_


NATHAN M. TECHNOLOGIES LIMITED PARTNERSHIP, a Nevada limited partnership

By:     _Allan Wachter_
Name:   _Allan Wachter_
Title:  _Partner_

**Acknowledgement (Individual)**

STATE OF ARIZONA        )
                                ) ss.

County of Maricopa       )

       The foregoing instrument was acknowledged before me this 13 day of February, 2008, by Allan Wachter .

                                        Notary Public

My commission expires:

     3-31-2010

JUAN VENZOR
Notary Public - Arizona
Maricopa County
Expires 03/31/10

## Acknowledgement (Corporation)

STATE OF ARIZONA         )

                                   ) ss.

County of _Maricopa_      )

      The foregoing instrument was acknowledged before me this _13_ day of February, 2008, by _Allan Wachter_, the _President_ of Seth Chemicals, Inc., a Nevada corporation, on behalf of the corporation.

_____
Notary Public

My commission expires:

_3-31-2010_

JUAN VENZOR
Notary Public - Arizona
Maricopa County
Expires 03/31/10

## Acknowledgement (Limited Partnership)

STATE OF ARIZONA        )
                                  )ss.
County of _Maricopa_        )

       The foregoing instrument was acknowledged before me this _13_ day of February, 2008, by _Allan Wachtr_, the _General Partner_ of Nathan M. Technologies Limited Partnership, a Nevada limited partnership, on behalf of the partnership.

                               _____
                               Notary Public

My Commission Expires:

_3-31-2010_

JUAN VENZOR
Notary Public - Arizona
Maricopa County
Expires 03/31/10

**EXHIBIT Q**

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
ORI KATZ, Cal. Bar No. 209561
MICHAEL M. LAUTER Cal. Bar No. 246048
TIMOTHY C. PERRY, Cal. Bar No. 248543
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:   415-434-9100
Facsimile:    415-434-3947

Attorneys for ARRIVA PHARMACEUTICALS, INC.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 07-42767 |
| ARRIVA PHARMACEUTICALS, INC., a California corporation, | Chapter 11 |
| Debtor. | **NOTICE OF OCCURRENCE OF EFFECTIVE DATE, OF INJUNCTIONS AND OF EFFECTIVENESS OF RELEASES AND EXCULPATIONS** |
| Tax ID: 94-3287067 | |

1   **PLEASE TAKE NOTICE** that the Debtor's Fourth Amended Chapter 11

2   Plan of Reorganization, Dated December 12, 2007 (the "Plan") has become effective, and

3   the "Effective Date" of the Plan is February 13, 2008.  All capitalized terms used but not

4   defined herein shall have the meanings ascribed to them in the Plan.

5   **PLEASE TAKE FURTHER NOTICE** that pursuant to and as more fully

6   described in Section 6.2 of the Plan and Paragraphs 11 and 12 of the order confirming the

7   Plan (the "Confirmation Order"), on the Effective Date, the Debtor, the Estate, their

8   respective successors or assigns, and any Person or Entity claiming a right in a derivative

9   capacity on their behalf (all of which are collectively referred to as the "Debtor

10  Claimants") were deemed to have unconditionally and irrevocably released certain

11  "Released Parties" from any and all direct, indirect or derivative claims, obligations, suits,

12  judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of

13  contribution and indemnification, and all other controversies of every type, kind, nature,

14  description or character whatsoever.

15  **PLEASE TAKE FURTHER NOTICE** that pursuant to and as more fully

16  described in Section 6.3 of the Plan and Paragraph 13 of the Confirmation Order, as of the

17  Effective Date the Debtor Claimants respecting the claims released in Section 6.2 of the

18  Plan shall be permanently enjoined from commencing, conducting or continuing in any

19  manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting

20  any setoff, right of subrogation, contribution, indemnification or recoupment of any kind,

21  directly or indirectly, or proceeding in any manner in any place inconsistent with the

22  releases granted to the Released Parties pursuant to the Plan.

23  **PLEASE TAKE FURTHER NOTICE** that pursuant to and as more fully

24  described in Section 11.7 of the Plan and Paragraph 17 of the Confirmation Order, on the

25  Effective Date, (a) the Debtor, and the Debtor's current officers, current directors,

26  professionals who have been approved by the Bankruptcy Court to represent the Debtor,

27  and any consultants that performed services after the Petition Date (solely in their

28  capacities as such, but excluding the Lezdeys in every capacity) and (b) the Plan Funders,

-1-

1  DIP Agent and DIP Lenders, together with all of their current officers, current directors,

2  current attorneys, current advisors, and any consultants that performed services after the

3  Petition Date, were deemed to have released each of the other of and from any claims,

4  obligations, rights, causes of action and liabilities for any act or omission occurring solely

5  during the period from the Petition Date through the Effective Date.

6        **PLEASE TAKE FURTHER NOTICE** that pursuant to and as more fully

7  described in Section 11.8 of the Plan and Paragraph 18 of the Confirmation Order, and in

8  accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order

9  acted as a discharge effective as of the Effective Date of all debts, Claims against, Liens

10  on, and Interests in the Debtor, its assets and Property, which debts, Claims, Liens and

11  Interests arose at any time before the entry of the Confirmation Order.  The discharge of

12  the Debtor is effective as to each Claim and Interest, regardless of whether a proof of

13  Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the

14  holder of the Claim or Interest votes to accept the Plan.  As of the Effective Date, as to

15  each and every discharged Claim and Interest, any holder of such Claim or Interest is

16  precluded from asserting such Claim or Interest against  the Debtor or Reorganized Debtor

17  or their assets or properties.

18        **PLEASE TAKE FURTHER NOTICE** that pursuant to and as more fully

19  described in Paragraph 19 of the Confirmation Order, on and after the Effective Date,

20  except to enforce the terms and conditions of the Plan before the Bankruptcy Court, all

21  Persons or Entities who have held, hold or may hold any Claim arising before the Petition

22  Date against or Interest in the Debtor and all Persons or Entities who have filed a Proof of

23  Claim in the above-captioned Bankruptcy Case are permanently enjoined from and after

24  the Confirmation Date from:

25            a.      commencing, conducting or continuing in any manner, any suit,

26                    action or other proceeding of any kind (including, without limitation,

27                    any proceeding in a judicial, arbitral, administrative or other forum) or

28                    enforcing, levying, or collecting, against (i) the Debtor or the

-2-

NOTICE OF EFFECTIVE DATE, INJUNCTIONS AND
EFFECTIVENESS OF RELEASES AND
EXCULPATIONS

1  Reorganized Debtor or their property and (ii) the officers and
2  directors of Arriva for Claims arising after the Petition Date and prior
3  to the Effective Date.

4

5      b.    Notwithstanding the provisions of the Plan, nothing in the Plan shall
6            be deemed or construed:

7

8          (1)    To discharge the debt or liability of any person, other than the
9                 Debtor and the Reorganized Debtor, for any act, event or
10                 Claim arising before the Petition Date.

11

12         (2)    To enjoin any person from commencing, conducting or
13                continuing in any manner, any suit, action or other proceeding
14                of any kind (including, without limitation, any proceeding in a
15                judicial, arbitral, administrative or other forum) against any
16                person other than the Debtor or the Reorganized Debtor for any
17                act, event or Claim arising before the Petition Date.

18

19  DATED: February 13, 2008

20                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

21

22                          By    _____/s/ Michael M. Lauter_____
23                                      MICHAEL M. LAUTER

24                                      Attorneys for Debtor

25

26

27

28

-3-

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  ORI KATZ, Cal. Bar No. 209561
   MICHAEL M. LAUTER, Cal. Bar No. 246048
4  TIMOTHY C. PERRY, Cal. Bar No. 248543
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:   415-434-9100
6  Facsimile:    415-434-3947

7  Attorneys for ARRIVA PHARMACEUTICALS,
   INC.

8

9                  UNITED STATES BANKRUPTCY COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12  In re                                Case No. 07-42767

13  ARRIVA PHARMACEUTICALS, INC.,        Chapter 11
    a California corporation,
14                                       **CERTIFICATE OF SERVICE**
                   Debtor.
15
    Tax ID: 94-3287067
16

17  _____

18

19

20

21

22

23

24

25

26

27

28

1         I am employed in the County of San Francisco; I am over the age of 18 years
2    and not a party to the within entitled action; my business address is Four Embarcadero Center, 17th Floor, San Francisco, California 94111-4106.

3         On February 13, 2008, I served the following documents described as:

4    **NOTICE OF OCCURRENCE OF EFFECTIVE DATE, OF INJUNCTIONS AND**
     **OF EFFECTIVENESS OF RELEASES AND EXCULPATIONS**
5

6    **NOTICE OF BAR DATES FOR ADMINISTRATIVE CLAIMS AND FEE**
     **CLAIMS**

7

8    ☒    **BY MAIL:**  I am "readily familiar" with the firm's practice of collection and
          processing correspondence for mailing.  Under that practice it would be deposited
9         with the U.S. postal service on that same day with postage thereon fully prepaid at San
          Francisco, California in the ordinary course of business.  I am aware that on motion
10        of the party served, service is presumed invalid if postal cancellation date or postage
          meter date is more than one day after date of deposit for mailing in affidavit **[Exhibit**
11        **A]**.

12   ☐    **BY HAND DELIVERY:**  I caused such envelope(s) to be delivered by hand
          to the office of the addressee(s).

13   ☐    **BY OVERNIGHT DELIVERY EXCEPT AS OTHERWISE STATED:**  I served
          such envelope or package to be delivered on the same day to an authorized courier or
14        driver authorized by the overnight service carrier to receive documents, in an envelope
          or package designated by the overnight service carrier.

15

16   ☒    **FEDERAL:**  I declare that I am employed in the office of a member of the bar
          of this Court at whose direction the service was made.  I declare under penalty of
17        perjury under the laws of the United States of America that the foregoing is true and
          correct.

18             Executed on February 13, 2008 at San Francisco, California.

19

20             /s/ Lisa Semeraro
          Lisa Semeraro
21

22

23

24

25

26

27

28        -2-

# EXHIBIT A

Actis Biologics, Inc.
2625 Middlefield Road, No. 218
Palo Alto, CA  94306

Advanced Chemical Transport
Corporate Office
1210 Elko Drive
Sunnyvale, CA  94089


AHC Media
P.O. Box 530161
Atlanta, GA  30353-0161

Ahwatukee Foothills Allergy
8547 South Dorsey Lane
Tempe, AZ  85284


Akerman, Senterfitt and Edison, PA
Sun Trust International Center
One Southeast Third Avenue, 28th Floor
Miami, FL  33131-1714

Alameda County Industries
2307 Blanding Avenue, Suite B
Alameda, CA  94501


Alameda Power and Telecom
2000 Grand Street
P.O. Box H
Alameda, CA  94501-9777

American Express
PO Box 0001
Los Angeles, CA  90096-0001


AMS Bekins
1873 Rollins Road
Burlingame, CA  94010

Aramark Uniform Services, Inc
P.O. Box 5034
Hayward, CA  94540-5034


Arrowhead Mountain Spring Water
P.O. Box 856158
Louisville, KY  40285-6158

Assurant
P.O. Box 806644-1
Kansas City, MO  64180-6644


AT and T
AT and T Payment Center
4130 S. Market Ct.
Sacramento, CA  95887-0001

Bay Area Modular
1507 Budd Court
San Mateo, CA  94403

Steven M. Berman
Berman PLC
401 S. Florida Ave., Ste. 300
Tampa, FL  33602

BioCentury
1225 Eye Street, N.W. Suite 400
Washington, DC  20005-5958

Biocentury Publications Inc.
2008 Q St. NW
Washington, DC 20009

Brooke A. Bohlke
Callister and Reynolds
825 Las Vegas Boulevard South
Las Vegas, NV  89101

Boudin Bakery
221 Main Street, Suite 1230
San Francisco, CA  94105-1906

David P. Brooks
Brooks and Affiliates, PLC
1930 North Arboleda, Suite 217
Mesa, AZ  85213

C and R Cleaning Services
P.O. Box 2824
Alameda, CA  94501

California Chamber of Commerce
P.O. Box 537016
Sacramento, CA  95835-7016

California Chamber of Commerce HQ
P.O. Box 1736
Sacramento, CA 95812-1736

Matthew Q. Callister
Callister and Reynolds
825 Las Vegas Boulevard South
Las Vegas, NV  89101

John F. Chiapelone
and Sherry C. Chiapelone
Olympian Gulf Properties, Inc.
1300 Industrial Road., No. 2
San Carlos, CA  94070

Chipman Moving and Storage
1551 Buena Vista Avenue
Alameda, CA  94501

Citicorp Vendor Finance, Inc
PO Box 7247-0322
Philadelphia, PA  19170-0322

City of Alameda
Finance Department
2263 Santa Clara Ave.
Alameda, CA  94501

CKS Employee Benefit Systems, Inc.
6715 North Palm Avenue, Suite 101
Fresno, CA  93704

Eric Potter Clarkson
Park View House 58 The Ropewalk
Nottingham
UNITED KINGDOM  NGI 5DD

Richard Collier
Titchell Maltzman Mark
 and Ohleyer PC
650 California St. 25th Floor
San Francisco, CA  94108

Computer Patent Annuities
225 Reinekers Lane, Suite 400
Alexandria, VA  22314

Costco Wholesale
PO Box 34783
Seattle, WA  98124

County of Alameda
Tax Collector
1221 Oak Street
Oakland, CA  94612

Melanie Courtemanche
448 Norfolk Drive
Pacifica, CA  94044

Covad Wireless
Covad Communications Dept. 33408
PO Box 390000
San Francisco, CA  94139-0001

Michael D. Crosbie
Foley and Lardner
111 North Orange Avenue, Ste. 1800
Orlando, FL  32802

CSC
P.O. Box 13397
Philadelphia, PA  19101-3397

Matthew A. Dean, Consultant
1639 Dayton Avenue
Alameda, CA  94501

DemoMasters
6925 San Leandro St.
Oakland, CA 94621

DHL Express
P.O. Box 4723
Houston, TX  77210-4723

Dougal Investment Corp.
c/o Noreen Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Dougal Investment Corp.
c/o Noreen Lezdey
20 Crosby Village Road
Eastham, MA 02642

David W. Dow
Mohr Hackett Pederson Blakley
  and Randolph PC
2800 North Central Avenue, Suite 1100
Phoenix, AZ 85004

P. Michael Dubinsky
695 Posada Way
Fremont, CA 94536

Edwards Angell Palmer and Dodge
111 Huntington Avenue
Boston, MA 02199

EVault, Inc.
Dept. LA 22257
Pasadena, CA 91185-2257

EVault, Inc. World HQ
6121 Hollis St., Suite 2
Emeryville, CA 94608

Federal Express
P.O. Box 7221
Pasadena, CA 91109-7321

Fennemore Craig
3003 N. Central Avenue, Suite 2600
Phoenix, AZ 85012-2913

Fisher Clinical Services UK Limited
Langhurstwood Road
Horsham, West Sussex
UNITED KINGDOM RH12 4QD

Fisher Clinical Services, Inc
13741 Collections Center Drive
Chicago, IL 60693

Franchise Tax Board
PO Box 942857
Sacramento, CA 94257-0531

Franchise Tax Board
Bankruptcy Unit
P.O. Box 2952
Sacramento, CA 95812-2952

Marvin R. Garovoy, MD (Clinical Cnsltnt)
9 Dutch Valley Lane
San Anselmo, CA 94960

Genworth Life & Annuity Insurance Co.
700 Main Street
Lynchburg, VA 24504

Michelle M. Gervais
Duane Morris LLP
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131

Glenn Rasmussen Fogarty and Hooker, PA
PO Box 3333
Tampa, FL 33601-3333

Gold Shield Dist.
3111 Depot Road
Hayward, CA  94545-2707

Paul Hastings
61 Hartford Street
San Francisco, CA  94114

HealthNet
FILE No. 52617
Los Angeles, CA  90074-2617

HealthNet
10835 Santa Monica Blvd. #209
Los Angeles, CA 90025

Heffernan Insurance Brokers
120 Howard Street, Suite 550
San Francisco, CA  94105

Heller Ehrman
File No. 73536
P.O. Box 60000
San Francisco, CA  94160-3536

Hillcrest Advisors LLC
6114 La Salle Ave., #602
Oakland, CA  94611

IfeTayo Bonner-Payne
850 92nd Avenue No. 5
Oakland, CA  94603

Gregory Ikonen
5839 Ross Street
Oakland, CA  94618

Integrated Access Solutions
23 Spectrum Pointe Drive, Suite 207
Lake Forest, CA  92630

InterCall
Dept. 1261
Denver, CO  80256

Internal Revenue Service
Special Procedures Section
1301 Clay Street, Stop 1400S
Oakland, CA  94612-5210

International Quantitative Consultants
3941 Eureka Drive
Studio City, CA  91604

Invitrogen Life Technologies
12088 Collections Center Drive
Chicago, IL  60693

Ionics
12088 Collections Center Drive
Chicago, IL  60693

Jamie Holding Company, LLC
148 Marcdale Blvd.
Indian Rocks Beach, FL 33872

Jamie Holding Company, LLC
c/o Shumaker, Loop and Kendrick, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602

Jamie Holding Company, LLC
c/o John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Jamie Holding Company, LLC
c/o Noreen Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

J and D Sciences, Inc.
921 Looking Glass Lane
Las Vegas, NV 89110

J and D Sciences, Inc.
c/o John Lezdey
701 Haddon Avenue
Collingswood, NJ 08108

J and D Sciences, Inc.
c/o John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

JL Technology LP
921 Looking Glass Lane
Las Vegas, NV 89110

JL Technology LP
c/o Prentice-Hall Corporation System
502 East John Street, Room E
Carson City, NV 89701

JL Technology LP
c/o John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Kemira Water Solutions, Inc.
Dept. AT952344
Atlanta, GA  31192-2344

KPMG, LLP
Department 0922
P.O. Box 120001
Dallas, TX  75312-0922

Kurtzer's Heating and
Air Conditioning, Inc.
P.O. Box 304
Livermore, CA  94551-0304

Joshua M. Landish
Joshua M. Landish, Ltd.
818 East Charleston Blvd.
Las Vegas, NV  89104

Legacy Partners I Alameda, LLC
Dept No. 2029
PO Box 29675 AZI-2170
Phoenix, AZ  85038

Darren Lezdey
148 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Darren Lezdey
AlphaMed Pharmaceuticals Corp.
2401 West Bay Drive, Suite 118
Largo, FL 33770

Jarett Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Jarett Lezdey
148 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Jarett Lezdey
AlphaMed Pharmaceuticals Corp.
2401 West Bay Drive, Suite 118
Largo, FL 33770

John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

John Lezdey
John Lezdey and Associates
2401 West Bay Drive, Suite 118
Largo, FL 33770

John Lezdey
John Lezday and Associates
993 Cropwell Drive
Cherry Hill, NJ 08993

John Lezdey
20 Crosby Village Road
Eastham, MA 02642

John Lezdey
AlphaMed Pharmaceuticals Corp.
2401 West Bay Drive, Suite 118
Largo, FL 33770

Noreen Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33872

Noreen Lezdey
20 Crosby Village Road
Eastham, MA 02642

Aaron Lovaas
Shimon & Lovaas, PC
3016 W. Charleston, Suite 210
Las Vegas, NV  89102

David Madden
P.O. Box 664
Orinda, CA  94563

Marathon Products, Inc.
Accounts Receivable
P.O. Box 21579
Oakland, CA  94620-1579

Michael C. Markham
Johnson Pope Bokor Ruppel and Burns LLP
P. O. Box 1368
911 Chestnut St.
Clearwater, FL  33756

Marina Gourmet Coffee Mill
857 Marina Village Parkway
Alameda, CA  94501

James McDonald
Squire, Sanders and Dempsey LLP
200 South Biscayne Boulevard, Suite 4000
Miami, FL  33131

Joseph R. Meaney
Mohr Hackett Pederson Blakley
  and Randolph PC
2800 North Central Avenue, Suite 1100
Phoenix, AZ  85004

Millipore Corporation
2736 Paysphere Circle
Chicago, IL  60674

Molecular Devices
2680 Collections Center Drive
Chicago, IL  60693

Morrison and Foerster
PO Box 60000
San Francisco, CA  94160-2497

MPM Asset Management
The John Hancock Tower
200 Clarendon Street, 54th Floor
Boston, MA  02116

NAMSA
P.O. Box 710970
Cincinnati,, OH  45271-0970

Nathan Technologies LP
c/o Allan Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

NewCal Industries
3266 Buskirk Avenue
Pleasant Hill, CA  94523

NextWeb
48820 Kato Road, Suite 101-B
Fremont, CA  94538

Office Depot
Box 70025
Los Angeles, CA  90074-0025

Paul L. Orshan
Duane Morris LLP
200 South Biscayne Boulevard, Suite 3400
Miami, FL  33131

Rene N. Pagila
240 3rd Street, No. 101
Oakland, CA  94607

Patheon
Viale G.B. Stucchi,
110 I-20052
Monza, Milan  ITALY

PDQ Print Copy Mail
1150 East 12th Street
Oakland, CA  94606

Philip A. Pemberton, Ph.D.
439 Midway Avenue
San Mateo, CA  94402

PG and E
3250 Grant Street
Signal Hill, CA  90804

Pierce Biotechnology, Inc.
13750 Collections Center Drive
Chicago, IL  60693

Pitney Bowes Postage by Phone
P.O. Box 856042
Louisville, KY  40285-6042

Principal Financial Group
P.O. Box 14513
Des Moines, IA  50306-3513

Protease Sciences, Inc.
c/o John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Protease Sciences, Inc.
c/o Allan M. Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

Protection Service Industries, L.P.
P.O. Box 30330
Los Angeles, CA  90030-0330

PYRAMID Laboratories, Inc.
3598 Cadillac Avenue
Costa Mesa, CA  92626

QSV Biologics
20 Marcuse Fields
Bosham, West Sussex
UNITED KINGDOM  PO18 8NA

Rainin
P.O. Box 94081
Palatine, IL  60094-4081

Recall
P.O. Box 79245
City of Industry, CA  91716-9245

Regent Press
6020-A Adeline
Oakland, CA 94608

Roche Diagnostics Corp.
Dept. 0243 P.O. Box 120243
Dallas, TX 75312-0243

Lida Rodriguez-Taseff
Duane Morris LLP
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131

Douglas J. Rovens
Squire Sanders and Dempsey LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071

RS Calibration
1047 Serpentine Lane, Suite 500
Pleasanton, CA 94566

Sacks Tierney P.A. Lawyers
4250 N. Civic Center Blvd., 4th Floor
Scottsdale, AZ 85251-3900

Eric Saida
Duane Morris LLP
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131

Atul Saran
c/o Carol Murdock
MedImmune Ventures, Inc.
One MedImmune Way
Gaithersburg, MD 20878

Richard S. Schwartz, M.D.
1325 Howard Avenue PMB 712
Burlingame, CA 94010

Securities and Exchange Commission
Attn: Bankruptcy Counsel
5670 Wilshire Boulevard, Floor 11
Los Angeles, CA 90036

Seth Chemicals Inc.
c/o Allan Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

Snell and Wilmer
One Arizona Center
Phoenix, AZ 85004

Sonoran Desert Chemicals, LLC
c/o John Lezdey
140 Marcdale Blvd.
Indian Rocks Beach, FL 33782

Sonoran Desert Chemicals, LLC
c/o Allan M. Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

Sprint PCS
PO BOX 79357
City of Industry, CA  91716-9125

John Steele
Squire Sanders and Dempsey LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071

Stikeman Elliott LLP
1155 Rene-Levesque Blvd. West 40th
Floor
Montreal, Quebec
CANADA  H3B 3V2

Studio 678
678 61st Street
Oakland, CA  94110

TC Tech Corporation
P.O. Box 78 South
St. Paul, MN  55075

Technical Safety Services
33265 P.O. Box 39000
San Francisco, CA  94139-3265

Thermo Forma, Inc.
PO Box 712480
Cincinnati, OH  45271-2480

T-Mobile
P.O. Box 742596
Cincinnati, OH  45274-2596

Track Computer Center
7068 Koll Center Pkwy No. 417
Pleasanton, CA  94566

Richard Turegano, Consultant
25853 Westview Way
Hayward, CA  94542

U.S. Treasury

USP
12601 Twinbrook Parkway
Rockville, MD  20852

Vision Service Plan
815 Route 208
Gardiner, NY  12525

VWR Scientific
P.O. Box 640169
Pittsburgh, PA  15264-0169

Allan M. Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

Allan M. Wachter, M.D.
8547 South Dorsey Lane
Tempe, AZ  85284

Susan Wachter
c/o Allan Wachter, MD
12020 S. Warner Elliot Loop, Suite 124
Phoenix, AZ 85044

Waters Corporation
4559 Paysphere Circle
Chicago, IL  60674

Timothy Weber
Battaglia Ross Dicus and Wein P.A.
980 Tyrone Boulevard
Post Office Box 41100
St. Petersburg, FL  33743

World Courier
1313 Fourth Avenue
New Hyde Park, NY  11040

World Customs Brokerage
1313 Fourth Avenue
New Hyde Park, NY  11040

Robert Williamson
140 LaSalle Ave.
Piedmont, CA 94610

Graeme Macaloney
QSV Biologics Ltd.
1938-94 Street
Edmonton, AB T6N 1J3

Teresa T. Bonder
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree St.
Atlanta, GA 30309-3424

Cobra Biologies
Stephenson Building, The Science Park
Keele, Staffordshire
ST5 5SP UK

Alameda Real Estate Investments
2479 E. Bayshore Rd., Suite 704
Palo Alto, CA 94303

James T. Barrett, Esq.
Edwards Angell Palmer & Dodge LLP
111 Huntington Ave.
Boston MA 02199-7613

Stuart M. Brown, Esq.
Edwards Angell Palmer & Dodge LLP
919 No. Market St., 15th Floor
Wilmington, DE 19801

Legacy Partners I Alameda, LLC
1150 Marina Village Parkway, Suite 100
Alameda, CA  94501

Baxter Healthcare Corporation
One Baxter Way
Westlake Village, CA  91364

AlphaOne Pharmaceuticals, Inc.
850 Marina Village Parkway
Alameda, CA  94501

ProMetic BioSciences Inc.
6100 Royalmount avenue
Montreal, Quebec, Canada
H4P 2R2

9076-1339 Quebec Inc.
6100 Royalmount avenue
Montreal, Quebec, Canada
H4P 2R2

M. Sue Preston
1010 Atlantic Avenue
Alameda, CA 94501

Rebecca Wheeler
1010 Atlantic Avenue
Alameda, CA 94501

Alexander Stafford
1010 Atlantic Avenue
Alameda, CA 94501

David Madden
1010 Atlantic Avenue
Alameda, CA 94501

Phil Barr
1010 Atlantic Avenue
Alameda, CA 94501

John MacDonald
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA  02116

Martin Lee, Ph.D.
3941 Eureka Drive
Studio City, California, 91604

Trail Holdings
16 rue du Bassin
2001 Neuchatel, Switzerland

MDS Pharma Services France SAS
Regulatory Affairs Department
6, avenue de la Cristallerie
92316 Sevres Cedex
France

Cardiff University
Research and Commercial Division
McKenzie House
30-36 Newport Road
CARDIFF CF24 ODE

Financial Services
University of Alberta
31d Floor, Administration Building
Edmonton, Alberta
Canada T6G 2M7
ATTENTION: RESEARCH RECEIVABLES

VDK Architects
360 Seventeenth Street
Suite 210
Oakland, CA 94612-3340

Penn Ayers Butler, Of Counsel
Squire, Sanders & Dempsey LLP
600 Hanson Way
Palo Alto, CA 94304-1043

Michael D. Cooper
Wendel Rosen Black & Dean, LLP
1111 Broadway, 24th Floor
Oakland, CA 94607
(510) 834-6600

American Express Bank FSB
c/o Becket and Lee LLP
POB 3001
Malvern, PA 19355-0701

Allan Wachter
c/o Chris D. Kuhner, Esq.
Kornfield, Paul & Nyberg, P.C.
1999 Harrison Street, Suite 2675
Oakland, CA 94612

BenefitStreet.com
2420 Camino Ramon
Suite 208
San Ramon, California 94583

Heller Ehrman
333 Bush Street
San Francisco, CA 941104-2878

JACO Environmental, Inc.
PO Box 1478
Snohomish WA 98291

James E. MacDonald, Esq.
Squire, Sanders & Dempsey LLP
200 South Biscayne Blvd., Suite 400
Miami, FL 33131-2398

CT Corporation
1350 Treat Blvd. - Team 1
Suite 100
Walnut Creek, CA 94597

M. David Minnick
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
(415) 983-1351

Baxter Healthcare Corporation
c/o David M. Wiseblood
Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105
(415) 544-1039

JMBM | Jeffer, Mangels, Butler & Marmaro
LLP
Attention Nicolas De Lancie
Two Embarcadero Center, Fifth Floor
San Francisco, California 94111-3824

Biologics Consulting Group
1317 King St.
Alexandria, VA 22314

Infobond, Inc.
4450 Enterprise Street, Ste. 102
Fremont, CA 94538

Philip J. Barr, M.D.
5602 Denton Place
Oakland, CA 94619

Ian Cyril Bathurst
82 Brietenbach
A6252
AUSTRIA

Faith Fuller
2305 Prince Street
Berkeley, CA 94705

Helen Gibson
87 Donna Way
Oakland, CA 94605

Gabriel Herrera
500 Maple Ave. #14
South San Francisco, CA 94080

Thomas L. Hershner
PO Box 620765
Woodside, CA 94062

Judith L. Huenefeld
1517 Marjorie Street
Oceanside, CA 92056

Katherine S. Jonas
2874 Georgia St.
Oakland, CA 94602

David Kent
40 Vineyard Hill
London SW19 7JH
UNITED KINGDOM

Karen M. Kim
3073 North Main St. #304
Walnut Creek, CA 94596

Catherine Langfeldt
2485 Shoreline Drive, #317
Alameda, CA 94501

C. Owen Paepke
3102 N. 47th Pl.
Phoenix, AZ 85018

Dung Phan
1101 Saddlewood Drive
San Jose, CA 95121

Martin Preuveneers
1207 St. Charles Street
Alameda, CA 94501

Protease Sciences, Inc.
Attn: John Lezdey
2206 Sandra Road
Voorhees, NJ 08043

Protease Sciences, Inc.
Attn: Alan Wachter
8547 South Dorsey Lane
Tempe, AZ 85284

Colin Scott
227 Martin Court
Benicia, CA 94510

Elizabeth M. Tilson
8731 N. Shadow Mtn. Drive
Tucson, AZ 85704

Tracy Walker
3860 Howe St.
Oakland, CA 94611

Nassar Abdullah Al-Nassar
PO Box 24376
13104 Safat
KUWAIT

Stephen Austen
5 Hall Court
Shedfield Hants
S03 22HL
UNITED KINGDOM

Philip J. & Clare E Barr
5602 Denton Place
Oakland, CA 94619

Ian Cyril Bathurst
82 Brietenbach
A6252
AUSTRIA

Boomshoes Family Trust
c/o Renee Fox & Jonathan R. Fox,
Trustees
5929 East Via Del Cielo
Paradise Valley, AZ 85253

Casola Revocable Family Trust
c/o Salvatore Casola, Trustee
192 South Canyon View Drive
Los Angeles, CA 90049

Classic Complexes
c/o Kenneth & Karen Hodges
615 N. Larkspur
Gilbert, AZ 85234

James D. Coombes
Riversdale, Castle Street
Bakewell
Derbyshire
DE45 1DU
UNITED KINGDOM

Gordon E., M.D. Genta
2600 E. Southern Ave., Suite J-2
Tempe, AZ 85282

Yew Lin Goh
50 Raffles Place, #33-00
Singapore Land Tower
Singapore 048623
SINGAPORE

Geok Khim Goh
50 Raffles Place, #33-00
Singapore Land Tower
Singapore 048623
SINGAPORE

Greendale Enterprises Ltd. BVI
c/o Wafa Shihabi
PO Box 27050
Sufat 13131
KUWAIT

Thomas L. Hershner
PO Box 620765
Woodside, CA 94062

Inversiones Varadero Limitada
Attn Mario Lobo
Merced 106, piso 7
Santiago
CP 6500466
CHILE

David M. Kent
40 Vineyard Hill
London
SW19 7JH
UNITED KINGDOM

John & Noreen V. Lezdey
2206 Sandra Road
Voorhees, NJ 08043

Charles K. Marlowe
636 California Way
Woodside, CA 94062

Antoine Massad
MAN Investments Middle East Limited
PO Box 73221
Dubai
UNITED ARAB EMIRATES

Pamela Molsick
87 Donna Way
Oakland, CA 94605

Office Direct APS
c/o Michael Thestrup
Bjerggårdsvænget 21
DK-2840 Holte
DENMARK

Theresa Stone Pan
1650 Calera Creek Height Drive
Milpitas, CA 95035

Jing-Jong Pan
978 Westridge Drive
Milpitas, CA 95035

Donald Alan & Juliet M. Parker
5570 Lawton Avenue
Oakland, CA 94618

Harry Penhasi
68 Potomac Street
San Francisco, CA 94117

Sally Jessy Raphael
219 East 61st Street
New York, NY 10021

Martin Resch
394 Camino Sobrante
Orinda, CA 94563

Helmuth Resch
Kaserng. 9/5
1230 Wein
AUSTRIA

Michael Resch
220 Bush Street, Suite 845
San Francisco, CA 94104

S.E. Songer Trust
Joan M. Songer, Trustee
1067 Norwood Avenue
Oakland, CA 94610

Dr. Pritam & Mrs. Tripat Sahni
PO Box 23188
13092 Safat
KUWAIT

Richard M. Sanfilippo
184 Wilshire Court
San Carlos, CA 94070

Dale M. & Lynn M. Vear Schultz
112 Grace Lane
Mill Valley, CA 94941

Gary Sparks
107 Santa Rosa
Sausalito, CA 94965

Alan M. & Susan H. Wachter
8547 South Dorsey Lane
Tempe, AZ 85284

John Wack, M.D.
222 Tunnel Road.
Oakland, CA 94611

Dawn L. & Irl E. Ward
1493 Amherst Court
Bethlehem, PA 18015

Kathleen L. Wong
475 27th Avenue #2
San Francisco, CA 94122

Matthew M. Zahner
1254 Crimson Court
Walnut Creek, CA 94596

Nassar Abdullah Al-Nassar
PO Box 24376
13104 Safat
KUWAIT

Stephen Austen
5 Hall Court
Shedfield Hants
S03 22HL
UNITED KINGDOM

Baxter Healthcare Corporation
One Baxter Way
Westlake Village, CA 91364

Forest Nominees Limited
P.O. Box 328
St. Peter Port
GUERNSEY, CHANNEL ISLANDS

Gordon E., M.D. Genta
2600 E. Southern Ave., Suite J-2
Tempe, AZ 85282

Geok Khim Goh
50 Raffles Place, #33-00
Singapore Land Tower
Singapore 048623
SINGAPORE

Jing-Jong Pan
978 Westridge Drive
Milpitas, CA 95035

Prometic BioSciences, Inc.
8168 Montview Road
Mount-Royal
Quebec H4P 2L7
CANADA

Dr. Pritam & Mrs. Tripat Sahni
PO Box 23188
13092 Safat
KUWAIT

Baxter Healthcare Corporation
One Baxter Way
Westlake Village, CA 91203

Dow Pharmaceutical Sciences
1330A Redwood Way
Petaluma, CA 94954

Theresa Pan
1650 Calera Creek Height Drive
Milpitas, CA 95035

Jing-Jong Pan
978 Westridge Drive
Milpitas, CA 95035

Prometic BioSciences, Inc.
8168 Montview Road
Mount-Royal
Quebec H4P 2L7
CANADA

Kenneth Weg
One Palmer Square, Suite 436
Princeton, NJ 08542

AIG Horizon Partners Fund, L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

AIG Horizon Side-by-Side Fund, L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

AIG Private Equity Portfolio II, L.P.
Attn: Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

AIG Private Equity Portfolio, L.P.
Attn: Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

CIBC WMC Inc.
Attn: David Shotland
300 Madison Avenue, 7th Floor
New York, NY 10017

Commerce & Industry Insurance
Company
c/o AIG Global Investment Group
Attn: Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

MPM Asset Management Investors 2002
BVII LLC
Attn: Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures GMBH & CO.
Parallel-Beteiligungs KG
Attn: Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures II, L.P.
Attn: Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures II-QP, L.P.
Attn: Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

CIBC WMC Inc.
Attn: David Shotland
300 Madison Avenue, 7th Floor
New York, NY 10017

Chadi Trust
c/o JP Morgan House
P.O. Box 289, Grenville Street
St. Helier JE4 8TH
JERSEY, CHANNEL ISLANDS

Chapa Trust
c/o JP Morgan House
P.O. Box 289, Grenville Street
St. Helier JE4 8TH
JERSEY, CHANNEL ISLANDS

Gacita Limited
Cititrust (Bahamas) Limited
P.O. Box N-1576
Thompson Blvd.
NASSAU, BAHAMAS

High Tor Limited
Unit #2, Cable Beach Court
PO Box CB-10975, West Bay Street
NASSAU, BAHAMAS

Kendall Family Investments LLC
c/o Moore Capital Management, LLC
1251 Avenue of the Americas
New York, NY 10020


MedImmune Ventures, Inc.
Attn:  Legal Dept.
One MedImmune Way
Gaithersburg, MD 20878

Moore Macro Fund, L.P.
One Montague Place
East Bay Street
NASSAU, BAHAMAS


MPM Asset Management Investors 2002
BVII LLC
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures GMBH & Co.
Parallel Beteiligungs KG
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116


MPM Bioventures II, L.P.
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures II-QP, L.P.
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116


AIG Horizon Partners Fund L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

AIG Horizon Side-By-Side Fund, L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022


AIG Private Equity Portfolio II, L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

AIG Private Equity Portfolio, L.P.
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022


Nassar Abdullah Al-Nassar
PO Box 24376
13104 Safat
KUWAIT

Commerce & Industry Insurance Co.
c/o AIG Global Investment Group
Attn:  Deanna Devloo
599 Lexington Avenue, 25th Floor
New York, NY 10022

Gordon E., M.D. Genta
2600 E. Southern Ave., Suite J-2
Tempe, AZ 85282

ITOCHU Corporation
5-1, Kita-Aoyam 2-chome
Minato-ku
Tokyo 107-8077
JAPAN

Langdon Limited
P.O. Box 728
38 Esplanade
St. Helier JE4 8XH
JERSEY, CHANNEL ISLANDS

MPM Asset Management Investors
2002 BVII LLC
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures GMBH & Co.
Parallel Beteiligungs KG
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures II, L.P.
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

MPM Bioventures II-QP, L.P.
Attn:  Edward Mascioli, MD
200 Clarendon Street, 54th Floor
The John Hancock Tower
Boston, MA 02116

Dr. Pritam Sahni
PO Box 23188
13092 Safat
KUWAIT

Daniel Balmat
Squire, Sanders and Dempsey LLP
1 Maritime Plaza, #300
San Francisco, CA 94111

Steven A. Delchin
Squire, Sanders and Dempsey LLP
4900 Key Tower
127 Public Square, Cleveland, Ohio
44114-1304

Arriva Pharmaceuticals B.V.
c/o Nordic Biotech Advisors Aps
Ostergade 5,3
DK-1100 Copenhagen K
Denmark
Attention: Chief Financial Officer